**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PHIL EHR FOR CONGRESS CAMPAIGN COMMITTEE, <br><br> *Plaintiff*, <br> v. <br><br> GRASSROOTS ANALYTICS, INC., <br><br> *Defendant*. | |
| GRASSROOTS ANALYTICS, INC., <br><br> *Counterclaim-Plaintiff,* <br> v. <br><br> PHIL EHR FOR CONGRESS CAMPAIGN COMMITTEE; PHIL EHR FOR SENATE CAMPAIGN COMMITTEE; PHIL EHR (INDIVIDUALLY) <br><br> *Counterclaim-Defendants*. | Civil Action No. 1:24-cv-03035-APM |

**DEFENDANT & COUNTERCLAIM-PLAINTIFF GRASSROOTS ANALYTICS, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

**The Ehr Campaign's Launch & Organization**

1.   Grassroots Analytics, Inc. is a technology firm that was founded in 2017 whose chief mission is to lower barriers in fundraising for candidates to public office, causes, and nonprofit organizations. Ex. 1 ¶ 2, Dec. 18, 2025 Declaration of D. Hogenkamp ("Hogenkamp Decl."). Grassroots operates a first-in-class national progressive donor database that houses contact information, political preference analysis, biographical details, donation history, and net worth data. *Id.* Just in the past few years, Grassroots has supported more than 2,000 campaigns and organizations across all 50 states and territories of the United States, including Kamala Harris's presidential campaign, the Democratic Congressional Campaign Committee, the Democratic

Senatorial Campaign Committee, and the congressional campaigns of Eric Swalwell, Ro Khanna, Mary Peltola, and others. *Id.* Grassroots has raised over $50 million for its clients through its text messaging program, and won two Reed Awards in 2023 for its direct mail and email services. *Id.*

2.  In July 2023, Phil Ehr launched a campaign for a United States Senate seat in Florida in the November 2024 election. Ex. 2, Campaign RFA Resp. No. 1; Campaign Answer to Counterclaim ¶¶ 9, 31 (Jan. 9, 2025), ECF No. 9 ("Campaign Answer").

3.  Ehr had previously run for Congress twice before, most recently in 2020 against GOP incumbent Matt Gaetz for Florida's 1st Congressional District. Ex. 3 at 12:3–20, Oct. 20, 2025 Deposition Transcript of P. Ehr ("Ehr Dep. Tr."). Ehr worked with Grassroots Analytics during his 2020 campaign, *id.* at 12:16–23, and thought they provided a good service during that campaign. Affidavit of Phil Ehr In Supp. of Reply Re Mot. to Dismiss ¶ 4 (Aug. 13, 2025), ECF No. 35-1 ("Ehr Affidavit"); Ehr Dep. Tr. 14:5–16.

4.  The Phil Ehr for Senate Campaign Committee was formed in 2023 as a Florida unincorporated association to support and raise money for Ehr's 2024 Senate campaign. Compl. and Jury Demand ¶ 8 (Oct. 24, 2024), ECF No. 1 ("Campaign Compl."); Ex. 4, Campaign Rog. Resp. No. 1.[1]

5.  Ehr was involved in the Campaign's formation, Campaign Answer ¶ 4, and in fact was one of only two members of the Phil Ehr for Senate Campaign Committee (and later the Phil Ehr for Congress Campaign Committee, *see infra* SUMF ¶ 84) during 2023 (the other being a treasurer). Ex. 4, Campaign's Rog. Resp. No. 1.

6.  The Campaign was "bare bones" and lacked any real infrastructure. Ex. 5 at 23:20–24, Oct.

---

[1] This brief will use "the Campaign" to refer to Plaintiff/Counterclaim-Defendant, Phil Ehr for Congress Campaign Committee (including during the time it was known as the Phil Ehr for Senate Campaign Committee), *infra* ¶ 84.

21, 2025 Deposition Transcript of J. Briggs ("Briggs Dep. Tr."). It had no employees at any point, Ehr Dep. Tr. 15:11–15, 23:10–18, no campaign staff at the beginning, and 3–4 staff (who were all contractors, not employees) at most at any point, Ex. 6 at 18:7–19:3, Sept. 4, 2025 Deposition Transcript of D. Keith ("Keith Dep. Tr."); Briggs Dep. Tr. 22:20–25.

7.    David Keith and Jake Briggs were brought on as consultants to work on the launch of Ehr's Senate Campaign in approximately June 2023. Ehr Dep. Tr. 14:23–15:21, 40:15–19. They were not working directly for the campaign at that time. Keith Dep. Tr. 14:17–25, 15:11–18; Briggs Dep. Tr. 95:25–96:7. Both were experienced political consultants, each with years of experience working on political campaigns. Keith Dep. Tr. 13:11–21; Ex. 7 (errata correcting line 13:16); Briggs Dep. Tr. 17:12–25; Ehr Dep. Tr. 16:9–17, 42:18–19. It was Ehr's decision to hire Keith. Ehr Dep. Tr. 16:6–8. He relied on both Keith and Briggs to monitor the day-to-day operations of the campaign. Ehr Dep. Tr. 17:7–14; Ex. 4, Campaign Rog. Resp. No. 2.

8.    Ehr personally interacted with Campaign consultants and staff on a daily basis. Briggs Dep. Tr. 20:15–24 (Q. How often did you interact with Mr. Ehr personally? A. Daily. Q. Like, more than once a day? A. Yes . . . we were in contact most of the working day in some form or another"). *See also id.* 23:5–9; Keith Dep. Tr. 16:9–17:6.

9.    Ehr personally made decisions about "every aspect" of the campaign, including messaging, spending, and fundraising strategy. Keith Dep. Tr. 17:7–24; Briggs Dep. Tr. 20:25–21:24. He gave final approval for major decisions on the Campaign, Briggs Dep. Tr. 22:4–6; Keith Dep. Tr. 17:22–24, and was involved in more minor functions like reviewing and editing website copy, mailers, and talking points, Briggs Dep. Tr. 21:25–22:3; Ex. 8 at 2 (Ehr editing website copy); Ex. 9 at 1 (Ehr approving memo to reporters and making "wordsmith change"); Ex. 10 at 2 (Keith saying he will "ask phil for final edits and to approve" mailer); Ex. 11 at 1 (Ehr weighing in on campaign

website domain name), and authorizing payments to vendors, Ex. 12 (Keith asking that a vendor be paid "as phil requested"); Briggs Dep. Tr. 36:8–14 (Ehr sometimes requested that money be disbursed to specific vendors).

10. Ehr signed contracts on behalf of the Campaign, including one with Grassroots. Briggs Dep. Tr. 22:10–12; Ex. 13 at 9; Ex. 14 at 1.

11. Ehr gave final approval of campaign finance reports filed with the Federal Election Commission. Ex. 15 at 1. These reports could not be filed without his final sign-off. *Id.* at 2 ("Please do not file until Phil gives the final ok.").

**<u>The Campaign Pursues an Aggressive Fundraising Strategy and Enlists Grassroots to Assist with Text Message Fundraising</u>**

12. In early July 2023, Ehr met an account manager from Grassroots at an event, and spoke with her about using Grassroots for his campaign's launch. Ehr Dep. Tr. 41:19–22; Ex. 16 at 1. Ehr told her that his "finance team is highly experienced, and also likes your product," and that they would reach out later. *Id*.

13. Later that month, Grassroots' CEO, Daniel Hogenkamp, reached out to Ehr and Keith to make a pitch for the Campaign to use Grassroots' texting services. Ex. 17. Ehr and Briggs were skeptical of this pitch. Ehr Dep. Tr. 51:10–13; Briggs Dep. Tr. 43:13–44:10; Ex. 18 (Briggs telling Ehr that the pitch from Grassroots "felt very spammy"); Ex. 19 (Briggs told Ehr that the pitch from Grassroots was "a scam"); Ex. 17 (Ehr saying the pitch was "probably spam"). But, as noted above, Ehr had been pleased with Grassroots' services in 2020, *supra* ¶ 3, which informed the decision to enlist Grassroots' assistance with the 2024 campaign.

14. On July 18, 2023, the Campaign signed a contract ("the July Services Agreement") with Grassroots Analytics for text message list rental services. Ex. 20 at 10; Campaign Compl. ¶ 15; Campaign Answer ¶¶ 10, 11, 33. With list rental services, Grassroots texts its list of donors to

solicit contributions for the Campaign. Keith Dep. Tr. 38:8–11. Unlike a list *purchase*, where a campaign would receive the full list of any contacts texted on the campaign's behalf, a campaign doing a list *rental* only receives contact and demographic information for those who choose to donate. Keith Dep. Tr. 38:12–16; Briggs Dep. Tr. 49:24–50:10; Ex. 19; Hogenkamp Decl. ¶ 8. In other words, with the list rental services, if Grassroots sent fundraising text messages to 100,000 potential donors in its database on the Campaign's behalf, the Campaign would not receive demographic and contact information for all 100,000 potential donors. Hogenkamp Decl. ¶ 10. Instead, the Campaign would receive demographic and contact information only for the people who chose to donate, and that information would come from ActBlue (not from Grassroots). *Id.*; Briggs Dep. Tr. 50:11–51:15.

15. Ehr authorized Keith to execute the July Services Agreement, Ex. 2, Campaign RFA Resp. Nos. 7–8; Ehr Affidavit ¶ 2, which Keith signed on the Campaign's behalf, *id.* ¶ 3; Ex. 20 at 10. A representative from Grassroots counter-signed the contract. *Id.*

16. Ehr expected Keith to understand what services the contract provided for, Ehr Dep. Tr. 59:15–18, and Keith did have a general understanding of the terms of the contract and what services Grassroots would provide pursuant to those terms. Keith Dep. Tr. 38:3–5; *see also id.* 37:7–13 (confirming Keith had no questions about the terms of the contract).

17. The July Services Agreement provided that Grassroots would: (A) conduct a text messaging program as requested and instructed by the Campaign; (B) provide copywriting, production, and quality assurance for the text message program; (C) generate an analysis of results, including periodic reports as requested by the Campaign; and (D) perform all other services agreed upon by the parties in writing. Ex. 20 at 1 ¶ 3.

18. Keith understood Grassroots' obligation to "provide copywriting, production, and quality

5

assurance for the text message program" to mean that Grassroots "would do some of the writing" for the text messages. Keith Dep. Tr. 39:18–24. Neither Ehr nor Keith interpreted the contract as guaranteeing any minimum amount of donations. Keith Dep. Tr. 40:2–5; Ehr Dep. Tr. 115–16.

19. The July Services Agreement provided that Grassroots' services were "provided on an 'as is' and 'as available' basis, with all faults." Ex. 20 at 6 ¶ 16C.

20. The July Services Agreement obligated the Campaign to pay Grassroots for text message list rentals at a cost per contact rate of $0.15 to $0.25. Ex. 20 at 2 ¶ 5E(ii); Campaign Answer ¶ 12. This was Grassroots' standard pricing at the time, and was industry standard for text message list rental services. Hogenkamp Decl. ¶ 9. The Agreement laid out a list of factors that Grassroots generally weighs when setting the cost per contact rate within that range, such as "inventory of text messages," "length and type of text messages," and "volume of replies." Ex. 20 at 2 ¶ 5E(ii); Hogenkamp Decl. ¶ 9. The Agreement also contained payment provisions for texting and email list purchases, which laid out pricing at "fair market value" for "high-dollar" and "low-dollar" mobile numbers. Ex. 20 at 2 ¶ 5A–D; Hogenkamp Decl. ¶ 8. However, the Campaign never purchased any lists from Grassroots; it only used Grassroots' list rental services. *See supra* ¶ 14.

21. The Agreement further provided that the Campaign would pay all fees owed within 15 days of receipt of any invoices, Ex. 20 at 2 ¶ 5F, and that late payments would incur late fees (payments 6–15 days late would incur a 5% fee; payments made 16+ days late would incur a 10% fee). Ex. 20 at 2 ¶ 5G; Campaign Answer ¶ 12.

22. The Agreement provided that either party could terminate the agreement with 30 days' written notice. Ex. 20 at 1 ¶ 2.

23. The Agreement also provided that the prevailing party in a dispute arising under the contract would be entitled to recover reasonable attorneys' fees and other costs and expenses. Ex.

20 at 7 ¶ 19.

24. And the Agreement provided that it was the entire agreement between the parties. Ex. 20 at 5–6 ¶ 13.

25. Ehr knew the Campaign had contracted with Grassroots for fundraising services, Ex. 2, Campaign RFA Resp. No. 14; Ehr Dep. Tr. 58:11–18, and was "pleased that GA [Grassroots Analytics] services were to begin." Ex. 4, Campaign Rog. Resp. No. 2; *see also* Ehr Dep. Tr. 57:20–58:2. He relied on Keith and Briggs to monitor Grassroots' performance. Ehr Affidavit ¶ 6; Ehr Dep. Tr. 58:7–10, 59:15–18.

26. Grassroots began providing text messaging services to the Campaign in accordance with the July Services Agreement, Campaign Compl. ¶ 10, beginning on July 18, 2023, Ex. 21 at 16.

27. Keith had authority to manage the launch phase of the campaign, Ehr Affidavit ¶ 3, including approving and authorizing expenditures. Ex. 2, Campaign RFA Resp. Nos. 2–5.

28. The Campaign's fundraising strategy at launch was to be "as aggressive as possible." Ehr Dep. Tr. 14–18, 59:19–62:22; Briggs Dep. Tr. 36:15–19, 34:6–11; Keith Dep. Tr. 22:21–24. Ehr believed that this aggressive approach was "necessary to launch a viable Senate Campaign." Ehr Dep. Tr. 16:17–21; *see also* Keith Dep. Tr. 23:2–7. The Campaign also believed an aggressive launch strategy might help stave off a primary challenger from entering the race. Keith Dep. Tr. 53:3–20, 62:16–20; Ehr Dep. Tr. 60:3–7; *see also* Ex. 22 at 4, 6, 14; Keith Dep. Tr. 59:1–7 ("The entire campaign was focused on keeping Debbie out of the race.").

29. Raising money is particularly important early in a campaign. Keith Dep. Tr. 15:19–22; Hogenkamp Decl. ¶ 3. It shows credibility, builds momentum, generates media interest, and allows investment in campaign infrastructure, all of which can yield higher future fundraising returns in the longer term. *Id.*

30. Keith and Briggs knew that pursuing an aggressive fundraising strategy would be expensive. Keith Dep. Tr. 46:13–18; Ex. 23 at 1 (Keith telling Katz Compliance "[d]on't be concerned with the spend-down. Just doing heavy acquisition"); Ex. 12 (Keith telling Katz Compliance "we will be doing a lot of early spending on this campaign"); Briggs Dep. Tr. 34:12–23 ("acquisition sometimes carries a heavy cost"), 35:17–36:1 (Briggs understood there might be "a lot" of spending on acquisition and list rentals), 82:25–83:5 (Briggs understood high spending was part of the Campaign's strategy).

31. Keith repeatedly pushed Grassroots Analytics to be as aggressive as possible. For example, on July 17, 2023, Keith texted Hogenkamp, saying: "I want to go very hard very very fast. The minute I raise $1 I'll spend it."; "Money is not a concern . . . . I want to shock people."; "Just go full gasoline on the fire . . . ." Ex. 22 at 3–4, 6. That same day, Keith emailed the Grassroots team with a directive to "go wide with tests and a fast aggressive scale up." Ex. 21 at 18.[2]

32. Keith continued to push Grassroots to be more aggressive throughout July. *See, e.g.*, Ex. 22 at 7 (Keith texting Hogenkamp on July 18, 2023: "Pls go as large as possible…Let's not be conservative"), 9 (Keith texting Hogenkamp on July 18, 2023: "If we have to spend $600k to [raise $500k] that's fine. . . . F*** if we have to [s]pend $700k to [d]o [i]t, fine. This will all pay off!"), 12 (Keith texting Hogenkamp on July 23, 2023: "Push like a mad man. I'm all in."), 13 (Keith texting Hogenkamp on July 26, 2023: "Want to keep pushing Ehr everywhere we can…Aggressive as can be."), 14 (Keith saying on July 27, 2023: "Keep going pls pls pls."); Ex. 21 at 16 (July 18, 2023: "please . . . ensure we are testing everything we can"; "i want to scale everywhere possible"),

---

[2] "Testing" is when a Campaign sends a certain text to a small universe to see if the donations generated warrant expanding the universe for that text. Keith Dep. Tr. 44:14–25. If the test does well enough, the Campaign then "scales," meaning it sends the text to more people. Keith Dep. Tr. 28:11–14, 44:21–45:9; Hogenkamp Decl. ¶ 12.

6 (July 21, 2023: "stay aggressive as can be and scale, even at a lower ROI").

33. At times, Grassroots pushed back to try to slow down Keith's spending, *see* Ex. 22 at 11 (Keith texting Hogenkamp "please tell Davies [a Grassroots employee working on the Ehr Campaign's text message list rentals] to double [d]own," and Hogenkamp responding "We wanna ensure high R[OI] and slow and steady each day . . . ."); Ex. 21 at 13–17 (Keith says he is "happy to go much larger with a test than [$5,000]"; David Davies suggests a $6,000 test; Keith asks Davies if that test will be "robust enough"; and Davies replies "that test size will be robust enough").

34. Keith instructed Grassroots to continue to send texts as long as the return on investment was at least 40%, *see* Ex. 22 at 12 (Keith instructing Hogenkamp to "scale on anything above 40%").[3] Keith knew this strategy was risky. Ex. 22 at 10 ("Even if there is 50% ROI, I'll take the risk."), 11 ("Even if ROI [i]s super risky, let's scale"). *Cf. id.* at 1 (Hogenkamp recommending that they should scale if "immediate ROI [was] above 100%").

35. Grassroots generally drafted proposed copy for text messages and the Campaign made edits and approved it. Keith Dep. Tr. 39:18–40:1, 43:4–11; Ex. 21 at 2, 6–11, 13; *see also* Ex. 24 at 1–6.

36. Grassroots then performed "production" and "quality assurance" services, meaning it prepared the messages to be sent out, including proofreading them, preparing any attached images, and ensuring that the text and image would present well in a mobile format. Hogenkamp Decl. ¶ 11.

---

[3] Return on investment (ROI) is the amount of donations the Campaign receives as a percentage of the amount of money it spends on texting to solicit those donations. For example, if a Campaign spends $10,000 on texts and receives $15,000 in response to those texts, the ROI is 150%. Keith Dep. Tr. 112:19–25, 113:7–16.

37. Keith periodically asked for updates on how the texts were performing, which Grassroots timely provided. Keith Dep. Tr. 49:25–50:4; Ex. 21 at 12, 3.

38. Grassroots tracked donations and clicks and calculated return on investment for different batches of texts sent, *see* Ex. 25 at 1–5, and used these data to make strategic decisions about subsequent texting, including which donors to target, what messaging strategy to use, and what quantity of texts to send. Keith Dep. Tr. 47:20–48:7; Hogenkamp Decl. ¶ 12. For example, at one point, Grassroots sent follow-up texts to the "best performing audiences" from a test. Ex. 21 at 10.

39. Grassroots charged the Ehr Campaign a rate of $0.15 per "prospect text" (*i.e.*, texts sent to new donors) for the initial batches of texts it sent out, defaulting to the lowest per-message rate in the contractually specified range ($0.15–$0.25). Ex. 26 at 2.

40. Grassroots also sent an additional 3,240,442 free texts for the Campaign to help the Campaign and to reach the Campaign's desired minimum ROI of 40%, *see supra* ¶ 34. Grassroots sometimes sends free texts (like it did for the Ehr Campaign) as a way to help campaigns hit their targets and to improve client satisfaction. Ex. 26 at 2. This is because Grassroots is mission-driven and invested in candidates meeting their fundraising targets. *Id.*

41. Grassroots sent 87,654 "resolicit texts" (*i.e.*, texts sent to donors who have already given to the campaign), for which it charged a discounted rate of $0.10 per message. Ex. 26.

42. Grassroots sent a total of 7,237,620 text messages for the Campaign from July–September 2023 (in addition to the prepaid texts sent in October, *see infra* ¶ 83 and the texts sent in November for which the Campaign was not charged, *see infra* ¶ 92). *See infra* ¶¶ 43, 61, 73; *see also* Ehr Dep. Tr. 99:23–100:12 (no dispute as to the number of texts sent). More than 3 million of those texts were sent free of charge, *infra* ¶ 40, and more than 87,000 were sent at the discounted rate for the resolicit texts, *infra* ¶ 41. As a result, the overall cost-per-message that Grassroots charged

the Ehr Campaign was well below the range specified in the contract. *See infra* ¶ 43 (July invoice average cost-per-message was $0.08); ¶ 61 (August invoice average cost-per-message was $0.08); ¶ 73 (September invoice average cost-per-message was $0.10).

43. Grassroots sent 5,363,853 texts on behalf of the Phil Ehr for Senate Campaign in July 2023. Ex. 27; Ex. 28; Ehr Dep. Tr. 99:23–100:12 (no dispute as to the number of texts sent). On July 31, 2023, Grassroots billed $430,433 for its July texting services. Ex. 27. Nearly 2.5 million of the messages sent in July were sent at no cost to the Campaign, to help it meet its ROI goals, Ex. 26 at 2; *see also supra* ¶ 40. As a result, the average cost-per-message that Grassroots billed the Campaign for the July texting services was $0.08, well below the $0.15 to $0.25 range specified in the July Services Agreement, *supra* ¶ 20. The July invoice was due on August 15, 2023. *Id.* ("net 15" due date on July 31, 2023); Ex. 29 (Campaign's internal balance sheet listing due date as August 15, 2023).

44. Grassroots incurred $159,835.83 in out-of-pocket costs for sending these texts on behalf of the Campaign in July 2023. Ex. 28 (totaling "Amount" column for "Phil Ehr for Senate SMS" and "Phil Ehr for Senate MMS").

45. In August, the Campaign continued "to push aggressively on fundraising," Keith Dep. Tr. 62:16–20, with Keith continuing to direct Grassroots to be as aggressive as possible with its texting for the Campaign. *See* Ex. 22 at 23 (Keith texting Hogenkamp on August 22, 2023, "Pls tell David and the texting team to go absolutely hog wild").

46. In late July/early August—including after the Campaign had received Grassroots' July invoice and was aware of the outstanding balance—the Campaign explored engaging Grassroots to assist with direct mail fundraising. *See, e.g.*, Ehr Dep. Tr. 75:7–77:20. Specifically, Keith reached out to Hogenkamp to inquire about hiring Grassroots for direct mail fundraising, which

led to Keith discussing a direct mail fundraising plan with Grassroots employee Kevin Ralph, Ex. 22 at 15; Ex. 30 at 1–3, and the Campaign contracting with Grassroots for direct mail fundraising services. Ex. 13. Phil Ehr signed that contract for the Campaign on August 9, 2023. *Id.* at 9; Ex. 4, Campaign Rog. Resp. No. 2.

47. Although Keith initially told Grassroots that the Campaign wanted to pursue an aggressive direct mail fundraising strategy, Ex. 30 at 2–3, 1, Keith had to ask Grassroots in mid-August to hold off on printing the mailers so that the Campaign could first finish paying down the invoice for the July texting services. As he put it, he did not want the Campaign "to have a cash flow problem." Ex. 31 at 1–2; *see also* Ex. 32 at 5. Several weeks later, Keith told Grassroots the Campaign did not have the resources to move forward with an "acquisition" direct mailer (*i.e.*, mail sent to try to engage new potential donors), but that Ehr did want to pursue a "resolicit" mailing (*i.e.*, attempting to raise additional funds from existing donors). Ex. 32 at 3. However, the Campaign never paid the costs needed to start the direct mail fundraising effort, and Keith later asked Grassroots to hold off on the resolicit mailing as well. *Id.* at 2. In late September, Grassroots followed up about the mailing program and Keith replied that the Campaign did not have the cash flow to pay for it. *Id.* at 1. Ultimately, because the Campaign never paid for direct mail services, Grassroots never sent any direct mail on the Campaign's behalf. Exs. 33–34.

48. Keith also asked Grassroots about email fundraising services in early August 2023, Ex. 35 at 2, and on August 9, (the same day Ehr signed the direct mail contract, *supra* ¶ 46), the Campaign executed yet another contract with Grassroots for email fundraising services, Ex. 36, which allowed the Campaign to participate in Grassroots' free Click Collective program, where Grassroots identified "re-activation targets" (or people to start emailing again, Keith Dep. Tr. 69:12–16) within the Campaign's existing email list. Ex. 37 at 2–3; Hogenkamp Decl. ¶ 13. The

Campaign did not pay Grassroots any money for the "Click Collective" email fundraising services Grassroots provided, and Grassroots never sent out any emails on the Campaign's behalf or sold the Campaign any email lists. *Id.*

49. Keith routinely conveyed his satisfaction with Grassroots' services. *See*, *e.g.*, Ex. 21 at 12 (Keith reviewing copy: "looks great", "love it"); Ex. 22 at 15–16 (Keith to Hogenkamp on August 1, 2023: "REALLY enjoying working with your company. Great work and great service all around"), 22 (Keith to Hogenkamp on August 22, 2023: "[W]e love your work so keep pushing. Your [sic] our team"); Keith Dep. Tr. 83:13–14 (Keith had no complaints about Grassroots as of November 2023). He also reached out to Hogenkamp to inquire about engaging Grassroots for fundraising assistance for his other clients, Keith Dep. Tr. 69:19–70:4; Ex. 22 at 25, 27.

50. Keith has engaged Grassroots' services for other campaigns he has worked on since leaving the Ehr Campaign. Keith Dep. Tr. 70:12–21.

51. Other Campaign representatives expressed satisfaction with Grassroots' services, too. Ex. 38 at 4–5 (campaign consultant Aaron Parnas responding to Grassroots' suggested copy: "Fantastic," "Great," "Looks good to me"); Ex. 55 (Briggs telling Hogenkamp in October 2023 "You're the best!"). And, as the Campaign has admitted, the very first time anyone from the Campaign ever communicated any supposed dissatisfaction with Grassroots' services was in December 2023, Ex. 39, Campaign Rog. Resp. No. 10—months after Grassroots had performed its obligations under the July Services Agreement, and invoiced the Campaign for those services.

52. The Campaign had significant "cash flow issues" throughout its existence, Ehr Dep. Tr. 87:5–7; Briggs Dep. Tr. 63:3–5; Keith Dep. Tr. 71:6–12, which began "pretty much immediately" after it launched. Briggs Dep. Tr. 63:6–9.

53. The Campaign raised a "solid" amount of money, but was also spending aggressively, Ex.

40 at 1; Briggs Dep. Tr. 56:20–57:16, and having trouble re-soliciting existing donors to give again, Ex. 41; Briggs Dep. Tr. 74:17–75:5. Fundraising from phone calls with potential donors produced disappointing results, which campaign staff attributed at least in part to Ehr being "passive" on those calls. Briggs Dep. Tr. 75:17–76:3, 77:5–17.

54. The amount of money a campaign raises can depend on a number of factors, including the overall appeal and quality of the individual candidate, the organization of the campaign, the importance and competitiveness of the race, the number of candidates in the race, and a candidate's network and relationships with potential donors. Keith Dep. Tr. 21:13–22:9; Hogenkamp Decl. ¶ 4.

55. The Campaign was overdue on multiple bills during 2023, including payments owed to multiple consultants and outside vendors. Briggs Dep. Tr. 67:25–68:8; *see also id.* at 69:4–6 (Campaign was late to pay Briggs' expenses), 69:18–24 (there were delays in payment of salaries of those working on the Campaign), 72:4–73:15 (campaign consultant Obi Umunna was having trouble getting paid by the Campaign); Ex. 29 (Campaign was overdue on payments to Grassroots and compliance consultant Katz Compliance); Ex. 42 at 1 (Campaign was late to pay Briggs' expenses); Ex. 43 at 1–3(Campaign was late multiple times on payments to Umunna); Ex. 44 (listing unpaid bills to Katz Compliance, Grassroots Analytics, and other vendors (AGP Strategies and Vision Media Marketing)); Ex. 45 at 1 (listing unpaid bills to Katz Compliance, Grassroots Analytics, Vision Media Marketing, and Umunna Legal Group); Ex. 46 (unpaid bills for NGP, Umunna Legal, Grassroots, and Katz Compliance). Some of these bills were outstanding when the campaign ended; many have never been paid. Briggs Dep. Tr. 69:7–70:2 (Campaign has not paid Briggs more than $5,000 owed for expenses and salary); Ehr Dep. Tr. 130:16–22 (Campaign did not pay Meadowlark in full); Ex. 47 (Campaign owed $9,500 to Katz Compliance, $5,000 to

Lawlor Strategies, $7,920 to Change Research, $2,173 to NGP Van, Inc., and $740 to Genova Burns LLC as of December 31, 2024); Ex. 48 (paying off amounts owed to NGP Van, Inc., Change Research, and Genova Burns LLC).

56. During summer and fall 2023, the Campaign made several partial payments to Grassroots and repeatedly represented that it intended to pay in full. Briggs Dep. Tr. 79:9–12, 93:20–22; *see also infra* ¶¶ 57–60, 68, 70, 76, 78.

57. On August 21, 2023, the Campaign made its first payment to Grassroots, paying $200,000 towards its July texting invoice, leaving a balance of $230,433. Ex. 49.

58. On August 28, 2023, the Campaign paid another $25,000 towards its July texting invoice. Ex. 50. The Campaign intended to make a bigger payment so that it could have Grassroots continue sending text messages on its behalf, but simply did not have enough cash on hand. Ex. 51 at 1; Briggs Dep. Tr. 84:22–85:4. At this point, the Campaign had paid down $225,000 of the $430,433.00 July invoice, leaving $205,433 outstanding.

59. On August 29, 2023, Keith and Briggs asked Ehr to send a text message to Hogenkamp saying "check processing is going slowly this last week of summer. We are going to pay every day with all that comes in the day prior and this will be paid off this week. Sorry for the delay and thank you for everything. No one else gets paid before this is done." Exs. 52–53. Keith wanted Ehr to send the text because the texting program was being shut down due to nonpayment, and he believed that it was important to the Campaign to keep Grassroots' services going. Keith Dep. Tr. 80:20–81:10. On August 29, 2023, Ehr sent the text message Briggs and Keith had asked him to send to Hogenkamp verbatim. Ex. 55.

60. As of the end of August 2023, the Campaign still intended to pay the entire amount owed to Grassroots for the July invoice. *See* Ex. 31 at 2 (Keith telling Ralph on Aug. 18 that he wanted

Ehr to "finish invoice number one to [Grassroots]" before beginning direct mail services); Ex. 23 (Keith telling Katz Compliance on Aug. 21 to pay $200,000 of the bill from Grassroots and that "[t]he rest will be paid by [end of quarter]"); Keith Dep. Tr. 78:18–24 (Campaign intended to pay the invoices it owed to Grassroots as of Aug. 21); Briggs Dep. Tr. 82:9–13 (similar); Ex. 32 at 5 (Keith telling Ralph on Aug. 22 that the Campaign "want[s] to get [Grassroots] paid in full on [its texting invoice] now"); Ehr Dep. Tr. 83:20–23 (Campaign intended to pay down all invoices owed to Grassroots as of Aug. 29); Ex. 54, Ehr Rog. Resp. No. 8 (similar); Briggs Dep. Tr. 89:19–22 (similar).

61. Meanwhile, Grassroots sent 1,510,494 texts on behalf of the Phil Ehr for Senate Campaign in August 2023. Exs. 56–57; Ehr Dep. Tr. 99:23–100:12 . On August 31, 2023, Grassroots billed $126,943 for its August texting services. Ex. 56. Grassroots sent more than 650,000 of the texts at no cost to the Campaign, *see* Ex. 26; *see also supra* ¶ 40, resulting in Grassroots billing the Campaign for the August texting services at an average cost-per-message of $0.08—again, significantly lower than the rates specified in the July Services Agreement, *supra* ¶ 20, 42.

62. Grassroots incurred $40,249.89 in out-of-pocket costs for its texting services for the Ehr Campaign in August 2023. Ex. 57 (totaling "Amount" column for "Phil Ehr for Senate SMS" and "Phil Ehr for Senate MMS").

63. The Campaign has never made any payments towards the balance on the August invoice. Ex. 2, Campaign RFA Resp. No. 18; Campaign Answer ¶¶ 16, 21.

64. On September 1, 2023, Hogenkamp told Keith that Grassroots would have to pause its texting program for the Campaign until the July invoice was fully paid. Ex. 22 at 28. Keith directed Hogenkamp to reach out to Ehr directly about payment. *Id.*

65. Later that day, Hogenkamp reminded Ehr and Briggs that the Campaign still owed

Grassroots $200,000 on the July invoice. Ex. 55. Neither contested the amount owed or raised any concerns with the quality of the services Grassroots had provided. *See id.*; Briggs Dep. Tr. 89:23–90:6; Ehr Dep. Tr. 85:24–86:2. On the contrary, Ehr replied by assuring Grassroots that the Campaign would imminently send over "the first traunch of what's owed, with the balance to follow as soon as [the Campaign] can." Ex. 55; Ehr Dep. Tr. 83:3–86:7 (Ehr affirming that he was "absolutely" telling the truth when he made these representations).

66. On September 1, 2023, Briggs asked Grassroots to keep the texting going for the Campaign until they could pay down the balance owed, which Grassroots agreed to. Ex. 55. Briggs made this request because the Campaign wanted Grassroots to continue providing texting services. Briggs Dep. Tr. 91:9–12; *see also* Ex. 58 (Keith asking Ehr to text Grassroots to "get some good will from them" to continue texting).

67. The next week, after Hogenkamp told Keith that Grassroots still had not been paid in full, Keith followed up directly with Ehr to ask about payment. *See* Ex. 22 at 28–29.

68. On September 6, 2023, the Campaign paid $29,989.83 toward the July invoice, Ex. 59—the Campaign's entire cash on hand at the time, Ex. 60 (Keith telling compliance to send all remaining cash to Grassroots); Briggs Dep. Tr. 93:13–19, 94:10–12—bringing the total amount paid on the July invoice to $254,989.83, Ex. 27. To date, the Campaign has not paid any of the remaining $175,443.17 balance on the July invoice. Ex. 2, Campaign RFA Resp. No. 17; Campaign Answer ¶ 15. It lists this outstanding balance as a debt on its FEC filings. *See* Exs. 61–62.

69. On September 13, 2023, Josh Lewis, Grassroots' Controller, emailed Briggs and Keith to request payment of the July and August texting invoices. Ex. 63 at 2. Keith directed Lewis to contact Ehr personally about the outstanding amounts owed to Grassroots and to send all future billing directly to Ehr. *Id.* Lewis then emailed Ehr directly, explaining the total amount due and

informing him that late fees would accrue if payment was not received by the end of September. Ex. 64. Ehr did not respond. *See id.*; Ex. 65.

70. At this point, Ehr was "well aware" of the debt owed to Grassroots and intended for the Campaign to pay it. Ex. 63 at 2; Briggs Dep. Tr. 96:8–12; *see also* Ex. 44; Ehr Dep. Tr. 92:3–13.

71. Ehr believed that Grassroots' services were important for the Campaign, *See* Ex. 63 at 1; Briggs Dep. Tr. 96:22–97:1; Keith Dep. Tr. 86:15–25, as did Briggs and Keith, Briggs Dep. Tr. 97:2–5 ("Texting was raising the majority of the money at that time."); Keith Dep. Tr. 86:2–14.

72. In late September 2023, Ehr said he was going to take the Campaign's entire cash on hand and send it to Grassroots. Ex. 67; Keith Dep. Tr. 87:21–88:7.

73. Grassroots sent 363,273 texts on behalf of the Phil Ehr for Senate Campaign in September 2023. Ex. 68; Ex. 69 at 4; *see also* Ehr Dep. Tr. 99:23–100:12. On September 30, 2023, Grassroots billed $37,821.40 for its September texting services. Ex. 68. The average cost-per-message for the September texting services was $0.10—once again, significantly lower than the rates specified in the July Services Agreement. *Supra* ¶¶ 20, 42.

74. Grassroots incurred $10,531.37 in out-of-pocket costs for its texting services for the Ehr Campaign in September 2023. Ex. 69 (totaling "Amount" column for "Phil Ehr for Senate SMS" and "Phil Ehr for Senate MMS").

75. The Campaign has never made any payments towards the balance on the September invoice. Ex. 2, Campaign RFA Resp. No. 19; Campaign Answer ¶¶ 17, 21.

76. On October 3, 2023, Briggs assured Hogenkamp that he was going to loop him in with the Campaign's compliance team and "make sure [he] receive[s] payment." Ex. 55 at 2. Both Ehr and Briggs testified that, as of that time, the Campaign still intended to make sure Grassroots was paid in full. Briggs Dep. Tr. 99:8–11; Ehr Dep. Tr. 87:1–4.

77. In mid-October 2023, Ehr announced he was ending his candidacy for Senate and would instead run against Republican incumbent Carlos Gimenez to represent Florida's 28th Congressional District. *See* Ehr Dep. Tr. 133:23–135:2. It was Ehr's decision to drop out of the Senate race. Briggs Dep. Tr. 100:18–21; Keith Dep. Tr. 90:3–5. The primary reason for the switch was that Democratic challenger Mucarsel-Powell had gotten into the Senate race and had the backing of the Democratic party's establishment. *See* Keith Dep. Tr. 90:6–91:2; Briggs Dep. Tr. 100:5–14; *see also* Ehr Dep. Tr. 133:12–18; Ex. 2, Campaign RFA Resp. No. 24.

78. Around October 10, 2023, Briggs once again assured Grassroots that the Campaign intended to pay the outstanding balances in full before its operations transitioned to the campaign for Congress. Ex. 70 at 2; *see also* Briggs Dep. Tr. 101:14–19.

79. Grassroots staff then sent Briggs (and Keith and another Campaign consultant) reminders for the Campaign's outstanding invoices. *See* Exs.71–72; *see also* Ex. 70. These reminders were accompanied by a message saying, "Let us know if you have any questions." Exs. 71– 72. Briggs never responded to these emails to dispute the amount owed, to raise issues with Grassroots' services, or to ask any questions about the invoices (nor did Keith or Trent Schacht, a digital consultant). Briggs Dep. Tr. 102:1–103:2.

80. Around this time, as Ehr was planning to switch from the Senate to the House race, *supra* ¶ 77, Keith emailed Briggs and Aaron Parnas, a digital advisor for the Campaign, Briggs Dep. Tr. 103:5–14, to tell them that the Campaign would continue to use Grassroots' texting services for the House race, Ex. 73. Neither Parnas nor Briggs expressed any hesitation about continuing to use Grassroots' fundraising services. *Id.*; Briggs Dep. Tr. 104:11–13.

81. On or about October 16, 2023, Briggs spoke to Hogenkamp about the Campaign's debt to Grassroots, and they agreed that Grassroots would "roll [the Campaign's] debt," Ex. 74, meaning

that the Campaign would pay down its $339,000 bill "as their [cash on hand] buil[t]" throughout the quarter, Ex. 75 at 12; *see also* Briggs Dep. Tr. 107:10–19, 112:17–24. They also agreed that the Campaign would have to pay upfront for any texting services going forward. Ex. 74; Briggs Dep. Tr. 108:1–5, 112:8–16; *see also* Ex. 75 at 10–12.

82. Grassroots proposed a strategy for the congressional launch where Grassroots would begin with $10,000 of resolicit texts and move into new donor acquisition only if ROI from existing donors was very high. Ex. 75 at 11–12. During the back and forth with the Ehr Campaign about this proposal, it was once again Grassroots suggesting a more conservative approach. Ex. 75 at 11–12 ("We are going to . . . see what copy does well . . . . We will not spend the money unless the ROI is high."); Briggs Dep. Tr. 111:19–112:7.

83. On October 17, 2023, the Campaign paid Grassroots $10,000 up front for two weeks of texting for the congressional launch. Ex. 76. Grassroots sent the full $10,000 worth of texts. Ex. 24 at 1.

84. Ehr publicly announced his switch from the Senate race to a House race on or about October 17, 2023, Ex. 2, Campaign RFA Resp. No. 23; Campaign Answer ¶ 23, at which point the Phil Ehr for Senate Campaign Committee was renamed Phil Ehr for Congress. Ex. 2, Campaign RFA Resp. No. 25.

85. Keith left the Campaign around this time. Briggs Dep. Tr. 104:22–24; Ex. 77. Ehr then decided that Briggs and Obi Umunna, a consultant, Briggs Dep. Tr. 71:11–16, would together manage the House Campaign, Briggs Dep. Tr. 105:8–19.

86. In early November 2023, Briggs, Ehr, and Umunna discussed a payment plan with Grassroots. Briggs Dep. Tr. 114:24–115:8. Grassroots and Briggs came away from those discussions with the impression and understanding the Campaign agreed to a plan where the

Campaign would pay Grassroots $42,500 per month for eight months, with the first payment due at the end of November. Ex. 78; Briggs Dep. Tr. 115:23–116:7; *see also* Ex. 22 at 30–32 (Hogenkamp mentioning the "November payment plan" to Keith; Keith asking "Didn't you work out a payment plan with the[m]?"); Ex. 79 at 3 (Hogenkamp saying Grassroots team "will lay out . . . the payment plan as agreed to by your campaign" and Briggs responding "Thank you"). Hogenkamp emailed Briggs to confirm the payment plan. Ex. 78.

87. On November 15, 2023, Briggs emailed Grassroots to thank them for their work and to inform them that the Campaign would be closing its contract with Grassroots because it was "streamlining [its] services and cutting expenses" as it made the switch from the Senate race to the House race. Ex. 79 at 4. Campaign consultant Aaron Parnas followed up soon afterward to say that the Campaign was "bringing on a new digital firm that will handle texting (and may use [G]rassroots as one of the vendors)." Ex. 79 at 3.

88. On November 20, 2023, Grassroots' Controller sent the Campaign an email detailing the basic terms of the agreed-upon payment plan. Ex. 79 at 2. He followed up later that day, with links to the invoices and itemizations. *Id.* at 1–2.

89. That same day, Grassroots billed the Campaign for $2,976.82 in late fees, Ex. 80, in accordance with the payment plan detailed in the Controller's email, Ex. 79 at 2. This was well below the $34,020.76 (10% of the outstanding $340,207.57 owed) in late fees that Grassroots was entitled to charge under the contract. *See supra* ¶ 21. The Campaign has not made any payments towards the balance on that invoice. Ex. 2, Campaign RFA Resp. No. 20; Campaign Answer ¶¶ 18, 21.

90. On November 22, 2023, Briggs replied to Lewis' email, stating for the very first time that the Campaign did not believe the amount owed was correct but providing no details as to what

amount the Campaign was disputing or why. Ex. 79 at 1.

91. Prior to Briggs' November 22, 2023 email, no one from the campaign had ever disputed the amount owed to Grassroots, despite having been aware of the total balance for months and despite having been offered multiple opportunities to discuss or ask questions about the invoices. *See* Ex. 75 at 12 (October 16, 2023: no dispute after Hogenkamp emailed Parnas and Briggs about "action plan" including that the Campaign would pay down "$339k bill"); Briggs Dep. Tr. 112:25–113:3 (Briggs did not dispute that $339,000 was the correct amount owed to Grassroots); *supra* ¶ 79 (October 12, 2023: no dispute after Briggs, Keith, and Schact were sent the invoices for the total amounts and told to let Grassroots know if there were questions); *supra* ¶ 65 (September 1, 2023: no dispute after Hogenkamp told Ehr and Briggs that $200,000 was outstanding on the July bill); Ex. 22 at 22–24 (August 22, 2023: Hogenkamp telling Keith that the bill is $420,000, and Keith responding that he will "push to get it in"); Ex. 81 (August 21, 2023: Hogenkamp resending Keith the invoices at Keith's request, and Keith responding to say the Campaign was making a large payment); *see also* Ex. 22 at 20 (August 18, 2023: Hogenkamp informing Keith about overdue bills and asking if Campaign had "any questions or something," and Keith responding "Nope we'll be getting them in"). Nor had anyone from the Campaign ever expressed any dissatisfaction with Grassroots' services. Ex. 39, Campaign Rog. Resp. No. 10; *see also* Keith Dep. Tr. 70:5–11 (Keith never expressed dissatisfaction with Grassroots' services and was not aware of anyone else from the Campaign doing so); Briggs Dep. Tr. 102:23–25 (Briggs did not reach out to raise issues with services after receiving reminders about the outstanding invoices on October 12, 2023); *supra* ¶¶ 49–51, 80.

92. Grassroots sent 21,268 texts on behalf of the Phil Ehr for Senate Campaign in November 2023. Ex. 82 at 4. Grassroots incurred $616.75 in out-of-pocket costs for these texts. *Id.* (totaling

"Amount" column for "Phil Ehr for Congress SMS" and "Phil Ehr for Congress MMS"). Grassroots never invoiced the Ehr Campaign for these texts.

93. On December 1, 2023, Grassroots' then-CFO (Claudia Shrivastava) emailed several Ehr Campaign consultants to say that the Campaign had missed its November payment under the payment plan and that Grassroots applied additional late fees as a result. Ex. 79 at 1. That day, Grassroots billed the Campaign for $3,002.85 in late fees, Ex. 83, well below the amount it was entitled to charge under the contract, *see supra* ¶¶ 21, 89. The Campaign has not made any payments towards the balance on that invoice. Ex. 2, Campaign RFA Resp. No. 21; Campaign Answer ¶¶ 19, 21.

94. At some point in or after November 2023, Phil Ehr made the decision that the Campaign would not make any further payments to Grassroots. Briggs Dep. Tr. 116:13–20, 117:7–10; Ex. 54, Ehr Rog. Resp. No. 8; *see also supra* ¶¶ 86, 90–91. Other members of his Campaign believed the Campaign should have paid the invoices in full. Ex. 22 at 30 (Keith saying: "Ehr has to pay that would be my position"); Ex. 22 at 31 (Keith saying: "Tell Phil to sack it up and agree to a payment plan and not try and wiggle out of things through lawyers. It's bad form."); Keith Dep. Tr. 83:9–14.

95. On April 11, 2024, Ehr called Hogenkamp inadvertently while making fundraising calls, which led to a discussion of the outstanding bills. *See* Ex. 84. Hogenkamp came away from that call believing that they had once again worked out a payment plan. Ex. 85; *see also* Ex. 86 at 1 (Shrivastava's impression from Ehr and Hogenkamp's phone call was that the overdue amounts would be paid). Grassroots' CFO followed up after the call with an email to Ehr and Briggs sending copies of the outstanding invoices once more. *See* Ex. 86 at 1–2.

96. In total, Grassroots billed the Campaign $595,197.40 for its services from July–September

2023, *see supra* ¶¶ 43, 61, 73, and $5,979.67 in late fees, *see supra* ¶¶ 89, 93. The Campaign paid $254,989.83 towards its July invoice, *see supra* ¶¶ 57–58, 68, and still owes Grassroots $346,187.24, consisting of $175,443.17 owed on the July invoice, $126,943 owed on the August invoice, $37,821.40 owed on the September invoice, and $5,979.67 invoiced in late fees. *See supra* ¶¶ 43, 61, 63, 68, 73, 75, 89, 93.

**The Campaign's Supposed Damages**

97. Ehr testified that the Campaign's damages calculation, Ex. 87, was prepared by Vanessa Brito, Ehr Dep. Tr. 140:23–142:20, 144:10–17, 182:25–183:7, a campaign consultant who was not affiliated with the Campaign during the events relevant to this litigation, Ehr Dep. Tr. 23:1–7 (Brito did not join the Campaign until spring 2024), was not disclosed as an expert in this litigation, and was not listed as a potential fact witness on the Campaign's Rule 26(a)(1) disclosures, Ex. 88. Her only "expertise" to calculate damages is "ten years' worth of campaigning experience in South Florida," "a very successful recall of a mayor of Miami . . . 15 or so years ago," "advocacy in the health care field," "Spanish language abilities," and a PhD in political science that she earned "within the past year." Ehr Dep. Tr. 182:25–184:9.

98. Ehr did not know what methodology was used to calculate the Campaign's alleged damages, was not sure what was included in many of the categories of damages claimed by the Campaign, did not know whether any documentation existed to support these categories of damages, and in some instances expressly conceded Defendants had no evidence—only speculation—of certain claimed damages. Ehr Dep. Tr. 102–04, 140–162.

99. In support of its claim for "direct financial damages" for "refunded contributions" and associated "processing fees," Ex. 87, the Campaign produced a "refund analysis report," Ex. 66, and a spreadsheet that purports to show refunds requested by donors to the Campaign, Ex. 89. There is no information in the record about where these documents came from, or how or by whom they were generated. *See* Ehr Dep. Tr. 135:14–137:24 (Ehr testifying that he is not sure who made

the refund analysis report or where specifically the information written in it came from).

100.  In support of its claim for "direct financial damages" for "refunded contributions" and associated "processing fees," Ex. 87, the Campaign produced a "refund analysis report," Ex. 66, and a spreadsheet that purports to show refunds requested by donors to the Campaign, Ex. 89. There is no information in the record about where these documents came from, or how or by whom they were generated. *See* Ehr Dep. Tr. 135:14–137:24 (Ehr testifying that he is not sure who made the refund analysis report or where specifically the information written in it came from).

101.  The Campaign has theorized that Grassroots fraudulently charged donor credit cards to try to induce the Campaign to purchase more services from it. Ex. 39, Campaign Rog. Resp. No. 9. This is false, Hogenkamp Decl. ¶ 14, and there is no evidence to support it. Ehr Dep. Tr. 104:12–15 ("Q. . . .  Other than speculation—I think you called it—do you have any evidence that there was any fraud committed here? A. No.").

102.  Some of the refunds for which the Campaign seeks damages were refunds of contributions that were made before Grassroots' services for the Campaign even began. Ex. 89 ("Paid At" column showing several donations made prior to July 18, 2023, when the Campaign signed the July Services Agreement and Grassroots began texting on behalf of the Campaign, *supra* ¶¶ 14, 26).

103.  The Campaign has alleged damages for "Staff/Legal/Admin Labor," FEC filing amendments, and "Internal Systems Disruption," Ex. 87, but did not provide any receipts or other evidence supporting any of these alleged damages. Ehr admitted during his deposition that he was not sure what was included in these damages categories, Ehr Dep. Tr. 141:12–146:15, did not know what some of the terms used to describe the damages in this category meant, Ehr Dep. Tr. 144:8–9, and did not know how the damages in this category were calculated or how they were

broken down into each sub-category. Ehr Dep. Tr. 142:23–145:3. He also conceded that some of what was included in this category was "just fundraising activities." Ehr Dep. Tr. 143:15–17. Ehr also did not know if there was any documentation for these costs. Ehr Dep. Tr. 145:4–16.

104. The Campaign additionally has alleged damages for "Reputational and Opportunity Costs," Ex. 87, but there is no evidence in the record about how these damages were calculated, and Ehr conceded that he did not know what methodology was used to calculate any of these damages. Ehr Dep. Tr. 155:11–161:24 ("Q. You don't know how $5,000 was the number that was come up with? A. I cannot articulate that here.").

105. Ehr admitted that his Campaign has no evidence that any prospective donor did not donate because they were turned off by refund reports or perceptions of instability or fraud. Ehr Dep. Tr. 161:6–11 ("Q. Do you know whether you or your campaign has any evidence that any prospective donors did not donate because they were turned off by refund reports . . . ? A. As I see right now, the answer is no for specific feedback that I can identify.").

106. Ehr never received any communications or complaints from donors about perceived instability or fraud in the Campaign due to the refunded contributions, nor was he aware of anyone on his campaign receiving any such communications or complaints. Ehr Dep. Tr. 160:16–161:5.

107. Ehr did not know what damages associated with "Fundraising Momentum Lost" meant, Ehr Dep. Tr. 161:12–18, but thought it generally included damages caused by "turbulence within the campaign" which resulted in him not knowing if the people he was calling to ask for donations had already been texted. Ehr Dep. Tr. 161:21–162:12. However, he admitted this "may or may not have been a positive" and that it was not Grassroots' responsibility to prevent him from calling people who were getting texts. Ehr Dep. Tr. 162:12–22.

108. Ehr has loaned over $100,000 to the Campaign, most of which has never been repaid. *See*

26

Ex. 54, Ehr Rog. Resp. No. 4. The exact amount of total loans is unclear due to inconsistencies in reports from Ehr and the Campaign. Ehr indicated in an interrogatory response that he had loaned the Campaign $114,855.46, of which $15,000 had been repaid. *Id.* However, the Campaign's FEC reports indicate that Ehr loaned $213,000 to the Campaign, none of which was repaid. *See* Exs. 90–91. During his deposition, Ehr testified that the FEC reports were incorrect. Ehr Dep. Tr. 172:19–173:10. He also testified that he made other loans to the campaign in this time frame, although none were reported to the FEC. *Compare* Ehr Dep. Tr. 173:11–16, *with* Ex. 91. He testified that the total amount loaned was "$200-some thousand." Ehr Dep. Tr. 173:17–20. Ehr was unsure whether he had loaned more money to the Campaign since the last FEC filing, Ehr Dep. Tr. 174:4–12, and the Campaign is overdue on filing its October 2025 Quarterly Report, which presumably would contain this information, Ex. 92.

109.  At the end of 2024, after losing the November 2024 Congressional election, the Campaign spent $14,459.76, including on travel to Walt Disney World and elsewhere, as well as "[s]upplies" from Target, Lowe's, and Navarro Discount Pharmacy. Ex. 93 at 2–3.

110. During Q1 2025, the Campaign spent down more than $64,000 of campaign funds, including eight disbursements to Total Wine; eight others to Target, Walmart, Lowe's, and Dick's Sporting Goods for "[s]upplies"; approximately $1100 total in disbursements to the Dahlia Lounge (a restaurant in Disney World, Walt Disney World, *Dahlia Lounge, available at* https://disneyworld.disney.go.com/dining/coronado-springs-resort/dahlia-lounge/), Party Cake Bakery VI, Publix, The Bayshore Club Bar & Grill, and Two Brothers Restaurant for "[f]ood & [b]everages"; two disbursements to Island Queen 4 Miami FL (a cruise ship and boat tour company, Island Queen Cruises & Tours, *Explore Miami, available at* https://islandqueencruises.com/); and three disbursements to Vanessa Brito (Ehr's current

campaign manager, Ehr Dep. Tr. 182:5–6). Ex. 48.

111.  Ehr was not running for any office between November 6, 2024 (the day after the November 2024 election) and May 6, 2025. *See supra* ¶ 117 (Ehr did not launch his next campaign until May 7, 2025). The Campaign's only staff during this time were Ehr and Brito. *See* Briggs Dep. Tr. 139:1–13; Ehr Dep. Tr. 140:1–5, 165:2–6.

112.  In June 2025, the Campaign spent $178.92 at Petsmart on supplies for Brito's dog and made another 11 disbursements to Total Wine. Ex. 94; Ehr Dep. Tr. 171:7–172:1.

113.  The Campaign has no dedicated staff. Ehr Dep. Tr. 165:2–6. Ehr serves as its Treasurer but has no accounting background and needs assistance to perform the treasurer's duties. Ehr Dep. Tr. 168:22–169:1. The Campaign no longer receives donations. Ehr Dep. Tr. 165:10–15. It currently owes $15,000+ to staff and vendors, in addition to the debt owed to Grassroots. *See supra* ¶ 96; Exs. 61–62.

114.  Ehr testified that the only campaign debts he is certain he intends to pay back are those owed to himself. Ehr Dep. Tr. 199:10–15. As to the debts to vendors and staff, Ehr will prioritize their payment only if he "determine[s] that their work warranted payment." Ehr Dep. Tr. 199:22–200:8. He intends not to pay some of the Campaign's outstanding debts because of purported "concerns about performance issues." Ehr Dep. Tr. 197:10–23, 199:6–9.

115.  The Campaign submitted its 2025 July Quarterly report on August 22, 2025, 38 days after the July 15, 2025 deadline, Federal Election Commission, *2025 Quarterly reports – Quarterly schedule, available at* https://www.fec.gov/help-candidates-and-committees/dates-and-deadlines/2025-reporting-dates/2025-quarterly-filers/. Ex. 94 at 1; Ex. 95. It also submitted its 2024 October Quarterly Report after the deadline. Ex. 96; Ex. 97 at 1 ("Filed 10/24/2024").

116.  As of December 18, 2025, the Campaign has two outstanding letters from the Federal

Election Commission regarding deficiencies in its campaign finance reports. Exs. 92, 98, 100. One of those letters required a response by October 14, 2025, Ex. 98 at 1, and the other urged that action be taken "immediately," Ex. 92 at 1. The Campaign has not responded to either letter or filed any amendment to its reports. *See* Ex. 100 (depicting no Campaign responses or filings after the September 8 letter, Ex 98, or the November 25 letter, Ex. 92).

117. Not later than October 20, 2025, Ehr discovered a major error in the 2025 July Quarterly report that "needs to be corrected." Ehr Dep. Tr. 166:6–24. No amendment or correction has been filed with the Federal Election Commission as of December 17, 2025. *See* Ex. 100.

118. Ehr started a new campaign committee, Ehr Force, Inc., on or about May 2, 2025, Ehr Dep. Tr. 175:6–10; Ex. 99, and launched a campaign for the 2026 election for Florida's 28th Congressional District on or after May 7, 2025, Ehr Dep. Tr. 164:5–13. Ehr testified during his deposition that he formed this new committee and incorporated it (rather than setting it up as a traditional campaign) on the basis of legal advice. Ehr Dep. Tr. 174:21–23, 175:11–15. The purpose of Ehr Force Inc. is the same as that of the Phil Ehr for Congress Campaign Committee: "[t]o support the election of Phil Ehr to congressional office." Ex. 99 at 3; *see also* Ehr Dep. Tr. 174:24–175:5.

119. Ehr is the director of Ehr Force, Inc. Ehr Dep. Tr. 174:19–20. Its board members are "in flux," but as of Ehr's deposition, there were three Board members: Ehr, Shelby Green, and Jill Lewis-Daggs. Ehr Dep. Tr. 175:20–24. Shelby Green is the former Treasurer of Phil Ehr for Congress and is being removed from the Board. Ehr Dep. Tr. 176:5–11, 196:11–197:4. She has no qualification to sit on the Board except that she is a "professional" and a citizen of Florida. Ehr Dep. Tr. 176:12–19. Jill Lewis-Daggs is Ehr's "colleague." Ehr Dep. Tr. 176:20–22. She does not have any compensated political role. Ehr Dep. Tr. 176:24–177:2.

DATED: December 18, 2025     Respectfully Submitted,

          By: /s/ *Kathryn Ali*_____
          Kathryn Ali (D.C. Bar No. 994633)
          Elizabeth Lockwood (D.C. Bar No. 1029746)
          Arianna Zoghi (D.C. Bar No. 90036562)
          ALI & LOCKWOOD LLP
          501 H Street NE, Suite 200
          Washington, D.C. 20002
          (202) 651-2475
          katie.ali@alilockwood.com
          liz.lockwood@alilockwood.com
          arianna.zoghi@alilockwood.com

          Mark A. Lancaster (D.C. Bar No. 1620256)
          General Counsel,
          Grassroots Analytics, Inc.
          mlancaster@grassrootsanalytics.com

          *Counsel for Defendant-Counterclaimant*
          *Grassroots Analytics, Inc*