# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PHIL EHR FOR CONGRESS CAMPAIGN COMMITTEE, | |
| *Plaintiff*, | |
| v. | |
| GRASSROOTS ANALYTICS, INC., | |
| *Defendant*. | |
| GRASSROOTS ANALYTICS, INC., | Civil Action No. 1:24-cv-03035-APM |
| *Counterclaim-Plaintiff,* | |
| v. | |
| PHIL EHR FOR CONGRESS CAMPAIGN COMMITTEE; PHIL EHR FOR SENATE CAMPAIGN COMMITTEE; PHIL EHR (INDIVIDUALLY) | |
| *Counterclaim-Defendants*. | |

## DEFENDANT & COUNTERCLAIM-PLAINTIFF GRASSROOTS ANALYTICS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD .......................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.    COUNTERCLAIM-DEFENDANTS    BREACHED    THE    JULY    SERVICES
      AGREEMENT BY FAILING TO PAY GRASSROOTS FOR ITS SERVICES. ................ 3

      A.    The July Services Agreement Is a Valid Contract. ......................................... 3

      B.    The Contract Obligated the Campaign to Pay Grassroots for Its Services. .................... 6

      C.    Counterclaim-Defendants Breached the Contract by Failing to Pay Grassroots. ........... 7

      D.    Grassroots Suffered Damages Because of Counterclaim-Defendants' Failure to
            Pay. ............................................................................................................... 8

II.   ALTERNATIVELY,  IF  THIS  COURT  DECLINES  TO  ENFORCE  THE
      CONTRACT  FOR  ANY  REASON,  COUNTERCLAIM-DEFENDANTS  WERE
      UNJUSTLY ENRICHED. ............................................................................................ 9

III.  PHIL EHR IS AN ALTER EGO OF HIS CAMPAIGN AND IS PERSONALLY
      LIABLE FOR THE DAMAGES OWED TO GRASSROOTS. .......................................... 10

IV.   GRASSROOTS FULFILLED ITS CONTRACTUAL OBLIGATIONS AND THE
      CAMPAIGN HAS OFFERED NO EVIDENCE OF ANY DAMAGES. .......................... 18

V.    THE CAMPAIGN HAS NO CLAIM FOR RESCISSION. ............................................... 26

CONCLUSION ..................................................................................................................... 30

i

# TABLE OF AUTHORITIES

**CASES**                                                                           **Page(s)**

*707 G St. Rest., LLC v. Jemal's Mickelson, LLC*,
    No. CV 20-685, 2023 WL 2571753 (D.D.C. Mar. 20, 2023)............................................ 5

*A.J. Amer Agency, Inc. v. Astonish Results, LLC*,
    No. CA 12-351, 2014 WL 3496964 (D.R.I. July 11, 2014) ............................................ 22

*A.M. Castle & Co. v. United Steelworkers of Am.*,
    898 F. Supp. 602 (N.D. Ill. 1995) .......................................................................... 27, 29

*Affordable Elegance Travel, Inc. v. Worldspan, L.P.*,
    774 A.2d 320 (D.C. 2001) ................................................5**Error! Bookmark not defined.**

*Ali v. Mid-Atl. Settlement Servs., Inc.*,
    640 F. Supp. 2d 1 (D.D.C. 2009) ........................................................................... 26

*Anderson v. Abbott*,
    321 U.S. 349 (1944)........................................................................................... 16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................ 2, 3

*Apprio, Inc. v. Zaccari*,
    104 F.4th 897 (D.C. Cir. 2024).............................................................................. 4

*Armenian Assembly of Am., Inc. v. Cafesjian*,
    597 F. Supp. 2d 128 (D.D.C. 2009) ....................................................................... 9

*Arthur Andersen LLP v. Carlisle*,
    556 U.S. 624 (2009).......................................................................................... 10

*Ben-Kotel v. Howard Univ.*,
    319 F.3d 532 (D.C. Cir. 2003) .............................................................................. 3

*Brown v. Hornstein*,
    669 A.2d 139 (D.C. 1996) .............................................................................. 26, 28

*Brown v. Sessoms*,
    774 F.3d 1016 (D.C. Cir. 2014)......................................................................... 3, 18

*Cadence Design Sys. v. Pounce Consulting, Inc.*,
    No. 17-cv-04732, 2019 WL 1768619 (N.D. Cal. Apr. 1, 2019)...................................... 18

*Cahn v. Antioch Univ.*,
    482 A.2d 120 (D.C. 1984) .............................................26**Error! Bookmark not defined.**

*Camacho v. 1440 Rhode Island Ave. Corp.*,
    620 A.2d 242 (D.C. 1993) ........................................................................ 17

*Campbell Music Co. v. Singer*,
    97 A.2d 340 (D.C. 1953) ........................................................................ 26

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................. 3

*Colfax Envelope Corp. v. Loc. No. 458-3M,*
    *Chicago Graphic Commc'ns Int'l Union, AFL-CIO*,
    20 F.3d 750 (7th Cir. 1994) .............................................................. 27, 29

*Davis v. Winfield*,
    664 A.2d 836 (D.C. 1995) ........................................................................ 4

*Dean v. Garland*,
    779 A.2d 911 (D.C. 2001) .............................................................. 26, 27, 28

*Deutsche Credit Corp. v. Case Power & Equip. Co.*,
    876 P.2d 1190 (Ariz. Ct. App. 1994)..................................................... 13

*Doe v. Gates*,
    981 F.2d 1316 (D.C. Cir. 1993)............................................................... 3

*Duffy v. Duffy*,
    881 A.2d 630 (D.C. 2005) .............................................5**Error! Bookmark not defined.**

*EastBanc v. Georgetown Park Assocs. II, L.P.*,
    940 A.2d 996 (D.C. 2008) ........................................................................ 3

*Emeronye v. CACI Int'l, Inc.*,
    141 F. Supp. 2d 82 (D.D.C. 2001) .......................................................... 4

*Est. of Raleigh v. Mitchell*,
    947 A.2d 464 (D.C. 2008) ...................................................................... 11

*Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*,
    749 A.2d 724 (D.C. 2000) ...................................................................... 22

*Fennell v. AARP*,
    770 F. Supp. 2d 118 (D.D.C. 2011)........................................................ 26

*Fererro v. W.U. Tel. Co.*,
    9 App. D.C. 455 (D.C. Cir. 1896)................................................................. 22

*Flynn v. Thibodeaux Masonry, Inc.*,
    311 F. Supp. 2d 30 (D.D.C. 2004).................................15**Error! Bookmark not defined.**

*Francis O. Day Co. v. Shapiro*,
    267 F.2d 669 (D.C. Cir. 1959)....................................................................... 17

*Frito-Lay, Inc. v. Willoughby*,
    863 F.2d 1029 (D.C. Cir. 1988)....................................................................... 3

*Garcia v. Llerena*,
    599 A.2d 1138 (D.C. 1991) ........................................................................... 23

*Gibraltar Sav. v. LDBrinkman Corp.*,
    860 F.2d 1275 (5th Cir. 1988) ....................................................................... 14

*Grymes v. Sanders*,
    93 U.S. 55 (1876)........................................................................................... 28

*Hackney v. Morelite Constr.*,
    418 A.2d 1062 (D.C. 1980) .........................................5**Error! Bookmark not defined.**

*Harding v. Jacoby & Meyers, LLP*,
    No. CV 14-5419, 2020 WL 468952 (D.N.J. Jan. 28, 2020) ............................ 13

*Harvey's Inc. v. A. C. Elec. Co.*,
    207 A.2d 660 (D.C. 1965) ............................................................................... 2

*Hoodlums Welding Hoods, LLC v. Redtail Int'l, LLC*,
    No. 4:08 CV 893, 2009 WL 3617479 (E.D. Mo. Oct. 28, 2009) .................... 13

*Howard Town Ctr. Dev., LLC v. Howard Univ.*,
    788 F.3d 321 (D.C. Cir. 2015).......................................................................... 3

*In re Est. of McKenney*,
    953 A.2d 336 (D.C. 2008) ............................................................................. 26

*In re Nat'l Student Mktg. Litig.*,
    445 F. Supp. 157 (D.D.C. 1978).................................................................... 26

*Klayman v. Jud. Watch, Inc.*,
    628 F. Supp. 2d 112 (D.D.C. 2009)............................................................... 27

*Labadie Coal Co. v. Black*,
    672 F.2d 92 (D.C. Cir. 1982) ............................................................................. 11

*Lore v. All-Weather Storm Window Co.*,
    107 A.2d 660 (D.C. 1954) ................................................................................. 4

*M3 USA Corp. v. Qamoum*,
    No. 20-cv-2903, 2021 WL 2324753 (D.D.C. June 7, 2021)........................... 10

*Manes v. Dowling*,
    375 A.2d 221 (D.C. 1977) ................................................................................. 22

*Mariner Water Renaturalizer of Washington, Inc. v. Aqua Purification Sys., Inc.*,
    665 F.2d 1066 (D.C. Cir. 1981) ........................................................................ 27

*McWilliams Ballard, Inc. v. Broadway Mgmt. Co., Inc.*,
    636 F. Supp. 2d 1 (D.D.C. 2009) ...................................................................... 11

*Mid Am. Title Co. v. Transnation Title Ins. Co.*,
    332 F.3d 494 (7th Cir. 2003) ............................................................................ 13

*Milford Yacht Realty Co. v. Milford Yacht Club*,
    72 A.2d 482 (Conn. 1950) ................................................................................. 26

*Miller v. U.S. Foodservice, Inc.*,
    361 F. Supp. 2d 470 (D. Md. 2005)................................................................... 28

*News World Commc'ns, Inc. v. Thompsen*,
    878 A.2d 1218 (D.C. 2005) ............................................................................... 9

*Oparaugo v. Watts*,
    884 A.2d 63 (D.C. 2005) ................................................................................... 2

*Osseiran v. Int'l Fin. Corp.*,
    950 F. Supp. 2d 201 (D.D.C. 2013)................................6**Error! Bookmark not defined.**

*Pac. W. Grp., Inc. v. Real Time Sols., Inc.*,
    321 F. App'x 566 (9th Cir. 2008) ..................................................................... 20

*Parker v. K & L Gates, LLP*,
    76 A.3d 859 (D.C. 2013) ................................................................................... 4

*Philips N. Am. LLC v. KPI Healthcare, Inc.*,
    No. 8:19-cv-01765, 2022 WL 20273589 (C.D. Cal. Aug. 15, 2022) ............... 17

*Powervar, Inc. v. Power Quality Scis., Inc.*,
    No. 20-5908, 2021 WL 2986417 (E.D. Pa. July 15, 2021) ............................................ 18

*Record v. Rochester Tr. Co.*,
    192 A. 177 (N.H. 1937) ........................................................................................... 28

*Regal Coal, Inc. v. LaRosa*,
    No. 2:03-cv-90, 2004 WL 7334926 (N.D.W. Va. Nov. 16, 2004) ................................. 13

*Ristau v. Madhvani, Civ. A.*,
    No. 90-2682, 1991 WL 283666 (D.D.C. Dec. 20, 1991)............................................... 8

*Robinson v. Nussbaum*,
    11 F. Supp. 2d 1 (D.D.C. 1997) ................................................................................. 10

*Rosenthal v. Nat'l Produce Co.*,
    573 A.2d 365 (D.C. 1990) ...............................................5**Error! Bookmark not defined.**

*Roth v. Speck*,
    126 A.2d 153 (D.C. 1956) ...........................................26**Error! Bookmark not defined.**

*Severs v. Garcia*,
    No. 24-cv-01456, 2025 WL 2458862 (N.D. Cal. Aug. 25, 2025) ................................... 18

*Signature Tech. Sols. v. Incapsulate, LLC*,
    58 F. Supp. 3d 72 (D.D.C. 2014) .................................................................................. 4

*TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*,
    808 F. Supp. 2d 60 (D.D.C. 2011) ......................................................................... 11, 17

*Teamsters Loc. Union , LLC, No. 727 Pension Fund v. Cap. Parking, LLC*,
    No. 19 C 837, 2019 WL 6210955 (N.D. Ill. Nov. 21, 2019).......................................... 17

*Teitelbaum v. Lay Siok Lin*,
    No. CV073971, 2010 WL 11527279 (E.D.N.Y. Aug. 3, 2010) ...................................... 13

*Townsend v. Benjamin Enters., Inc.*,
    679 F.3d 41 (2d Cir. 2012).......................................................................................... 12

*Tsintolas Realty Co. v. Mendez*,
    984 A.2d 181 (D.C. 2009) ...................................................................................... 3, 18

*Twin City Fed. Sav. & Loan Ass'n v. Transamerica Ins. Co.*,
    491 F.2d 1122 (8th Cir. 1974) .................................................................................... 26

*U.S. E. Telecomms., Inc. v. U.S. W. Info. Sys., Inc.*,
   No. 87-cv-2924, 1993 WL 385810 (S.D.N.Y. Sept. 30, 1993) ....................................... 10

*U.S. Through Small Bus. Admin. v. Pena*,
   731 F.2d 8 (D.C. Cir. 1984) ............................................................................................. 11

*UIRC-GSA Holdings Inc. v. William Blair & Co.*,
   289 F. Supp. 3d 852 (N.D. Ill. 2018) ............................................................................... 18

*United States ex rel. Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*,
   498 F.2d 335 (9th Cir. 1974) ........................................................................................... 10

*United States v. Algernon Blair, Inc.*,
   479 F.2d 638 (4th Cir. 1973) ........................................................................................... 10

*United States v. Andrews*,
   146 F.3d 933 (D.C. Cir. 1998) .................................................................................... 11, 17

*United States v. Emor*,
   850 F. Supp. 2d 176 (D.D.C. 2012) ........................................................................... 11, 15

*United States v. Fox*,
   No. CV 21-8785, 2023 WL 12075238 (C.D. Cal. Mar. 21, 2023) ................................... 12

*United States v. TDC Mgmt. Corp.*,
   263 F. Supp. 3d 257 (D.D.C. 2017) ........................................................................... 16, 17

*Veazie v. Williams*,
   49 U.S. 134 (1850) ........................................................................................................... 28

*Vuitch v. Furr*,
   482 A.2d 811 (D.C. 1984) ................................................................................................ 16

*W. Union Tel. Co. v. Hall*,
   124 U.S. 444 (1888) ......................................................................................................... 22

*W.G. Cornell Co. v. Ceramic Coating Co.*,
   626 F.2d 990 (D.C. Cir. 1980) .........................................26**Error! Bookmark not defined.**

*Wash. Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*,
   28 A.3d 566 (D.C. 2011) ................................................6**Error! Bookmark not defined.**

*Women's Dev. Corp. v. City of Cent. Falls*,
   764 A.2d 151 (R.I. 2001) ................................................................................................. 22

**FEDERAL RULES**

Fed. R. Civ. P. 56 ................................................................................................................. 2

## INTRODUCTION

This is a clearcut breach of contract case: The parties signed a contract for text message fundraising services. Grassroots upheld its end of the deal and sent millions of texts to try to get Phil Ehr elected to Congress. The Campaign drove the volume of texts, pushing Grassroots to send more and more: "Pls go as large as possible." "I want to shock people." No one at the Campaign ever complained about Grassroots' services.[1] Instead, they praised Grassroots: "REALLY enjoying working with your company. Great work and great service all around." "You're the best." Grassroots billed far less than the agreed-upon rate for its services, but the Campaign's fundraising returns were disappointing, and it began to fall behind on payments. For months, Phil Ehr and his Campaign staff pleaded with Grassroots to keep providing services, promising that the Campaign would pay its invoices in full. At some point, however, Ehr and his Campaign apparently decided they simply were not going to pay what they owed Grassroots, claiming for the first time that the billing was wrong and that there were issues with Grassroots' services. But the Campaign has adduced no evidence whatsoever to support either proposition, and Grassroots is entitled to judgment on its breach of contract claim (or, alternatively, its unjust enrichment claim).

Phil Ehr—as the alter ego of his Campaign—is jointly liable for the amounts owed to Grassroots. Ehr dominated his Campaign, making decisions large and small. He and the Campaign failed to keep track of his personal funds flowing into the campaign and to observe required campaign-finance reporting requirements. After Ehr lost his election—with significant debts to vendors and staff outstanding and with this lawsuit over debts owed to Grassroots pending—Ehr drained the Campaign's coffers, spending its money on travel, alcohol, restaurant meals, and even

---

[1] This brief will use "the Campaign" to refer to Plaintiff/Counterclaim-Defendant, Phil Ehr for Congress Campaign Committee (including during the time it was known as the Phil Ehr for Senate Campaign Committee). SUMF ¶¶ 4, 84.

pet supplies. He then stopped raising money into the Campaign (where it could be used to pay off remaining debts) and instead incorporated a new campaign committee to fundraise for his latest race for Congress. Under these circumstances, where Ehr has clearly used his campaigns as shell organizations, allowing Ehr to shield himself with the corporate veil would be unjust.

Grassroots is also entitled to summary judgment on the Campaign's claims. First, Grassroots undisputedly did not breach the contract with the Campaign. Grassroots performed its obligations under the contract, and in fact went above and beyond by sending millions of additional free texts for the Campaign. The Campaign also has fallen far short of its burden to prove any damages, offering only speculation, not admissible evidence. Second, Grassroots is entitled to judgment on the Campaign's claim for "rescission" for at least three independent reasons: (i) rescission is a remedy, not a standalone claim; (ii) the Campaign waived any claim for rescission as a remedy by sitting on its rights; and (iii) the Campaign has made vague claims about supposedly ambiguous terms in the contract and lobbed far-fetched (and patently false) conspiracy theories about supposed fraud, but has offered no evidence of either, and both Phil Ehr and his former campaign staffers testified that no such evidence existed.

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). The Ehr Campaign bears the burden of proof as to its breach of contract and rescission claims, and Counterclaim-Defendants (the Campaign and Phil Ehr) bear the burden of proof as to any affirmative defenses to Grassroots' claims. *Harvey's Inc. v. A. C. Elec. Co.*, 207 A.2d 660, 661 (D.C. 1965); *Oparaugo v. Watts*, 884 A.2d 63, 75 (D.C. 2005). As to these issues, Grassroots' burden is met by a sufficient "'showing' . . . that there is an absence of evidence to support [Counterclaim-Defendants'] case."

*Doe v. Gates*, 981 F.2d 1316, 1323 (D.C. Cir. 1993) (quoting *Frito-Lay, Inc. v. Willoughby*, 863

F.2d 1029, 1032 (D.C. Cir. 1988)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(summary judgment appropriate when "nonmoving party has failed to make a sufficient showing

on an essential element of her case with respect to which she has the burden of proof"). A genuine

issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson*, 477 U.S. at 248. A mere "scintilla of evidence," or

unsupported speculation, is insufficient to defeat a motion for summary judgment. *Id.* at 252;

*accord Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003).

## ARGUMENT

### I. COUNTERCLAIM-DEFENDANTS BREACHED THE JULY SERVICES AGREEMENT BY FAILING TO PAY GRASSROOTS FOR ITS SERVICES.

"To prevail on a claim of breach of contract, a party must establish (1) a valid contract

between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty;

and (4) damages caused by breach." *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014)

(quoting *Tsintolas Realty Co. v. Mendez,* 984 A.2d 181, 187 (D.C. 2009)). There is no genuine

dispute as to any of these four elements, and Grassroots is entitled to judgment as a matter of law.

#### A. The July Services Agreement Is a Valid Contract.

In July 2023, Grassroots and the Campaign entered into a written agreement ("the July

Services Agreement") for text message list rental services. SUMF ¶ 14.  This written contract is

enforceable, as long as the parties "[1] expressed an intent to be bound, [2] agreed to all material

terms, and [3] assumed mutual obligations." *EastBanc v. Georgetown Park Assocs. II, L.P.*, 940

A.2d 996, 1004 (D.C. 2008); *accord Howard Town Ctr. Dev., LLC v. Howard Univ.*, 788 F.3d

321, 326 (D.C. Cir. 2015) (citation omitted).[2] The undisputed material facts show that they did.

  ***The parties intended to be bound by the July Services Agreement:*** The "intent to be bound" or "mutual assent" element is easily met in this case. A signed, written agreement is the "most clear[] evidence[]" of the parties' intent to be bound. *Apprio, Inc. v. Zaccari*, 104 F.4th 897, 906–07 (D.C. Cir. 2024) (quoting *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995)); *see also Davis*, 664 A.2d at 838 ("The purpose of a signature is simply to demonstrate mutual assent to a contract[.]"). Here, there is no dispute that both Grassroots and the Campaign signed the July Services Agreement. SUMF ¶¶ 14–15. David Keith signed the contract on the Campaign's behalf, and he had authority to do so. SUMF ¶¶ 15, 27. The Court can stop there. *See, e.g.*, *Emeronye v. CACI Int'l, Inc.*, 141 F. Supp. 2d 82, 86 (D.D.C. 2001) (under D.C. law, "a signature on a contract indicates 'mutuality of assent' and a party is bound by the contract"); *Signature Tech. Sols. v. Incapsulate, LLC*, 58 F. Supp. 3d 72, 81 (D.D.C. 2014) (similar); *Parker v. K & L Gates, LLP*, 76 A.3d 859, 865 (D.C. 2013) (similar); *Lore v. All-Weather Storm Window Co.*, 107 A.2d 660, 660–61 (D.C. 1954) (defendant cannot claim no mutual assent where "there was a written contract signed by [defendant], which recited that it contained all the terms of the transaction").

  This conclusion is underscored by the fact that Grassroots provided text messaging services to Counterclaim-Defendants pursuant to the contract, SUMF ¶¶ 26, 35–38 42–43, 61, 73; who accepted and took an active role in directing those services, including approving drafts of message language and pushing Grassroots to expand the scope of its services and send more texts, SUMF ¶¶ 31–34, 46, 48; and the Campaign also made partial payments to Grassroots for these services. SUMF ¶¶ 56–58, 68. This performance (in whole by Grassroots and in part by the Campaign) of

---

[2] The July Services Agreement provides that the Agreement "will be governed by and construed" under the laws of the District of Columbia. Ex. 20 at 7 ¶ 21.

the parties' obligations under the contract is "further evidence of an intent to be bound." *Davis*, 664 A.2d at 838; *see also 707 G St. Rest., LLC v. Jemal's Mickelson, LLC*, No. CV 20-685, 2023 WL 2571753, at *3 (D.D.C. Mar. 20, 2023) (defendant's "silence in the face of, and, at times, active facilitation of" plaintiff's performance of a written agreement supports finding that defendant intended to be bound).

*The parties agreed to the material terms of the July Services Agreement:* The July Services Agreement is "sufficiently definite as to its material terms (which include, *e.g.*, subject matter, price, payment terms, quantity, quality, and duration) that the promises and performance to be rendered by each party are reasonably certain." *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990). The contract sets out each party's obligations, the services to be provided (including an as-is clause), the pricing, the payment terms (including deadlines, invoicing, and late fee structure), and the method for ending the contractual relationship. SUMF ¶¶ 17, 19–24. These terms "need not be fixed with complete and perfect certainty." *Rosenthal*, 573 A.2d at 370; *see also Eastbanc*, 940 A.2d at 1003 ("The enforceability of the agreement comes from the definitive character of the *obligation* to perform, not a precise description of the ways in which the obligation might be fulfilled." (citing *Hackney v. Morelite Constr.*, 418 A.2d 1062, 1068–69 (D.C. 1980))). Instead, it is enough that the terms were "sufficiently definite so that the parties [could] be reasonably certain as to how they [were] to perform." *Duffy v. Duffy*, 881 A.2d 630, 638 (D.C. 2005); *see also Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 327 (D.C. 2001) (contract is enforceable if the terms are "clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy"). Here, they were, as evidenced by the fact that David Keith, an experienced political consultant who signed the contract on the Campaign's behalf, SUMF ¶¶ 7, 15, testified that he understood the contract's general terms and

had no questions about them, SUMF ¶ 16.[3]

     ***The parties assumed mutual obligations:*** Under the Agreement, Grassroots assumed an obligation to provide text message list rental services, and the Campaign assumed an obligation to pay a certain per-text rate for those services. SUMF ¶¶ 17, 20. "[E]ach party undertook to do something it would otherwise have no legal obligation to do," so this "exchange of promises suffices" as legal consideration for the contract. *Osseiran v. Int'l Fin. Corp.*, 950 F. Supp. 2d 201, 209 (D.D.C. 2013) (quoting *Eastbanc*, 940 A.2d at 1004); *see also id.* ("District of Columbia courts 'will not inquire into the adequacy of' consideration, . . . as long as it is 'legally sufficient.'" (quoting *Wash. Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 574 (D.C. 2011))).

## B. The Contract Obligated the Campaign to Pay Grassroots for Its Services.

     The Agreement also clearly obligated the Campaign to pay Grassroots for the text messaging services it provided. The payment clause provides: "Client agrees to pay [Grassroots], the amounts specified below[] in this Section 5(E): . . . (ii) Text messages at a cost per contact rate of $0.15 to $0.25." SUMF ¶ 20; *see also* Ex. 20 at 2 ¶ 5(E)(ii). It also provides that such payments must be made within 15 days of receipt of an invoice, and that late payments would incur a late fee, SUMF ¶ 21.

     Pursuant to the contract and at the Campaign's direction, Grassroots sent more than seven million fundraising text messages on the Campaign's behalf from July to September 2023.[4] SUMF

---

[3] As discussed below, *infra* Section V, the Campaign alleged that the July Services Agreement contained several ambiguous material terms but took no discovery relating to this allegation and adduced no evidence to support it. The evidence in the record on the terms of the contract comes primarily from the contract itself and David Keith, who said he understood the material terms, SUMF ¶ 16. In any event, as discussed below, the supposedly ambiguous terms alleged in the complaint are either irrelevant, immaterial, and/or unambiguous.

[4] Grassroots also sent texts on the Campaign's behalf in October and November 2023. SUMF ¶¶ 83, 92. The Campaign paid in advance for the October texts, and Grassroots did not charge the Campaign for the November texts. SUMF ¶¶ 83, 92. Neither the October nor the November invoices are included in the damages Grassroots is seeking for its breach of contract claim.

¶ 42. Keith repeatedly urged Grassroots to send more and more texts—pushing Grassroots to "go full gasoline on the fire," "go very hard very very fast," [p]ush like a mad man," and "go absolutely hog wild", SUMF ¶¶ 31–32, 45; *see also* SUMF ¶ 28 (Campaign had an aggressive fundraising strategy)—with full awareness that such a quantity of texting services would be costly. SUMF ¶ 30. Grassroots charged the Campaign between $0.08–$0.10 per contact for these services—well below the bottom of the range provided by the contract, SUMF ¶¶ 20, 42—for a total of $595,197.40, SUMF ¶ 96. When the Campaign did not timely pay these invoices, Grassroots charged only $5,979.67 in late fees, well below what it could have charged under the contract. SUMF ¶¶ 21, 89, 93, 96. The contract indisputably obligated the Campaign to pay Grassroots these even-lower-than-agreed-upon rates for the text messaging services it received, as evidenced by the fact that the Campaign never once disputed the amount owed (and in fact repeatedly made assurances it would pay the full amount charged, SUMF ¶¶ 56, 59, 65–66, 78, 86), until late-November 2023, despite having been informed of the total balance multiple times and offered various opportunities to discuss or ask questions about the invoices. SUMF ¶ 91.

## C. Counterclaim-Defendants Breached the Contract by Failing to Pay Grassroots.

There also is no dispute that Campaign has only paid Grassroots $254,989.83 of the $601,177.07 owed for Grassroots' July–September texting services and associated late fees, which leaves $346.187.24 outstanding. SUMF ¶ 96. This is a clear and obvious breach of the contract. It is Defendants' burden to prove any legal excuse or affirmative defense that could excuse this breach, but they have not even articulated any plausible excuse or defense, much less adduced any evidence that could meet this burden. *Compare, e.g.*, Campaign Answer to Counterclaim at 5 (Jan. 9, 2025), ECF No. 9 (alleging as an affirmative defense that Grassroots' claims "may be barred by fraud"), *with* Ex. 3 at 104:12–15, Oct. 20, 2025 Deposition Transcript of P. Ehr ("Ehr Dep. Tr.") (Ehr admitting he has no evidence that there was any fraud, just speculation), *and* SUMF ¶ 100.

And the undisputed record demonstrates that (i) based on the contract's plain terms (which, among other things, contained an "as is" clause, SUMF ¶ 19), Counterclaim-Defendants' obligation to pay for the services Grassroots provided did not turn on their satisfaction with those services; (ii) in any case, they were satisfied with Grassroots' services—so much so that they pushed Grassroots to send more text messages while also asking Grassroots to expand its services to include not just texting but also direct mail and email fundraising services; and (iii) they intended to and were making efforts to pay down the full balance on the contract until some point when Ehr decided they simply would not pay what they owed. SUMF ¶¶ 46–49, 51, 56, 60, 65, 68, 70, 76, 94. No one from the Campaign ever raised any issues with Grassroots' services or otherwise disputed the amounts owed during the time the services were being provided. SUMF ¶¶ 51, 91. In fact, Keith—the Campaign representative charged with monitoring Grassroots' performance, SUMF ¶ 25—even texted Grassroots' CEO to say: "REALLY enjoying working with your company. Great work and great service all around," and reached out repeatedly about engaging Grassroots for his other clients, SUMF ¶ 49; *see also* SUMF ¶ 50. So even if the Court were to find that the as is clause is not dispositive on its own, the factual record clearly precludes any affirmative defense based on alleged insufficient performance by Grassroots.

**D. Grassroots Suffered Damages Because of Counterclaim-Defendants' Failure to Pay.**

Grassroots suffered $346,187.24 in damages as a result of Counterclaim-Defendants' failure to pay for the services contracted for and provided. SUMF ¶ 96. *See Ristau v. Madhvani*, Civ. A. No. 90-2682, 1991 WL 283666, at *4 (D.D.C. Dec. 20, 1991) (where rates charged were provided for in the contract, compensatory damages for breach are the outstanding amount on invoices billed). This includes $175,443.17 outstanding on Grassroots' July 2023 invoice, $126,943 outstanding on Grassroots' August 2023 invoice, $37,821.40 outstanding on Grassroots' September 2023 invoice, and $5,979.67 in outstanding late fees. SUMF ¶ 96. Grassroots spent

significant time, resources, and labor, in addition to incurring over $200,000 in out-of-pocket expenses to provide services to Ehr and his Campaign. SUMF ¶¶ 44, 62, 74, 92. Under the contract, Grassroots is also entitled to recover the fees and expenses incurred in this case. SUMF ¶ 23.

## II.    ALTERNATIVELY, IF THIS COURT DECLINES TO ENFORCE THE CONTRACT FOR ANY REASON, COUNTERCLAIM-DEFENDANTS WERE UNJUSTLY ENRICHED.

Although the Counterclaim-Defendants have adduced no evidence to show the July Services Agreement was invalid, the law is also clear that even if the Court were to find there is no enforceable contract, Grassroots can recover for unjust enrichment because (1) it "confer[red] a benefit on" Ehr and the Campaign; (2) they "retain[ed] the benefit", and (3) "under the circumstances, [their] retention of the benefit is unjust." *Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 134 (D.D.C. 2009) (citing *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005)).

It is undisputed that Grassroots provided text message fundraising services to Counterclaim-Defendants and, at the Campaign's direction, sent over seven million texts on their behalf. SUMF ¶ 42. It is also undisputed that Grassroots' services benefited Ehr and the Campaign, SUMF ¶ 71, who accepted, retained, and benefited from those services, including the funds raised from the texts and the contact information obtained from new donors to the campaign brought in by the texts, *see* SUMF ¶ 14. And it is undisputed that the Campaign only partially paid Grassroots for this benefit. SUMF ¶¶ 68, 96. Counterclaim-Defendants then pushed Grassroots to send more texts on their behalf, obtaining more services by falsely assuring Grassroots that they would pay the full amount owed. SUMF ¶¶ 59, 65–66, 72, 76. Grassroots spent time, resources, and money on these texting services with the expectation that it would receive full payment. Under these circumstances, it would be unjust to permit Counterclaim-Defendants to retain the benefits of

Grassroots' texting services, and Grassroots is entitled to recover "the reasonable value of the services already performed," *Robinson v. Nussbaum*, 11 F. Supp. 2d 1, 5 (D.D.C. 1997).

The "reasonable value" of Grassroots' services is reflected by the amounts invoiced to the Campaign. "[T]he standard for measuring the reasonable value of the services rendered is the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered." *United States v. Algernon Blair, Inc.*, 479 F.2d 638, 641 (4th Cir. 1973); *accord United States ex rel. Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*, 498 F.2d 335, 338 (9th Cir. 1974). Here, the amount charged to the Campaign clearly meets this standard. The range provided in the contract was Grassroots' standard pricing range, which was also the industry standard pricing at the time, *see* SUMF ¶ 20, and the Campaign was charged a rate well below that range, *see* SUMF ¶ 42. *See also U.S. E. Telecomms., Inc. v. U.S. W. Info. Sys., Inc.*, No. 87-cv-2924, 1993 WL 385810, at *28 (S.D.N.Y. Sept. 30, 1993), *aff'd sub nom. U.S. E. Telecomms., Inc. v. US W. Commc'ns Servs., Inc.*, 38 F.3d 1289 (2d Cir. 1994) (value of services may be shown by expert or opinion testimony, including from the claimant himself; bills sent by a claimant and the customary and usual charge for services are competent to show reasonable value of services; contract price can also be evidence of reasonable value).

## III.    PHIL EHR IS AN ALTER EGO OF HIS CAMPAIGN AND IS PERSONALLY LIABLE FOR THE DAMAGES OWED TO GRASSROOTS.

Phil Ehr is not listed as a party to the July Services Agreement, but he is an alter ego of the Campaign (which was one of the parties to the contract), and Grassroots therefore may enforce the contract against him (or recover against him for unjust enrichment in the alternative). *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *M3 USA Corp. v. Qamoum*, No. 20-cv-2903, 2021 WL 2324753, at *9 (D.D.C. June 7, 2021). "Courts apply the 'alter ego' theory 'to cast aside the corporate shield and fasten liability on the individual shareholder[.]'" *Est. of Raleigh v.*

10

*Mitchell*, 947 A.2d 464, 470 (D.C. 2008) (quoting 1 William Meade Fletcher, et al., Fletcher Cyclopedia of the Law of Corporations § 41.35 (perm. ed., rev. 2006)). A party is deemed an "alter ego" of a corporate form when "there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong," or "other considerations of justice and equity [that] justify [piercing the corporate veil]." *McWilliams Ballard, Inc. v. Broadway Mgmt. Co., Inc.*, 636 F. Supp. 2d 1, 8 (D.D.C. 2009) (quoting *Est. of Raleigh*, 947 A.2d at 470).

Factors for determining when to pierce the corporate veil include, among others: (1) "domination of the organization by a single individual," *United States v. Emor*, 850 F. Supp. 2d 176, 205–207 (D.D.C. 2012) (citing *Labadie Coal Co. v. Black*, 672 F.2d 92, 97–99 (D.C. Cir. 1982)), (2) "whether corporate formalities have been disregarded," (3) "whether corporate funds and assets have been extensively intermingled with personal assets," and (4) "inadequate initial capitalization," *McWilliams Ballard, Inc.*, 636 F. Supp. 2d at 8. "Not all factors need be present in order to justify piercing the corporate veil," *Emor*, 850 F. Supp. 2d at 207, but these four are all present here. And piercing the veil is also necessary in this case "to avoid injustice." *TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 67 (D.D.C. 2011) (quoting *United States v. Andrews*, 146 F.3d 933, 940 (D.C. Cir. 1998)); *see also U.S. Through Small Bus. Admin. v. Pena*, 731 F.2d 8, 13 (D.C. Cir. 1984) ("[T]he essential legal test [for veil piercing analysis] in all jurisdictions is whether it would be equitable to allow the stockholders to invoke the corporate mantle to shield themselves from personal liability.").

***Ehr dominates the Campaign.*** Ehr was involved in the formation of the Campaign, which was formed for the purpose of electing him to public office. SUMF ¶¶ 4–5. Ehr himself "exercised ultimate power over all [the Campaign's] decisionmaking." *See Emor*, 850 F. Supp. 2d at 207. He made decisions about "every aspect" of the Campaign, from major decisions like spending, hiring,

11

and overall campaign strategy, all the way down to the language on the website. SUMF ¶ 9; *see also* SUMF ¶¶ 7 (Ehr made the decision to hire David Keith), 85 (Ehr decided that Keith and Umunna would succeed Keith to manage the Campaign), 77 (Ehr made the decision to drop out of the Senate race and run for Congress). He gave final approval for all of the Campaign's major decisions. SUMF ¶ 9. He was the decisionmaker with authority to approve the Campaign's FEC finance reports, which could not be filed without his say-so. SUMF ¶ 11. He also supervised Campaign consultants and staff, interacting with them on a daily basis, SUMF ¶¶ 8–9, and signed contracts on behalf of the Campaign (including one with Grassroots). SUMF ¶ 10. Ehr was the point person on Grassroots' outstanding payments, *see* SUMF ¶¶ 64 (Keith telling Hogenkamp to reach out to Ehr directly about unpaid bills), 69 (Keith directing Lewis, Grassroots' controller, to reach out to Ehr directly about unpaid bills); 67 (Keith telling Hogenkamp he would reach out to Ehr about unpaid bills); *see also* SUMF ¶ 70 (Ehr was "well aware" of the debt owed to Grassroots), and he personally assured Grassroots that the Campaign's invoices would be paid in full, SUMF ¶¶ 59, 65, 72, 95, and made the final decision not to pay the outstanding bills. SUMF ¶ 94; *see also* SUMF ¶ 113 (if the Campaign receives additional money, Ehr will decide which debts to vendors and staff merit repayment). These factors weigh in favor of piercing the veil. *See Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 54 (2d Cir. 2012) (defendant "exercised a significant degree of control over corporate affairs . . . consistent with alter ego liability" where he "collaborated . . . on corporate decisions including hiring, and the supervisors and managers in the field reported directly to him"); *United States v. Fox*, No. CV 21-8785, 2023 WL 12075238, at *13 (C.D. Cal. Mar. 21, 2023) (test for unity of ownership and interest for alter ego finding "envisions pervasive control over [the controlled entity], such as when [the controlling entity] 'dictates every facet of the [controlled entity's] business — from broad policy decisions to

routine matters of day-to-day operation"); *Harding v. Jacoby & Meyers, LLP*, No. CV 14-5419, 2020 WL 468952, at *4 (D.N.J. Jan. 28, 2020) (veil piercing appropriate where party had "final-decision making authority over every aspect of [the business]").

And as an unincorporated association, the Campaign had no board of directors or anyone else to check Ehr's authority. SUMF ¶¶ 4–6. It had only ever had two members: Ehr and a treasurer. SUMF ¶ 5. The Campaign was "bare bones" with no employees, very little infrastructure, and just a few part-time staff (who were all independent contractors) at most at any given time. SUMF ¶ 6. At this point, the Campaign has *no* dedicated staff except Ehr himself, who serves as its treasurer despite not being qualified to do so. SUMF ¶ 112. This weighs in favor of a finding that Ehr is the Campaign's alter ego. *See Regal Coal, Inc. v. LaRosa*, No. 2:03-cv-90, 2004 WL 7334926, at *20 (N.D.W. Va. Nov. 16, 2004), *report and recommendation adopted,* No. 2:03CV90, 2005 WL 8162412 (N.D.W. Va. Jan. 12, 2005) (party was alter ego of company where company had two employees and he was one of them); *Hoodlums Welding Hoods, LLC v. Redtail Int'l, LLC*, No. 4:08 CV 893, 2009 WL 3617479, at *3 (E.D. Mo. Oct. 28, 2009) (similar).

***The Campaign disregards "corporate formalities."*** Although the Campaign is not a corporation and so does not have "corporate formalities" to comply with in the traditional sense, it does have an analogous requirement to file regular reports with the Federal Election Commission (FEC). *Cf. Mid Am. Title Co. v. Transnation Title Ins. Co.*, 332 F.3d 494, 497 (7th Cir. 2003) ("alter ego factors include whether corporation observes formalities of separate corporate existence such as maintaining corporate financial records, . . . , and filing . . . annual reports with the Arizona Corporation Commission" (citing *Deutsche Credit Corp. v. Case Power & Equip. Co.*, 876 P.2d 1190, 1195–96 (Ariz. Ct. App. 1994))); *Teitelbaum v. Lay Siok Lin*, No. CV073971, 2010 WL 11527279, at *15 (E.D.N.Y. Aug. 3, 2010), *amended,* No. CV073971, 2010 WL 11527277

(E.D.N.Y. Aug. 25, 2010), and *aff'd,* 423 F. App'x 106 (2d Cir. 2011) (failure to timely file tax returns was evidence of failure to observe corporate formalities and weighed in favor of piercing the veil). *Cf. Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1292 (5th Cir. 1988) (observation of corporate formalities such as making the "appropriate filings . . . with the Internal Revenue Service, the Securities and Exchange Commission, and other governmental bodies" insulated defendant from alter ego liability). The Campaign has repeatedly submitted its FEC reports late, submitted reports with serious inaccuracies or deficiencies, and ignored letters from the FEC requesting corrections of these errors. SUMF ¶¶ 114–16. As of the time of this filing, the Campaign is more than two months late to file its October Quarterly Report (which was due on October 15, 2025), despite a November 25, 2025, letter from the FEC urging that the report must be filed "immediately." SUMF ¶¶ 107, 115; *see also* Ex. 92.

**The Campaign's funds have been intermingled with Ehr's personal assets.** When the Campaign ended in November 2024, it owed tens of thousands of dollars to various vendors and campaign staff, in addition to the hundreds of thousands of dollars it owed to Grassroots. SUMF ¶ 55. Rather than paying off that debt, Ehr spent nearly $80,000 in campaign funds between the end of the November 2024 election and the end of the first quarter of 2025, even though he was not running for any office during that period. SUMF ¶ 108–10. These expenditures included a trip to Walt Disney World; hundreds of dollars spent in eight separate trips to Total Wine; thousands of dollars on travel and at restaurants, and nearly $2,400 on "supplies" from Dick's Sporting Goods, Target, Walmart, Lowe's, and Navarro Discount Pharmacy. SUMF ¶¶ 108–09. Ehr has tried to explain away some of these expenses in his interrogatory responses and deposition testimony, but their connection to any legitimate campaign needs remains murky at best. For example, although Ehr claimed that the purpose of some of the expenses was "debt retirement

fundraising," Ex. 54. Ehr Rog. Resp. Nos. 5–7, less than $11,000 of the debt owed to vendors and staff has been repaid, SUMF ¶ 55. *See Emor*, 850 F. Supp. 2d at 198 (defendant's claim that he bought cars with company funds to make money for company by reselling them at a higher price was "implausible" where there was no evidence that the vehicles were actually offered for sale).

Since launching his latest campaign in May 2025, Ehr has continued to use campaign funds for personal uses. In June 2025, he made another eleven trips to and spent hundreds of dollars at Total Wine, in addition to nearly $200 in campaign funds at Petsmart on supplies for his campaign manager's dog, SUMF ¶ 111, another expenditure that crosses the line into personal spending.

In addition to spending campaign money on personal funds, Ehr has also spent personal funds on the campaign. Ehr has "loaned" his Campaign over $100,000, most of which has never been repaid—though both he and the Campaign seem to have lost track of the actual amount. SUMF ¶ 107. This mixing of Campaign and personal funds without proper accounting or financial reporting is textbook commingling of funds. *See Emor*, 850 F. Supp. 2d at 208 (failure to keep formal records of loans weighs in favor of alter ego finding); *see also Flynn v. Thibodeaux Masonry, Inc.*, 311 F. Supp. 2d 30, 42 (D.D.C. 2004) (failure to keep "appropriate records" suggests corporation is a shell and not a separate entity). And Ehr—as the sole decisionmaker about which outstanding debts will be paid—testified that his loans were the only outstanding debt he was sure he would repay if the Campaign received funds, SUMF ¶ 113.

***The Campaign was inadequately capitalized from the start.*** The Campaign had significant cash flow issues "pretty much immediately" after its launch, SUMF ¶ 52, which continued throughout the entire time it worked with Grassroots as Ehr authorized aggressive spending, SUMF ¶¶ 53 (Campaign was spending aggressively), 28 (Ehr approved of aggressive fundraising strategy), 30–32 (aggressive fundraising strategy was expensive), and the Campaign fell behind

on payments to multiple vendors and staff, SUMF ¶ 55; *see also* SUMF ¶¶ 47 (Campaign wanted to do direct mail program but did not have the cash flow), 58 (Campaign wanted to make a bigger payment to Grassroots but did not have enough cash on hand). Many of the Campaign's overdue bills were never paid. SUMF ¶ 55. This sort of "obvious inadequacy of capital" is yet another "important factor" weighing in favor of denying Mr. Ehr's defense of limited liability. *Anderson v. Abbott*, 321 U.S. 349, 362 (1944); *see also Vuitch v. Furr*, 482 A.2d 811, 819 (D.C. 1984) ("[I]nsolvency or undercapitalization is often an important factor evidencing injustice . . . ."); *United States v. TDC Mgmt. Corp.*, 263 F. Supp. 3d 257, 272 (D.D.C. 2017) (piercing corporate veil where entity had insufficient assets available to satisfy a judgment).

*Piercing the veil is needed to avoid injustice.* Grassroots Analytics provided months of services to Ehr, including sending more than seven million text messages to help try to get him elected to Congress, SUMF ¶ 42, drafting and proposing copy for such text messages, SUMF ¶ 35, tracking and analyzing the performance of such text messages, SUMF ¶ 38, and planning a fundraising strategy based on its expertise and the performance data collected, *id*. In addition to its own labor and resources, Grassroots incurred significant out-of-pocket costs to provide these services to the Campaign. SUMF ¶¶ 44, 62, 74, 92. Ehr accepted and benefited from these services, using them to raise money and collect donor contact information. SUMF ¶¶ 71, 59. To date, Ehr and his Campaign have paid less than half of what is owed to Grassroots for the services it provided, and have made no payments since September 2023. SUMF ¶¶ 61, 63, 68, 73, 75, 89, 93, 96. Instead, Ehr drained the Campaign's coffers on post-election trips and personal expenditures. *See* SUMF ¶¶ 108–11. Because the undisputed evidence shows that Grassroots' services performed were "worth many thousands of dollars, all at the expense of [Grassroots] and for the ultimate benefit of [Ehr]," "the concept of separate corporate entity cannot . . . be permitted to

stand as a bar" to a suit against Ehr in his individual capacity. *See Francis O. Day Co. v. Shapiro*, 267 F.2d 669, 674 (D.C. Cir. 1959) (permitting veil piercing to prevent unjust enrichment in connection with breach of contract claim); *see also TAC-Critical Sys., Inc.*, 808 F. Supp. 2d at 67 ("[T]he ultimate principle [of veil piercing] is one permitting its use to avoid injustice." (quoting *United States v. Andrews*, 146 F.3d 933, 940 (D.C. Cir. 1998))); *United States v. TDC Mgmt. Corp.*, 263 F. Supp. 3d 257, 266 (D.D.C. 2017) (veil piercing appropriate where "an adherence to the fiction of the separate existence of the corporation would . . . promote injustice." (quoting *Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 249 (D.C. 1993))).

That conclusion is underscored by the fact that, after spending all of the Campaign's money (and during the pendency of this litigation), Ehr—purportedly on the advice of legal counsel—stopped using the Campaign to raise funds and instead started a new campaign committee, Ehr Force, Inc., which is now accepting donations. SUMF ¶ 117. This new entity has three board members, two of whom are Phil Ehr and Shelby Green (the Campaign's former treasurer). SUMF ¶ 118. The new entity has the same purpose as the Campaign: to elect Phil Ehr to Congress. SUMF ¶ 117.[5] Ehr's dissolution of Phil Ehr for Congress and creation of this new similar entity while aware of liability in this lawsuit amounts to "bad faith which makes it inequitable for [Ehr] to hide behind the corporate form." *See Philips N. Am. LLC v. KPI Healthcare, Inc.*, No. 8:19-cv-01765, 2022 WL 20273589, at *3 (C.D. Cal. Aug. 15, 2022); *Teamsters Loc. Union No. 727 Pension Fund v. Cap. Parking, LLC*, No. 19 C 837, 2019 WL 6210955, at *2 (N.D. Ill. Nov. 21, 2019)

---

[5] And although Ehr claimed at his deposition that Ehr Force, Inc. was created specifically for the new 2026 election cycle, Ehr Dep. Tr. 174:24–175:1, the evidence suggests otherwise. Ehr's own FEC filings and deposition testimony indicate that he spent money from the Phil Ehr for Congress Committee on the 2026 election cycle—including after Ehr Force, Inc. was established. SUMF ¶ 111 (Campaign spent money in June 2025 (citing Ex. 94; Ehr Dep. Tr. 171:7–172:1)). And Ehr Force, Inc.'s Articles of Incorporation list its purpose as "support[ing] the election of Phil Ehr to congressional office," with no mention of any specific year or congressional district. SUMF ¶ 117.

(attempting to avoid contractual liability by forming a new entity is a "compelling" fact in favor of veil piercing (quoting *UIRC-GSA Holdings Inc. v. William Blair & Co.*, 289 F. Supp. 3d 852, 860–61 (N.D. Ill. 2018))); *Powervar, Inc. v. Power Quality Scis., Inc.*, No. CV 20-5908, 2021 WL 2986417, at *6 (E.D. Pa. July 15, 2021) (creating new entity to avoid liability is evidence of abuse of corporate form to further personal interests). To hold otherwise would "allow [Mr. Ehr] to continue a 'shell game' to 'avoid paying [a] . . . judgment.'" *Severs v. Garcia*, No. 24-cv-01456, 2025 WL 2458862, at *4 (N.D. Cal. Aug. 25, 2025) (quoting *Cadence Design Sys. v. Pounce Consulting, Inc.*, No. 17-cv-04732, 2019 WL 1768619, at *6 (N.D. Cal. Apr. 1, 2019)).

## IV. GRASSROOTS FULFILLED ITS CONTRACTUAL OBLIGATIONS AND THE CAMPAIGN HAS OFFERED NO EVIDENCE OF ANY DAMAGES.

Grassroots is also entitled to summary judgment on the Campaign's breach of contract claim, which lacks any basis in law or fact. To prove breach of contract, the Campaign must establish: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting *Tsintolas Realty Co. v. Mendez,* 984 A.2d 181, 187 (D.C.2009)). Grassroots agrees that the first two factors are met in this case: The July Services Agreement was a valid contract, and under that contract, Grassroots was obligated to provide text message list rental services to the Campaign. *See supra* Section I.A. However, the Campaign has not met (and cannot meet) its burden as to the third or fourth prongs because the undisputed facts show that Grassroots performed its obligation under the contract and the Campaign has offered no evidence of any damages.

***Grassroots did not breach the contract.*** The contract required Grassroots to: "(A) conduct a text messaging program as requested and instructed by the Campaign; (B) provide copywriting, production, and quality assurance for the text message program; (C) generate an analysis of results,

18

including periodic reports as requested by Client; and (D) perform all other services agreed upon by the parties in writing." SUMF ¶ 17. The parties understood that this contract would be for text message list rental services, where Grassroots would send text messages on the Campaign's behalf, and the Campaign would receive basic information about any donors from ActBlue, a separate donation platform (unaffiliated with Grassroots). SUMF ¶¶ 14, 16. The Campaign does not dispute that Grassroots conducted a text messaging program, sending more than seven million messages on the Campaign's behalf. SUMF ¶ 42. The texting program was executed pursuant to the Campaign's repeated requests and instructions to "go as large as possible," and "scale everywhere possible" "even at a lower [return on investment]." SUMF ¶ 32.[6] The quantity of messages sent was driven by the Campaign's instruction to continue sending texts as long as the ROI was at least 40% (meaning the Campaign was making just $0.40 for every dollar that it spent), SUMF ¶ 34.

Grassroots also provided "copywriting, production, and quality assurance" pursuant to the agreement, *see* SUMF ¶¶ 17, 26. Keith—the person who signed the contract on the Campaign's behalf—understood this part of the contract to mean that Grassroots would "do some of the writing" of the text messages. SUMF ¶¶ 15, 18. And Grassroots did draft copy for the text messages, which it sent to the Campaign for edits and approval. SUMF ¶ 35. Grassroots then prepared the text messages and any accompanying images for release to ensure there were no typos or aesthetic issues. SUMF ¶ 36. During the many months Grassroots was providing services, the Campaign never expressed any issues with the quality of the text message drafts, instead responding with feedback like "looks great," "love it," and "fantastic." SUMF ¶¶ 49, 51.

---

[6] Scaling means sending a particular text message to a broader group of people. SUMF ¶ 31 n.1. Return on investment (ROI) is the amount of donations the Campaign receives as a percentage of the amount of money it spends on texting to solicit those donations. SUMF ¶ 34 n.2.

Finally, Grassroots "generated an analysis of results, including periodic reports as requested by [the Campaign]," see SUMF ¶ 17. In particular, Grassroots tracked the number of clicks and the number and amount of donations generated by each batch of messages sent, as well as the return on investment for each batch. SUMF ¶ 38. It used these data to make strategic decisions about subsequent texting—for example, sending follow-up copy specifically to the "best performing audiences." *Id.* And when the Campaign requested updates on how the texts were performing, Grassroots timely provided that information. SUMF ¶ 37.

These were the extent of Grassroots' obligations under the contract, all of which were performed in full. In fact, Grassroots went above and beyond its contractual obligations, sending more than three million additional texts for free to try to help boost the Campaign's fundraising results and hit its ROI targets, SUMF ¶ 40; *see also* SUMF ¶¶ 43, 61. This was done to help the Campaign, but it was not required under the contract. The contract contained no promise of any specific minimum amount of donations or return on investment. Quite the opposite, it specifically provided (in all caps) that the texting services were provided "as is . . . with all faults." SUMF ¶ 19. That should be dispositive. *See Pac. W. Grp., Inc. v. Real Time Sols., Inc.*, 321 F. App'x 566, 569 (9th Cir. 2008) (valid as-is clause in agreement bars as a matter of law breach of contract claim based on dissatisfaction with goods provided).

In addition, neither Keith—who signed the contract—nor Ehr understood Grassroots to be promising certain returns or any minimum amount of donations. SUMF ¶ 18. In fact, Keith was fully aware that the aggressive strategy he was pursuing might result in the Campaign raising less money from the texting services than it was spending on them. SUMF ¶ 34; *see also* SUMF ¶ 32 (Keith telling Grassroots he would spend $700,000 to raise $500,000).

20

That Grassroots adequately performed its contractual obligations is perhaps best evidenced by the lack of complaints from anyone at the Campaign during the entire time the services were being provided. SUMF ¶ 91. In fact, the Campaign repeatedly expressed satisfaction with Grassroots' services: Keith—the Campaign representative charged with monitoring Grassroots' performance, SUMF ¶ 25—told Grassroots' CEO: "REALLY enjoying working with your company. Great work and great service all around" and "we love your work so keep pushing[.]" SUMF ¶ 49; *see also* SUMF ¶ 51 (other Campaign representatives expressing satisfaction). The Campaign even sought out other additional types of fundraising services from Grassroots, SUMF ¶¶ 46, 48, and Keith attempted to engage Grassroots for some of his other clients, SUMF ¶ 49, and has continued to work with Grassroots for other clients since he left the Ehr Campaign, SUMF ¶ 50. Ehr, Keith, and Briggs all believed Grassroots' services were important for the Campaign, SUMF ¶¶ 59, 71, and continuously tried to expand Grassroots' role and scope of services, SUMF ¶¶ 46, 48, pushing it to send more text messages, and even pleading with Grassroots to continue providing services when they were stalled due to the Campaign's non-payment. SUMF ¶¶ 59, 66. And when the Campaign ended the contract with Grassroots, the reason Campaign staff gave was not any dissatisfaction with Grassroots' services, but rather that the Campaign was streamlining its services and cutting expenses more generally. SUMF ¶ 87.  In addition, Ehr, Keith, and Briggs all affirmed during discovery that during this time period they intended to fully compensate Grassroots for its services and were making efforts to do so. SUMF ¶¶  56, 58, 60, 65, 70, 72, 76.

It was not until late November 2023—months after Grassroots had completed its work on behalf of the Campaign and months after it had invoiced the Campaign for that work—that the Campaign first raised any issue about payment. SUMF ¶ 91. And even at that point, the Campaign did not claim that Grassroots had not performed its obligations under the July Services Agreement;

rather, its newly minted dispute was limited to contesting the amount of the outstanding balance. SUMF ¶ 90. This kind of vague, post-hoc, and unsupported claim that Grassroots did not perform adequately—in the face of a mountain of evidence to the contrary—is plainly inadequate to excuse a contractual obligation to pay for services. As another district court put it: "This is buyer's remorse, not breach of contract." *A.J. Amer Agency, Inc. v. Astonish Results, LLC*, No. CA 12-351, 2014 WL 3496964, at *31 (D.R.I. July 11, 2014) (finding no breach of contract where plaintiff never complained about services provided until the lawsuit). *See also, e.g.*, *Women's Dev. Corp. v. City of Cent. Falls*, 764 A.2d 151, 160 (R.I. 2001) (where party never complained until it sued, breach of contract claim is post-hoc rationalization).

On this record, no reasonable juror could find that Grassroots did not perform its contractual obligations, which defeats the Campaign's breach of contract claim.

***The Campaign has no damages.*** Even if this Court were to find evidence of a breach, Grassroots still is entitled to judgment on the Campaign's breach of contract claim because the Campaign has not proven any damages related to Grassroots' performance under the contract. *See Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 736–37 (D.C. 2000). It is the Campaign's burden to prove "the amount of [] damages suffered as a result of defendant's conduct with reasonable certainty." *Manes v. Dowling*, 375 A.2d 221, 224 (D.C. 1977). *See also Fererro v. W.U. Tel. Co.*, 9 App. D.C. 455, 465 (D.C. Cir. 1896) (damages must be "certain and not remote, speculative, or contingent") (citing *W. Union Tel. Co.* v. *Hall*, 124 U.S. 444, 455 (1888)).

There is no evidence supporting any of the categories of damages the Campaign has claimed, much less that Grassroots proximately caused them. The Campaign's alleged damages were estimated solely by Vanessa Brito, a campaign consultant with no expertise conducting damages calculations and whom the Campaign did not disclose as either a fact or expert witness.

SUMF ¶ 97. Despite saying in its initial disclosures that it would produce evidence of damages, the Campaign produced none. In fact, the Campaign produced only three documents relating to damages at all. The first was a made-for-litigation "Statement of Damages," which contains no information about how the damages listed in the statement were calculated nor any evidence to support them. SUMF ¶¶ 98–99 (Ehr did not know how these damages were calculated, what was included in them, or whether there was any documentation for them). The second and third were a "refund analysis report" and an associated spreadsheet, but these documents lack any foundation, as there is no evidence in the record about where these documents came from, or how or by whom they were generated. *See* SUMF ¶ 99. On this record, and as explained below, the Campaign has not met its burden to put forth a "reasonable basis on which to estimate damages." *Garcia v. Llerena*, 599 A.2d 1138, 1142 (D.C. 1991).

*Direct Financial Damages*:[7] The Campaign alleges that it is owed $54,459.63 in damages

---

[7] In its initial disclosures, the Campaign claimed it was entitled to a refund of the full amount it had paid to Grassroots. Ex. 88 at 3. It appears to have abandoned this claim, as it subsequently produced a "Statement of Damages" omitting these damages. *See generally* Ex. 87. To the extent it is still claiming these damages, it has not proven them. The Campaign's stated basis for a refund was that it "relied on Grassroots Analytics' representations that the lists would yield a significant return on investment and contain actionable donor information." Ex. 88 at 3. But there is no evidence that the Campaign relied on a promise of significant ROI in signing the July Services Agreement. The contract itself does not guarantee any specific ROI and neither Ehr nor the Campaign staffer who signed the contract understood it to so guarantee. *See* SUMF ¶¶ 18–19. In fact, the Campaign specifically acknowledged that ROI might be low and directed Grassroots— against Grassroots' advice, SUMF ¶¶ 33–34—to send texts as long as ROI was just 40%, SUMF ¶ 34. Nor is there any evidence that Grassroots had an obligation to provide "donor information" to the Campaign at all. Rather, the Campaign contracted for text message list *rentals*, wherein the Campaign would receive contact information only for those who chose to donate. SUMF ¶ 14. Finally, the undisputed record shows that Grassroots sent millions of texts on the Campaign's behalf—many of which it sent at no cost, SUMF ¶ 40—raising the Campaign hundreds of thousands of dollars and allowing the Campaign to obtain contact information for thousands of new donors, all of which the Campaign has retained. SUMF ¶ 42; Ex. 25 (tracking donations). On this record, there is no basis to find that the Campaign should be entitled to a refund of the partial payments it made for Grassroots' services.

for "refunded contributions" and associated "processing fees." Ex. 87 at 2. Although this theory does not appear anywhere in its complaint, *see generally* Compl. and Jury Demand (Oct. 24, 2024), ECF No. 1 ("Campaign Compl."), the Campaign alleged in discovery responses that it experienced a higher-than-usual rate of requests from donors for refunds of their campaign donations, which the Campaign attributed, without evidence, to Grassroots, SUMF ¶¶ 99–101. The Campaign has provided no information about how this amount was calculated other than the aforementioned "refund analysis report," and spreadsheet that purport to show refunds requested by donors to the Campaign both of which are of unknown provenance. *See* SUMF ¶ 99. Nor has the Campaign offered any evidence that any donor requests for refunds were in any way connected to anything Grassroots did (and, in fact, some of the refunds for which the Campaign seeks damages were refunds of contributions that were made before Grassroots' services for the Campaign even began, SUMF ¶ 101). Instead, the Campaign has offered a wild conspiracy theory—that Grassroots fraudulently charged donor credit cards, which prompted these defrauded donors to request refunds. SUMF ¶ 100. This is patently false, and the Campaign has no evidence to support it, as Ehr admitted at his deposition. *Id.*

*Internal Response and Compliance Costs:* The Campaign also claims $15,000 in "internal response and compliance costs." Ex. 87 at 2. But it provided no receipts or other evidence for any of these alleged damages, and Ehr confirmed that at least some of these expenses were "just fundraising activities," SUMF ¶ 102, and otherwise was unable to explain what was included in this damages category or how these claimed amounts were calculated. *Id.*

*Reputational and Opportunity Costs:*[8] The Campaign additionally has alleged $16,000 of

---

[8] In its initial disclosures, the Campaign also indicated it was seeking a to-be-determined amount of "lost fundraising revenue" damages for the ROI it would have received from what it describes as "properly curated donor lists." Ex. 88 at 3–4. It appears to have abandoned these damages,

"reputational and opportunity costs," including for "donor retention loss," "lost re-engagement return on investment," "public perception impact," and "fundraising momentum lost." Ex. 87 at 3. Once again, there is no evidence showing how these damages were calculated, and Ehr conceded he didn't know. SUMF ¶ 103. In addition, the Campaign has claimed that its damages for "lost re-engagement return on investment," included the "failure to secure follow-up donations due to bounced emails/disputed contacts," Ex. 87 at 3, but it is unclear how bounced emails[9] could be attributed to Grassroots given that the Campaign never paid or contracted with Grassroots for the sending of fundraising emails or for the purchase of any lists of email addresses for fundraising, SUMF ¶ 48 (Grassroots only contracted for free "Click Collective" program, not for the sending of fundraising emails or the purchase of email lists).[10] And as for the "donor retention loss" and "public perception impact," the Campaign stated in its initial disclosures that it would produce complaints from donors about this issue, *see* Ex. 88 at 4, but never did so. And Ehr testified that he never received any such communications from donors or prospective donors, and was not aware of anyone else from his campaign receiving any. SUMF ¶¶ 104, 105. As to "fundraising momentum lost," Ehr was not even sure what damages this referred to, nor whether they actually caused any loss, SUMF ¶ 106 (Ehr stating that the alleged issues that caused these "damages" "may or may not have been a positive"). He also admitted that it was not Grassroots' responsibility to prevent the issues that caused these alleged damages. *Id.*

---

which it omitted from its Statement of Damages, *see generally* Ex. 87, and which it provided neither an estimate nor any evidence of.

[9] Ehr did not know what "disputed contacts" meant, but speculated that it related to emails. Ehr Dep. Tr. 158:19–24.

[10] It is not clear whether the Campaign is still seeking these damages. Ehr himself expressed uncertainty when asked whether the Campaign was "still claiming lost re-engagement" damages for bounced emails/disputed contacts even though the Campaign never paid Grassroots anything for email services. Ehr Dep. Tr. 158:8–18.

In short, the Campaign has put forth no evidence to prove the Grassroots' alleged breach proximately caused any of its claimed damages. And to the extent the Campaign has offered any proof of its identified damages, that proof is "vague and speculative," and insufficient to meet the Campaign's burden to establish "the fact of damage and a reasonable estimate." *Cahn v. Antioch Univ.*, 482 A.2d 120, 130 (D.C. 1984) (quoting *W.G. Cornell Co. v. Ceramic Coating Co.*, 626 F.2d 990, 993 (D.C. Cir. 1980) & *Roth v. Speck*, 126 A.2d 153, 155 (D.C. 1956)).

## V.    THE CAMPAIGN HAS NO CLAIM FOR RESCISSION.

Finally, the Campaign's "rescission" claim—which must be construed as an alternative to its breach of contract claim[11]—also fails. To begin with, "[r]escission is not an independent cause of action[.]" *Ali v. Mid-Atl. Settlement Servs., Inc.*, 640 F. Supp. 2d 1, 11 (D.D.C. 2009). It is instead "an equitable remedy that a plaintiff who has been induced to enter in a contract by false and fraudulent misrepresentations may elect as an alternative to damages." *Id.* Here, where the Campaign has not brought any claim for fraudulent inducement, its rescission claim must fail.

Even setting that aside, the Campaign has waived its ability to seek rescission as a remedy. "Rescission is a radical move," *In re Nat'l Student Mktg. Litig.*, 445 F. Supp. 157, 163 (D.D.C. 1978), *aff'd sub nom. Lipsig v. Nat'l Student Mktg. Corp.*, 663 F.2d 178 (D.C. Cir. 1980), and "[p]rompt election [to rescind a contract] . . . [is] essential," *Brown v. Hornstein*, 669 A.2d 139, 143 (D.C. 1996) (quoting *Milford Yacht Realty Co. v. Milford Yacht Club*, 72 A.2d 482, 485 (Conn. 1950)). *See also In re Nat'l Student Mktg. Litig.*, 445 F. Supp. at 163 (rescission must be "asserted without wait"). "This principle is stringently administered." *Id.* "[O]ne who seeks to rescind a

---

[11] *See, e.g.*, *Dean v. Garland*, 779 A.2d 911, 915 (D.C. 2001); *Campbell Music Co. v. Singer*, 97 A.2d 340, 342 (D.C. 1953); *Fennell v. AARP*, 770 F. Supp. 2d 118, 132 (D.D.C. 2011). *See also In re Est. of McKenney*, 953 A.2d 336, 341–42 (D.C. 2008); *Twin City Fed. Sav. & Loan Ass'n v. Transamerica Ins. Co.*, 491 F.2d 1122, 1124–25 (8th Cir. 1974).

contract must act within a reasonable time after discovery of the facts justifying rescission," *Klayman v. Jud. Watch, Inc.*, 628 F. Supp. 2d 112, 127 (D.D.C. 2009) (quoting *Mariner Water Renaturalizer of Washington, Inc. v. Aqua Purification Sys., Inc.*, 665 F.2d 1066, 1069 (D.C. Cir. 1981)); *see also id.* at 126 ("[R]escission is unavailable if the party seeking rescission has failed to seek rescission within a reasonable time."), or "entitlement to rescission disappears," *In re Nat'l Student Mktg. Litig.*, 445 F. Supp. at 163.

The Campaign's primary grounds for its "rescission" claim seem to be what it now claims are "ambiguities" in the July Services Agreement. *See* Campaign Compl. ¶¶ 27–29. But the Campaign was aware of the contract's terms on July 18, 2023, when its representative received (and signed) the contract. SUMF ¶ 14–15; *see also A.M. Castle & Co. v. United Steelworkers of Am.*, 898 F. Supp. 602, 607–08 (N.D. Ill. 1995) ("Patent ambiguities (those in which the ambiguity arises from the language itself,), are presumed to have been apparent to the parties at the time of the contract." (quoting *Colfax Envelope Corp.*, 20 F.3d at 757)). And it directed Grassroots to provide services pursuant to the contract, accepted those services and the benefits they yielded, and did not seek (or say anything about) rescission until more than a year later when it filed its complaint in October 2024. *See supra* Section IV; *see also* SUMF ¶¶ 31–34. "In these circumstances rescission [is] not an available remedy." *Dean v. Garland*, 779 A.2d 911, 915–16 (D.C. 2001) (rescission remedy waived where plaintiffs were aware of grounds for rescission of property sale contract before entering into it "but they nevertheless proceeded with the [contract] and accepted the property with these problems, . . . and did not seek rescission for a year and a half after").

Finally, even if the Court were to look past these threshold (fatal) defects in the Campaign's rescission claim, its rescission claim still fails as a matter of law. Rescission is "an extraordinary

power" and "a fraud or mistake must be very manifest to justify it." *Veazie v. Williams*, 49 U.S. 134, 157 (1850). The Campaign has not come close to meeting that high bar.

As a preliminary matter, rescission is generally disfavored and "must be supported by urgent reasons" where, as here, the party seeking rescission "had already accepted and enjoyed all of the benefits of the agreement when [it] first challenged [the contract's] validity." *Brown*, 669 A.2d at 143 (quoting *Record v. Rochester Tr. Co.*, 192 A. 177, 182 (N.H. 1937)); *see also Grymes v. Sanders*, 93 U.S. 55, 62 (1876) ("A court of equity is always reluctant to rescind, unless the parties can be put back *in statu quo*. If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it."). Grassroots has already fully performed its obligations under the contract, and the Campaign accepted and benefited from Grassroots' services. *See supra* Section IV; *see also* SUMF ¶¶ 31–34. This makes rescission "impracticable" "because it is not possible for the [Campaign] to restore to [Grassroots] the services [Grassroots] rendered to [it]." *See Miller v. U.S. Foodservice, Inc.*, 361 F. Supp. 2d 470, 485 (D. Md. 2005).

Nor has the Campaign put forth any "urgent reasons" to justify an exception to the general rule that "a party seeking rescission must restore the other party to that party's position at the time the contract was made." *Brown*, 669 A.2d at 143; *Dean*, 779 A.2d at 915. It is the Campaign's the burden to prove that rescission is merited, but it has never even clearly articulated the basis for its claim. Its complaint makes vague references to supposed ambiguities in the contract, Campaign Compl. ¶¶ 27-29 and its discovery responses reference alleged fraudulent inducement. Ex. 39, Campaign Rog. Resp. No. 8. But the Campaign has offered no evidence supporting either theory.

Start with the supposedly ambiguous contract terms. Keith—an experienced political consultant who signed the contract on the Campaign's behalf, SUMF ¶¶ 7, 15—understood its terms and had no questions about them. SUMF ¶ 16. At no point throughout the duration of the

contract did anyone from the Campaign ever raise any questions with Grassroots about its terms. SUMF ¶ 91. And the terms the Campaign now complains were "ambiguous" are entirely immaterial and irrelevant to the services Grassroots provided to the Campaign. For example, some of the terms it alleges are ambiguous—such as "high-dollar mobile numbers," "low-dollar mobile numbers,"[12] "'fair market value' for 'deliverables' or 'objectives,'" and "project phases," Campaign Compl. ¶ 28—pertain to pricing for *list purchases*. SUMF ¶ 20. But the Campaign never purchased any lists from Grassroots—it only used Grassroots' list *rental* services. SUMF ¶¶ 20, 14. The rest of the terms—"inventory of text messages," "length and type of text messages," and "volume of replies," as well as "the calculations to be used in all phases of G.A.'s pricing schedules"—pertain to Grassroots' process for setting pricing for list rentals within the contractual range. SUMF ¶ 20. But, as discussed, Grassroots invoiced the Campaign at rates significantly lower than the bottom of the contractual range, SUMF ¶ 42, so to the extent those terms were "ambiguous," it had no impact on the Campaign.

In any event, the ambiguities alleged by the Campaign are not a basis for rescission as a matter of law. Its complaint describes the alleged ambiguities in the contract as "patent ambiguities," Campaign Compl. ¶ 29, which are ambiguities which "arise[] from the language itself," *Colfax Envelope Corp. v. Loc. No. 458-3M, Chicago Graphic Commc'ns Int'l Union, AFL-CIO*, 20 F.3d 750, 757 (7th Cir. 1994) (McDade, J., concurring); *A.M. Castle & Co. v. United Steelworkers of Am.*, 898 F. Supp. 602, 607–08 (N.D. Ill. 1995) (same), as opposed to "latent ambiguities" or mutual misunderstandings, which arise "when parties agree to terms that reasonably appear to each of them to be unequivocal but are not," *Colfax Envelope Corp.*, 20 F.3d

---

[12] The Complaint actually refers to the term "low-value mobile numbers," Campaign Compl. 1 ¶ 28, but that term does not appear anywhere in the contract. *See generally* Ex. 20.

at 754 (majority opinion). While latent ambiguities can be grounds to rescind a contract, patent ambiguities—like those the Campaign alleges in the July Services Agreement—cannot. *See id.* (rescission not appropriate where reasonable person would have realized term might be interpreted differently by other party or by a tribunal); *id.* ("When parties agree to a patently ambiguous term, they submit to have any dispute over it resolved by interpretation [by a tribunal].").

Nor is there any evidence that the Campaign was fraudulently induced to sign the contract—a theory it did not even plead in its complaint. *See* Campaign Compl. at ¶¶ 27–30 (rescission claim which does not say anything about fraudulent inducement). To the extent the text messages Grassroots' CEO sent to Phil Ehr around the time of the Campaign's launch could even be construed as statements of fact that could support a fraudulent inducement claim (a dubious proposition), the record does not support a finding that the Campaign would not have contracted with Grassroots but for these text messages. On the contrary, the evidence shows that Campaign staff (and Ehr himself) were skeptical of Grassroots' pitch and that the reason the Campaign decided to hire Grassroots was because Ehr had been pleased with Grassroots' services in his prior campaign and because his campaign team already liked Grassroots' services. SUMF ¶¶ 3, 12–13. Not a single witness testified that they relied on Grassroots' CEO's representations in deciding to contract with Grassroots, nor are there any documents showing or suggesting this. *See* SUMF ¶ 13 (Campaign representatives were "skeptical" of Hogenkamp's pitch).

## CONCLUSION

For the foregoing reasons, Grassroots Analytics respectfully requests that the Court grant judgment to Grassroots on (i) its breach of contract claim (or, alternatively, on its unjust enrichment claim) against the Campaign and Phil Ehr, and (ii) the Campaign's breach of contract and rescission claims.

DATED: December 18, 2025

Respectfully Submitted,

By: /s/ *Kathryn Ali*
Kathryn Ali (D.C. Bar No. 994633)
Elizabeth Lockwood (D.C. Bar No. 1029746)
Arianna Zoghi (D.C. Bar No. 90036562)
ALI & LOCKWOOD LLP
501 H Street NE, Suite 200
Washington, D.C. 20002
(202) 651-2475
katie.ali@alilockwood.com
liz.lockwood@alilockwood.com
arianna.zoghi@alilockwood.com

Mark A. Lancaster (D.C. Bar No. 1620256)
General Counsel,
Grassroots Analytics, Inc.
mlancaster@grassrootsanalytics.com

*Counsel for Defendant-Counterclaimant
Grassroots Analytics, Inc*