# Exhibit 3

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

```
PHIL EHR FOR CONGRESS        )
CAMPAIGN COMMITTEE,          )
                             )
            Plaintiff,       )
                             )
        v.                   ) No.: 1:24-cv-03035-APM
                             )
GRASSROOTS ANALYTICS, INC.,  )
                             )
            Defendant.       )
_____)
                             )
GRASSROOTS ANALYTICS, INC.,  )
                             )
      Counterclaim-Plaintiff,)
                             )

        v.                   )

                             )

PHIL EHR FOR CONGRESS        )

CAMPAIGN COMMITTEE; PHIL EHR )

FOR SENATE CAMPAIGN          )

COMMITTEE; PHIL EHR          )

(INDIVIDUALLY)               )

                             )

      Counterclaim-Defendants.)

_____)
```

REMOTE VIDEOTAPED DEPOSITION OF PHIL EHR

MONDAY, OCTOBER 20, 2025

ELECTRONICALLY REPORTED BY:

LAUREN N. FRIDLEY

JOB NO. SY011333

Page 2

```
1
2
3
4                  OCTOBER 20, 2025
5
6                    9:06 a.m.
7
8
9
10        Remote videotaped deposition of PHIL EHR, held at
11  Hogan Lovells, 555 13th Street Northwest, Washington,
12  District of Columbia, 20004, before Lauren N. Fridley.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1   A P P E A R A N C E S :
2   ATTORNEYS FOR DEFENDANT:
3       ALI & LOCKWOOD LLP
4       501 H Street NE, Suite 200
5       Washington, D.C. 20002
6       202.651.2475
7       BY: KATHRYN "KATIE" ALI, ESQUIRE
8       EMAIL: katie.ali@alilockwood.com
9
10  ATTORNEYS FOR PLAINTIFF:
11      CHUNG & PRESS, P.C.
12      6718 Whittier Avenue, Suite 200
13      McLean, Virginia  22101
14      703.734.3800
15      BY: DANIEL PRESS, ESQUIRE
16      EMAIL: dpress@chung-press.com
17
18  Also present: Jonathan Perry, videographer
19
20
21
22
23
24
25
```

Page 4

```
1       ------------ INDEX ------------
2                   PAGE
3   Examination By Ms. Ali              10
4   Certificate of Oath           206
5   Certificate of Digital Reporter    205, 207
6   Errata Sheet                  208
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1       ------------ EXHIBITS ------------
2   NO.           DESCRIPTION           PAGE
3   1      Responses to the            33
4          Second Set of
5          Interrogatories
6   2       GRASSROOTS_00000744        41
7          to 00000745
8   3       Signal messages, 24        44
9          Raising, one page
10  4       24 Raising Signal          48
11         messages, 07/17/23,
12         one page
13  5       24 Raising Signal          51
14         messages continued,
15         07/17/23, one page
16  6       July Services              55
17         Agreement,
18         GRASSROOTS_00004137
19         to 00004155
20  7       Email chain,               60
21         GRASSROOTS_00002247
22         to 00002268
23
24
25
```

2 (Pages 2 to 5)

Page 6

```
 1           ---EXHS. CONT'D---        PAGE
 2    NO.        DESCRIPTION            66
 3    8      Email chain,
 4           GRASSROOTS_00004156
 5           to 00004187
 6    9        Invoice,               72
 7           GRASSROOTS_00004129
 8    10       Services Agreement,     76
 9           GRASSROOTS_00004147
10           to
11           GRASSROOTS_00004155
12    11       Invoice,               79
13           GRASSROOTS_00004130
14    12       Text messages from     83
15           Aug. 29, 2023, two
16           pages
17    13       Text chain between     90
18           Briggs and Ehr on
19           09/10/23, two pages
20    14       Email chain,           93
21           original date
22           11/15/23, six pages
23
24
25
```

Page 8

```
 1      ---------QUESTION(S) NOT ANSWERED---------
 2           PAGE  LINE
 3           194    6
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1           ---EXHS. CONT'D---
 2    NO.        DESCRIPTION            PAGE
 3    15       Text chain between     105
 4           Phil, Jake, Obi,
 5           and Joanna on
 6           12/22/23; one page
 7    16       Signal message         121
 8           between Phil, Jake,
 9           and Vanessa,
10           Obi; one page
11    17       Signal messages        124
12           Between Obi,
13           Vanessa and Phil;
14           one page
15    18       Refund analysis        135
16           Report, one page
17    19       Statement of damages,  141
18           two pages
19    20       Email chain, Bates     149
20           DK-000004 to
21           DK-000008
22    21       FEC Form 3 +           167
23           attachment, eight
24           pages
25
```

Page 9

```
 1         REMOTE VIDEOTAPED DEPOSITION OF PHIL EHR
 2              MONDAY, OCTOBER 20, 2025
 3
 4         THE VIDEOGRAPHER:  We are now on the record.
 5    This is the video deposition of Phillip Ehr taken in the
 6    matter of Phil Ehr for Congress Campaign Committee,
 7    Plaintiff, versus Grassroots Analytics, Inc., Defendant.
 8    And in the matter of Grassroots Analytics, Inc.,
 9    Counterclaim-Plaintiff, versus Phil Ehr for Congress
10    Committee, et al., Counterclaim-Defendants, case filed
11    in the U.S. District Court for the District of Columbia.
12    Case Number 124-cv-03035-APM.  We are at the offices of
13    Hogan Lovells, 555 13th Street Northwest in
14    Washington, D.C.
15         The date is October 20th, 2025.  The time is
16    approximately 9:06 a.m.  The videographer is Jonathan Perry, and
17    the court reporter is Lauren Fridley, both here on behalf of
18    TransPerfect.  All counsel will be noted on the stenographic
19    record.
20         And would the reporter please swear in the witness.
21         THE REPORTER:  Good morning.  My name is
22    Lauren Fridley.  I'm the reporter assigned by
23    TransPerfect to take this record of this deposition.
24    I'm a notary authorized to take acknowledgments and
25    administer oaths in Virginia.  All parties agree I will
```

3 (Pages 6 to 9)

Page 10

1    swear in the witness.
2        Sir, please raise your right hand.
3
4        (Phil Ehr, was called to testify, duly sworn,
5    and provided the following testimony:)
6
7        THE REPORTER:  Thank you.  We can proceed.
8        DIRECT EXAMINATION
9
10   BY MS. ALI:
11       Q    Good morning, Mr. Ehr.
12       A    Good morning.
13       Q    My name is Katie Ali.  I represent Grassroots
14   Analytics in this case.  And thank you for being here this
15   morning.  I know you don't really have a choice but thank you,
16   nonetheless.
17       A    I am thankful.
18       Q    Can you just say and spell your full name first for
19   the court reporter.
20       A    My full name is Phillip Charles Ehr, that's
21   P-H-I-L-L-I-P C-H-A-R-L-E-S E-H-R.
22       Q    And have you have you ever had your deposition taken
23   before?
24       A    Never.
25       Q    The court reporter, whom you can hear on the phone,

Page 11

1    will be recording my questions and your answers.  So it's
2    important to wait for the end of my questions, especially
3    because she's not here in person, to give verbal answers.  She
4    can't record anything, like, a nod of the head or a shake of the
5    head.  And also, for the benefit of the court reporter and to
6    make sure the record is clear, please wait for the end of my
7    questions.  That will also give Mr. Press a chance to object if
8    he wants to object to anything before you start your answer.
9        If you don't understand any of my questions, please tell
10   me, and I'm happy to try to rephrase or make the question
11   clearer.  If you don't hear a question I ask, please tell me.  I
12   don't want you to answer questions that you haven't properly
13   heard or understood.
14       And if you do answer my question, I will assume that you
15   have heard and understood it.  Is that fair?
16       A    Yes.
17       Q    If you need a break at any point, you can let me know.
18   I would just ask that you finish answering any question that's
19   pending before we take a break.
20       A    Okay.
21       Q    And you understand that you're under oath today and
22   must answer questions truthfully and to the best of your
23   knowledge?
24       A    Yes.
25       Q    Is there any reason why you cannot get full, complete,

Page 12

1    or accurate testimony today?
2        A    No.
3        Q    You first ran for congress during the 2020 cycle; is
4    that right?
5        A    No.
6        Q    Oh, okay.  Well, when -- when did you first run for
7    congress?
8        A    In the 2018 cycle.
9        Q    Okay.  And was that in the Florida 1st, or was that a
10   different?
11       A    It was a Florida 1st.
12       Q    Florida 1st.  Okay.
13       And you -- and who was your -- who was the Republican
14   running in that race?
15       A    Matt Gaetz.
16       Q    Okay.  And then you ran again against Matt Gaetz
17   in 2020; is that right?
18       A    Yes.
19       Q    Okay.  That was also in Florida's 1st?
20       A    Yes.
21       Q    And in the 2020 race, Grassroots Analytics helped your
22   campaign with fundraising services; is that right?
23       A    Yes.
24       Q    Was Grassroots Analytics also involved in the 2018
25   race?

Page 13

1        A    Not that I recall.
2        Q    Do you know what services Grassroots provided to your
3    campaign in the 2020 congressional campaign?
4        A    Vaguely.  I understood it to be call lists.
5        Q    Call lists?
6        A    That's what I understood it to be.
7        Q    Okay.  And what's the basis of your understanding?
8    How did you come to that understanding?
9        A    Conversations with my campaign manager.
10       Q    Who was your campaign manager at that time?
11       A    I had two campaign managers in the 2020 race, and the
12   last one would have been the one that was my source, Keith
13   Presley.
14       Q    Okay.  And when you say "call lists," do you mean
15   lists of potential donors for you to do call time with, or do
16   you mean something else?
17       A    That's what I mean.  Lists of potential donors that I
18   do call time with is my understanding.
19       Q    Do you know whether Grassroots helped with text
20   message fundraising in the 2020 cycle?
21       A    I just don't know.
22       Q    And the call list, as you -- to the best of your
23   knowledge in 2020, are those lists that Grassroots provided you,
24   and then you made those -- you knew the identities of the
25   donors; they gave you information, things like that?  Or do you

4 (Pages 10 to 13)

Page 14

1  know how it worked?
2      A   We were using -- I was using an interface called
3  CallTime.AI and call -- donors and their contact details were
4  uploaded on that interface.  That's what I used.
5      Q   Okay.  And were you satisfied with the fundraising
6  services that Grassroots provided to your campaign in 2020?
7      A   To the extent I knew that their services, I had no
8  reason to be dissatisfied.
9      Q   You made a sworn statement in August of this year
10 saying you thought that they provided good service in your 2020
11 campaign.  Do you stand by that?
12     A   I do.
13     Q   And in that same statement, you said you encouraged
14 David Keith and Jake Briggs in the 2024 campaign cycle to
15 consider Grassroots seriously; is that accurate?
16     A   Yes.
17     Q   Did you work with any other companies or organizations
18 to help with fundraising during your 2020 campaign?
19     A   Thinking.  Not that I recall.
20     Q   You launched your U.S. Senate campaign challenging
21 Rick Scott on or about July 17th, 2023.  Does that sound right?
22     A   Yes.
23     Q   And at the time you launched, did you have any
24 full-time campaign staff?
25     A   I had the full-time services of David Keith and Jake

Page 15

1  Briggs and those are my two full-time -- what I perceived to be
2  full-time.  They might have had other things going on, too.
3      Q   Were they employees or were they consultants?
4      A   Consultants.
5      Q   And was that also --
6      A   When I use the word "staff," I use it in a very broad
7  sense, a loose sense, from my perspective, of people who are
8  helping me, who are not volunteers.
9      Q   People your campaign is paying for services, whether
10 they're employees or consultants, or were they all consultants?
11     A   Let me just restate that when I say "staff," I mean
12 people who were not volunteers helping the committee.  And those
13 two were consultants.  And in the 2024 cycle, we didn't have any
14 employees in the way I would think about employees with
15 employment law.
16     Q   W-2s --
17     A   No W-2s.
18     Q   -- versus 1099s or --
19     A   No W-2s.
20     Q   -- yeah.
21     A   That I remember.
22     Q   Do you remember -- for David Keith, do you know
23 whether you hired him specifically, or did you hire the firm
24 that he worked for and they supplied David Keith?
25     A   Well, there was no contract.  I was introduced to

Page 16

1  David Keith; he was introduced to me.  And we had a discussion
2  and he said he would be there to help launch the Senate
3  campaign.
4      So I don't know if I answered that directly, but I didn't
5  know whether I was hiring him as a person or him as his company.
6      Q   Did you make the decision to hire David Keith?
7      A   I accepted the recommendation of my other colleague,
8  Bill Hyers, who recommended him.  So the answer is yes.
9      Q   Do you know why Bill Hyers recommended David Keith?
10     A   Not completely.  My thought would be that he had
11 worked with David Keith before and that he was good, competent,
12 and professional at what he does.
13     Q   And experienced?
14     A   And experienced.
15     Q   Was that your impression of David Keith once you
16 started working with him?
17     A   Yes.  Very aggressive and wanting to get things done.
18     Q   Did that align with your view of what your strategy
19 should be in that campaign?
20     A   It aligned with what I believed at the time to be
21 necessary to launch a viable Senate campaign.
22     Q   And you said that Bill Hyers introduced you to David
23 Keith and recommended him.  Did you ultimately make the decision
24 to bring David Keith on as a consultant to your campaign?
25     A   Oh, yes.  Bill Hyers was a friend and colleague from

Page 17

1  the 2020 campaign.  You might also want to know that David Keith
2  reminded me, at our first meeting, that we had met each other
3  previously, either in the 2018 or the 2020 cycle.
4      When I visited Washington and was visiting different
5  people, he and I and another consultant had a coffee together.
6  But I didn't recognize that until he brought it to my attention.
7      Q   You have said in interrogatory responses and
8  declarations that you've submitted in this case that you relied
9  on David Keith to sort of monitor day-to-day operations of the
10 campaign.  Is that accurate?
11     A   Absolutely.
12     Q   And you trusted him to do that?
13     A   I trusted him to do that based on him being a
14 professional campaign person.
15     Q   And how about Jake Briggs?  Who made the decision to
16 hire Jake Briggs?
17     A   David Keith introduced him and said he was going to be
18 helping me with call time -- start call time, meaning donor
19 calls.  So David Keith made that decision and I accepted it.
20     Q   David Keith made a recommendation and you agreed.
21     A   Well, David Keith said, "Here's the person that's
22 going to help you with calls."
23     Q   Okay.
24     A   And I accepted that decision, so I would view that as
25 David's decision that I accepted.

5 (Pages 14 to 17)

Page 18

```
 1      Q   Did you interview Jake Briggs?
 2      A   This was all done remotely.  I was introduced to Jake
 3  Briggs when I was in Europe, before coming back to Florida to
 4  run.  The introduction was a conversation.  It wasn't labeled an
 5  interview.  After the conversation, I forget whether it was Bill
 6  or David, probably David, said, "Okay, he's part of the team,
 7  let's go," or something to that effect.
 8      Q   Do you know whether your campaign was paying Jake
 9  Briggs directly or paying a consulting firm that Jake Briggs
10  worked for?
11      A   At the very beginning, I wasn't sure.  But as time
12  went on within the Senate campaign, I know that we were paying
13  him directly.
14      Q   What about during the congressional campaign that
15  started in October of 2023?
16      A   Would have been the same.  However, I say that with a
17  little bit of caution because I wasn't doing the actual
18  payments.  Our compliance firm was doing the payments, so I
19  wasn't watching which bank account it went to.
20      With the exception of the times when Jake would be wanting
21  his pay, it hadn't come.  This is later on in the congressional
22  campaign.  And I got involved with getting loans, personal loans
23  to the campaign to be able to pay him.
24      Q   The compliance firm that you mentioned, is that Katz
25  Compliance?
```

Page 19

```
 1      A   Katz Compliance, yes.
 2      Q   Did you ever work with any other compliance firm
 3  during the 2024 cycle, either the Senate or the congressional
 4  campaign?
 5      A   Yes.  So after Katz Compliance, we worked with, I
 6  believe, SB Solutions Consulting out of Tallahassee.
 7      Q   Do you remember what dates that would have been?
 8      A   Not without looking at records.
 9      Q   Okay.  And we talked a minute ago about how you had
10  made a state -- made sworn statements in this case that you
11  relied on David Keith to help monitor day-to-day goings-on of
12  the campaign, including Grassroots Analytics' performance.  And
13  you said the same about Jake Briggs; is that an accurate
14  statement?
15      A   I wouldn't say help monitoring.  I'd say execute.
16      Q   And you've mentioned Bill Hyers.  Was Mr. Hyers ever
17  formally affiliated with your campaign?
18      A   Only in so much as his company produced the launch
19  video for the Senate campaign.
20      Q   What company was that?
21      A   The Win Company, W-I-N Company.  And we -- the
22  campaign paid the Win Company, from what I recall, for that
23  launch video.
24      Q   Okay.  But Bill Hyers was not an ongoing paid
25  consultant to the campaign?
```

Page 20

```
 1      A   Correct.  He was an ongoing presence, but not on a
 2  day-to-day basis, to my knowledge.  He acted very much during
 3  the Senate campaign -- he acted very, very much as he acted on
 4  my 2020 Congressional campaign, my 2020 campaign, which was a
 5  kind of a leader or a mentor of consultants.  Consulting without
 6  me around.  Because that's what consultants do.  They work as a
 7  team to get things done.
 8      Q   He was a resource.
 9      A   He was a resource and a senior consultant, an unpaid
10  senior consultant.
11      Q   Is that how you think he would describe himself, as a
12  senior consultant on your campaign?
13      A   He may -- he may also -- he might -- in the 2020
14  campaign, he was a media consultant.  We didn't get to a point
15  when we were talking about that.  He was just there to provide
16  and produce videos, very good ones.  And, should we have needed
17  commercials or other commercial video product, I would have gone
18  to him.  But there was no contractual obligation to.
19      Q   So other than the launch video for your 2024 campaign,
20  he was not paid?  He didn't have a paid role on your campaign?
21      A   Correct.
22      Q   And he was not monitoring the day-to-day of the
23  campaign?
24      A   I can't be sure.  My impression is no, he wasn't.  It
25  was -- he has many, many clients all around.  Whereas, David
```

Page 21

```
 1  Keith I perceived to have me and me alone for a while, if not
 2  the whole Senate campaign.  Although, I'm not sure of that.
 3      Q   Okay.  You're aware that your campaign and you have
 4  produced documents in connection with this litigation?
 5      A   Yes.
 6      Q   And we see David Keith and Jake Briggs on many, many,
 7  many of those documents.  We see Bill Hyers only on a very small
 8  number of those documents.  Does that sort of sound right in
 9  terms of their day-to-day role in the case?
10      A   Yes, it does.  Yeah.
11      Q   Other than David Keith and Jake Briggs, did you have
12  anybody else who was, at any point during the 2024 cycle, who
13  was working full time or close to full time, in your
14  understanding, on your campaign?
15      A   Yes.
16      Q   And who is that?
17      A   We had several.  So we had two financial finance
18  assistants, also known as call-time managers, Joanna Fleming and
19  Jonathan Rowan.  I will not spell that without looking at his
20  name.  We had -- and they were helping full-time.
21      Q   Okay.
22      A   And that was -- my mind is going through the
23  chronology here, starting with the Senate.  Then we had, for a
24  time, a press officer, Mr. Zielinski.  Graeme is his first name.
25  And I think all this is also -- well, these names anyway, are
```

Page 22

1  written by or provided by interrogatory responses.  But there's
2  Graeme Zielinski.  He brought on somebody else who was working
3  with him, but it was part-time so that didn't count.  It doesn't
4  answer your question.
5       I should say other full-time in the Senate.  I don't recall
6  another full-time in the Senate.  There might have been until
7  Mr. Umunna came on board right toward the end of this.  And
8  Mr. Umunna, first name Obi, joined right at the end of the
9  Senate campaign and was, therefore, involved in helping to make
10  the transition.  His role was a political role.
11      There was also, right toward the end of the Senate
12  campaign, another finance consultant.  And I'm not sure if he
13  was full-time with us or not.  He didn't really appear to be.
14  So I guess that isn't part of your question.
15      Q    What was his name?
16      A    Lawler.  Last name Lawler, L-A-W-L-E-R.
17      Q    Okay.
18      A    And then that -- that, that leads up to the end of the
19  Senate campaign from what I recall.  And again, I'm not looking
20  at lists and stuff so I don't think I'm missing anybody.
21      Going into the House campaign.  We had some people
22  leave -- oh, I'm sorry, the Senate campaign -- we had -- well,
23  Aaron Parnas as well but not full-time.  I don't think.  I think
24  he was very part time so.
25      Q    And then into the congressional campaign?

Page 23

1       A    Thinking.  Yeah, no new people on a full-time basis.
2  We had another financial consultant come in and out but very
3  briefly.  It wasn't until May or springtime when some of these
4  people left and Vanessa Brito came on full-time as a call-time
5  assistant or finance assistant, call-time manager, with a view
6  that she would move into more responsibility as time went on.
7  But that was -- when was that -- that was spring or 2024.
8       Q    Do you remember what month that was?
9       A    Not off the top of my head.
10      Q    Okay.  Were any of these people -- well, I think,
11  you've already answered this -- but just so the record is clear.
12  None of these people were ever employees of the campaign; is
13  that correct?
14      A    That's correct.
15      Q    Some of these people were sort of full-time or close-
16  to-full-time consultants, and others were more periodic
17  consultants?
18      A    Correct.
19      Q    You said that Mr. Umunna's role was a political role.
20  What do you mean by that?
21      A    He was a political advisor.  He was brought on
22  specifically by David Keith to help me with the African American
23  interactions and engagement.
24      Q    Did he ever -- he is also a lawyer; is that right?
25      A    He is a lawyer.

Page 24

1       Q    But he was not serving as counsel to the campaign?
2       A    Most of the time, no.  There were discussions when we
3  brought him in to talk about compliance issues, and he provided
4  some legal advice.
5       Q    Okay.  And how about Aaron Parnas?  What was his role,
6  to the best of your knowledge?
7       A    I'm very clear about Aaron Parnas' role because it was
8  very limited to social media.
9       Q    Okay.  He was not full time on the campaign?
10      A    I didn't -- I didn't --
11      Q    As far as you know.
12      A    -- as far as I know, no.  And I didn't really care
13  whether he was.  I cared that the social media got out, and to
14  the best of my knowledge, he delivered.
15      Q    Okay.  And Ms. -- I'm sorry, is it Brito or --
16      A    Brito.
17      Q    Brito.  Okay.  At some point, she began as call-time
18  manager, finance assistant, you said.  Was that her role the
19  entire time working on your campaign, or did she at some point
20  have another role?
21      A    At some point she had another role.  That role was
22  campaign manager.
23      Q    Do you remember when that became -- when her role
24  switched to campaign manager?
25      A    Precisely when Mr. Briggs -- when Mr. Umunna left the

Page 25

1  campaign, it was left with Mr. Briggs and Dr. Brito, and then a
2  decision needed to be made about who was going to manage.
3       But prior to Mr. Umunna leaving -- let me back up and just
4  say the same thing I've said in the interrogatories:  When we
5  transitioned from the Senate campaign to the House campaign, I
6  needed a manager.  I didn't have one.  Mr. Umunna and Mr. Briggs
7  were there, and I charged them to both jointly manage the
8  campaign.  That arrangement maintained the committee's chain of
9  command, so to speak.  The leadership of the campaign was those
10  two jointly.  And when Mr. Umunna left because he was hired away
11  by the Biden campaign, I made a decision for Dr. Brito to be the
12  campaign manager.
13      Q    Okay.  And just so I have it -- the chronology clear.
14      A    Okay.
15      Q    Your Senate campaign was roughly July 17th until
16  October 17th or somewhere around that?
17      A    I think that's --
18      Q    Pretty much exactly right.
19      A    Pretty much exactly right.
20      Q    If Politico's articles are accurate then that's sort
21  of the time line I've got.
22      A    I think that would correspond with my FEC filings as
23  well.
24      Q    Okay.  And when you were running the Senate campaign
25  in the July-to-October period, did you have a formal campaign

7 (Pages 22 to 25)

Page 26

```
 1    manager, or just the collection of people we talked about, who
 2    were sort of serving those functions, but no one was sort of
 3    designated as your campaign manager?
 4        A    David Keith was, in my view, the manager.  We didn't
 5    call him the manager, but he performed all the functions of a
 6    manager, including HR, hiring coordination of the other
 7    consultants, and guidance and direction on a near day-to-day
 8    basis about what I would do as the manager or as a candidate.
 9        You know, his voice and his direction was what Mr. Briggs
10    responded to and what I responded to and what everybody else
11    responded to, with the exception of Bill Hyers, who was just
12    kind of not around most of the time.
13        Q    Okay.  Is there anybody else who we haven't talked
14    about yet, who was playing sort of a meaningful, not just an
15    occasional phone call here or there, but really sort of part of
16    your campaign that we haven't talked about yet?
17        A    On a senior-level or managerial-level?
18        Q    Not a volunteer, you know, people who were sort of
19    meaningfully involved in your campaign on a routine basis that
20    we haven't talked about yet.
21        A    Toward the end of the campaign we had some field
22    workers, but I don't think your question means that.
23        Q    I'm asking more about people who are sort of serving
24    in an advisory role or a managerial role.  I mean, I would
25    include people like and Aaron Parnas who were sort of directing
```

Page 27

```
 1    pieces of the campaign.  Not -- I don't mean only people who
 2    were sort of sitting on top of everything but.
 3        A    I think we covered it.
 4        Q    Okay.
 5        A    And, you know, that social media is -- he was more of
 6    the wag of the tail rather than anything else.
 7        Q    Okay.  And at some point during this litigation, you
 8    retained Mr. Press to represent you in your personal capacity;
 9    is that right?
10        A    In the full course of this litigation, as we sit here
11    today?  Yes.
12        Q    Do you remember when that was?
13        A    Yes.  To the best of my knowledge, it was when the
14    court ruled that I would be subject to this lawsuit as an
15    individual.
16        Q    Do you remember time frame when that was?
17        A    So last three or four months, I think -- and what is
18    it?  It's October now.  Yeah.
19        Q    And to the best of your recollection, before that
20    ruling, you were not represented in this case?
21        A    Not as an individual, no.
22        Q    What is Rob -- who is Rob Ross?
23        A    Rob Ross is an attorney who was providing legal advice
24    for my campaign at a certain point.
25        Q    Was he engaged by your campaign to provide legal
```

Page 28

```
 1    advice?  What was the arrangement there?
 2        A    The arrangement was all oral, nothing written.  The
 3    arrangement was that he was a volunteer, pro bono.  He has lots
 4    of experience in campaigns for most of his professional career,
 5    as I understood it.
 6        Q    Has Rob Ross ever represented you in your personal
 7    capacity?
 8        A    No.
 9        Q    Do you know if Rob Ross is licensed in D.C.?
10        MR. PRESS:  I'm sorry, I didn't hear you.
11    BY MS. ALI:
12        Q    Whether he's licensed to practice in the District of
13    Columbia?
14        A    To my understanding, from what he told me, no.
15        Q    Do you know roughly what dates Rob Ross was
16    representing the campaign in a volunteer pro bono capacity?
17        A    Rob Ross was helping the campaign in a pro bono
18    attorney capacity when I asked him in October.
19        MR. PRESS:  Be careful not to disclose the
20    substance of any communications between yourself and
21    Mr. Ross.
22        THE WITNESS:  Okay.
23        MS. ALI:  And I'll just add to that:  At any
24    point when Mr. Ross was acting as a lawyer -- if you had
25    communications with him before he was sort of formally
```

Page 29

```
 1    providing legal advice, then you can reveal those
 2    conversations?
 3        MR. PRESS:  Well, if they were preliminary to
 4    obtaining legal advice, no.
 5        MS. ALI:  So -- well, let me just ask my
 6    question because --
 7        THE WITNESS:  Okay.
 8        MR. PRESS:  Ask -- rather than get into an
 9    explanation that may be beyond the question.
10        MS. ALI:  Yeah.  My question is really trying
11    to set the bounds of that.
12    BY MS. ALI:
13        Q    So when did Rob Ross become engaged to provide legal
14    advice?  When did you first -- or let me ask it this way:  Who
15    first reached out to Rob Ross to seek legal advice?
16        A    I reached out to Rob Ross.
17        Q    Do you remember when that was?
18        A    On or about October 2023, as the campaign was shifting
19    away from the Senate to the House.
20        Q    And without revealing the substance of those
21    communications, did you reach out to Rob Press in connection
22    with issues that are involved in this litigation or something
23    else?
24        A    Issues involve this litigation.
25        Q    Okay.  And what was the purpose of you reaching out to
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 30

1  Rob Press?
2      MR. PRESS: Okay. Ob- --
3      MS. ALI: I'm trying to establish whether it
4  was to seek legal advice or something else. If it was
5  to seek legal advice, I'm not going to go any further
6  than that.
7      MR. PRESS: If the answer is to seek legal
8  advice, say it that way, and that's that. If it was to
9  ask him for his --
10     MS. ALI: Business advice, strategic advice.
11     MR. PRESS: -- risotto recipe --
12     MS. ALI: Yeah, right.
13     MR. PRESS: -- then you can explain that.
14     THE WITNESS: I reached out to Mr. Ross to
15 understand the legal perspective. So legal advice --
16     MR. PRESS: Then stop.
17 BY MS. ALI:
18     Q  Is Rob Ross continuing to represent the campaign?
19     A  No.
20     Q  When did Rob Ross stop representing the campaign, to
21 the best of your recollection?
22     A  Fairly recently, I'd say three or four months ago.
23     Q  And so it's your understanding that until three or
24 four months ago, Rob Ross had been representing the campaign
25 continuously since October of 2023 or?

Page 31

1      A  I think it would be fair to say, intermittently, not
2  on a continuing basis. But when there was something legal to be
3  discussed, then he would be part of a discussion.
4      Q  And to the extent you can answer without revealing
5  privileged communications, was there some event three or four
6  months ago that caused Rob Ross to no longer be representing the
7  campaign?
8      A  I think that would be getting into legal advice
9  issues.
10     Q  You were involved in searching for documents that
11 might be relevant to this litigation; is that right?
12     A  Yes.
13     Q  And what -- can you just walk me through all the
14 sources that you searched for, potentially relevant documents?
15     A  Yes. I have two primary devices on which I had
16 relevant, discoverable documents: My Apple iPhone and my Apple
17 computer MacBook Pro. And when I went through the discovery
18 requests, I searched on key terms and names -- Grassroots, GA --
19 those things and saw what -- what it was. And I clipped out,
20 specifically from some chats, relevant portions of ongoing
21 discussions and provided them as part of discovery, including
22 emails and text messages.
23     Q  And Signal messages also?
24     A  When I say chat -- okay . Signal messages, text
25 messages, and emails. I have WhatsApp; I checked there. I

Page 32

1  don't believe I found anything there. But on all my devices, on
2  my two devices, I searched in all of the normal ways that I
3  communicated with people.
4      Q  And other than that, did you run searches, do you
5  remember, for particular people's names: David Keith, Jake
6  Briggs?
7      A  Yes.
8      Q  Anybody else?
9      A  Danny Hogenkamp. Anybody -- Aaron Parnas. Everybody
10 that was requested by name, I did a search by their name.
11     Q  Did you have any hard copy files related to that
12 campaign?
13     A  No.
14     Q  The one person who we saw in -- I mean, I don't want
15 to say the only --
16     A  Let me back up to say I did carry a notebook, a
17 binded, you know, flip notebook and that is the only paper
18 copies, and I looked through those as well. And I think I might
19 have produced one screenshot or one page from that that I
20 personally wouldn't have thought answered much, but it had a
21 name on it so there was that.
22     Q  Okay. One of the names that we saw in the documents
23 that we haven't talked about yet is Trent Schacht.
24     A  Aw.
25     Q  Who was he?

Page 33

1      A  Trent Schacht, from my recollection, I didn't have
2  much interaction with him. But I believe him to be an employee
3  of a company called Meadowlark. Yes.
4      Q  Do you know what Meadowlark is?
5      A  It says consultant. One of the consultants that David
6  Keith brought in early on, prior to Grassroots, for fundraising
7  purposes. To my understanding, it's mostly email. It could
8  have been more.
9      Q  In -- to the best of your understanding, did you or
10 your campaign withhold any documents that might be relevant?
11     A  No.
12 Excuse me, for the court reporter. No.
13     Q  And put another way, to the extent any document that
14 you might have found might have been relevant to this
15 litigation, your understanding is that you or the campaign
16 produced it?
17     A  Yes.
18     Q  I'm going to hand you what I'll mark as Exhibit 1.
19 Sorry. Let me mark it.
20         (Exhibit 1 marked for identification)
21     A  Okay.
22     Q  These are -- well, do you recognize these as
23 your -- the campaign's responses and objections to Grassroots'
24 second set of interrogatories? It says in the title page,
25 Plaintiff's Responses and Objections to Defendant's Set of

Page 34

1    Requests for Admissions.
2        But I -- actually, if you look at the actual document, I
3    think these are meant to be the responses to the second set of
4    interrogatories.
5        MR. PRESS:  I will say they are.
6        MS. ALI:  Okay.
7        MR. PRESS:  And it actually says that in the
8    text and I apologize for the title.
9        MS. ALI:  Just trying to make the record clear
10   as to what we're looking at.
11   BY MS. ALI:
12       Q    You see the first interrogatory that's listed on this
13   first page is Interrogatory Number Four.  Do you see that?
14       A    I do see that.
15       Q    And if you flip to the very back page, do you see your
16   signature there?
17       A    I see my electronic signature, yes.
18       Q    And this says, I declare under penalty of perjury the
19   foregoing is true and correct to the best of my knowledge, and
20   it's executed on August 20th, 2025.  Do you see that?
21       A    I do.
22       Q    Okay.  Let's flip to Interrogatory Number Five.  The
23   question starts at the bottom of the first page and goes on to
24   the second page.  And this was a question about formal
25   statements that the campaign had attempted to take.  I'm not so

Page 35

1    interested in the statements piece of this.  I'm curious who Jim
2    Kottmeyer is, if you know.
3        A    I don't know him personally.  I know I understand him
4    to be, as stated here, with GPS Impact, which I also understand
5    him to be the parent company of Meadowlark.
6        Q    And this says "Jim Kottmeyer, GPS Impact - In or
7    about 2024, Vanessa Brito, on behalf of the campaign, contacted
8    Jim via phone to clarify David Keith's role in requesting lists
9    and executing/approving fundraising activities."  Do you see
10   that?
11       A    I do.
12       Q    What does that mean or what -- what's going on here?
13       A    What's going on here is that we understood
14   that -- well, we had -- there was, I believe, an email that we
15   probably produced, that had Mr. Kottmeyer referenced as -- what
16   did he do?  He was concerned about Meadowlark's compensation for
17   their services with the campaign.
18       Q    Jim, who was at Meadowlark's parent company, as you
19   understand it is, was concerned about Meadowlark getting paid for
20   services they provided to your campaign?
21       A    Yes.
22       Q    And when you -- when it says here, "contacted Jim via
23   phone to clarify David Keith's role in requesting lists and
24   executing/approving fundraising activities," why would
25   Meadowlark or GPS or Jim Kottmeyer have information about David

Page 36

1    Keith's role in requesting lists and executing or approving
2    fundraising activities?
3        A    There was a discussion about Meadowlark and Grassroots
4    working together and how that was happening during -- yeah,
5    that's.
6        Q    Is it your understanding that Meadowlark and
7    Grassroots did work together on your 2024 campaign?
8        A    It's my understanding, not real-time during the
9    campaign, that is my clear understanding after having seen
10   emails between those two companies that was produced in
11   Discovery Mr. Keith's discovery.
12       Q    Can you describe the kinds of emails that you're
13   talking about?
14       A    Well, it's in the record but what I recall of the
15   email that I'm thinking about is discussion between or among
16   David Keith, Meadowlark staff, and Grassroots Analytics staff.
17       Q    About what?
18       A    About Meadowlark and Grassroots working together on a
19   fundraising activity and some problems that they were trying to
20   work out that they identified and were trying to work out.
21       Q    Do you remember when those communications took place?
22       A    It would have been -- no, I don't remember.  I don't
23   remember.  I can speculate but I can't remember.
24       Q    Without speculating, do you remember whether it was
25   your Senate campaign or the House campaign?

Page 37

1        A    It makes sense that it was the Senate campaign.  But a
2    little bit of that is speculation because I didn't see it as it
3    was going on.  I'm remembering it from the Discovery.
4        Q    In this case, David Keith left around the time that
5    you ended the Senate campaign and launched the House campaign --
6        A    Correct.
7        Q    -- is that right?  Does that refresh your memory if
8    David Keith was on these --
9        A    Right --
10       Q    -- communications?
11       A    -- and so I'm deriving the answer rather than
12   Anything else.
13       Q    Okay.
14       A    If David Keith was on those emails, and I recall he
15   was, it would have been prior to his departure, which would have
16   been the Senate campaign.
17       Q    Okay.
18       A    But again, I'm deriving that without having looked at
19   the record that is in this case.
20       Q    Are the emails you're remembering and talking about,
21   emails about, like, an NGP VAN token?  Does that sound familiar,
22   or are you talking about something else?
23       A    I think I don't know.
24       Q    Okay.
25       A    Yeah.  I don't know when that type of detail is

Page 38

1  starting to be discussed.  I don't really know.
2     Q.  Okay.  And this -- the second sentence of Paragraph
3  One, in response to Interrogatory Number Five says, "during this
4  call Jim stated he would provide an email regarding the
5  agreement David Keith made with GPS Impact (Meadowlark)."  Do
6  you see that?
7     A.  I do.
8     Q.  Did Jim ever provide that email?
9     A.  And to the best of my knowledge, no.
10    Q.  Do you have any information about the agreement David
11 Keith made with GPS Impact that's referenced here?
12    A.  Let's read this first sentence again.
13 Please restate your question.
14    Q.  The second sentence is talking about an agreement that
15 David Keith made with GPS Impact.  Do you have any information
16 about what that agreement was or?
17    A.  I don't.
18    Q.  Okay.  Did you know -- did you have any knowledge that
19 David Keith had made an agreement with GPS Impact until this
20 phone call with Jim Kottmeyer?
21    A.  Only insofar as David Keith arranged for Meadowlark
22 Services.
23    Q.  Okay.  And then the second paragraph, or the numbered
24 paragraph two, in response to Interrogatory Number Five, refers
25 to the use of Sterling as a vendor.  Do you know what

Page 39

1  Sterling is?
2     A.  I don't.
3     Q.  Okay.  I don't -- that doesn't sound familiar.  This
4  is the only place I've seen that, so I wasn't sure what -- does
5  that have something to do with GPS impact; do you know?
6     A.  I don't.
7     Q.  Okay.  Does Sterling sound familiar to you?
8     A.  Yes.  I know it was brought up in conversation as we
9  looked into this case and what happened.  But I don't know what
10 their contribution was.
11    Q.  Okay.  And it says here that Dr. Brito sent a follow-
12 up email to Jim requesting copies of communications regarding
13 (b) David Keith's request for GPS impact to front or loan funds
14 for list acquisition.  Do you know what that's referring to?
15    A.  That is referring to -- referring to a discussion that
16 was had again while we were figuring out what was going on after
17 the Senate campaign.  And that's all I know.
18    Q.  Do you know whether David Keith made a request for GPS
19 impact to front or loan funds for list acquisition?
20    A.  Not by my direct observation.  No.
21    Q.  Do you know what is being referred to here by list
22 acquisition?
23    A.  It would be hearsay about what David Keith or legal
24 advice or Dr. Brito uncovered during her investigation of what
25 happened.  And I accepted that and put this in this response

Page 40

1  to you.
2     Q.  Do you know what list acquisition means?
3     A.  In broad terms, I'm not an industry expert, but in
4  broad terms, I think, it means just what it says:  Acquiring
5  lists of things that are relevant to donors.  Beyond that, you
6  know, there are all kinds of things that could be going into,
7  like, the extent of the list that I don't know.
8     Q.  Okay.
9     A.  Elements of the list, et cetera.
10    Q.  Did you have a fundraising strategy in place at the
11 time that you launched the Senate campaign?
12    A.  The committee did not have any fundraising strategy in
13 place except for the advice and execution that David Keith
14 brought to the table.
15    Q.  You were -- the campaign was relying on David Keith to
16 use his expertise to come up with a fundamental strategy?
17    A.  Absolutely.  Yes.  And that was his core purpose to
18 launch the campaign.  To launch the campaign required finances
19 and other things, but it was primarily finances.
20    Q.  And did that fall within David Keith's purview,
21 including text message fundraising?
22    A.  I assumed so.  In retrospect, as we sit here today,
23 the answer is clearly yes.
24    Q.  Okay.  I will hand you what I'll mark as Exhibit 2.
25 Do you recognize this email?

Page 41

1        (Exhibit 2 marked for identification)
2     A.  I recognize my name as the subject as the to-line and
3  I see two people from Grassroots Analytics.
4     Q.  Okay.  So the first email on the chain is a
5  July 10th, 2023, email from Katiana Person at Grassroots
6  Analytics.  Do you see that?
7     A.  Trying to --
8     Q.  It's sort of in --
9     A.  -- see which one --
10    Q.  -- reverse order.
11    A.  So the bottom is the first one.
12    Q.  Bottom is the first one.
13    A.  So there are three emails here.  Okay.  The bottom one
14 is 4:10 p.m. on the 10th.
15    Q.  And this is somebody from Grassroots Analytics.  Do
16 you recognize the name Katiana Person?
17    A.  I don't recognize the name.  I recognize the incident
18 or the event that she is describing.
19    Q.  And she's memorializing the fact that she met you at
20 Florida Leadership Blue the weekend before; is that right?
21    A.  I do remember meeting two women who -- at Leadership
22 Blue from Grassroots Analytics.
23    Q.  And she says here, "I wanted to reach out and see if
24 you would like to discuss more about your soon to be launch
25 date.  I'd be happy to go over our services and see how we may

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 42

1    be able to work together." Do you see that?
2        A   I do.
3        Q   And then you responded, it seems like very close in
4    time to that email. Do you see that?
5        A   I do. 4:16 p.m., six minutes later.
6        Q   And you said, "Hi, Katiana. Thanks. It was a
7    pleasure meeting you and your colleague. My finance team is
8    highly experienced and also likes your product. They will reach
9    out when the need arises." Do you see that?
10       A   I do.
11       Q   And she says a couple minutes later, it looks like,
12   let me -- "Sounds good! Let me know if you have any questions."
13   Do you remember this email?
14       A   Not vividly. I recognize that; I accept it as true.
15       Q   Was it true, you said here, "My finance team is highly
16   experienced and also likes your product." Were you referring to
17   David Keith there?
18       A   When I said that "my finance team is experienced," the
19   answer is yes. I was referring to David Keith and Jake Briggs.
20   When I said that they were -- when they also liked your product,
21   I don't know what I was thinking when I wrote that. Could have
22   been anything.
23       Q   Do you know whether David Keith had used Grassroots
24   Analytics' services on other campaigns?
25       A   I don't know. And I would be very comfortable saying

Page 43

1    that at that time during the Leadership Blue Conference, I would
2    not have discussed Grassroots Analytics with David Keith. I
3    might have mentioned it with Jake Briggs. I don't recall.
4        Q   And so when you say also "likes your product," do you
5    know what you were referring to?
6        A   No, I don't.
7        Q   But, presumably, you were making a true statement at
8    that time.
9        A   Presumably.
10       Q   Okay. Any reason to think you were not making a true
11   statement when you said my finance team likes your product?
12       A   I don't recall. There's no reason to -- I don't
13   recall the extent of that. Yeah.
14       THE REPORTER:  Ms. Ali, if you could let me
15   know which document you're looking at. I have a ton of
16   documents and some of them are emails. But I have no
17   way to decipher which one y'all are looking at unless
18   somebody gives me a file name.
19       MS. ALI:  So I will warn you that some of the
20   documents do not have Bates stamps on them. This one
21   does.
22       THE REPORTER:  Okay.
23       MS. ALI:  So I will give you the Bates stamp.
24   This is Grassroots 744. There's a bunch of zeros before
25   that but the last three are 744.

Page 44

1        THE REPORTER:  Perfect. Found it. Thank you
2    so much.
3        MS. ALI:  There are a bunch of Signal messages
4    and text messages that we'll go through that don't have
5    Bates stamps on them. And we can just sort of work
6    together to make sure that you know what I'm looking at.
7        THE REPORTER:  Thank you, ma'am.
8        MS. ALI:  And we're going to look at one of
9    those right now. So I will mark this as Exhibit 3.
10       This is a Signal message that, I think, in the
11   ZIP file that I sent, would have been labeled, something
12   like, four, the number four.
13       I'm talking to the court reporter now.
14       THE REPORTER:  If you could just show the
15   first page, it would be easier. If it's, like, a small
16   black area. I'm looking at a few different ones.
17       MS. ALI:  It's a Signal message that says at
18   top-left, "24 Raising." And then the first part of
19   this is a black box that says, "Hey Phil, this is
20   Danny."
21       THE REPORTER:  Got it.
22       MS. ALI:  Okay.
23       (Exhibit 3 marked for identification)
24   BY MS. ALI:
25       Q   So do you recognize this as a Signal message that you

Page 45

1    or your campaign produced in this litigation?
2        A   I recognize the format. I don't recognize this
3    particular thing but I don't doubt it.
4        Q   Okay. And there's no date on the message, but we had
5    an exchange with Mr. Press where he provided dates that, I
6    think, came from dates and times that came from you. I'll just
7    represent to you that, according to this email exchange I had
8    with Mr. Press, this was a message sent on July -- both of the
9    messages depicted here were sent on July 13th, 2023. Does that
10   sound --
11       A   That sounds --
12       Q   -- basically --
13       A   -- right --
14       Q   -- right?
15       A   -- because it follows this email. It's referencing
16   his staff. It's before we launched.
17       Q   Okay. And this is -- I think what's going on
18   here -- you are sending a screenshot of a text that you received
19   from Danny Hogenkamp at Grassroots to this 24 Raising Signal
20   group. Does that seem right to you?
21       A   That does seem right to me.
22       Q   And do you know who was in the 24 Raising group?
23       A   Yes.
24       Q   Who was that?
25       A   Myself, Jake Briggs, and David Keith.

Page 46

1    Q   To the best of your knowledge, was that true
2  throughout that time, that anytime we see the 24 Raising group at the
3  top of a Signal message, is that the group that was
4  included in --
5    A   To the best of my knowledge, yes.  And only them.
6    Q   So here we see a message that I think was on July 13th
7  at 12:02, and it says, Hey Phil, this is Danny with Grassroots
8  Analytics.  My staff tells me you are running for Senate.  I
9  have been in chats with Debbie and DS about P2P tech tool for
10 them, but I do have some fondness for you from our previous
11 relationship.  I'd love to chat."  Do you remember receiving
12 this message?
13    A   Not vividly but I think I received it.  And the record
14 shows that I received it.  And --
15    Q   Okay.  Go ahead.  I'm sorry.
16    A   And that.  Yeah, looks like I received it.  Yeah.
17    Q   You don't have an independent recollection of
18 receiving it, but you have no reason to doubt that this is real?
19    A   Yes, ma'am.
20    Q   Okay.  And so you -- you send this screenshot to the
21 24 Raising group, and David Keith responds, "Pls send to Trent."
22 Do you see that?
23    A   I do.
24    Q   And do you know who he is directing to send this to?
25    A   That would have been Trent Schacht.

Page 47

1    Q   And who is he saying -- who is he talking to here, to
2  you?
3    A   He was talking -- he would have been talking to Jake
4  Briggs.
5    Q   Okay.
6    A   And the reason he would have been talking to Jake is
7  because my job at this time -- my task at this time was on the
8  telephone calling donors.
9    Q   Okay.  So David is saying send this to Trent and do --
10 to Jake Briggs.  And do you know why he wanted Jake Briggs to
11 send this to Trent?
12    A   No.
13    Q   Okay.  Did you know who Danny with Grassroots
14 Analytics was when you received this message?  I mean I know you
15 don't remember receiving the message.  But do you remember
16 knowing who Danny was at this time?
17    A   No.
18    Q   Okay.
19    A   I can see plain language with def Grass -- I don't
20 know his role within Grassroots Analytics.
21    Q   You didn't see this and immediately know who Danny at
22 Grassroots Analytics was?
23    A   Correct.  There's no association between those two
24 names, the company name, or his name in my mind at that time.
25    Q   Okay.  Did Grassroots Analytics sound familiar to you

Page 48

1  from your 2020 campaign?
2    A   Yes.
3    Q   And you are aware that your campaign then signed a
4  contract with Grassroots Analytics a few days later
5  on July 18th, 2023, for text-message fundraising services; is
6  that right?
7    A   That is right.  After several other intervening
8  communications.
9    Q   I am going to hand you what I'll mark as Exhibit 4.
10 This is another Sig- -- 24 Raising Signal chat screenshot.
11 Oops.  I'm going to give you this version.  Can you hand
12 him that?
13    And so this is on July 17th, 2023.  So a week after the
14 email we just looked at and a few days after the text from Danny
15 Hogenkamp at Grassroots that we just looked at.
16    And here, the first bubble that we see, I think this is
17 again you taking a screenshot of texts coming from somebody and
18 then sending that screenshot to the 24 Raising Signal chat; is
19 that --
20        (Exhibit 4 marked for identification)
21    A   That is correct.
22    Q   And we'll get to what the messages that you
23 screenshotted say in a minute.  But you sent this screenshot
24 along with a note that says, "probably spam," dot, dot, dot; is
25 that right?

Page 49

1    A   That is me.
2    Q   And that's you.
3    And the Signal chat says it's a number at the top, an (802)
4  number that doesn't have a contact so presumably not somebody in
5  your contact list.  And it says, "Phil connect me with your CM!"
6  Is that referring to campaign manager?
7    A   Well, at the time I wasn't -- I remember not clearing
8  that -- knowing that as campaign manager, but I didn't think
9  about it much at all at the time.
10    Q   Okay.
11    A   But that's what it means.
12    Q   And it says, "We could --
13    A   My understanding that's what it means now.
14    Q   And he's saying we could raise you hundreds of
15 thousands today and help you put a big number and keep Debbie
16 out.  Who is the Debbie he's referring to?
17    A   Presumably he's referring to Debbie Mucarsel-Powell --
18 yeah, Debbie Mucarsel-Powell.
19    Q   And who is she?
20    A   She is a former representative in Southern Florida who
21 was thought to be thinking about running for the U.S. Senate.
22    Q   And so when he says, "keep Debbie out," did you
23 understand him to mean preventing a primary challenger?
24    A   Yes.
25    Q   And he says, "We have the entire cell database for

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 50

1   Florida.  They should all get your launch text.  People hate
2   Rick Scott.  And the first Florida senate candidate to connect
3   with all Florida and Val donors wins.  That's how it goes."  And
4   you took -- you read those messages, and you said to Jake Briggs
5   and David Keith, "probably spam;" is that right?
6       A   Yes.  And I note there are -- one, two, three, four,
7   five -- six different messages here pinging on my phone while
8   I'm in donor call time.  That's one reason I said probably spam.
9       Q   And David Keith responds, "Have Jake call them and see
10  who it is."  Do you see that?
11      A   I do.
12      Q   And then in the next screen, we see you screenshotting
13  another set of messages, some of which are duplicates of what we
14  just looked at.  Then there's a couple more messages from him,
15  or whoever this is, saying, "We should conduct a test ASAP
16  today, see your ROI.  don't leave all these, dollar signs, on
17  the table while Debbie is watching your first day fundraising
18  total."  And you screenshot that and said, "This guy texted
19  again.  ...rather aggressive...  good or not-so-good...your
20  call."
21      A   Yes.
22      Q   Okay.  And why did you write "probably spam"?
23      A   Because it's my recollection that over the course of
24  prior campaigns -- I've run for Congress before.  And I'm aware
25  that vendors often contact candidates offering their services,

Page 51

1   and spam might not be the right technical term, but it was
2   solicitation of business.  Solicitation of business and spam as
3   a shorthand for that.
4       Most of the time they are not useful, from my
5   understanding.  And when I have forwarded that to managers in
6   previous campaigns, maybe in this one as well, I viewed that my
7   team, David Keith and Jake Briggs, had everything under control.
8       So this person sent me six there, plus an additional two; I
9   thought maybe they should check it out.
10      Q   He was making a pitch?
11      A   He was making a pitch.
12      Q   You were a little skeptical of it?
13      A   Yes.  And I said but okay.  Check it out.
14      Q   Okay.  I'm going to hand you what I'll mark as
15  Exhibit 5, which is a continuation of the same set of Signal
16  messages.
17      So you're again screenshotting messages that you're adding
18  your own sort of commentary on to the 24 Raising group.  This is
19  also on July 17th, 2023.  And you say to Jake Briggs and David
20  Keith, "Notice this from a couple hours ago.  He may actually be
21  on-side and for real....?  I have yet to acknowledge him, which
22  is bit rude.  Request advise."  What did you mean by that?
23          (Exhibit 5 marked for identification)
24      A   I mean that if he, you know, if he's a legitimate
25  vendor from a legitimate company, you know, it's a bit rude for

Page 52

1   me to just ignore these overtures.
2       Q   Yeah.
3       A   So I acknowledge that.  And it was also a prompt for
4   them to figure out or to, you know, to reach out to him and
5   determine whether we want to use whatever he's offering.  To
6   include, who is he?
7       Q   Right.  And at this point, it seemed like nobody
8   knew --
9       A   I certainly did not --
10      Q   -- he hadn't said who he was?
11      A   -- know who he was.
12      Q   And the messages were looking -- he had identified
13  himself as Danny in a different set of text messages.  But in
14  this block of messages, he had not identified himself; is that
15  right?
16      A   Right.  And I did not know who he was at the time.
17      Q   And it seems from these messages David Keith is
18  saying, what company?  Nobody really knew who he was or what
19  company he was with; is that --
20      A   Nobody, meaning Jake Briggs and David --
21      Q   -- correct?
22      A   -- Keith --
23      Q   Right.
24      A   -- did not appear in this text message to know.
25      Q   Okay.

Page 53

1       A   And I did not know.
2       Q   In the campaign's camp -- in your campaign's complaint
3   against Grassroots in this case, there is an allegation.  It's
4   in paragraph 12 of the complaint that says in June and July that
5   you began to receive solicitations from various campaign vendors
6   at that time.
7       Other than these messages we looked at from Grassroots, do
8   you remember what other campaign vendors you were receiving
9   solicitations from?
10      A   No, I don't.
11      Q   Do you remember that you were receiving solicitations
12  from other campaign vendors at that time?
13      A   I'm sure that I did because I wrote it down.  I don't
14  recall any specifics.
15      Q   Aside from these messages that we just looked at and
16  the email from July 10th with the person from Grassroots, did
17  you communicate personally with anybody at Grassroots before
18  your campaign signed the contract with Grassroots?
19      A   I want to listen to the first part of your question
20  again, please.
21      Q   Let me make it a little bit cleaner:  So we looked up
22  some text messages that you received --
23      A   Yes.
24      Q   -- and as far as I have seen, in the discovery
25  materials that were produced, you didn't personally respond to

Page 54

1    any of those messages?
2        A   Correct.
3        Q   We did see you respond to the July 10th email from
4    Katiana Person at Grassroots.  This is the
5    my-finance-team-is-experienced-and-they-like-your-product email.
6        Other than that collection of communications that we just
7    looked at together, do you remember personally communicating
8    with anybody at Grassroots before your campaign signed the text
9    message fundraising services?
10       A   I do not remember and I'm pretty sure I did not.
11       Q   Okay.  And --
12       A   Let me just add that I viewed Katiana's approach to me
13   and her colleagues' approach to me at the Leadership Blue as a
14   sales team pitch.  And I did not connect them with this until,
15   you know, we're in this process.
16       Q   At the time you weren't thinking, oh, I just met this
17   person, and --
18       A   No.
19       Q   Okay.  And to the best of your knowledge, we see in
20   these texts that it seems like David Keith is saying to Jake
21   Briggs to reach out to him, and Jake Briggs is saying he did
22   reach out to him.  Other than maybe a conversation that Jake
23   Briggs had had with somebody at Grassroots -- and maybe David
24   Keith did -- do you know if anybody else from your campaign
25   spoke with anybody at Grassroots before the contract was signed?

Page 55

1        A   I do not know.
2        Q   Whose decision was it to bring Grassroots on to help
3    with fundraising for your 2024 campaign?
4        A   David Keith's decision.
5        Q   Was it David Keith's decision alone?
6        A   He might have discussed it with Jake Briggs.  But I
7    believe it to be David Keith's decision because my guidance to
8    him was check out this company, and if it makes sense, bring him
9    on.  And that was after he said -- well, I'll just leave it at
10   that.  Yeah.
11       MS. ALI:  Okay.  Why don't we take a short
12   break?
13       THE VIDEOGRAPHER:  Off the record at 10:15.
14       (OFF RECORD)
15       THE VIDEOGRAPHER:  Okay, just a moment, and
16   I'll start us up here on the record at 10:28.
17       MS. ALI:  Okay.  I'm going to hand you what
18   I'll mark as Exhibit 6.
19       And, Dan, I apologize.  I only have -- I realized I only
20   have one copy of this, but it's the July Services Agreement.
21       (Exhibit 6 marked for identification)
22       MR. PRESS:  Okay.  That's fine.
23       MS. ALI:  Yeah, you've seen it.  You have it
24   somewhere.
25   ///

Page 56

1    BY MS. ALI:
2        Q   Do you recognize this as the contract that your
3    campaign entered with Grassroots on or about July 18th, 2023?
4        A   I recognize the front page.  I have no reason to -- it
5    looks familiar as the July Services Agreement.
6        MS. ALI:  And for the court reporter's
7    benefit, this is Bates-labeled GRASSROOTS_00004147.
8        THE WITNESS:  Excuse me.
9        THE REPORTER:  Thank you.
10       THE WITNESS:  Looks like --
11       MS. ALI:  Oh, there are --
12       THE WITNESS:  -- you do have --
13       MR. PRESS:  You do have --
14       MS. ALI:  -- two copies.
15       MR. PRESS:  -- two copies.
16       MS. ALI:  I do have two copies.  Okay.
17       MR. PRESS:  This is number six, right?
18       MS. ALI:  Yes.
19   BY MS. ALI:
20       Q   And you see in the first paragraph of this agreement,
21   it says effective date of July 18th, 2023.  Do you see that?
22       A   I do.
23       Q   And if you flip to the very back page, which is
24   GRASSROOTS_00004146, you see that David Keith signed on behalf
25   of the campaign.

Page 57

1        A   I do.
2        Q   You see his electronic signature there, and that is
3    also dated July 18th, 2023?
4        A   Yes.
5        Q   And he wrote his name and then under title it says
6    General Consultant.  Do you see that?
7        A   Yes.
8        Q   Were you aware that David Keith was executing this
9    contract on the campaign's behalf?
10       A   No.
11       Q   You had no awareness that David Keith was signing a
12   contract with Grassroots?
13       A   Correct.
14       Q   When did you become aware that he had signed this
15   contract?
16       A   Precisely, I don't recall.  But certainly as -- as we
17   were discovering what was going on with Grassroots Analytics in
18   our campaign and Meadowlark as we were -- yeah, at some time in
19   the future.
20       Q   In your interrogatory -- in the campaign's
21   interrogatory responses, which you verified under oath, it said
22   Jake Briggs and/or David Keith reported to Mr. Ehr that
23   Grassroots services were arranged.  Mr. Ehr recalls being
24   pleased that Grassroots services were to begin.
25       A   Yes.

15 (Pages 54 to 57)

Page 58

1    Q    Does that sound accurate?
2    A    That sounds accurate.
3    Q    So you weren't necessarily aware that he had signed
4  this particular contract, but you were aware that Grassroots was
5  coming on board to help with fundraising?
6    A    That is correct.
7    Q    And this is also where you say that you relied on
8  Mr. Briggs and Mr. Keith to monitor Grassroots' performance?
9    A    Monitor and arrange, monitor and do whatever else is
10  necessary.
11    Q    Okay.  And then there were a lot of discovery requests
12  in this case.  In response to requests for admission to the
13  campaign, the campaign admitted that in July 2023 Philip Ehr was
14  aware that the campaign had executed an agreement with
15  Grassroots.  Do you recall that?
16    A    Yes.
17    Q    Okay.  And that's accurate?
18    A    Yes.
19    Q    Have you ever read this contract?
20    A    Yes.
21    Q    When was that -- when -- when do you remember reading
22  it for the first time?
23    A    It would have been either late 2024 -- excuse me --
24  late 2023 or in 2024 leading up to current proceedings here.
25    Q    Do you understand that the contract your -- this

Page 59

1  contract that your campaign signed -- I know there were several
2  contracts with Grassroots Analytics -- but this one was for text
3  message list rentals.
4    A    You say, do I know that now?
5    Q    Yes.
6    A    I don't know the full extent of the contract as we sit
7  here today.  It makes sense that it was text messaging services.
8    Q    Okay.  But do you, as we sit here today, understand
9  that the services that Grassroots Analytics agreed to provide to
10  the campaign were text message list rentals, not list purchases?
11    A    I don't -- I don't -- I don't have that in forefront
12  of my mind.  What I have in forefront of my mind is text
13  fundraising services, whether it's rentals or list acquisitions,
14  is -- is -- we could look at it together but.
15    Q    Okay.  You would have expected David Keith to sort of
16  have an understanding of what the services were and to be
17  arranging for that and monitoring that?
18    A    Absolutely.
19    Q    Would you agree that your campaign's fundraising
20  strategy, at least in the early days of your Senate campaign,
21  was to be as aggressive as possible?
22    A    I agree.  That's what David Keith portrayed,
23  recommended, and executed on behalf of the campaign.
24    Q    And you understood that at the time?
25    A    Yes.

Page 60

1    Q    That the strategy was to be quite aggressive?
2    A    That's what he articulated and that's all I know.
3    Q    And was part of the motivating force behind that
4  aggressive strategy to try to stave off a primary challenge from
5  Debbie Mucarsel-Powell?
6    A    That's what he recommended and so I knew that that was
7  the goal of the fundraising portion of our launch strategy.
8    Q    And you attended David Keith's deposition; is that
9  right?
10    A    Parts of it.  I was in and out.  It was a remote.
11    Q    Okay.
12    A    Parts of it.
13    Q    Do you recall David Keith testifying and looking at
14  texts and emails with Grassroots where he was pushing Grassroots
15  to be aggressive in the strategy?
16    A    I don't recall.  I don't doubt it but I don't recall.
17    Q    Well, I can show you them and we can look at them
18  together.  So I will hand you what I'll mark as Exhibit 7.
19        And this is an email chain.  The first page is
20  Bates-labeled GRASSROOTS_00002247.  If we go to flip through to
21  page 2262 toward the end -- or I'm sorry -- 2263 toward the end.
22              (Exhibit 7 marked for identification)
23    A    Okay.
24    Q    Tell me when you're there.
25    A    I'm there.

Page 61

1    Q    We see -- the way that these emails were produced, we
2  can't always see who's receiving the emails unless you look at
3  the very first email in the chain.  But we see some emails from
4  Danny Hogenkamp at Grassroots Analytics and David Keith is
5  responding to those.
6        There may be other people copied on those, but do you see
7  Monday, July 17th, for example?  Danny says, "We'll follow up in
8  the morning with various copies and our plan and get sending as
9  soon as you approve."
10    A    I see July 17th in three different locations.  So
11  where are we?
12    Q    I'm in the middle of the page, the email from Danny.
13    A    Okay.  At 9:46 p.m.
14    Q    9:46 p.m.
15    A    Okay.
16    Q    He seems to be responding to an email from Trent
17  Schacht, if you see that.
18    A    I do below.  Okay.  So it's --
19    Q    It's going --
20    A    -- sequentially up.
21    Q    -- yes.  Sequentially.
22        And then above that, we have a 9:48 p.m. email from David
23  Keith saying, "I will approve very quickly as long as there are
24  no typos."  Do you see that?
25    A    I do.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 62

1    Q    And there's sort of some more back and forth.  Take
2    the time you need to read whatever pieces of this you want to
3    read.  But we see at the very bottom of what's labeled
4    GRASSROOTS_00002262, we see an email from Diego Dew, who is
5    another Grassroots person, saying, "Hi David, I just sent the
6    services and data licensing agreement over via DocuSign.  To
7    confirm, did the team want to start with a $5K test?  We can test
8    out a couple different audiences depending on copy."  Do you
9    see that?
10    A    I do.
11    Q    And then we see David Keith responding to that email
12    the next morning, July 18th, 2023.  And David Keith says, "I am
13    happy to go much larger with a test than that as long as we have
14    the 30 day invoice policy in place."
15    And in the next sentence, he says, "please work with Trent
16    and Megan to ensure we are testing everything we can.  i want to
17    scale everywhere possible, as Daniel knows."  Do you see that?
18    A    I do.
19    Q    And is that sort of consistent with the strategy, as
20    you understood it, to be aggressive in the early days of the
21    campaign?
22    A    I recognize these sentences as being aggressive.
23    Q    Okay.  And who is Trent?  I assume it's Trent Schacht
24    that he's talking about.
25    Who is Megan?  Do you know?

Page 63

1    A    So I also assume Trent is Trent Schacht.  And I do
2    know of a Megan at Meadowlark with whom I was working.
3    Q    Okay.
4    A    On -- she -- yeah, who I was working with.
5    Q    Do you remember her last name?
6    A    Not off the top of my head.
7    Q    Okay.  And there's some more back and forth about
8    where Grassroots is proposing sort of different strategies for
9    testing different kinds of messages with different kinds of
10    audiences.  We see David Keith/
11    A    Where are you?
12    Q    I'm in the middle of the page on 2262.
13    A    Okay.
14    Q    And David Keith says, "From my point of view, lets go
15    hard and aggressive.  Phil Ehr is a great profile against Scott
16    and all the other insane senators/gop people."
17    And then we see above that it looks like the contracts were
18    signed.  And Diego from Grassroots is saying, "We should be on
19    track to launch by noon eastern."  Do you see that?
20    A    I see that.
21    Q    And then, if we skip ahead -- so does that -- and I
22    will represent to you that the first text messages that
23    Grassroots sent out did go out on, maybe, midday or afternoon of
24    July 18th, 2023.  Does that sound familiar to you?  You'll take
25    my word for it?

Page 64

1    A    I'll take your word for that.
2    Q    Okay.  And then if we flip, if you sort of keep
3    flipping, like, the numbers and the Bates are going down toward
4    the front of the chain.  We see different versions of copy being
5    sent by people at Grassroots for folks at your campaign to
6    review and approve.  Do you see that?
7    It sort of starts on 2259 on July 18th.  We have an email
8    from David Davies saying, "Please see below for three proposed
9    versions of copy.  Let us know if you have any edits or if these
10    are approved.
11    A    If I'm on GRASSROOTS_00002259, then read down.
12    Q    Right.
13    We're seeing over the next few pages just a few versions of
14    copy that Grassroots was proposing to use as a text message
15    send.  Do you see those?  It says --
16    A    At version --
17    Q    -- version one.
18    A    -- one it would be -- it's a blank square with
19    something small.
20    Q    This is a -- the substance of it is not so important
21    for purposes --
22    A    Yes.
23    Q    -- right now.
24    A    I agree.
25    Q    You see that there's sort of different versions of

Page 65

1    copy being sent around.  If you skip to the next page, you see
2    version 2, and the next page is version 3.  Do you see that?
3    A    I do.
4    Q    Okay.  And David Davies says in the email, the
5    July 18th, 11:12 a.m., email on 2259, he's proposing:  "We would
6    love to start with a $6k test split across all three versions
7    (2K each)."  That will help us monitor results and allow us to
8    scale -- quickly scale as needed.
9    And if you look up the page, David K. Keith says, "is this
10    test robust enough?"  Do you see that?
11    A    I do.
12    Q    And split from 2258 over on to 2259, we see David
13    Davies from Grassroots responding that test size will be robust
14    enough.  Do you see that?
15    A    I do.
16    Q    If we skip ahead, you can kind of skim through the
17    chain as we're looking forward in time.  You're seeing more of
18    the same kinds of emails where people at the Grassroots team are
19    sending versions of copy to your campaign team for approval,
20    saying things like, "We want to test to our best performing
21    audiences."  And that sort of goes on each day or sometimes more
22    than once in a day.  There's sort of different versions of copy
23    being sent back and forth.
24    And then if we get to -- do you see that?
25    A    I see copies for approval headers on these emails.

17 (Pages 62 to 65)

Page 66

1   One, two -- yeah. A series -- two and probably more occasions.
2       Q   And --
3       A   Three. Yeah.
4       Q   Okay. And then on 2252, about at the middle of the
5   page, we have an email from David K. Keith on
6   July 21st, 2023, 2:25 p.m., and he says, "Hi all thanks for the
7   great first week. I really want to stay as aggressive as can be
8   in scale, even at a lower ROI." Do you see that?
9       A   I do.
10      Q   And then I will also hand you what I'll mark as
11  Exhibit 8. This is a text message chain. The first Bates
12  number is GRASSROOTS_00004156. And it doesn't say this anywhere
13  in the way that this is produced. But I'll represent to you
14  that this is a text chain between Danny Hogenkamp at Grassroots
15  Analytics and David Keith that spans quite a long period of
16  time --
17      A   This whole package --
18      (Exhibit 8 marked for identification)
19      Q   This whole package.
20      A   -- between those two.
21      Q   The whole Exhibit 8 that I just handed you is a text
22  chain. The first text that we see is from July 17th, 2023, and
23  the last one on page GRASSROOTS_00004187 is December 11th, 2023
24      So this is just the text messages downloaded from Danny
25  Hogenkamp's phone between him and David Keith.

Page 67

1       A   Okay.
2       Q   We're not going to look through all of this. But we
3   see at the top of the first page, on 4156, we see, "Hi this is
4   David. Helping Phil Ehr with the launch. He asked me to reach
5   out. Who is this?"
6       So this seems to be in response to you having sent the
7   screenshot from Danny to the 24 Raising Signal chat, asking
8   folks to figure out who this guy was and whether he's for real
9   and on side and all that. Does that sound -- seem -- seem like
10  what's going on here?
11      A   That seems correct.
12      Q   And we see on this first page, also on July 17th, we
13  see David Keith saying, "We're being pretty aggressive but happy
14  to scale wherever there's ROI."
15      That's sort of similar to what we've seen. David Keith,
16  you know, continuing to say that the strategy is to be
17  aggressive.
18      A   I don't see that right now. Where is it? Probably in
19  front of me. I don't see it.
20      Q   First page, we see --
21      A   Oh, I see it. "What are you thinking?"
22      Q   Yes.
23      A   Okay.
24      Q   Yes. And on page 4158, we see David Keith. This is
25  on July 17th, later that night, middle of the page. He says, "I

Page 68

1   do not want to be conservative at all. I got roped in here last
2   min. I stupidly assumed you were all involved. Just stay close
3   to me here. I'll get everything rolling."
4       I want to go very hard very fast.
5       "The minute I raise $1 I'll spend it." Do you see that?
6       A   I see that.
7       Q   And a little bit farther down in the page, we see a
8   response from Danny. And he says, "Im assuming your digital
9   firm has signed off?"
10      And David Keith responds, "Trent is on it. Yes."
11      Danny says, "ok ok."
12      And David Keith responds, "They will do what I say. I'm in
13  charge not them."
14      Is that generally your understanding of sort of how the
15  chain of command was working on your campaign?
16      A   That he was -- that -- that David Keith was in
17  charge? Yes.
18      Q   And at the top of the next page, GRASSROOTS_00004159
19  we see David Keith saying, "I want to keep Debbie out. Tell me
20  what to do and I'll do it. Money is not a concern. We'll raise
21  it." Do you see that?
22      A   I see it.
23      Q   And we see sort of -- you can take the time you need
24  to flip through -- but sort of similar things throughout. On
25  page 4161, for example, middle of the page, David Keith says,

Page 69

1   "Just go full gasoline on the fire I'm not known for being
2   particularly scared of these types of uphill risks." This is
3   all still on July 17th so.
4       A   Okay. Let me just stop and read a little bit up to --
5       Q   Sure.
6       A   Where is -- where is --
7       Q   I'm on 4161.
8       A   -- "the uphill risks"?
9       All right. You're two pages ahead of me. Hold on.
10      Q   Yeah.
11      A   Finished 4161; is this where you were?
12      Q   Yes. So now we are on July 18th, 2023. And on the
13  next page, 4162, we see David Keith saying, "I signed."
14      Which I understand, based on the timing, to be referring to
15  the contract with Grassroots. And David Keith then says, "Pls
16  go as large as possible. See email. Let's not be
17  conservative." Do you see that?
18      A   I see that.
19      Q   And then about two-thirds of the way down the page,
20  David Keith says, "Don't feel shy about hitting trump and
21  desantis. How much do you think we can raise out of the gate
22  with your lists?"
23      And we see Danny responding, "Depends on the tests.
24  They're starting to go out in the next 30." Do you see that?
25      A   I do.

18 (Pages 66 to 69)

Page 70

1    Q   On let's -- on 4163, there's some more exchanges
2  between David Keith and Danny.  Around halfway down the page,
3  Danny says, "Anything over 100 can be scaled immediately."  Do
4  you know what that means?
5    A   Not specifically.  I could guess but sounds like
6  industry talk.
7    Q   For maybe talking about return on investment?
8    A   I'll accept what you say.
9    Q   Okay.  Well, if you don't know, I don't want you to
10 guess.
11     So -- and if we go to the next page, page 4164, about
12 halfway down the page, we're now still in July 18th, 2023.
13 David Keith says, "I'm trying to get us to $500k by Monday.  If
14 we have to spend $600k to do it that's fine.  We're at $250k
15 now."
16     "Need to double in four to five days.  I bet we can."
17     And then the next block of text, he says, "Fuck if we have
18 to spend $700k to do it, fine.  This will all pay off!"  Do you
19 see that?
20    A   I see that.
21    Q   On the next page -- page 4165 he says -- David Keith
22 says, 'Let's just go big, big, big.  I think Debbie ultimately
23 doesn't pull trigger.  She wanted this nomination handed to her.
24 Phil's profile resonates with donors.  I told David Davies
25 today, I want to get him in front of every single donor on text

Page 71

1  we can.  Even if there is a 50% ROI, I'll take the risk."  Do
2  you see that?
3    A   I do.
4    Q   And on the next page, July 20th, we see David Keith.
5  This is toward the top of the page.  He says, "Please keep this
6  between us.  Michelle's business partner told me Debbie is
7  getting cold feet.  Please tell Davies to double down.  Even if
8  ROI is super risky, let's scale, dude."  Do you see that?
9    A   I see that.
10    Q   And then about halfway down the page, we see Danny
11 responding and saying, "We wanna ensure high Roi and slow and
12 steady each day trying to get spend towards 30 or 40k with 70%
13 Roi.  Test test test."  Do you see that?
14    A   I see that.
15    Q   And if we flip ahead to GRASSROOTS, page 4167, the
16 next page, we see on July 23rd, 2023.  This is about halfway
17 down the page, David Keith says, "Let's go scale on anything
18 above 40%."  Do you see that?
19    A   I see that.  Not sure I know what it means, but I
20 see that.
21    Q   Okay.  And then a few days later, on the next page, we
22 see GRASSROOTS_00004168.  On July 26th, 2023, David Keith says,
23 "I'll call you in the AM want to keep pushing air everywhere we
24 can aggressive as can be."  Do you see that?
25    A   I do see that.

Page 72

1    Q   Okay.  So that's July 26th.  I'll hand you what I'll
2  mark as Exhibit 9.  I think Exhibit 9 -- should be keeping
3  better track of that -- do you recognize this as Invoice
4  Number 9664 from Grassroots Analytics to Phil?  It says, "Bill
5  to Phil Ehr," and it's dated July 31st, 2023.
6        (Exhibit 9 marked for identification)
7    A   I see this invoice number and I see the date and I see
8  my name billed to.
9    Q   Have you ever -- do you know if you've ever seen this
10 document before?
11    A   I don't recall if I've seen that.
12    Q   Here it says, "Activity Sales - Peer to Peer Phil
13 Ehr."  July 2023, Peer to Peer List Rental Services."  Do you
14 see that?
15    A   I do see that.
16    Q   And then underneath that in the smaller text, it says
17 Again, "Phil Ehr July 2023, Peer to Peer List Rental Services."
18 Then it says, "July overall spend: $430,433.00," and then it
19 says, "#  of messages sent:  5,363,853."  Do you see that?
20    A   I do see those.
21    Q   Then it says, "Of these, 11,600 were for resolicits
22 and the rest were prospects."  Do you see that?
23    A   I do.
24    Q   And then it says, "Please reach out if you have any
25 questions," and then has payment instructions.  Do you see that?

Page 73

1    A   I do.
2    Q   Do you know what it means by re-solicits here?
3  "11,600 were for resolicits."
4    A   I don't precisely know, but I have a general idea of
5  what re-solicits are.  In my experience with donor calls, in
6  this experience, it may or may not be the same.
7    Q   And what is your understanding?
8    A   When I was asked to do re-solicits on those people, I
9  would call from my phone, was to go back to people who had
10 previously donated.
11    Q   And prospects do you know what that means in this
12 context?
13    A   I know from my interaction with donors prospects would
14 be but not in this.
15    Q   My understanding from David Keith's deposition and
16 otherwise is re-solicits are exactly what you say, going back to
17 donors who had previously --
18    A   Okay.
19    Q   -- donated to your campaign.  And prospects or
20 acquisitions are trying to acquire new potential donors.
21    A   Okay.  That's maybe a little --
22    Q   That sound --
23    A   That sounds ballpark.
24    Q   Okay.
25    A   But not quite the same as what I understand prospects

19  (Pages 70 to 73)

Page 74

1    to be in the context of me calling donors.
2      Q    What is the difference?  What's different about what I
3    said in your understanding of prospects?
4      A    Well, for me, calling donors, it's prospecting who
5    should we put on the list?  Go out and research, find somebody,
6    bring them back.  But again, that's just me as a candidate.  I
7    may not know the technical effort behind the statement of the
8    invoice.
9      Q    The total bill amount here is $430,433.
10     A    Right.
11       Do you see that?
12     A    I do.
13     Q    And then below that, it says
14   payment $254,990 -- 989.83.  Do you see that?
15     A    I do.
16     Q    And then it leaves a balance of $175,443.17.  Do you
17   see that?
18     A    I do.
19     Q    And who authorized the $254,000 payment that we see
20   here?
21     A    I don't know specifically.  I do know it was not me.
22     Q    Who had the authority to authorize payments like this,
23   and what would that process have looked like?
24     A    That process would have looked like him communicating
25   with our compliance company to cut a check or to make a payment

Page 75

1      Q    So to the best of your knowledge, would it have been
2    David Keith who decided to pay $254,989.83 of this invoice?
3      A    I have no reason to think otherwise.
4      Q    Do you have any idea how he came up with that amount
5    to pay and what amount to leave unpaid?
6      A    Absolutely no idea.
7      Q    Okay.  Let's look back at those text messages that we
8    were just looking at between Danny and David Keith.  So that
9    invoice is dated July 31st, 2023, the day after.  And let's flip
10   to what's Bates-labeled 40 GRASSROOTS_00004171, which are text
11   messages from August 1st, 2023.  So the day after that invoice
12   was sent.
13       And we see at the very top of the -- of the page David
14   Keith saying, "REALLY," really is in all caps, "enjoying working
15   with your company.  Great work and great service all around."
16   Do you see that?
17     A    I do.
18     Q    And a little bit farther down the page, Danny asks,
19   "How are things going with Team Ehr?  And David Keith says,
20   "Real good.  Looks like one million raised by the 17th,
21   parentheses, one mill in one month, is doable as long as we
22   continue the scale and our team," focus on -- "focuses on
23   resoliciting efficiently all the while Phil has to hold strong
24   on call time."  Do you see that?
25     A    No but put my eyes on it again.

Page 76

1      Q    I'm at 4171.
2      A    Right here?
3      Q    Right here.  Yeah.
4      A    Okay.  Yes, I see that.
5      Q    And again, this was on August 1st.  So the day after
6    that invoice was sent to your campaign.  And then also after
7    your campaign received that July invoice and paid part of it,
8    your campaign continued to seek out additional services from
9    Grassroots.  Are you aware of that?
10     A    I don't know if we sought them out.
11     Q    Well, let's look at what I'll mark as Exhibit 10.
12   This is the one that I only have one copy of, but this is the
13   August 1st Services Agreement.
14       If you flip to the very back page, which is
15   GRASSROOTS_00004155, do you see your electronic signature there?
16          (Exhibit 10 marked for identification)
17     A    I do.
18     Q    And that's dated August 9th, 2023.  Do you see that?
19     A    I see that.
20     Q    And this was a contract for Grassroots to conduct a
21   direct fundraising mail program.  Are you aware of that?
22     A    I was aware that.  I was aware of it being a
23   mailer-type contract.  I'm saying that now from memory without
24   really looking at the contract again.  But the August Services
25   Agreement is as we've been referring to it as.

Page 77

1      Q    Do you -- did you review this contract before you
2    signed it?
3      A    Yes, I read it.
4      Q    Why did you personally sign this contract?
5      A    I was asked to by David Keith.
6      Q    Do you know why?
7      A    I don't know why.
8      Q    Okay.  Had he, to the best of your memory, asked you
9    to personally sign other contracts at that time?
10     A    I think I signed the launch video.  Pretty sure I signed.
11   I'm not certain but I'm pretty sure I signed the contract for
12   the launch video.
13     Q    Okay.  And at this point, we're now into August
14   2023.  Grassroots, in addition to you and the campaign, was
15   signing a contract on behalf of the campaign for this direct
16   mail program.  Grassroots was continuing to send fundraising
17   texts on the campaign's behalf.  Are you aware of that?
18     A    I was aware that Grassroots' services continued when I
19   was signing this contract.  I was aware that Grassroots'
20   services were continuing.
21     Q    And the strategy seems to have been similar in August.
22   The campaign continued to be very aggressive on text-message
23   fundraising into August?
24     A    I accept that but, again, my role was on the
25   telephone.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 78

1    Q   If we look back at the text, I'll just point you to a
2  couple more texts.  If we look back at the text chain between
3  David Keith and Danny Hogenkamp, we can skip ahead to
4  August 22nd on GRASSROOTS_00004177.
5      And this is the day that -- well, at the top where it's --
6  we first see the August 22nd, 2023, note.  There's a text here
7  that says, "MW just launched her."
8      And then David Keith says, "Who?"
9      And Danny says, "Mission wired.  Our big competitor in the
10  data space."
11      I think he's referring here to Debbie having launched a
12  primary challenge or launched her Senate campaign here.
13      Then David Keith says, "Are they referring to Mission
14  wired?  Are they good?"
15      Danny says, "We have been eating their lunch.  They get all
16  the DSCC clients tho."
17      And David Keith says, "Well we love your work so keep
18  pushing.  Your [sic] our team."  Do you see that?
19    A   I do see that.
20    Q   And on the next page, at the top of the page, we see
21  David Keith saying, "Pls tell David," to
22  David Davies at Grassroots Analytics.  "Pls tell David and the
23  texting team to go absolutely hog wild and push acquisition.
24  You're our guys and we are loyal."  Do you see that?
25    A   I see that.

Page 79

1    Q   And I'll hand you what I will mark as Exhibit 11.
2  This is an invoice dated August 31st, 2023.  It says Invoice,
3  Bill to Phil Ehr.  Do you see that?
4      (Exhibit 11 marked for identification)
5    A   Yes.
6    Q   And this should be Bates-labeled GRASSROOTS_00004130.
7    A   Yes.
8    Q   And here we see under activity it says, "Sales - Peer
9  to Peer Phil Ehr 8.31.23 Peer to Peer List Rental Services."
10  And the total amount is $126,943.00.  Do you see that?
11    A   I see those.
12    Q   And then underneath we have the same sort of
13  description that we saw on the July 31st invoice.  It says,
14  "Phil Ehr 8.31.23 Peer to Peer List Rental Services.  August
15  overall spend: $126,943.00."  And then it says, "# of messages
16  sent: 1,510,494.  Of those 25,660 were resolicits and the rest
17  were prospects."
18      So the same kind of different numbers, but the same sort of
19  breakdown information provided as on the first invoice we
20  looked at.
21    A   I see that.  I don't quite understand what these
22  numbers actually mean, but I see that written.
23    Q   And again, you had delegated authority to sort of
24  monitor this, including invoices to David Keith?
25    A   Arrange and monitor, yes.

Page 80

1    Q   And this is dated August 31st, 2023.  Even after this
2  invoice was received, your campaign continued to push Grassroots
3  to continue to be aggressive on text-message fundraising
4  services.  Are you aware of that?
5    A   Are you pointing to --
6    Q   Well, we can look back at the text messages.  At
7  GRASSROOTS_00004183, we see texts on September 1st, 2023.  We
8  see a text from Danny Hogenkamp at Grassroots saying, "ROI has
9  been pretty good on text lately, but we need to hold on it until
10  we get the first texting invoice all paid."
11      And David Keith responds, "did you hear from Phil?  He
12  should have it.  I'm not on it day to day so pls send him this
13  note if you don't mind.  I see good numbers in act blue so I
14  gotta think he can pay it down in full."  Do you see that?
15    A   I do but who's talking to whom here?
16    Q   This is Danny Hogenkamp saying, "ROI has been pretty
17  good on text lately, but we need to hold on."
18      I think he's saying we need to pause on sending any more
19  texts until the first invoice is all paid.
20    A   Okay.
21    Q   David Keith responds, "did you hear from Phil?  He
22  should have it."
23      And then in the -- and then he says, "I see good numbers in
24  act blue so I gotta think he can pay it down in full."  Do you
25  see that?

Page 81

1    A   I see Danny Hogenkamp saying, I see -- where is the
2  ActBlue again?
3    Q   So here is Danny and this is David Keith's response.
4    A   "I'm not on" -- "I'm not on it day-to-day so pls" send
5  this note -- "pls send him this note if you don't mind."
6      I don't know who he's -- is he asking Danny to send me
7  a note?
8    Q   It sounds to me you -- you know, you don't have to
9  take my word for it.  We're reading the same --
10    A   Right.
11    Q   -- thing and have the same amount of information.
12      But what I see here is Danny saying, "ROI has been pretty
13  good on text lately, but we need to hold on sending more texts
14  until we get the first texting invoice all paid."
15      David Keith then responds to Danny, "Did you hear from
16  Phil?  He should have it.  I'm not on it day to day so pls send
17  him this note if you don't mind."
18      And then David Keith says, "I see good numbers in act blue,
19  so I gotta think you he can pay it down in full."  Do you see
20  that?
21    A   I do see that.
22    Q   The way that I read this is that he is saying to
23  Danny, please send him to, I think, the 'him' there is meant to
24  refer to you.
25      And then "I see good numbers in act blue so I gotta think

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 82

1  he can pay it down in full."
2      I interpret that to be 'he' is you or your campaign.  Do
3  you read it the same way?
4      A  I speculate -- well, on the plain language that we're
5  seeing here, that's reasonable interpretation of what's being
6  written about.  Yes.
7      Q  At this point your campaign was planning to pay the
8  outstanding invoices; is that right?
9      A  As far as I know, yes.
10     Q  And if we look on to the next page,
11  GRASSROOTS_00004184, on September 5th, we see a text from David
12  Keith that says, "another payment went out today."  Do you see
13  that?
14     A  I see that.
15     Q  Do you have any reason to doubt whether that's true?
16     A  I have no reason to doubt that it's not true.  I have
17  every reason to believe that it is true.
18     Q  Okay.
19     A  Because I rely on good faith of professionals in the
20  field.
21     Q  I'll hand you what mark as Exhibit 12.
22         MS. ALI:  This is, I think, for the court
23  reporter, this would have had a 16 in front of it.  It's
24  a text chain that starts on August 29th, 2023 -- it's a
25  little hard to read.  I'm sorry -- between Jake Briggs

Page 83

1  and Danny Hogenkamp.  And do you recognize this text
2  chain?
3         (Exhibit 12 marked for identification)
4      A  I see Danny Hogenkamp's name.  I see Jake Briggs name.
5  I can see that printed.
6      Q  Okay.  I'll -- I'll just tell you that this was
7  something that you, either you or your campaign, produced in
8  this litigation.
9      A  Okay.
10     Q  The first text that we see is from you, and it says,
11  "Hi Danny - Jake Briggs asked me to text you.  I'm copying him
12  here.  Phil."  Do you see that?
13     A  I do.
14     Q  And then it says, "Check processing is going slowly
15  this last week of summer.  We are going to pay every day with
16  all that comes in the day prior and this will be paid off this
17  week.  Sorry for the delay and thank you for everything.  No one
18  else gets paid before this is done."  Do you see that?
19     A  I do.
20     Q  And does that -- is that consistent with your memory,
21  that at least as of this time, the campaign was intending to pay
22  down all of the invoices owed to Grassroots?
23     A  Yes.
24     Q  And Danny responds the same day, August 29th, 2023,
25  "Understood!!  EOW works for us."

Page 84

1  I interpret that to mean end of week works for us.  Do you
2  see that?
3      A  I do.
4      Q  And the next message is from a couple days later,
5  September 1st, 2023, Danny from Grassroots says, "Any word on
6  this gentleman?  We would love to keep raising for you but need
7  this paid first."
8      And you respond, "Danny - Good to meet you.  How much do we
9  owe you?"  Do you see that?
10     A  I do.
11     Q  Danny then responds, same day, "I think the invoice
12  and reference was for," there's a little symbol there to signify
13  approximately, "~$440k and you have paid around $250k of it
14  already.  So 200 is the difference."  Do you see that?
15     A  I do.
16     Q  And you responded, "I'm told we have ActBlue pending
17  deposit.  We'll send it over ASAP as the first traunch of what's
18  owed, with the balance to follow as soon as we can."  Do you see
19  that?
20     A  I do.
21     Q  And then we see Jake Briggs chiming in, "With the
22  holiday," I assume Labor Day, "with the holiday can you keep us
23  going until we," can't get that pending -- "can get that pending
24  actblue.  I asked them to wire today."  Do you see that?
25     A  I do.

Page 85

1      Q  And when he says, "I asked them to wire today," would
2  that be your compliance firm or do you know who he's referring
3  to -- referring to there?
4      A  I don't.
5      Q  Okay.  And when you're -- these messages about the
6  pending ActBlue, am I interpreting it right to -- do I
7  understand it right that what you're all talking about here is
8  that as you continue fundraising, more money is coming into the
9  campaign, and the intent was to use those fundraising monies to
10  pay down the bill owed to Grassroots?
11     A  And your question to me is, is that my understanding?
12     Q  Yes.  When you say, here, "I'm told we have ActBlue
13  pending deposit."
14     A  That's my rough understanding, yes.
15     Q  As money comes in, then it goes out?
16     A  That's my understanding, based on communications from
17  Jake and David.
18     Q  And in response to Jake's message asking if Grassroots
19  can keep going until the pending ActBlue hits the account, Danny
20  says, "That should work."
21     And we see Jake Briggs saying, "Thanks, Danny!  You're the
22  best!"  Do you see that?
23     A  Yes.
24     Q  And nowhere in here are we seeing you or Jake Briggs
25  or anybody else questioning the amount of the unpaid invoices in

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 86

1   the text we just looked at?
2       A   I see that that question is not asked in these texts.
3       Q   And in fact, you're making representations to Danny
4   that the campaign would pay ASAP?
5       A   Yes.
6       Q   And were you telling the truth when you said that?
7       A   Absolutely.
8       Q   So if you flip to the next page of the document.
9       A   Reverse of --
10      Q   Reverse, yes.
11      A   Okay.
12      Q   And go -- we see Danny asking on September 5th for any
13  updates, and Jake Briggs responds, "Happy September!  You should
14  have received 30k this afternoon with more coming."
15      Danny says, "Ok great!  Jake I will connect you with our
16  billing team moving forward.  I run 100 person tech company, so
17  only have so much awareness on billing."
18      And then on October 3rd, 2023, so almost a full month
19  later, we see a text from Danny saying, "Hey!  Happy to have
20  delayed invoices after quarter but we need to chat about GA
21  Bill."
22      And Jake Briggs response, "Hi Danny!  I will loop you in
23  with our compliance folks and make sure you receive payment.
24  Thank you!"  Do you see that?
25      A   I do.

Page 87

1       Q   And so based on these texts, does it appear to you
2   that, at least as of early October of 2023, the campaign's
3   intent was still to pay the Grassroots' invoices?
4       A   Yes.
5       Q   At some point during your campaign, the campaign began
6   to have significant cash flow issues; is that correct?
7       A   Yes.
8       Q   And do you know about when that started?
9       A   Not precisely.
10      Q   Do you know whether that started during your Senate
11  campaign?
12      A   What I know is that we had a goal to raise a million
13  dollars by the end of September.  What I know is that I was
14  instructed to -- I was told that we were getting an ROI of
15  two-to-one.  And I was instructed to put that into my
16  solicitation phone calls.  And because of the aggressive
17  direction I got from David Keith and Jake Briggs, I was aware we
18  were not quite meeting -- well, short of our million-dollar goal
19  leading into September, leading in -- toward the end of
20  September.
21      Q   When you say you were.
22      A   And --
23      Q   -- oh, I'm sorry.  Go ahead.
24      A   -- just -- so at the end of September, I was
25  recognizing we were not meeting our goals or our goal.

Page 88

1       Go ahead.
2       Q   You say you were told that there was an ROI of two-to-
3   one.  Who told you that?
4       A   Jake Briggs, specifically, many times.  Jake Briggs
5   and, I believe, Danny Hogenkamp as well.
6       Q   Danny --
7       A   Oh, excuse me.  I'm sorry.  Pardon me.  Not Daniel.
8       Q   Okay.
9       A   Never had any conversation with Daniel.  With David
10  Keith as well.
11      Q   Okay.
12      A   So Jake Briggs, yes.  David Keith, yes.  Yes.
13      Q   Okay.  And when you say that Jake Briggs told you that
14  many times, do you know when?  About what time period was it
15  during?
16      A   It would have been in August that he said that.
17      Q   And when you --
18      A   August, plus or minus a month.  I don't actually --
19      Q   So August, September, somewhere in that time frame?
20      A   In the Senate campaign, absolutely, in the Senate
21  campaign.
22      Q   And when you say two-to-one, do you know what percent
23  are -- well, let me ask it this way:  Do you know if Jake Briggs
24  said two-to-one, or did he say a percentage that you understood
25  to be two-to-one?

Page 89

1       A   No.  He was very clear.  Two-to-one, meaning we get
2   double the return on investment for every $1, we get $2 back.
3       Q   Okay.
4       A   Is what I understood that to mean.  We talked about
5   it.  That's what was represented.  Yes.
6       Q   And did you understand that that was ROI across all
7   fundraising streams or on text specifically?
8       A   I did not know.
9       Q   Did he -- did Jake Briggs or David Keith ever
10  clarify that?
11      A   Not that I reckon.
12      Q   Do you know how close your campaign was to
13  the $1-million goal by the end of September?
14      A   Not here without referring to the books, no.  Except
15  it was significantly short.
16      Q   I'll hand you what I'll mark as Exhibit 13, which is a
17  text chain.  It's actually -- yeah.  Okay.
18      I think for the court reporter, this would have had an 18
19  in front of it.
20      This is a text chain from September 10th.  I think this is
21  just messages between Jake Briggs and you, Mr. Ehr.  So this is
22  message on September 10th that was produced by you or your
23  campaign in discovery.  As I said, I think, this is between you
24  and Jake Briggs.  And on September 10th, you said, "I received
25  word that the September 20 Zoom event is canceled.  ??"

23  (Pages 86 to 89)

Page 90

1    And Jake responds, "We're postponing it bc we aren't
2  getting great -- traffic -- traction, currently 4 RSVPs.  Yes
3  Joanna and I are planning on scheduling Rolodex sessions during
4  the week to help break up call time."  Do you know what he means
5  by that?
6         (Exhibit 13 marked for identification)
7    A   By what, the Zoom or the Rolodex?
8    Q   The Rolodex sessions to break up call time.
9    A   I don't.
10   Q   Okay.  And you say in response, "Just got a $6600
11  pledge for a check by mail from Nelson Helm.  How close are we
12  to $1 million?  ...I'm very concerned about the unpaid
13  invoices."  Do you see that?
14   A   I do.
15   Q   And Jake says, "What specific unpaid invoices?"  And
16  then says, "Also happy to talk about any and all of this after
17  you're done with call time at 4.  That's the only way to pay
18  invoices."  Do you see that?
19   A   I do.
20   Q   And then you -- it looks like you're sort of pasting
21  something from a -- you say, "I see the following on the weekly
22  report from compliance.  See attached for this week's financial
23  report."  And then there's a list of COH, which I assume means
24  cash on hand.  COH, plus pending ActBlue.  And then a list of
25  unpaid bills.  Do you see that?

Page 91

1    A   I do.
2    Q   And then it says, "Best regards, Bradley."  Is this
3  you, I think, copying and pasting something from Katz
4  Compliance?
5    A   It appears that way.
6    Q   And here we see unpaid bills.  They have dates
7  so 07/01 Katz compliance, $6K; 07/01 Katz
8  compliance, $6K; 07/31/2023 Grassroots
9  Analytics, $175,443.17; 08/03/02023 AGP Strategies, $4,530.  Do
10  you see all of those?
11   A   I do.
12   Q   What is AGP Strategies?
13   A   I don't know.
14   Q   Okay.  And 09/01/2023, Vision Media Marketing, $10K
15  (will renegotiate).  Do you know what Vision Media Marketing is?
16   A   I did not at the time.  I'm not certain now.  I think
17  I know but I'm not certain.
18   Q   What do you think that it is?
19   A   I think it may be the company that David Keith works
20  for.  I'm not certain of that.
21   Q   Okay.  And then we see -- and what is -- do you know
22  what it means, "(will renegotiate)," this parenthetical here?
23   A   No.
24   Q   Okay.  And then this September 1st, 2023, Katz
25  Compliance, another $6K; is that it?  Were you paying Katz

Page 92

1  Compliance a flat monthly fee?  Is that how that worked?  Maybe?
2    A   I believe so, yes.
3    Q   And you said in the message before you listed all
4  these out, I'm very concerned about the unpaid invoices.  Why
5  were you very concerned about the unpaid invoices?
6    A   Well, I had apparently received this email from
7  Bradley or this communication from Bradley.  I don't recall his
8  email, probably was.  And I see a whole bunch of unpaid bills.
9  And we pay our bills.  That's what we should be doing.
10  Specifically, these on -- well, the Katz Compliance.  I was very
11  concerned about that.
12      They keep us legal; they keep us in compliance, and also
13  Grassroots and also these others that I didn't know about.
14   Q   And at this point, it was your intention to pay all of
15  these invoices; is that correct?
16   A   Yes.
17   Q   Did you have a sense of how to prioritize who to pay
18  first or any of that?
19   A   I left that up to David Keith and Jake Briggs.  Well,
20  I would communicate, as I'm communicating here, with Jake Briggs
21  and relied on their judgment about what was the priority.
22   Q   And I'll hand you what I'll mark as Exhibit 14.  This
23  is an email chain.  If you flip to the back of the email chain,
24  there's no Bates stamp.  This was something that either you or
25  your campaign produced.  The first email in the chain is from

Page 93

1  November 15th, 2023, 6:25 p.m. from Jake Briggs to Danny.
2      And for the court reporter's benefit, I think this would
3  have had a 19 in front of the document name.
4      And again, this is November 15th, 2023.  We see Jake Briggs
5  saying, "Hi Danny, thank you for your work with Phil Ehr's
6  campaign for Senate.  As we have closed that committee and are
7  moving forward with House District 28, we are streamlining our
8  services and cutting expenses."  Do you see that?
9         (Exhibit 14 marked for identification)
10   A   I do.
11   Q   And the next sentence he says, "So effective today we
12  are going to be closing our contract with Grassroots.  If you
13  can please provide us with a detailed breakdown of our
14  outstanding balances.  Also if you could provide us with 10DLC
15  for the campaign that would be helpful.  Thank you for your
16  understanding.  Looking forward to the detailed breakdown of our
17  outstanding balances.  Thank you!"  Do you see that?
18   A   I do.
19   Q   And Danny responds, if you look up at the top of the
20  page, the next day, on November 16th, 2023, to say, "Totally
21  understand!  Good luck with Florida-28.  I'm looping in our team
22  who can pass on the 10DLC code.  And we will lay out the
23  outstanding invoices and the payment plan is agreed to by your
24  campaign."  Do you see that?
25   A   I see that.

Page 94

1    Q   And on the next page, which is sort of back in time in
2  the document, on Thursday, November 16th, 2023, we see Jake
3  Briggs saying, "Thank you -- I will keep an eye out for
4  the 10DLC and I'll reach out to directly.  What time works for
5  you?"  Do you see that?
6    A   I do.
7    Q   And then on November 17th, which is toward the top of
8  that page, we see an email at 10:31 a.m. from Aaron Parnas.  Do
9  you see -- are you finding where I'm at?
10    A   Yes.
11    Q   Hi -- hold on -- hi, Erin -- "Hi Andrew," from Aaron
12  saying, "Hi Andrew", who I think is Andrew Donohue at Grassroots
13  Analytics.
14    A   Okay.  Talk me through that again, please.
15    Q   Right here, "Hi, Andrew."
16    A   Okay, I see that.
17    Q   And from Mr. Parnas -- from Mr. Parnas to Andrew
18  Donohue at Grassroots Analytics saying, "Hi Andrew, we do not
19  plan to text on our own.  We are bringing on a new digital firm
20  that will handle texting (and may use Grassroots Analytics as
21  one of the vendors).  Do you see that?
22    A   I do.
23    Q   Do you know who that new digital firm was?
24    A   No.
25    Q   And we see Danny respond on November 18th.  This is

Page 95

1  the top email on that page.  "Hi Aaron, We think your digital
2  firm should have no problems re-registering with their
3  own 10-DLC!  But plz connect us with them if they do need more
4  info, and we will help them!"
5    And then he says, "Looping in Josh who will write out the
6  itemized bill -- and the months of the payment plan."  Do you
7  see that?
8    A   I do.
9    Q   And then the next email that we see in the chain is
10  from Josh Lewis at Grassroots Analytics, who is laying out his
11  understanding of the terms of the payment plan.  Do you see that
12  on November 20th?
13    A   I do.
14    Q   And then on November 22nd, on the bottom of the page
15  it says page two of six, November 22nd.  In the middle of the
16  page, we see Jake Briggs say for the very first time, "Hi
17  Danny -- We don't believe that this is the correct amount owed
18  and we are going to be talking with our attorneys.  We'll circle
19  back with you.  Thanks."  Do you see that?
20    A   I do.
21    Q   And then if you flip to the very first page of this
22  document, we see you -- this is page one of six.
23    A   First page being -- okay.
24    Q   Yep.  On November 30th, 2023, you forward that whole
25  chain to it, says, "Hi Bill and David, The situation with

Page 96

1  Grassroots continues in the wrong direction.  I understand
2  you're helping, no thanks.  Jake and Obi are working it.  I
3  don't know the details, but it may be appropriate for us to
4  start demanding refunds from Grassroots for over-charging."  Do
5  you see that?
6    A   I do.
7    Q   And am I right to assume, based on the emails we see
8  up, that the Bill and David here that you're sending this to are
9  Bill Hyers and David Keith?
10    A   Yes.
11    Q   When you said here, "Jake and Obi are working it," do
12  you know what you meant by that?
13    A   I meant that Jake Briggs and Obie Umunna were in
14  conversation with Grassroots Analytics and doing their own
15  research about the services that Grassroots Analytics was
16  providing.
17    Q   And when you say "demanding refunds from Grassroots
18  Analytics for over-charging," what did you mean by
19  "overcharging"?
20    A   I would receive oral reports from them that there were
21  problems with the Grassroots Analytics services.  And I was
22  alarmed to the extent that I thought they owed us refunds.
23  Grassroots Analytics did not provide the service that they had
24  represented they would provide.
25    Q   When you said you received reports from them, do you

Page 97

1  mean from Jake and Obi?
2    A   From Jake and Obi, and in conversation with an
3  attorney as well.
4    Q   And what's your understanding of what services
5  Grassroots Analytics didn't provide?  What would have been the
6  basis for refunds, in your understanding, at that time?
7    A   The basis was similar to what I believe today, and
8  that is what they represented.  Mr. Hogenkamp represented to me,
9  personally, in his solicitation for our business in the first
10  place, that there would be a lot of money coming in.  That's one
11  measure.
12    Another concern I had was reports of a slew of refunds
13  early on in the Senate campaign that I became aware of through
14  the course of this investigation.  Another concern was
15  discussions with Jake, Obi, and an attorney looking at the data
16  and asking how this matches up with the contract and what the
17  basis is for the invoices.
18    So those questions were out there, and I was not satisfied
19  that contract terms were being met.
20    Q   You listed sort of three buckets of things just now.
21  Tell me if I've got any of this wrong; I'm not trying to put
22  words in your mouth, but this is my summary of what you said.
23  One was that Danny from Grassroots Analytics had represented to
24  you that there would be a lot of money coming in.
25    A   Yes.  And we just saw in my deposition today those

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 98

1   text messages from him.  That's what I was referring to.
2       Q   Besides those text messages, are you referring to any
3   other representations that Danny made to you?
4       A   No.
5       Q   Okay.  So when you say that, we're talking about the
6   text messages that we looked at together today?
7       A   Yes.
8       Q   Okay.  The second thing you said was a report of a set
9   of refunds earlier in the campaign and that you became aware of.
10  What are you referring to there?
11      A   We've put it in the discovery list of ActBlue refunds
12  for about 53 or $50,000 plus, which were unusual, so I was told
13  by Jake, Obi, and others.
14      Q   Jake and Obi's view was that the amount of refunds was
15  unusual?
16      A   Yes.
17      Q   And when and how did you become aware of the refunds?
18      A   I don't know, specifically.  In the course of
19  conversations, there were many over the phone, over Zoom, or the
20  other video conferencing services we used.  That's how I became
21  aware because I was asking questions.  And they were doing some
22  digging and they were coming back and reporting.  That's how I
23  became aware in the course of that autumn, and this is November
24  correspondence.  That makes sense.
25      Q   The third kind of bucket of things that you mentioned

Page 99

1   is looking at the data and asking how the data matches up with
2   the contract.  What did you mean by that?
3       A   The questions that were given to -- were shared with
4   me are about:  Okay.  We have these invoices.  We don't
5   understand how these invoices were -- what the numbers mean.
6   Why did they choose this number to invoice us?  What does it
7   mean?  What do these other phrases in the invoice mean?
8       So many texts, resolicits that you and I just talked about
9   as well.  There are questions around, you know, what does that
10  mean?
11      Q   Did you ever talk with David Keith about that?
12      A   I don't remember calling or talking to David Keith
13  about it.  I do remember talking to Jake Briggs about it, Obi
14  Umunna about it, and an attorney about it.
15      Q   Did you understand then that Grassroots' invoices
16  charge a per-text amount?  So it's just multiplying the per-text
17  amount times the number of texts sent.  Did you understand that
18  at that time in November?
19      A   No, I did not.
20      Q   Do you understand that now?
21      A   I have been told of that.  So I understand that that
22  is probably the case for the contract.
23      Q   You have not made any argument, by your campaign or by
24  you in this case, that you're doubting that Grassroots actually
25  sent this number of texts.  That's not your claim in this case,

Page 100

1   as I understand it; is that right?
2       A   As far as text messages going out from some number to
3   some -- I don't know.  I don't know.
4       Q   Well, as far as you're aware, you have not made a
5   claim in this case that Grassroots, when it says we sent five
6   million texts, didn't actually send five million texts?
7       A   I don't recall that.  Our complaint -- the committee's
8   complaint represented that.
9       Q   You might have different problems with what happened
10  here.  But it's not that you're saying that Grassroots is
11  incorrectly reporting the number of texts that went out?
12      A   I don't think our submission said that.
13          MS. ALI:  Let's take another break.
14          THE VIDEOGRAPHER:  Off the record at 11:40.
15          (OFF RECORD)
16          THE VIDEOGRAPHER:  On the record at 12:30.
17  BY MS. ALI:
18      Q   All right, Mr. Ehr, before the break, we were looking
19  at the email chain that was marked as Exhibit 14.
20      A   Okay.
21      Q   And we left off with your email to Bill Hyers and
22  David Keith on November 30th.  And now I want to look at the
23  email on the very top of the chain, also on November 30th.  But
24  this one is a response from Bill Hyers back to you, copying
25  David Keith, Jake Briggs, and Obi Umunna.  Do you see that?

Page 101

1       A   I do.
2       Q   And here Bill Hyers says, "That this actually looks
3   like it's going well, notice how they stopped in their tracks as
4   soon as you mentioned 'Lawyer'."  Do you see that?
5       A   I remember it now.  I'm putting my eyes on it.  Yes, I
6   see that.
7       Q   And in the next paragraph, he says he would say three
8   things long term.  Do you see that?
9       A   I do.
10      Q   "1) If we have a friendly lawyer we can attach and
11  scare them a little more, parentheses, (could be Obi but I don't
12  want to overstep since he's here in a political capacity).
13      What did you understand that he meant by "he's here in a
14  political capacity"?
15      A   That Mr. Umunna's primary role on the campaign was as
16  a political consultant, not as an attorney.  And Bill Hyers is
17  writing that because that's what he knows.
18      Q   And when he says "scare them a little," was it your
19  goal to scare Grassroots?
20      A   Let me look at what I wrote before.  (sotto voice).
21  No.  One doesn't need to scare.  One needs to look at facts.
22      Q   You didn't agree with this part of his email?
23      A   I did -- I didn't have an opinion on that part of his
24  email.  I didn't -- I didn't go -- yeah, I didn't have an
25  opinion on that.

26 (Pages 98 to 101)

Page 102

1      Q    And next to number two he says, "Demand that they
2  produce every document that authorised these expenses, the
3  reason for the absurd costs of these list that didn't produce."
4  Do you know what he's referring to there?
5      A    I'm not sure what he's referring to so I guess I
6  should let his words speak for themselves.
7      Q    At this point when you were having this exchange with
8  Bill Hyers, had you seen all the emails and texts, some of which
9  we've looked at today, where David Keith is authorizing and
10 pushing Grassroots to send more texts, scale bigger?
11     A    No.
12     Q    And next to number three, in Bill Hyers' email, he
13 says, "an explanation on the absurd amount of refunds demanded
14 back from them (and I would hint we do not want to be a part of
15 any fraud)." Do you know what he's talking about there?
16     A    Again, I don't know specifically.  But it's reasonable
17 to think he was talking about the ActBlue refunds.
18     Q    And do you know what fraud he's referring to here?
19     A    He's referring to speculation that a number of donors
20 may not actually have donated and that that was the reason why
21 there were a bunch of refunds.  I don't know but that was
22 speculation.  I think it referred to the $53,000 worth of
23 refunds, which is unusual.
24     Q    Do you know that it's unusual?  Or did Jake Briggs and
25 Obi tell you it was unusual?

Page 103

1      A    I don't personally know it's unusual.  Jake Briggs
2  told me it was unusual.  Obi told me it was unusual.  An
3  attorney told me, "Hey, this looks odd."  And since then, other
4  people we've discussed it with have said this is not usual; it's
5  unusual.
6      Q    Who are the other people?  Without revealing any
7  privileged communications, other than Obi or Jake or Bill Hyers,
8  who else has told you that it's unusual?
9      A    In this time frame or just at all?
10     Q    At all.
11     A    Dr. Vanessa Brito has looked at it and said this is
12 unusual.  Specifically, I think she looked at it when she was
13 starting to assume the role of campaign manager and almost
14 didn't take the job, thinking that there was something fishy
15 going on in the campaign -- not quite right -- and that caused
16 great concern on her part.
17     Q    Are you aware that when your campaign switched from
18 the Senate to the House campaign, you had to notify donors and
19 offer them the option of a refund?
20     A    We took legal advice on that transition.  As we sit
21 here today, I am not aware of that kind of requirement.  I do
22 know that we followed the legal advice of an attorney.  We paid
23 a stipend to provide it, and that was nobody that's been
24 mentioned here today.
25     Q    Are you aware that somebody from Katz Compliance sent

Page 104

1  an email to your campaign at the time of the transition to say
2  you need to contact donors and offer them the opportunity for a
3  refund?
4      A    No, I'm not.  I would also just note that the period
5  of refunds we're talking about was in the month of July or
6  early -- well, before the transition occurred in early October.
7      Q    All of the refunds that you're referring to?
8      A    Yes.
9      Q    Were, in your understanding, not only charged in July
10 but refunded in July?
11     A    Yes.
12     Q    Okay.  Other than speculation -- I think you called
13 it -- do you have any evidence that there was any fraud
14 committed here?
15     A    No.
16     Q    I'll hand you what I will mark as Exhibit 15.  This is
17 another signal produced by you or your campaign.  This is dated
18 December 22nd, 2023.  And at the top, it looks like the
19 participants are Phil, Jake, Obi, and Joanna.
20     And for the court reporter, I think, this is a document
21 that would have had a 20 in front of it.
22     And here we see the first message is on
23 December 22nd, 2023.  And I think based on context clues, the
24 darker messages are the ones from you.  And the others are
25 designated -- you can see, you know, the first one is from Jake

Page 105

1  Briggs in a lighter background and then one from Obi.  And so I
2  think that these darker messages seem to be from you in the
3  first -- does that seem right to you?
4      A    Yes,.  But I'd like to just read it for a second to
5  make sure.
6          (Exhibit 15 marked for identification)
7      Q    Of course.
8      A    I'm pretty sure it is standby.  It -- yes.  This
9  is -- the dark is mine.
10     Q    And there's three bubbles here that are dark text in a
11 block on December 22nd.  The first one you say,
12 "Obi/Jake - I spoke with Cassie this morning."  Is that Cassie
13 from Katz Compliance?
14     A    Yes.
15     Q    And you say -- bless you -- "I went through all the
16 points on the emails you both wrote."  Do you have any
17 recollection of what those emails were?
18     A    I don't.
19     Q    "She understands the trust I placed in Obi.  She
20 accepts the shortcomings we experienced.  She affirmed the back
21 payment plan worked out with Jake."  Do you know what back
22 payment plan worked out with Jake you're referring to there?
23     A    Referring to a payment plan we had with Katz
24 Compliance with their firm.
25     Q    And then you say, "She understands I want Rob to see

Page 106

1  the data he needs for his review."  Do you know what that is
2  referring to?
3      A    "She understands I want Rob to see the data he needs
4  for his review."
5      Yes.  That was -- I had asked Cassie to produce for Rob all
6  the payments from the campaign so that he could take a look.
7  This is -- from a legal point of view, and I'd say that's his
8  legal perspective on that.
9      I've been asking him to look in to the legal compliance and
10 the performance of Grassroots with respect to the contract.  So
11 here I'm asking an attorney to that.  And I'm asking the
12 compliance company to give them the data so he can do his
13 review.
14     Q    The second text here is referencing a 1:30 meeting
15 with Grassroots.  Do you recall, did that meeting happen on
16 December 22nd?
17     A    I'm unclear whether that meeting happened on the 22nd.
18 I do know that there was an arrangement to have Grassroots
19 Analytics staff and Jake, Obi, and an attorney meet with them to
20 understand matters better.
21     Q    But you're not sure if that meeting actually happened?
22     A    I know that it happened.  I'm not sure it happened on
23 that date --
24     Q    Okay.  Do you know that --
25     A    -- or that time.

Page 107

1      Q    -- in happened December of 2023?
2      A    Yes.
3      Q    Somewhere around --
4      A    Yes.
5      Q    -- that time period?
6      And do you know who from the campaign joined that meeting?
7      A    Yes.
8      Q    And who was that?
9      A    It was Jake Briggs, Obi Umunna, and an attorney.
10     Q    Do you know who the attorney was?
11     A    Mr. Ross.
12     Q    Okay.  And do you know who joined on the Grassroots'
13 side?
14     A    I heard some names.  I don't remember but --
15     Q    Okay.
16     A    I think one of the names -- here I am may be
17 speculating out of turn -- but one of the names started with.
18 an 'S.' it's very long.
19     Q    Okay.  Claudia, with a last name --
20     A    There you go.
21     Q    -- that starts with an 'S'?
22     A    Yes, ma'am.
23     Q    Okay.  That sounds familiar to you?
24     A    Yes.
25     Q    Anybody else that comes to mind?

Page 108

1      A    he CFO, possibly.
2      Q    I think that was Claudia at that time.
3      A    Okay.  So beyond that, I'm struggling.
4      Q    Okay.  And do you know if that was a Zoom or a phone
5  call?
6      A    It was either a Zoom or Google Meet.
7      Q    Okay.  A video call?
8      A    A video call of some sort is what I was told it was.
9  I was not at the meeting itself.
10     Q    Did you get a readout of the meeting?
11     A    An oral readout of the meeting?  Yes.
12     Q    Do you have any idea how long that meeting lasted?
13     A    No.  But I was led to believe it was a substantial
14 meeting.
15     Q    And when you say "substantial meeting," more than five
16 minutes?
17     A    Yes.
18     Q    More than 20 minutes?
19     A    Probably.
20     Q    Okay.  But you don't know?
21     A    Almost certainly but I don't know.
22     Q    Do you know what was discussed during that meeting?
23     A    The topics going in to the meeting were clarification
24 on the invoices, clarification of who is being -- clarification
25 on the data that Grassroots was providing, clarification on the

Page 109

1  audience to which they were sending text messages, and related
2  matters.  Matters relating to targeting.  I think I might have
3  just said that just now.
4      Q    Anything else besides those things as far as you know?
5      A    Bottom line is of how much they raised for the
6  campaign and how much we paid them for the campaign.  That
7  was -- that's all I know that we talked -- that they talked
8  about.
9      Q    You said part of the purpose of the meeting was
10 clarification on invoices.  What specifically did the campaign
11 want clarification about?
12     A    I can -- maybe there's more than what I can say, but
13 if I could refer to one of the exhibits?
14     Q    Sure.
15     A    Let's take one of the invoices.  Let's say
16 Exhibit No. 9.
17     Q    Okay.
18     A    As an example there were questions around, looking at
19 Exhibit 9, when it says, "July - overall spend," this
20 many -- $430,000, and more, a # "of messages sent." So of
21 5,363,853 of those, 11,600 were resolicits and the rest were
22 prospects.
23     They reported to me that part of the questions they asked
24 in this meeting of Grassroots was:  Okay, does that mean
25 5,300,000 different people were sent a message?  Or was it half

28 (Pages 106 to 109)

Page 110

1  of that sent two messages?  Or just what is behind that?  What
2  is the targeting of it?  Like, what was your plan and why was
3  that -- why did you select the people that you selected, and did
4  that match our strategy?
5      That's the kind of questions they were exploring.  That's
6  the sort of thing that they felt they needed, and I agreed,
7  before we could understand what this invoice was for.
8      Q   And when you say "they reported," you're talking about
9  the folks from the campaign who joined that call and reported
10 back to you?
11     A   Yes.  Specifically, the attorneys, Mr. Umunna and\
12 Mr. Briggs.
13     Q   Okay.  And the something else you said was questions
14 about the data Grassroots was providing.  Is that similar to
15 what you just mentioned about who these texts were being sent
16 to, and how those groups were defined?
17     A   Yes.  There's a whole set of technical questions that
18 I don't have a big grasp on.
19     Q   Okay.
20     A   But I do know that there's a lot of ambiguity around
21 it.  So I was happy that this meeting was occurring so that we
22 could get resolution about how much they thought we owed and how
23 much we thought we owed.
24     Q   Was David Keith involved in any of these conversations
25 leading up to this meeting in December 2023 with Grassroots, or

Page 111

1  did he join that meeting?
2      A   It's my understanding -- well, I never talked to David
3  Keith directly about it.
4      Q   Okay.
5      A   It's my understanding that he was not at the meeting.
6  It's my understanding that there may have been several from him
7  by one or more of the three of these.  We might have even had
8  some discovery on this about reaching out to him.  I forget.
9      But leading up in the month, in the couple -- in the weeks
10 and months leading up to this meeting.
11     Q   But as far as you're aware, you personally -- well,
12 let me ask you this first:  You personally never spoke with
13 David Keith about the invoices or targeting or any of those
14 things?
15     A   Right.
16     Q   Do you know whether anybody from your campaign ever
17 actually spoke to David Keith about any of those topics?
18     A   I believe the answer is yes.  But I can't vividly tell
19 you who it was.
20     Q   Or when it happened?
21     A   Right.
22     Q   Or what they talked about?
23     A   Well, if they talked -- so the question was
24 clarification on the invoices and Grassroots' services.  So I
25 think that kind of thing-- I'm not sure if the conversation

Page 112

1  occurred about that.  My interest would have been in David
2  answering the questions.  Did Grassroots produce the services
3  that they were required to produce under the contract?
4      Q   And if David Keith's testimony or his response was,
5  yeah, they did, you know, we didn't raise a lot of money.  But
6  they did what they were supposed to under the contract.  How
7  would that have impacted the way that you were viewing the
8  situation at that time?
9      A   The way you describe it, probably not because I didn't
10 hear a lot of technical targeting or justification in that kind
11 of vague response.
12     Q   What do you mean by "technical targeting?"
13     A   Selection of which people to call and which people to
14 send solicitations to.  And, again, this gets in to it, you
15 know, matters that are beyond my competency as a candidate, but
16 I know exist in the industry of professional fundraising.
17     Q   When you say you know they exist, how do you know they
18 exist and what do you know about it?
19     A   I know they exist because of experience listening to
20 fundraising companies over the course of now four congressional
21 campaigns.
22     What's the other part of your question?
23     So I hear professionals talking in my presence about the
24 existence of targeting, about the existence of how many times
25 you reach out and touch a person before they're likely to

Page 113

1  contribute to your campaign, those types of things.
2      Q   And what would you expect a professional organization
3  to do on that front?  What's your expectation of what would have
4  met the standards that you think exist?
5      A   Positive fundraising results.  So I don't know the
6  different numbers of touches, different modes, different
7  targeting, messaging.  But I do know that professional
8  fundraisers offer a service, a good service, and that's what I
9  was relying on for my consultants, including Grassroots and
10 Meadowlark, to produce fundraising results.
11     Q   Were you disappointed in the fundraising results for
12 your 2024 campaign?
13     A   Yes.  We're talking about the Senate campaign.  Yes.
14     Q   Were you disappointed in the House campaign
15 fundraising results?
16     A   Yes, for different reasons.
17     Q   Other than the fact that you were disappointed in the
18 fundraising returns on your Senate campaign, do you have any
19 basis to believe that Grassroots did not perform its obligations
20 under the contract?
21     A   Yes.
22     Q   And what is the basis of that?
23     A   One basis is what I discovered from David Keith's
24 email.  David Keith's production is this case was a conversation
25 between Meadowlark and Grassroots about the performance of

29 (Pages 110 to 113)

Page 114

1   Grassroots and how our ability to contact donors was degraded
2   and turned off for a while. That's my understanding.
3       We should look at it to examine it. I think based on them
4   not performing professionally, they made a mistake in the
5   coordination between Meadowlark and Grassroots Analytics.
6       Q   Your understanding is that your campaign's ability to
7   contact donors was turned off for a while because of something
8   that Grassroots did?
9       A   Severely degraded, possibly turned off.
10      Q   When was that?
11      A   I have to refer to the production of Mr. Keith.
12      Q   David Keith produced maybe four or five emails in this
13  case,.
14      A   I think one of the ones that --
15      Q   I don't think --
16      A   -- one of them was that --
17      Q   Okay. We can check that during a break. But are you
18  referring to when you had to change the token when you changed
19  from the Senate to the House campaign, this 10DLC token?
20      A   We need to look at it. I don't -- so when you -- when
21  the person says 10DLC, I don't have a full understanding of what
22  that means.
23      Q   Okay.
24      A   And the token -- I don't have a full understanding of
25  that either.

Page 115

1       Q   Okay. Other than the disappointing fundraising
2   returns, was there any other basis for you to think that
3   Grassroots did not perform its obligations under the contract?
4       And you mentioned this communication between David Keith
5   and Meadowlark. Other than those two things, is there any other
6   basis for your claim in this case that Grassroots did not
7   perform its obligations under the contract?
8       A   Well, okay, so the disappointment is an emotional
9   response from the result of having not produced a significant
10  amount of income for the campaign, which is the core purpose of
11  our arrangement, our relationship. That was the deliverable so
12  that was not forthcoming.
13      There was this problem I referred to with Mr. Keith's
14  revealed by Mr. Keith's email, and it might have been something
15  else. I'm not remembering at the time. But I need to
16  refer -- and I refer to my written responses of the
17  interrogatories for something further. But nothing is coming to
18  mind right now. I think I'm missing something but I don't know
19  what it is.
20      Q   Okay. You can't think of anything right now?
21      A   I can't think of it.
22      Q   You said the Grassroots' purpose, the deliverable, was
23  fundraising returns. Did you have an understanding that they
24  had guaranteed some floor that they would fundraise for your
25  campaign?

Page 116

1       A   I understood what I received in the text
2   communications from Danny Hogenkamp. I did not read the
3   contract until after our services were complete with Grassroots.
4   So the answer is no, I didn't understand.
5       I did not comprehend that there was a floor. And I left
6   that up to the good faith and professionalism of both Mr. Keith
7   and other consultants, meaning Meadowlark and Grassroots and
8   anybody else that had come on the campaign.
9       Q   Do you know whether your campaign was carrying out a
10  re-solicit strategy for text message fundraising?
11      A   To characterize our strategy as re-solicit overall, I
12  don't know the answer to that. I have heard the term from David
13  Keith about re-solicit. He would often tell Jake and me,
14  possibly in this chat, but certainly by phone, by video, you
15  know, when we'd have oral meetings where we're just with our
16  voices, go out, get those re-solicits, go out and get those
17  pledges.
18      I mean there are lots of those types of words used. And
19  that drove how I would get on the phones talking to people.
20  Grassroots, to my knowledge, did not have to get on the phones
21  talking to people, they had other means, principally texts, as I
22  understand it.
23      Q   In the third text in this Exhibit 15, toward the end
24  of this one, you say, "He asks for 1:10 meeting. He needs
25  approval for the" -- negotiations -- "negotiating

Page 117

1   strategy. ...exploratory call only....or...negotiating meeting
2   where we terminate the mailing contract and ask for $150k
3   refund... ...still don't raise the refund issue...?"
4       So here, when you say "terminate the mailing contract," did
5   you have an understanding that as of December 2023 you still had
6   an active mailing contract with Grassroots?
7       A   It appears that way from this, yes. In hindsight, I
8   think at this time that I was writing this, I had signed -- I
9   personally signed the August Service Agreement, which was
10  mailing.
11      So, yeah, I'm sure that I viewed that as still being active
12  at that time, even though we had told them previous to
13  December 22nd that we were stopping their services.
14      Q   Do you know whether your campaign ever paid anything
15  for mailing services to Grassroots?
16      A   There was an invoice but I think it was chalked up in
17  the end to a mistake that listed the August Service Agreement as
18  something that we paid and they didn't provide any result for.
19      But as I understand it, it can be checked by the record
20  that there was just a mistake in the invoice itself, which was
21  correct that I understood that Grassroots would say no. No.
22  No. This invoice that you paid was not meant to say the mail of
23  contract, slash, August; it was meant to be on the July Service
24  Agreement.
25      So there is something out there from my memory that pinned

30 (Pages 114 to 117)

Page 118

1    a payment to this. But we never received services and I don't
2    believe that Grassroots intended to bill it like that. I think
3    it was just a clerical error that was corrected in the course of
4    these proceedings and put onto the July Service Agreement.
5        Did that answer make sense?
6        Q    I might -- well, I'll tell you my understanding. Just
7    having looked at the documents, I think you signed that contract
8    for mail services. There was quite a lot of back and forth,
9    some of which we went through with David Keith at his
10   deposition, with the Grassroots mail team, which was a different
11   group of people than the text message peer-to-peer services
12   team, about different kinds of copy and different kinds of mail
13   services that could happen.
14       Then we have David Keith saying, let's put the mail on
15   pause because we still owe on this text message agreement and we
16   want to get Grassroots paid on the text messaging. So let's hit
17   pause on any direct mailing services.
18       So your campaign never paid anything for mail services and
19   the contract was never, I don't think, formally terminated. But
20   no work ever -- no mail ever went out from Grassroots on behalf
21   of your campaign because I think no money ever came in from your
22   campaign to Grassroots.
23       A    That sounds right to me.
24       Q    Okay. And while we're on that topic, do you know
25   whether -- or do you have an understanding of whether your

Page 119

1    campaign ever paid Grassroots for anything other than text
2    message fundraising services in connection with the 2024
3    campaign cycle?
4        A    I'm not sure. I do know that it was fundraising
5    services, whether it included anything more than text messages,
6    I can't be sure. I know that there might have been other
7    things. I don't know.
8        Q    Do you remember ever hearing about a program called
9    CLIK Collective?
10       A    I think I remember that from our analysis leading to
11   these proceedings so I've heard of it. I don't know what it
12   means. I think it's in that email that we'll probably get to.
13       Q    Okay.
14       A    That David Keith produced.
15       Q    Okay. And back to these text messages we were looking
16   at in Exhibit 15 you say, "terminate the mail contract and ask
17   for a $150k refund... ...still don't raise the refund issue?"
18       What are you asking or suggesting here?
19       A    Okay. So I'm -- what I'm doing in this text is I'm
20   communicating to Jake, Obi, and Joanna conversations and
21   recommendations from our attorney.
22       Q    Okay.
23       A    So I am relaying potentially privileged information,
24   but since it's here, I'm relaying that he is seeking approval to
25   negotiate strategy. That's the first -- he needs approval for

Page 120

1    negotiation strategy. That's what the attorney wanted.
2    Exploratory only, negotiating meeting where we terminate the
3    mail contract and ask for a 50k refund. I don't know how
4    the 50k number --
5        Q    150.
6        A    Excuse me. $150,000 was arrived as we sit here today.
7    I don't remember that. I don't remember. You know that and
8    says, "still don't raise the refund issue?" That's, I
9    guess -- I -- that's what --
10       Q    You don't remember what you meant?
11       A    I don't remember.
12       Q    Okay.
13       A    And then I see the response.
14       Q    Okay.
15       THE WITNESS: I have a request.
16       MS. ALI: Yes?
17       THE WITNESS: Could I take a little break?
18       MS. ALI: Sure. No problem.
19       THE WITNESS: I'll be right back.
20       THE VIDEOGRAPHER: Off the record at 1:04.
21           (OFF RECORD)
22       THE VIDEOGRAPHER: On the record at 1:14.
23   BY MS. ALI:
24       Q    Okay. I'll mark Exhibit 16. This is a Signal message
25   that you or your campaign produced in this case that Mr. Press

Page 121

1    has indicated was from June 8th, 2024. So we've jumped ahead in
2    time --
3        A    Okay.
4        Q    -- a bit.
5        And for the court reporter, we -- this should have
6    been -- this is in the documents that you received. And it
7    should be number 22.
8        This is a Signal chat. It looks like Phil, Jake, Vanessa,
9    Obi, and I think this is a message from you. And it says,
10   "What's missing from this list?" And then it lists operating
11   expenses, consistent payments, wholly deferred payments, and
12   disputed payment claim. Do you see this?
13           (Exhibit 16 marked for identification)
14       A    Yes, I do.
15       Q    And in the wholly deferred payments, it says, "Change
16   Research, Meadowlark, GWI, and Phil's loan." Do you see that?
17       A    I do.
18       Q    And what does it mean, "wholly deferred payments?"
19       A    Well, I wrote it so I will try to tell you what I was
20   thinking at the time, that we had not paid any of these yet,
21   whether or not they were due or, you know, needed to be paid.
22   So it means we just haven't paid them at all. No part of the
23   payment.
24       Q    What is "change research?"
25       A    It's a company that produced the polling that we used

31 (Pages 118 to 121)

Page 122

1    to -- just to help to assess my viability in the Senate race
2    back in June and July of 2023, and also for a potential House
3    race in October 2023.
4        Q   So that was sort of like work that had already been
5    done but not yet paid for?  Or were they doing ongoing work?
6        A   No.  It was already done in that paper.  Yeah.  It was
7    discrete, finite work.
8        I'll just add one node here if -- I don't dispute that.
9    It's -- this is June 8th, 2020 --
10       Q   That's what I thought.
11       A   -- yeah, that's probably correct.  But I just note
12   that Mr. Umunna is on this, and he had left the campaign so I
13   don't doubt that date.  I think it's correct.
14       But I just want to highlight that I'm aware that he left
15   the campaign.  But as he is mentioned here, he's still
16   contactable and so he wasn't, you know, shunned or anything.  I
17   must have included him on this because we wanted to make sure
18   things are done right.
19       Q   Under consistent payments, it says, "Obi, Cassie,
20   Evan."  Who's the -- Obi, we've talked about.  Cassie, I assume,
21   is Cassie from Katz Compliance?
22       A   Yes.
23       Q   And then who's the Evan that's listed?
24       A   Evan is Evan Lawler.  You'll see payments to Lawler
25   Strategies, a fundraising consultant who came on and then he

Page 123

1    wasn't producing, and very forthrightly departed.
2        Q   And when you say "he wasn't producing," what do you
3    mean by that?
4        A   He wasn't -- his services weren't producing the
5    expected results.
6        Q   Was there any fundraising consultant who came on board
7    in your 2024 Senate or House campaign who you felt did produce
8    the expected results?
9        A   Well, Evan did for a time and then it stopped.
10   Meadowlark was doing their fundraising, and I had no reports of
11   anything wrong with their results.  Yeah.
12       Q   What was Meadowlark doing, to the best of your
13   understanding?
14       A   To the best of my understanding, they were putting
15   email solicitations to donors.
16       Q   And what about Mr. Lawler?  What was he doing?
17       A   He was providing lists of people for me to call.  He
18   was also calling donors in preparation for me to call them.  He
19   was, at times, soliciting himself for the campaign.  And those
20   produced results for a while.
21       Q   That was all calls?
22       A   From what I recall, yes.
23       Q   Okay.  And later, farther down in this text, you say,
24   "No longer contemplating: campaign manager or comms Director."
25   Do you see that?

Page 124

1        A   Yes.
2        Q   And why were you no longer contemplating a campaign
3    manager or comms director?
4        A   Let me think.  At that time June 2024, Vanessa Brito
5    was the campaign manager, and we might have been thinking of
6    this group as kind of an interim, maybe somebody else coming in.
7    I don't recall if that was the actual though.  But this line
8    means no longer contemplating anybody else.
9        Q   Okay.
10       A   Comms Director -- same.  We just didn't have the
11   resources to have a comms director.
12       Q   Okay.
13       A   That's what that means.  And it's -- and it makes
14   sense also because it's after the secondary nice-to-haves, you
15   know, in this progression of lists.
16       Q   I'll hand you what I've marked as Exhibit 17.  This is
17   another Signal chat produced by you or the campaign.  This one
18   is Obi, Vanessa, Phil.  So no Jake Briggs --
19       A   Right.
20       Q   -- on this one.  And I will represent to you that
21   Mr. Press has told me that this message is from July 23rd, 2024.
22           (Exhibit 17 marked for identification)
23       A   Okay.
24       Q   And I don't -- this is how the message was produced.
25   So the message starts.  I think it's from you.  "Thank you."  I

Page 125

1    don't know what that's responding to because we don't have the
2    preceding messages.
3        But then it says, "Vanessa and I are struggling with
4    upcoming payments, as usual."  Do you see that?
5        A   I do.
6        Q   And what did you mean by "as usual"?
7        A   Because by that time there would -- there was
8    a -- there was a backup payments due to this part of this list
9    that -- this -- and another list, I think, we discussed here
10   today, that hadn't been paid.  And we needed to pay them.
11       Q   And then it says, "Three requests, please, please,
12   regarding (1) your payment plan, (2) Caiman; (3) the recorded
13   meeting with Grassroots for previous negotiations with
14   Meadowlark.  Specifics follow."
15       I'll say I don't know what specifics there were because we
16   didn't get the follow-up.  But what is this regarding your
17   payment plan; is that to Obi?
18       A   Yes.
19       Q   About paying him for services provided?
20       A   Correct.  And we had worked out an oral plan with Obi
21   about how to pay him what was due.
22       Q   Okay, what is Caiman?
23       A   It was another vendor who came on to provide some
24   services.
25       Q   Do you remember what time period that was?

32 (Pages 122 to 125)

Page 126

```
1      A   It was not the Senate, as far as I recall.  Well, let
2  me just specify.  I'm not sure so let me just leave it at that.
3      Q   Okay.
4      A   It might have been the Senate.  I don't -- I
5  don't -- I don't really recall.
6      Q   Do you remember what their role is or what they did
7  for the campaign?
8      A   They had intended to do a number of things, one of
9  which was a series of YouTube videos and Spanish-language
10 targeting and messaging.  Those are the core things that they
11 were doing.  They also helped to arrange a seminar or speaking
12 engagement with me and some academics on a particular topic.
13     Q   And is this -- is there inclusion in this list?  Does
14 that mean that money was owed to them that had not been paid?
15     A   Or it was money that we hadn't paid and hadn't
16 determined whether they really earned it.
17     Q   What do you mean by that?
18     A   They might not have earned it.  And so I think we've
19 since determined they didn't produce what they said they were
20 going to produce.  At this time we hadn't made that
21 determination yet.
22     Q   What had they said they were going to produce?
23     A   I'd have to refer to their contract again, but it was
24 pretty clear.  One of them was YouTube production.  That did not
25 occur.  And there were other things, too.
```

Page 127

```
1      Q   When you say "did not occur," do you mean they
2  literally just didn't do what they were supposed to do?  Or they
3  did it but it didn't produce returns that you were expecting?
4      A   No.  They didn't do what they were supposed to do.
5      Q   Okay.
6      A   They were not a fundraising operation.
7      Q   Okay.
8      A   They were an engagement operation.
9      Q   Okay.  Did that situation with Caiman get resolved?
10     A   To my satisfaction, yes.  And we haven't heard from
11 them.
12     Q   Okay.  Meaning, you didn't pay but they haven't come
13 after you for the money?
14     A   Correct.
15     Q   Okay.  And then item number -- and when -- when was
16 that resolved to your satisfaction?
17     A   I'm guessing it was not.  I think it was in
18 early 2020 -- wait, early 2025 is what I remember.  I could be
19 wrong.  It could be, you know, a range.
20     Q   Six months ago, probably?
21     A   More than six months.
22     A   More than six months ago.  Okay.
23     A   From today, yes.
24     Q   And is that a guess or you're pretty confident about
25 that?
```

Page 128

```
1      A   Yes.  I'm sorry.  Yes.  It was more than six
2  months ago.
3      Q   Okay.  And you're -- that's not a guess?
4      A   That's not a guess.
5      Q   Okay.  The number three here is the "recorded meeting
6  with Grassroots Analytics."  What does that mean?
7      A   That was -- this was my request to Obi for a copy of
8  the meeting that Mr. Briggs had said on many occasions was
9  recorded.  This meeting between Grassroots Analytics staff and
10 Obi, Jake, and Mr. Ross.
11     Q   This is the December 2023 meeting?
12     A   Correct.  And recorded by Mr. Briggs, or so it was
13 represented by Mr. Briggs to me to Obi, many times, that it was
14 recorded.
15     Q   Mr. Briggs said that he had taken -- taken a record, a
16 video recording --
17     A   He said he recorded the meeting.
18     A   But he never provided that to you?
19     A   Correct.
20     Q   Did you ask him for that recording?
21     A   Multiple occasions.
22     Q   And were any of those requests made in writing?
23     A   I don't recall.
24     Q   And how would he respond to those requests?
25     A   Yes, I'll have it to you.  Yes, I have to find it.
```

Page 129

```
1  He -- he promised in the end of this series of questions that
2  occurred, stretched out for the length of his tenor, for his
3  term with this campaign, he said, well, I don't have it.  At the
4  end, he said, he doesn't have it.
5      Q   You have no idea whether it actually exists or not?
6      A   Correct.
7      Q   And you don't know whether it ever existed or not?
8      A   Correct.  I never heard it but I put it in here
9  because I wanted Obi's assistance in getting that recording.  So
10 we have, you know, our team had a clearer understanding of what
11 occurred at that meeting.
12     Q   Do you know if Mr. Briggs told the Grassroots
13 participants that he was recording the call?
14     A   I have no idea.
15     Q   Did you ever ask Obi that, whether Mr. Briggs said
16 that during the call?
17     A   I didn't ask Obi that.
18     Q   Did you ever ask Dr. Brito that?
19     A   I did not ask her.  She was not on the call.
20     Q   Okay.
21     A   And I did not ask Mr. Ross either.
22     Q   And the last item in this list says, "previous
23 negotiations with Meadowlark."  Do you remember what that was
24 referring to?
25     A   He was most likely referring to Meadowlark's request
```

33 (Pages 126 to 129)

Page 130

1  for more payments they felt they were owed.
2      Q.  Okay.  And did that situation get resolved to your
3  satisfaction?
4      A.  Yes.
5      Q.  Do you know how much Meadowlark was claiming it was
6  owed?
7      A.  No.
8      Q.  Do you have a ballpark figure?
9      A.  In the same order, my understanding is it's in the
10  same order as Grassroots Analytics.
11      Q.  Over $100,000?
12      A.  I think.
13      Q.  So somewhere in that ballpark?
14      A.  Somewhere in that ballpark.  It wasn't 5,000.  It was
15  more than that.
16      Q.  And do you know whether your campaign paid Meadowlark
17  for those services?
18      A.  The parts -- we paid them for services.  Did we pay
19  them all that they thought they were owed?  To my understanding,
20  not being the person that actually approved or watched specific
21  payments, I think, they wanted more than what we ended up
22  paying them.
23      Q.  And was there a reason that you paid them less than
24  what they thought that they were owed?
25      A.  To my understanding -- and this is again a candidate's

Page 131

1  understanding -- I understood them to be not satisfied with the
2  amount we had already paid Grassroots.  And they thought that
3  maybe they should have been paid that money instead.  That's my
4  understanding.  Again, it's not -- this is a better question for
5  Mr. Keith or Mr. Briggs or Grassroots or Meadowlark themselves.
6      Q.  Did you have a -- did the campaign have a written
7  contract with Meadowlark?
8      A.  Not to my knowledge.
9      Q.  Do you know how Meadowlark billed for its services?
10      A.  No.
11      Q.  Do you know?  Do you know that Meadowlark knew how
12  much the campaign had paid to Grassroots?
13      A.  I don't know from firsthand experience or firsthand
14  observation.
15      Q.  What is your understanding?  That the reason
16  Meadowlark felt it was owed more money is that they knew how
17  much money your campaign had paid to Grassroots?
18      A.  From oral -- from verbal reports from my staff of
19  consultants, Obi and Jake, that they were upset so I'm repeating
20  the report I got from them.
21      Q.  You don't have any firsthand knowledge, correct?
22      A.  I have no firsthand knowledge.
23      Q.  Were you satisfied with the services you received from
24  Meadowlark?
25      A.  Overall, yes.  There was a time when their emailing

Page 132

1  was not as descriptive as it could have been but that was not a
2  big red flag to me.  At some point they stopped providing
3  services.  That decision was not made by me; it was made by Jake
4  or David.  I asked why and I didn't really get a good answer.
5      Q.  Do you know how much your Senate campaign raised in
6  total?
7      A.  Here, as we speak?  No.  It was less than during the
8  Senate campaign.  It was less than a million dollars, obviously.
9      Q.  But you don't know how much?
10      A.  No.
11      Q.  And do you know how much your House campaign raised?
12      A.  Well, in total, I think the figure is
13  about $1.3 million in sum total, from July 2023 until after the
14  election.
15      Q.  Meaning, you're including the amount you raised while
16  you were running for Senate?
17      A.  Yes.
18      Q.  The total amount you raised between the Senate and the
19  House campaign is somewhere in the $1.3 million region?
20      A.  Yes.
21      Q.  Okay.
22      Do you know how much of that 1.3 million was raised via
23  text-message fundraising?
24      A.  I don't.
25      Q.  Versus email fundraising?

Page 133

1      A.  Versus my calling?  No.
2      Q.  Versus calling?
3      A.  I don't.
4      Q.  Okay.
5      A.  Or anything else, parties.
6      Q.  Do you know if your campaign kept records
7  showing that?
8      A.  I'm not certain but I think the attribution data
9  exists.  I suspect the attribution data exists.
10      Q.  But you're not sure?
11      A.  But I'm not sure.
12      Q.  We talked about this a little bit, but in
13  mid-August of 2023, Debbie MuCarsel-Powell entered the Senate
14  race in Florida as a primary challenger; is that right?
15      A.  Yes.
16      Q.  And that was just August 22nd, 2023, sound right,
17  to you?
18      A.  Sounds about right.
19      Q.  And you stayed in the race for some period of time
20  after she --
21      A.  Yes.
22      Q.  -- announced her candidacy?
23      And it wasn't until mid-October of 2023 that you decided to
24  exit the Senate race and run for a congressional seat instead?
25      A.  Yes.

34 (Pages 130 to 133)

Page 134

1    Q    And that was on or about October 17th, 2023?  Does
2  that right?
3    A    That's when we formally switched.
4    Q    When did you make the decision to switch?
5    A    Before October 17th and after September 30th.
6  Directly after September 30th, I hadn't made a decision on that,
7  you know, on October 1st.  But we looked at it -- we, a group,
8  looked at it for a period of days, looked at her fundraising,
9  compared it with my fundraising, and assessed the situation from
10  money as well as political considerations and made a decision.
11    Q    Do you remember giving statements to a Politico
12  reporter in mid-October 2023?
13    A    I remember having a press conference in
14  mid-October 2023 with Debbie Mucarsel-Powell.  She and I stood
15  together at a podium and had a press conference, and Politico
16  was probably there.
17    Q    And do you remember saying something along the lines
18  of you decided to compete for the House seat because you were
19  motivated by chaos in the nation's capitol due to Republican
20  infighting over House Speaker shenanigans?  Do you remember
21  saying something like that?
22    A    That sounds like something that I probably said.
23    Q    And at that time there was reporting that
24  Carlos Gimenez had raised something like 890,000 for his
25  reelection campaign and that you had raised nearly 700,000 at

Page 135

1  that point in October?
2    A    That sounds right.
3    Q    And when you switched from the Senate to the House
4  race, do you recall that for a short period of time, your
5  campaign had to stop accepting ActBlue contributions until you
6  formally switched over the campaigns?
7    A    Yes.  It was a very short period of time.
8    Q    A day or a few days?
9    A    Something like that, yeah, de minimis.
10    Q    Okay.  I am handing you what I will mark as
11  Exhibit 18.
12        And this would have been a document that I think had a 27
13  in front of it.
14        Do you recognize this document?
15            (Exhibit 18 marked for identification)
16    A    Not on first blush.
17    Q    Okay.
18    A    But let's look at it.
19    Q    I'll just tell you, this is a document produced by
20  your campaign or by you in this litigation called Refund
21  Analysis Report.
22    A    Okay.
23    Q    Do you know if you've ever seen this document before?
24    A    I have seen this data before.
25    Q    What do you mean by that?

Page 136

1    A    It means I don't recall the document, but I do recall
2  the data, data of 50- --
3    Q    The numbers?
4    A    The numbers, yeah.
5    Q    And which data in particular do you remember
6  Having seen?
7    A    The number of refunds:  93, 94.  That's about
8  ballpark.  And the amount of the refunds:  53,000 -- 52,000
9  or 53,000 in another product that I remember seeing.
10    Q    Do you know who created this document?
11    A    Most likely, maybe it was Vanessa Brito.
12    Q    But you don't know?
13    A    I'd have to ask her.
14    Q    You didn't create this document?
15    A    Correct.
16    Q    Do you know where these -- the data that are reflected
17  in this document, the 94 refunds, the $52,390, do you know where
18  that came from?
19    A    Well, I do know that in her research, whether it's in
20  this document or not, it came from ActBlue's server,
21  ActBlue's files.
22    Q    And how do you know that?
23    A    Because she told me and she showed me on a screen that
24  had the ActBlue URL on it.
25    Q    When was that?

Page 137

1    A    On a number of occasions.  It would have been in this
2  calendar year, summertime, in preparation for the series of
3  depositions we're going through now.
4    Q    And on the document itself, there's a chart, and then
5  there's sort of an explanation with bullet points below.  Do you
6  see that?
7    A    I do.
8    Q    Do you know where the explanations that are in these
9  bullet points came from?  Did that come from ActBlue or where
10  did that information come from?
11    A    I don't know specifically where these came from.  It
12  appears to have come from analysis of ActBlue's data.
13    Q    And it says here, "The provided data shows refunds for
14  donations made to 'Phil Ehr for...' between June 2023 and
15  June 2024."  Do you see that?
16    A    I do.  Which indicates to me that this data,
17  this document, was produced shortly after June 2024.
18    Q    Why does that indicate that to you?
19    A    Because the data includes June 2024.
20    Q    And this says refunds by month --
21    A    Excuse me.  Excuse me.  I misspoke.  I'm
22  thinking 2025.
23    Q    Okay.  You don't know when, though?
24    A    I don't know when so I withdraw.
25    Q    Okay.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 138

1      A   So I was -- I was wrong with that.  I might have been
2  wrong with that statement.
3      Q   Okay.  I appreciate the clarification.  And here it
4  says refunds by month above the table.  Do you see that?
5      A   I do.
6      Q   And it says, "Paid Month" in the left column.
7      A   Right.
8      Q   And then the other column says, "Number of Refunds."
9  Do you see that?
10     A   Right.
11     Q   It doesn't say here -- it says, "Paid Month."
12     A   Right.
13     Q   That means the month that the donation was
14 made, correct?
15     A   Correct.
16     Q   But that doesn't tell you the month that the refund
17 was requested?
18     A   Correct.
19     Q   Okay.  And that doesn't appear anywhere on this
20 document?
21     A   Not on this document.
22     Q   Okay.  Were you aware, before your campaign filed this
23 lawsuit, that it was planning to sue Grassroots Analytics?
24     A   Was I aware of what?
25     Q   Before your campaign filed this lawsuit, that the

Page 139

1  campaign was planning to sue Grassroots Analytics?
2      A   No.
3      Excuse me.  I don't quite understand the question.  Was I
4  aware that the lawsuit was being filed before we filed the
5  lawsuit?
6      Q   Correct.
7      A   Perhaps a day or two.
8      Q   So, yes.  You -- you were aware?
9      A   Well, I was part of the -- just part of the decision
10 process to.  Yes.  We need to file suit in U.S. District Court.
11     Q   Okay.
12     A   So I was part of the approval of it.  So,
13 therefore, yes.
14     Q   Okay.  And -- but you were not represented personally
15 by counsel at that time?
16     A   I wasn't party to the suit.  I wasn't the plaintiff in
17 the suit.  And I wasn't represented by counsel.  This is solely
18 a committee decision or committee -- yeah, committee decision.
19 Committee suit.
20     Q   Who else from the campaign was -- was anybody else
21 from the campaign involved in that decision to file the lawsuit?
22     A   The attorney and the other staff members who were
23 around at the time were either in agreement or not objecting to
24 the decision that I put forward or, you know, a course of action
25 that I put forward with legal advice.

Page 140

1      Q   And who were those other staff members at that time?
2      A   Okay.  Let's recall who, so this would have been
3  around the time of the election because I think we filed in
4  October then.  The current campaign manager was not objecting to
5  this course of action.  Vanessa Brito, myself, and the attorney.
6      Q   Anybody else?
7      A   I'm thinking.  I don't recall anybody else.  I do
8  recall -- and I'll share this -- that previous to the decision
9  to do it, I had other legal advice that we probably would have
10 to sue Grassroots Analytics to resolve the issue because it
11 didn't look like we were having some kind of resolution short of
12 legal proceedings.  And that was legal advice as well.
13     Q   Your Campaign stated in discovery responses that it
14 had borrowed all of the monies expended by the campaign for this
15 litigation.  Are you aware of that?
16     A   Yes.
17     Q   And do you know whether the campaign has borrowed
18 money from anybody except for you, personally, for this
19 litigation?
20     A   No.  I'm not aware of the campaign doing anything.  To
21 the best of my knowledge and belief, the loans that the campaign
22 received were from me and me alone.
23     Q   In interrogatory responses from your campaign, and
24 then again, in what was produced to us as a Statement of Damages
25 in August, you indicated that the campaign had spent $10,000 on

Page 141

1  donor communications, compliance, refiling, accounting, and
2  vendor escalation.
3      A   Yes.
4      Q   Do you know what -- where did those $10,000 go?  Where
5  were those $10,000 sent?
6      A   The itemized damages to include the $10,000 that
7  you're asking about were derived by Campaign Manager
8  Vanessa Brito.
9      Q   And what methodology did she use to come up with that
10 number?
11     A   Okay.  Let's -- can you read again the --
12     Q   I'll hand you what's been marked as Exhibit 19.
13         (Exhibit 19 marked for identification.)
14     A   Okay.  Thank you.
15     Q   Which is the Statement of Damages produced in this
16 case.  And under item two, there's a table called -- item two is
17 internal response and compliance costs.  There's a table.  The
18 first row in the table is "Category:  Staff/Legal/Admin Labor,
19 Amount:  $10,000; Description:  Hours spent managing donor
20 communication, compliance, re-filing, accounting, and vendor
21 escalation."  Do you see that?
22     A   Yes.
23     Q   And are there receipts showing where this $10,000 were
24 spent, or how did that ten -- where did that $10,000 number
25 come from?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 142

1     A    An estimate of the amount of work required to -- and
2  to deal with -- well, and the fees required by ActBlue to -- I
3  think, it was ActBlue is in this, unless I'm mistaken -- I think
4  that figure includes the administrative fees that ActBlue would
5  have charged for these refund transactions.  Managing donor
6  communication, additional communications to donors that resulted
7  from the change in this short form in fundraising, and the
8  refunds.
9     Q    How are those donor -- well, let me just -- just to
10  clarify something.  I think the -- I don't think that this
11  cat- -- I don't read this category to include any ActBlue fees.
12  I think that's a separate line item --
13     A    Okay.
14     Q    -- which we can get to in a minute.  But I think I
15  read this as just saying hours spent managing and then it's got
16  a list of things.  So I don't think that there's any fees
17  included in this.  I don't read it to include the -- anything
18  like that.
19     A    Okay.  Well, to get more specific, I would need
20  to -- I would need to ask Vanessa Brito for more specific on it.
21     Q    Well --
22     A    For more clarity on what each of these are.
23     Q    You mentioned donor communications, and it says that
24  here.  How were those donor communications done?  Was that in
25  email, texts, phone calls?

Page 143

1     A    Hours spent managing donor communications, assembling
2  donors to call based on what had happened within the campaign,
3  assembling lists to text based on that, and sorting out who got
4  contacted when and by what means.  And that's probably the best
5  I can do off the top of my head.
6     Q    Is this related to something in connection with
7  Grassroots Analytics or?
8     A    The effects of Grassroots Analytics.
9     Q    I'm sorry.  What were the communications to donors?
10  What was the communication that was going out about Grassroots
11  Analytics?
12     A    Nothing stating Grassroots Analytics by name.  Nothing
13  stating anything other than we need to get more money in to our
14  campaign.
15     Q    Yeah, meaning all of these things in the staff, legal,
16  admin labor, $10,000, are just fundraising activities?
17     A    Well, the legal is.
18     Q    Well, I'm just focused on this top row, the first row
19  here.  That was just -- it says, "compliance re-filing," what
20  does that have to do with Grassroots Analytics?
21         MR. PRESS:  Phil, if you don't know, don't
22  speculate.
23         THE WITNESS:  It -- well, I'm not sure.
24         I mentioned legal just now because I see it
25  also in column one.

Page 144

1  BY MS. ALI:
2     Q    Where do you see that?
3     A    Admin -- staff, legal, admin labor.
4     Q    And where -- what was the legal, in this first row,
5  what was the legal spend?
6     A    I'm not sure.  It could have been retention of my
7  counsel today.
8     Q    Do you know what vendor escalation means in this row?
9     A    Technical term, I don't know.
10     Q    Do you have any idea how the $10,000 was calculated
11  for this top row?
12     A    It was calculated by someone who is professional at
13  this job.  That's what I can say.  A professional campaigner,
14  Dr. Vanessa Brito, managed the campaign so she put a
15  reasonable -- I viewed it -- and when I approved this, I viewed
16  it as a reasonable estimate of additional work that was
17  resulting from our dispute with Grassroots.
18     Q    Do you know how much of the $10,000 in this first row
19  was spent managing donor communication?
20     A    I don't.
21     Q    Do you know how much of this $10,000 was spent on
22  compliance refiling?
23     A    I do not.
24     Q    How about of accounting?
25     A    No.

Page 145

1     Q    Do you know how much of the $10,000 was spent on
2  vendor escalation?
3     A    No.
4     Q    In the next row, it says, "Category, FEC Filing
5  Amendments," and it lists $2,500.  Do you see that?
6     A    I do.
7     Q    And then it says, "Cost of legal review and
8  resubmission of amended finance reports due to refunded max-out
9  contributions."  Do you know whether there's any documentation
10  of any of that?
11     A    I do know that we filed amended reports with the FEC,
12  and a lot of the substance of the amended reports would have
13  been related to refunds.
14     Q    Other than filings made with the FEC, do you know
15  whether there's any documentation of anything in this category?
16     A    I don't know right as we sit here today.
17     Q    Now, do you know whether it costs money to file
18  FEC reports?
19     A    To submit a report, it does not cost money to prepare
20  the report.  It costs time and expertise of a compliance
21  professional.
22     Q    The next row is "Internal Systems Disruption."  Do you
23  know what that refers to?
24     A    Well, by the description here, "Workflow
25  interruptions, reprogramming," workflow of interruptions.  The

37 (Pages 142 to 145)

Page 146

1  lack of smoothness of this operation caused disruptions that are
2  inherent in what we're doing.  So that workflow would have been
3  better managed, and would have had a better effect in the field
4  or in other areas of the campaign other than dealing with this
5  contract.
6      "Reprogramming of ActBlue/VAN fundraising sequences,"
7  refers to, again, technical issues that I don't fully grasp but
8  I believe exist.  That's why it's here.  And "donor suppression
9  fallout," making sure that we communicate well.  Again, my view
10  of that is making sure we communicate with donors that we're
11  operating, that we're having a good campaign going forward, and
12  that we're worthy of their continued investment.
13      But again, I should defer.  That's my candidate
14  understanding of this technical description, which should be
15  addressed to the technical author.
16      Q  Is it your understanding that all of the things listed
17  that we've just talked about are in this Category Two --
18      A  Yes.
19      Q  -- you would not have done but for the issues with
20  Grassroots.
21      A  That's my understanding.
22      Q  So all these hours spent managing donor communication,
23  that would not have happened except for what you view as issues
24  with the Grassroots contract?
25      A  Yes.

Page 147

1      Q  And same goes for "reprogramming of ActBlue/VAN
2  fundraising sequences"?
3      A  Yes.
4      Q  Do you know if Grassroots analytics had anything to do
5  with VAN fundraising sequences?
6      A  VAN fundraising sequences?  Grassroots had anything to
7  do with that?
8      The effect of Grassroots delivery had an effect on us,
9  which had us needing to do these items to include fundraising
10  sequences, reprogramming of fundraising sequences.
11      Q  And so it's your testimony that but for any issues
12  that you saw with Grassroots, you would not have had to do this
13  VAN fundraising sequence reprogramming?
14      A  Not -- it's my view that $2,500 in all of these
15  functions resulted from Grassroots analytics not producing what
16  we understood them to have promised to produce.
17      Q  And what did you understand them to have promised to
18  produce?
19      A  Positive fundraising flow into the campaign.
20      Q  That's your understanding of what Grassroots had
21  promised?
22      A  Per the text messages that Danny Hogenkamp gave to me
23  that we went -- on earlier in this deposition.
24      Q  Do you know whether the contract said that Grassroots
25  would provide a positive flow of donations into the campaign?

Page 148

1      A  I would defer that into our discussion on the
2  contract, if we're going to have it.
3      Q  Well, have you -- do you read the contract to say that
4  Grassroots is guaranteeing a certain amount of fundraising?
5      A  I read the contract to say that there was a quality
6  control program, that there were standards in any professional
7  operation, and that a standard in the industry surely would not
8  have been for negative return on investment.
9      Q  Other than what you view as a negative return on
10  investment, do you have any basis to think that Grassroots
11  services were deficient?
12      A  The lack of effective coordination with Meadowlark is
13  a factor.
14      Q  Meadowlark, again, was doing email fundraising; is
15  that right?
16      A  I believe them to be doing email fundraising and
17  potentially other activities as well.
18      Q  And what was your expectation about coordination
19  between Grassroots and Meadowlark?
20      A  My expectation was that the consultants would work
21  together to produce positive results for the campaign.  What got
22  my attention to this lack of effective coordination was
23  David Keith's production of an email that showed conflict
24  between Meadowlark and Grassroots to the detriment of the
25  campaign.

Page 149

1      Q  Okay.  Well, I think -- let me show you what I'll mark
2  as Exhibit 20.
3      And for the court reporter's benefit, this is the new
4  document which we can send you.
5      So if you just flip through this, is this the document
6  produced by David Keith that you have been referencing just now
7  and earlier in the deposition?
8      (Exhibit 20 marked for identification)
9      A  It appears to be, yes.
10      Q  And if we start on what's been marked as DK-000007 on
11  August 9th, 2023, you see Katiana Person from Grassroots
12  Analytics, who in her email at the beginning of the deposition,
13  says, "Hi team, welcome to the GA Clik Collective.  Attaching
14  the countersigned contract below, Looping you in here with some
15  other members of the team."  Please let us know if there's
16  anything you'd like for us to get started.  If you have any
17  questions.
18      And we see Trent at Meadowlark responding two days later.
19  Do you see that?
20      A  Yes.
21      Q  And he says, "Hi Katiana - just added you to NGP w/
22  full access manager permissions.  Please let me know if you need
23  anything else!"  Do you see that?
24      A  I do.
25      Q  And do you know, again, I asked you this earlier, but

38 (Pages 146 to 149)

Page 150

1  does anything about this -- and you said you didn't know what
2  the GA CLIK Collective was -- but does anything about this
3  refresh your memory about what the GA CLIK Collective
4  permission was?
5      A.  No.  I still don't know what the GA CLIK
6  Collective is.
7      Q.  I will represent to you that it's a free email program
8  that Grassroots Analytics does not charge for that helps provide
9  email data for campaigns to use in fundraising.
10     A.  Helps provide email data for campaigns to use in
11  fundraising.
12     Q.  But it is a free program.
13     A.  Okay.
14     Q.  And in the email right above that, August 14th, 2023,
15  we see Katiana Person from Grassroots saying, "Hi Trent, Thank
16  you!  Please let us know when you want our team to get started
17  on an email buy for the campaign.  We'd be happy to get things
18  moving with your free benefits too like email reactivations."
19  Do you see that?
20     A.  I do.
21     Q.  And then if you turn to what the Bates stamp
22  says, DK-000006.
23     A.  Yes.
24     Q.  There's no response from Trent at Meadowlark, but we
25  still see Joey Mamlin from Grassroots saying, "Hey folks! Just

Page 151

1  wanted to check in here!  Let us know if there is anything you
2  need from us."  Do you see that?
3      A.  I do.
4      Q.  And again, no response from Meadowlark.
5      So Joey says, I just "went ahead and pulled a list of re-
6  activation targets.  These are folks that are on your list who
7  seem like they are very active emails and might be worth
8  re-engaging (if they haven't been emailed recently)."  Do you
9  see that?
10     A.  Yes.
11     Q.  And it looks like there's an attachment -- attachment
12  that would have come with this email.
13     A.  Okay.
14     Q.  Then we see Trent responding to this the next day on
15  August 16th.  And he said, "At this point we haven't discussed
16  additional paid acquisition for email gain, given the
17  deliverability issues from launch - let me know if i'm wrong
18  here but i thought the understanding is that we would opt into
19  Clik Collective in order to flesh out which names were
20  worthwhile to attempt to re-activate as part of the free piece
21  for signing up to be part of this data sharing service, with the
22  incentive that if we did decide to move forward on acquiring
23  additional emails it would be at a significant discount."  Do
24  you see that?
25     A.  I do.

Page 152

1      Q.  And another Grassroots person responds ten minutes
2  later -- 11 minutes later, on August 16th to say your
3  understanding is correct.  Do you see that?
4      A.  I do.
5      Q.  And she then goes on to explain sort of how their
6  process works to identify target donor emails.  Do you see that?
7      A.  I see the written parts here, yes.
8      Okay.  She's explaining a process.  Yes.
9      Q.  And then if you look at what's been marked as
10  DK-000005, or that's the page number, we see an email five days
11  later from Trent on August 21st saying he's adding another team
12  member of his.  "We've run into an issue as we were attempting
13  to upload names and there were around ~760 names that were new
14  contacts."  He's basically saying we're having a technical issue
15  but that was on Meadowlark's end.  Do you see that?
16     A.  I see he's referring to 760 "have tried uploading just
17  based on VAN ID as well as email only."  "It's giving us similar
18  results.  Wondering if y'all had the original list that was
19  exported or created that we could compare in order to figure out
20  where the discrepancy might be."  I see that by Trent.
21     Q.  And six minutes later we see Grassroots responding to
22  say, "For sure, I'm attaching the list that I pulled from NGP
23  below!  Do you want to send over the 760 names that were new so
24  I can investigate?"  Do you see that?
25     A.  Yes.

Page 153

1      Q.  And then if we go to the first page of this document,
2  which is DK-000004.
3      A.  Okay.
4      Q.  There's some more sort of back and forth about how to
5  fix the issue.  And it looks like by August 22nd, it had been
6  solved.  And we see on August 22nd Matt from Meadowlark
7  Strategies writes, "Thank you for sorting this out, Joey!  If
8  this turned out to be an issue on the NGP side, I was worried
9  that we'd be dealing with some much bigger problems, so I'm VERY
10  glad we isolated it now."  Do you see that?
11     A.  I do.
12     Q.  And Joey then responds on August 25th to say, "Hey
13  Matt, Just wanted to check in and see if everything seems
14  resolved here, or if you needed anything else from us here."  Do
15  you see that?
16     A.  I do.
17     Q.  And is this -- again, now that we've looked at the
18  whole email chain -- is that the document that you were
19  referring to that had been produced by David Keith?
20     A.  I don't think so.  I think there was an additional one
21  and I could be mistaken, but was there an additional document
22  produced by David Keith?
23     Q.  He did -- he produced maybe four or five documents.  I
24  don't think he produced anything else like this.  There were a
25  few emails that he produced.  But I'm not -- I have not

39 (Pages 150 to 153)

Page 154

1    seen -- maybe you all got something else from David Keith -- but
2    I have not seen anything else like that. That's the only thing
3    I've seen about Meadowlark that David Keith produced, as far as
4    I remember.
5        A    Okay. Probably just need to leave that there then.
6        Q    Okay. In other words are you seeing any issue here
7    that Grassroots didn't deliver on something that they were
8    supposed to deliver?
9        A    I'm seeing a little glitch, but I am not seeing what I
10   recall seeing before.
11       Q    And what is it that you recalled seeing before to the
12   best of your memory?
13       A    An outage of our ability to communicate with donors,
14   either by a web server or our 10DLC. And I'm unclear about
15   that.
16       Q    Okay.
17       A    10DLC telephone service.
18       Q    Okay. But this is not what you were --
19       A    I don't think it was.
20       Q    Okay. And you don't remember any other details of
21   when that was or what happened or how Grassroots might have been
22   involved?
23       A    Not as I sit here right now without referring to other
24   pieces of paper.
25       Q    Okay. Turning back to the damages -- the statement of

Page 155

1    damages that we marked as Exhibit 19.
2        A    Yes.
3        Q    Do you know whether -- for anything in this Statement
4    of Damages that was produced by your campaign -- there are
5    receipts or documentation of any of these costs?
6        A    Well, in the first chart, the processing fee would
7    have been documented by ActBlue in a refund processing fee, the
8    processing fees for refunds, and then the refunds themselves
9    would just be an added amount totaling $52,390.
10       Q    And what about any of the rest of this?
11       A    We already discussed Chart Number Two, Chart Number
12   Three on the reverse side of Exhibit 19, "Donor Retention Loss,
13   lost Re-engagement, return on investment, Public Perception
14   Impact, Fundraising Momentum Lost," and then a total. These
15   items were produced by someone with many years of experience
16   campaigning with expert-level estimates for these amounts.
17       Q    But you don't know what methodology was used to get to
18   these particular numbers?
19       A    Not in specifics.
20       Q    And when it -- in the category three, reputational and
21   opportunity costs, in the "Category, Donor Retention Loss,
22   Amount $5,000," it says, "Description: Estimated loss from
23   prospective donors turned off by refund reports." What does
24   that mean?
25       A    To my knowledge, it means just what topic it is -- an

Page 156

1    estimate of loss.
2        Q    What does it mean, "prospective donors turned off by
3    refund reports"?
4        A    When the refunds are in the public domain, donors know
5    of it. That activity of having refunds is a discrediting factor
6    in people's individual calculations or assessments of how much
7    they want to contribute to a campaign. That is the
8    understanding that I would have as a layperson from this
9    technical estimate.
10       Q    Have you ever made a political donation?
11       A    I have.
12       Q    Did you look up donor refunds for that candidate
13   before you made the contribution?
14       A    I have -- no. I have a general awareness of the
15   health of a campaign or of a committee or club's political
16   contributions before I make one, you know, yeah.
17       Q    And what refund reports are you referring to?
18       A    Refund reports that would have been on our FEC reports
19   from ActBlue refunds. The FEC reports would show the refunds
20   from the table of ActBlue.
21       Q    Do you know how often your campaign files FEC reports?
22       A    Quarterly.
23       Q    And so there would have been some lag between any
24   public reporting of refunds and when they happened; is
25   that right?

Page 157

1        A    I believe so.
2        Q    So if a refund was requested and given in
3    October 2023, donors wouldn't have immediately known that if
4    they were going to your FEC reports before deciding whether to
5    make a campaign contribution.
6        A    Okay. So we're getting into a little technical
7    compliance so I'm not certain of my answers. I am aware that
8    the campaign has more frequent reporting leading up to a primary
9    election in August, in our case in Florida, and also in November
10   for the general. So it's not necessarily quarterly at that
11   time; it is more frequent.
12       Q    And so your understanding of this $5,000 is that
13   that's meant to capture donors who would have made a donation to
14   your campaign but went to the FEC website, saw refund reports,
15   and decided not to make a contribution because of that?
16       A    Not to make further contributions to retention.
17       Q    That's your understanding of that $5,000?
18       A    Yes.
19       Q    Okay.
20       A    But again, it's a layperson's understanding but an
21   inherently technical and professionally derived estimate.
22       Q    You don't know how $5,000 was the number that was come
23   up with?
24       A    I cannot articulate that here.
25       Q    And how about "Lost Re-engagement ROI," estimate

40 (Pages 154 to 157)

Page 158

1   of $2,500, "Failure to secure follow-up donations due to bounced
2   emails/disputed contacts."  What does that mean?
3        A   Failure to secure follow-up donations due to bounced
4   emails and disputed contacts, there was some question about the
5   quality of the emails that we had that related to Grassroots
6   activity, but I cannot articulate it more.  And again I need to
7   refer that to the estimator of this -- of this -- of this loss.
8        Q   But we've talked about the fact that your campaign
9   didn't pay anything to Grassroots for emails.  Everything was
10  text.  Any payment was made for text messages.  So emails was
11  never part of services that your campaign paid for to
12  Grassroots.
13       A   Okay.
14       Q   So are you still claiming lost re-engagement ROI due
15  to bounced emails even though Grassroots was not --
16       A   I would want to refer to -- I would like to consult my
17  technical advisor on the production on this line item before I
18  make a definitive testimony on it.
19       Q   And what does "disputed contacts" mean?
20       MR. PRESS:  If you don't know, don't
21  speculate.
22       THE WITNESS:  I don't know.  But I do say -- I
23  do see that due to bounced emails -- possibly disputing
24  emails so I'm speculating.  I don't know.
25  ///

Page 159

1   BY MS. ALI:
2        Q   Here it says, "Public Perception Impact, $3,500,"and
3   then the description is "Perception of instability or fraud from
4   large refund fund totals on public FEC reports."
5        Do you know if any donor or anybody ever contacted your
6   campaign to suggest that they perceived instability or fraud in
7   your campaign?
8        A   I know that when my soon-to-be campaign manager
9   Vanessa Brito joined the campaign, she was smart enough, as are
10  many in the industry, to take a look at refunds and make an
11  assessment.  In her case, she almost declined the role of
12  campaign manager because of suspicion of fraudulent activity.
13       Q   Did any donor ever communicate to you or anyone at
14  your campaign that they viewed your campaign as unstable or
15  fraudulent?
16       A   I had calls from -- or when I called some donors, I
17  don't -- I can't tell you who -- but it was frequent that we'd
18  get a general response that was specific to my campaign, you're
19  calling us too much or you are texting too much.
20       Q   And how do you know that that's specific to your
21  campaign?
22       A   Because I talked to him on the phone or in -- yeah.
23       Q   And did they say --
24       A   That's at least -- that's something I personally
25  observed.  There might be other feedback we get from texting

Page 160

1   outside of Grassroots.
2        Q   Did they say you're calling too much or did they say
3   you were texting too much?
4        A   Getting in touch with the campaign in both modes and
5   to also included emails.  So donors were basically burnt out by
6   the number of solicitations they're getting by all means.
7        Q   And you -- your understanding is that that's specific
8   to your campaign not that it was an election season and they
9   were getting lot of funding --
10       A   Well, it was both.  It was both election season and a
11  general problem with candidates across the country, and I was
12  certainly one of them.
13       Q   But that's setting aside people who might have been
14  fatigued by the number of fundraising communications they were
15  getting from your campaign or maybe other campaigns also in a
16  presidential election year.  What -- did you ever get contacts
17  from donors or communications from donors about instability or
18  fraud that they perceived in your campaign?
19       A   I personally did not have that direct feedback.  My
20  campaign team or others might have.
21       Q   But you're not aware of any?
22       A   I'm not aware of any specific communication.
23       Q   Did your campaign ever get a communication from any
24  donor saying that they were turned off from donating to your
25  campaign because of fraud reports?

Page 161

1        A   I personally did not get that specific feedback.
2        Q   Did anyone from your campaign ever communicate to you
3   that they had gotten that feedback from donors?
4        A   Specific to fraud and refunds, I can't remember a
5   specific report from a member of my team.
6        Q   Do you know whether you or your campaign has any
7   evidence that any prospective donors did not donate because they
8   were turned off by refund reports or perception of instability
9   or fraud?
10       A   As I see right now, the answer is no for specific
11  feedback that I can identify.
12       Q   And this last category, "Fundraising Momentum
13  Lost, $5,000," and the description is "Inability to capitalize
14  on fundraising windows due to corrective actions."  Do you know
15  what that means?
16       A   Yes.  The corrective action -- well, I know part of
17  it, part of what that means.  Again, I would have to refer to
18  the technical experience estimator here.  However, there was a
19  lot of turbulence in our campaign because of this inability to
20  have a good fundraising operation, which I attribute to this
21  contract and to bottom-line performance.  That caused a lot of
22  internal turbulence within the campaign, and that certainly
23  affected my ability to make as many and to have as good quality
24  of calls as I would have otherwise.
25       It also had effects beyond the Senate campaign and beyond

41 (Pages 158 to 161)

Page 162

1   the time when we were working with Grassroots into the House
2   campaign. More than me, Jake, when he was helping with
3   fundraising; Joanna, when she was helping with fundraising; the
4   other fundraisers; and myself had trouble keeping the momentum
5   going of a building -- building campaign.
6       Q   And how did Grassroots text message fundraising
7   services impact your call time experience?
8       A   During the Senate campaign, so we're talking the
9   period of July through September. They were working independent
10  of me. But it was a team effort in that I was calling folks and
11  I didn't know whether or not I was calling the same people that
12  others were texting. I suspected that was happening, so that's
13  more touches. And that may or may not have been a positive.
14      I suspect it was a negative in that we didn't actually
15  produce the income that we expected to produce based on the
16  contract and the representations. That was a negative influence
17  on internal systems.
18      Q   And is it your view that if you were calling people
19  who were also getting texts from Grassroots, that that's
20  Grassroots' responsibility to prevent you from calling people
21  who were getting texts?
22      A   No.
23      Q   You mentioned this earlier and in response to an
24  interrogatory response in this case, you said that in July 2023,
25  campaign staff informed you that text-and-email fundraising was

Page 163

1   producing a two-to-one ROI, but that by August or early
2   September 2023, you recognized the ROI claim was false.
3       How did you come to learn that the ROI claim was
4   false -- the ROI claim from your campaign staff was false?
5       A   It was my own determination based on our lack of
6   progress toward a million-dollar goal by the end of September.
7   It was patently not happening. Therefore, I stopped using it
8   and asked my team why I was continuing. Why are you directing
9   me to use this?
10      Q   In other words you saw disappointing fundraising
11  returns, and you said it can't possibly be true that we're
12  making a two-to-one ROI?
13      A   That's right.
14      Q   There was no other - you deduced that based on the
15  amount that you were bringing in the door on fundraising?
16      A   To the extent I knew the amount we'd bring in the
17  door, yes. And how did I know that? Because pressure was on to
18  get it, and it just was never satisfactory on a line to get
19  to 7,000 or One million. Yeah. And we ended up 7,000-ish.
20      Q   And most of the money that you raised from when you
21  launched your Senate campaign in July 2023 until the election in
22  November 2024 was raised in those early days -- July, August,
23  and September -- when you had raised about $700,000 going into
24  the -- when you exited the Senate campaign?
25      A   I would have to really look at the numbers to verify

Page 164

1   that, but I think early in this deposition we talked
2   about 700,000 or thereabouts in the Senate portion. And we
3   ended up with 1.3 million. So that's a little bit more than
4   half in those early months, if those numbers are correct.
5       Q   Are you currently running for office?
6       A   I am.
7       Q   And what are you running for?
8       A   U.S. House of Representatives for this 28th
9   Congressional District.
10      Q   And what date did you launch that campaign?
11      A   By memory, May 7th, 202- --
12      Q   Five.
13      A   -- -5. Thank you.
14      Q   And are you -- what's the current status of the
15  Phil Ehr for Congress Campaign Committee.
16      A   That refers to the 2024 campaign. The current status
17  is that it's open. We are keeping it open to resolve debt and
18  potentially retire debt, although prospects are looking pretty
19  poor. That's the status of that campaign.
20      Q   And when you say resolve or retire debt, are you
21  referring only to the Grassroots' issue or other issues also?
22      A   I'm referring to the Grassroots' issues, and I'm
23  referring to the other debts that are listed on the report.
24      Q   And when he said the report, you're referring to the
25  FEC report?

Page 165

1       A   I'm sorry. Yes, the FEC report. Yes.
2       Q   Does Phil Ehr for Congress have any staff?
3       A   Not dedicated staff. The Phil Ehr for Congress
4   Campaign is serviced by Dr. Brito and me and up until recently,
5   a compliance firm that we've since, you know, let go because for
6   various reasons it was not required.
7       Q   What do you mean by that?
8       A   It means we no longer need a compliance firm to make
9   FEC reports. The old campaign has very little activity.
10      Q   Do you still receive donations to Phil Ehr
11  for Congress?
12      A   We shut down the ActBlue part of that so I think the
13  answer is no. Although, there might be an odd check that
14  arrived, I don't think we've received anything in a very
15  long time.
16      Q   Do you disburse funds from Phil Ehr for Congress?
17      A   We disburse funds as required. We did disburse funds
18  for some compliance work. We disbursed funds for representation
19  in this legal case, and I'll have to look at the report to see if
20  we disbursed funds for other matters.
21      Q   Are the reports filed by the Phil Ehr for Congress
22  Campaign Committee with the FEC accurate and complete to the
23  best of your knowledge?
24      A   We're talking -- again, we're referring to this
25  old one?

42  (Pages 162 to 165)

Page 166

1    Q    The reports filed in 2025, let's say --
2    A    Right.
3    Q    -- for the old --
4    A    In preparation --
5    Q    -- Phil Ehr for Congress Committee Campaign?
6    A    -- in the preparation for this deposition, we noticed
7    there's a mistake that needs to be corrected.
8    Q    And what is that?
9    A    A report of a loan listed on an FEC report from Phil
10   Ehr for Congress to Phil Ehr for Congress.  On its face, that's
11   a mistake.
12   Q    And should it have said from you personally to the
13   campaign or what should it have said?
14   A    Needs a little bit further examination.  But on its
15   face is an erroneous line entry?
16   Q    Meaning there was no loan at all?
17   A    Correct.
18   Q    And do you remember the amount of that loan?
19   A    It was approximately 66,000 thereabouts.  And I'm
20   doing this from memory.  You know, it'd be better to look at the
21   report itself.  But I think you'd find that if you looked at two
22   other loans previous to that, you'll find that those add up to
23   the same value.  So it appears to be clerical error.  It needs
24   to be corrected.
25   Q    Who prepared that erroneous FEC report that had the

Page 167

1    erroneous loan information in it?
2    A    The treasurer at the time, who was the successor of
3    Katz Compliance SB Consulting Service -- Consulting Solutions
4    Limited.
5    Q    And when did you learn of this error on the form?
6    A    Last night.
7    Q    Okay.  Other than that issue, are the FEC reports that
8    your campaign filed true, accurate, and complete to the best of
9    your knowledge?
10   A    Well, because of that issue I don't want to certify
11   that.  I want to look at the other things that are there too.
12   Also was brought to -- that I realized that there's a request
13   for additional information from the FEC that I'm not sure if we
14   answered when the campaign was with the previous treasurer.  So
15   I need to look into that.
16   Q    But you no longer have a compliance firm to assist
17   with those kinds of things?
18   A    At the present, we don't.
19   Q    I'll hand you what I'll mark as Exhibit 21.
20        (Exhibit 21 marked for identification)
21   A    Thank you.
22   Q    This is an FEC Form 3 for Phil Ehr for Congress.  And
23   it's the July quarterly report filed August 2nd, 2025.  Do you
24   see that?
25   A    Yes.

Page 168

1    Q    And this is the -- this first piece of it is the
2    summary page.  If you look at the second page, there's a line
3    item, line 8, that say, "Cash on Hand at Close of Reporting
4    period."  Do you see that?
5    A    I do.
6    Q    And the number listed there is $88041.72, do you see
7    that?
8    A    I do.
9    Q    And this says, "Treasurer:  Shelby Green."  Was that
10   the treasurer of your campaign?
11   A    That's the Shelby Green who owns the consulting firm I
12   just mentioned.
13   Q    And it says date signed August 21st, 2025.
14   Do you see that?
15   A    Yes.
16   Q    How did the campaign -- has the campaign spent down
17   this $88,000 since August 21st, 2025?
18   A    I don't believe that $88,000 is an accurate figure.
19   Q    Why is that?
20   A    Because of -- well, because of the factors.  I
21   don't -- I don't know.  It includes the loan, this $66,000 loan
22   that we just mentioned.  But clearly this report requires me, as
23   the new treasurer, to go through it again.
24   Q    You are the new treasurer?
25   A    I am the new treasurer, and I will seek assistance

Page 169

1    with that because I'm not an accountant either.
2    Q    If you flip ahead to schedule B of this report.
3    A    Schedule B?
4    Q    I think keep going down.
5    A    I see Schedule B.
6    Q    Schedule B is a list of itemized disbursements.
7    A    Yes.
8    Q    There are payments listed on this first page to
9    Dr. Brito, different amounts that all are just listed as
10   payments.  Do you know what those are for?
11   A    Individual line items, I would need to consult with
12   Dr. Brito.  But I can tell you that each of these we've gone
13   through and they meet a political purpose that's permitted by
14   the FEC.
15   Q    But sitting here today, you don't know what those
16   payments are for?
17   A    Not one by one, no.
18   Q    And if you go ahead to the -- if you look at --
19   A    Although some of them I probably could.
20   Q    But what are the kinds of things that those payments,
21   in your -- without guessing --
22   A    Right.
23   Q    -- what are the kinds of things that those payments
24   are for?
25   A    For the purpose of raising money to retire debt.  For

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 170

1  the purpose of exploring whether I was viable to be a candidate
2  in another congressional district, specifically the First
3  Congressional District, where I previously ran during the
4  special election, to see if I would be a candidate for the
5  special election.
6      The determination was no. That the previous Democratic
7  nominee wanted to run and she was much more suitable for the
8  people up there than I would have been. That's part of what we
9  did.
10     Another part of what these items are for is for assistance,
11 political assistance to Democrats as part of my
12 exploratory -- as part of raising funds to retire debt and to
13 help them maximize electoral results. As in going through this,
14 we ended up -- yeah, I'll just stop there.
15     So airline tickets up to Pensacola and back. Flight and
16 other items that, from various vendors, related to sustenance
17 and beverages during work sessions and after-work sessions.
18 Normal type of things one does in a political context.
19     Q  Okay. And the payments to Dr. Brito, is that for
20 labor or those are reimbursements for out-of-pocket expenses?
21     A  (Indiscernible).
22     Q  Okay.
23     A  Mostly for labor.
24     Q  Okay. And if you look at the date of disbursement and
25 go down to June 17th, 2025.

Page 171

1      MR. PRESS: They're not in order.
2      MS. ALI: Oh, oh, God.
3      MR. PRESS: You've organized them
4  alphabetically.
5      MS. ALI: Oh, I see.
6  BY MS. ALI:
7      Q  Okay. Well, do you see a disbursement -- okay, so if
8  it's alphabetical, then do you see a disbursement to PetSmart on
9  June 17th, 2025?
10     A  Yes.
11     Q  For $178.92 --
12     A  Yes. Yes.
13     Q  -- do you know what that was for?
14     A  Pet supplies to include a dog. That was, I think,
15 there was in Miami-Dade County, a push to adopt pets. And we
16 viewed it as something that we should do. So that was adopted
17 and those supplies were in association with that, and not so
18 much in lieu of but in lieu of proper salary or compensation to
19 Dr. Brito, who keeps the pet in good health. I think we put
20 that on social media as hey, look at good things we're doing.
21     Q  There are a bunch of -- like, seven, eight -- no,
22 eight, nine ten, 11, -- 12 purchases at Total Wine. Do you know
23 what those are for?
24     A  Those are all for, as I said just as I mentioned
25 earlier, for activities with groups or with mostly small groups

Page 172

1  of work-related sustenance. The amount of work that was put in
2  after the election, leading up to my current candidacy and
3  leading up to the formation of a PAC organized under Florida law
4  was total.
5      It was substantial. 24/7 or near 24/7, you know, with
6  sleep, of course, in a full-on continuing pace for the political
7  effects that helped my political campaign back in 2024 have the
8  credibility to retire debt and to launch something else. That
9  something else being the PAC in my current campaign.
10     Q  In May and June of this year?
11     A  Yeah. And we launched my campaign in, I think we said
12 earlier in this deposition, on May 7th, 2025. And we opened up
13 the new account for the new campaign, a different entity,
14 shortly thereafter.
15     We didn't receive any donations in to my new campaign into
16 the bank account that's tied to this report. So we did use the
17 old campaign's bank account up until such time as we hit the
18 threshold to start reporting the new campaign.
19     Q  This FEC report lists a $66,000 -- $66,500 loan from
20 you to the campaign.
21     A  Could you show that -- that's -- that's just what --
22     Q  It's on the third page. It says, "Summary Page, then
23 there's a Detailed Summary Page." It's on the detailed
24 summary page.
25     Yep, you've got it. And it's paragraph or item 13, loans.

Page 173

1  And it says, "Made Or Guaranteed By The Candidate --
2      A  Yes.
3      Q  -- $66,500." You're saying that that's just wrong;
4  you did not make that loan?
5      A  Okay. So there I made two different loans that
6  from -- again, from memory -- we should look at it maybe more
7  forensically -- but made two different loans that added up
8  to -- if it added up to that amount. But there was one line
9  item that was 66,500 from the campaign to the campaign that was
10 in error.
11     There were other loans that were put into the campaign in
12 this general time frame that were made for the purpose of
13 clearing all their debt, making sure that Mr. Umunna was paid
14 what we owed him, making sure that other people that we owed
15 were compensated so we could clear out as much debt as we could.
16 It was proper to clear out, I should say.
17     Q  Do you know how much you have personally loaned your
18 campaign, the Phil Ehr for Congress campaign?
19     A  Looking at it, I received reports that it adds up to
20 quite a lot, $200-some thousand.
21     Q  And other than paying Mr. Umunna, clearing that debt
22 which you just mentioned, what other debt did you clear with
23 those loans?
24     A  Around that time frame? because there were other
25 things I paid for over the course of the two-year campaign. And

44 (Pages 170 to 173)

Page 174

1    I'd have to look at it to be sure.  There's Mr. Umunna and
2    there's some others.  I'm forgetting right now who those other
3    loans were, but it's in the disbursements as well.
4        Q   Have you loaned any money to the Phil Ehr for Congress
5    Campaign since June 30th, 2025?
6        A   Not that I recall, no.
7        Q   Is it possible that you've loaned more money since
8    June 30th to the Phil Ehr for Congress Campaign?
9        A   I guess it's possible to.  And it's possible to have
10   done it for paying NGP, for paying other infrastructure needs of
11   this old campaign.  But I think that I did that prior to that
12   June 30th date.  Again, I'd have to look at it.
13       Q   It's to make sure you're no longer actively
14   fundraising for the Phil Ehr for Congress, correct?
15       A   Correct.
16       Q   But you are fundraising for Air Force Inc.
17       A   Air Force Inc. being the new campaign committee for
18   the 2026 campaign cycle.  Yes, ma'am.
19       Q   And you are the director of Air Force Inc.?
20       A   I am a director of Air Force Inc.
21       Q   Why did you decide to start Air Force Inc. instead of
22   continuing to use Phil Ehr for Congress?
23       A   Legal advice.
24       Q   How does Air Force Inc.'s purpose differ from that of
25   Philip Ehr for Congress?

Page 175

1        A   Different election cycle.
2        Q   Anything else?
3        A   Not that pops to mind.  No.  It's meant that.
4    Air Force Inc.'s purpose is a campaign committee for the federal
5    election.  That's its only purpose.
6        Q   When did you incorporate Air Force Inc.?
7        A   After -- well, I don't recall exactly.  It's either on
8    or before the date of filing or shortly thereafter and I forget.
9    I think it might have been on or before but, again, I'd have to
10   just defer.
11       Q   Why did you decide to set up -- why did you decide to
12   incorporate Air Force Inc. instead of setting it up as an
13   unincorporated association like you did with Phil Ehr for
14   Congress?
15       A   On legal advice.  On legal advice is a better --
16       MR. PRESS:  That's all you need to say?
17       MS. ALI:  Yeah.
18       THE WITNESS:  Okay.
19   BY MS. ALI:
20       Q   Does Air Force Inc. have a board of directors?
21       A   Yes.
22       Q   And who are the members of that board?
23       A   It's in flux right now it's myself.  It's Jill
24   Lewis-Daggs and it's Shelby Green.
25       Q   What was the second name?

Page 176

1        A   Jill Lewis-Daggs.
2        Q   D-A-G-S?
3        A   Two Gs.
4        Q   Two Gs.
5        And who is Shelby Green?
6        A   Shelby Green was the former Compliance Officer.
7        Q   And treasurer, who prepared this July --
8        A   Yes.
9        Q   -- report that we looked at?
10       A   And we were in the process of changing her out to
11   another person on the incorporation.
12       Q   What are her qualifications to serve on the board of
13   Air Force, Inc.?
14       A   Who?
15       Q   Shelby Green.
16       A   Citizen of the State of Florida.
17       Q   Anything else?
18       A   Her professional, I think -- I think that's sufficient
19   qualification.
20       Q   And how about Jill Lewis-Daggs?  Who is she?
21       A   Who is she?  She's a colleague from Okaloosa
22   County, Florida.
23       Q   Is she a political consultant?
24       A   No.  She is a private citizen.  She is active in the
25   Democratic party.  She does not to my knowledge. -- To the best

Page 177

1    of my knowledge, she doesn't have a compensated role in
2    politics.
3        Q   Do you have a fundraising strategy for
4    Air Force, Inc.?
5        A   Not that's written down, but yeah, A fundraising
6    strategy is to get on the phone -- okay.  The answer is yes.
7        Q   And what is that strategy?
8        A   The strategy is to call donors who have given to me
9    before, and when we can afford text and email, we build the
10   infrastructure to be able to do that.  We have the capability to
11   do that.  We haven't really had the funds to execute it yet.
12       Q   Is your plan for Air Force, Inc. to do text and email
13   fundraising in-house rather than hiring an outside vendor?
14       A   That's the current plan.
15       Q   And who will run those programs?
16       A   Dr. Brito.
17       Q   Including writing copy?
18       A   In coordination with me, yes.
19       Q   And including deciding who to contact?
20       A   Yes.  What I would term targeting, yes.
21       Q   And how about cleaning data?  Who's responsible
22   for that?
23       A   Vanessa Brito, by the by, she has a PhD in political
24   science from Florida International University, to my
25   understanding, focused on the quantitative side of political

45 (Pages 174 to 177)

Page 178

1  science and campaigning.
2     Q  And do you know what software you use to clean data?
3     A  No.
4     Q  For texting, do you use an autodialer or do you have
5  individual people sending those texts?
6     A  I would defer but we haven't had a whole lot of
7  experience doing that this campaign yet.
8     Q  When did Jill Lewis-Daggs become a member of the Air
9  Force Inc. Board?
10    A  At the founding.
11    Q  And how about Shelby Green?
12    A  Same.
13    Q  And same for you?
14    A  Yes.
15    Q  Have you loaned any money to Air Force Inc.?
16    A  Yes.
17    Q  And how much?
18    A  In the order of -- from memory, in the order
19 of 30,000.
20    Q  When was that?
21    A  At its founding.
22    Q  What was the purpose of that loan?
23    A  I'm forgetting that at the moment.  It was probably
24 the infrastructure set up for NGP.  Other things that were
25 required to set up.

Page 179

1     Q  Do you have a particular fundraising goal, like the
2  same way that we were talking about with your Senate campaign?
3  David Keith's goal was, and it sounds like your goal was, to hit
4  a million dollars by October.  Do you have some kind of goal
5  like that for the current 2026 campaign?
6     A  No.  But the strategy for the campaign as a whole is
7  completely different.
8     Q  What do you mean by that?
9     A  The Senate campaign leading in to the previous 2024
10 House campaign was money-focused.  My current campaign for 2026
11 is voter-engagement-focused.
12    Q  And how does that impact your overall campaign
13 strategy?
14    A  Those two different goals are strategies in
15 themselves.  The level of engagement that I have currently is
16 head and shoulders miles ahead of what I ever had in the 2024
17 Senate campaign and in the early months of the 2024 House
18 Campaign.
19    What I mean by that is I'm helping neighbors.
20 Neighborhoods have come to my campaign as a last resort of
21 helping them with various issues, from fighting development that
22 was unwanted and non-environmentally sensitive land, to
23 helping -- recognizing that there's a waste transfer station
24 coming in a lot near some neighborhoods and also near an
25 airport.  And I've been seen by them as authentically and

Page 180

1  credibly helping them, standing with them at county and city
2  government venues, advocating it.
3     We have mixed results, wins and losses.  The firefighter
4  budget in Miami-Dade County and how that is determined for the
5  helicopter air-rescue service is another example.  So that kind
6  of activity was not possible in the Senate campaign, where my
7  role was to be on the phones.  Call, call, call, call.  I very
8  rarely interacted with voters.  This is the opposite.  So we are
9  interacting extensively with voters in my congressional
10 district.
11    Q  How are you measuring voter engagement in the way that
12 you're just talking about it now?
13    A  As a candidate measuring it anecdotally with credible
14 stories.  For a full answer, I would need -- I would refer you
15 to talk to Dr. Brito.  One other way is appearances in reporting
16 in newspapers.  I was just this weekend at a No Kings Rally, and
17 I was a speaker, and it was reported on NPR.  Not as a
18 candidate, though, just as me.
19    This was not a candidate activity.  So it's a little, you
20 know, it's not a candidate.  It was not a candidate activity,
21 but it was me showing up.  Why did I show up?  Because I'm
22 engaged in the community.  I had the credibility to be brought
23 into as a speaker because I have worked with people who are
24 relevant to the topic that I was talking -- talking about
25 working -- or talked to the crowd about.

Page 181

1     Q  Why wasn't that a candidate activity?
2     A  In the past?
3     Q  No.  The No Kings Rally.
4     A  Why wasn't that?  Because the organizers did not want
5  candidates speaking so very deliberately.  I did not have my
6  candidate badge on.  I was there with the credibility of a
7  retired Navy veteran.  Also with the credibility to talk about
8  the subject I talked about, which was the proposed Trump
9  Presidential Library next to the Freedom Tower in the heart of
10 Miami.
11    Why did I have that credibility?  Because I have worked
12 alongside Dr. Dunn in at least one.  Dr. Dunn was the person who
13 is the plaintiff in a lawsuit in the State of Florida that had a
14 temporary stay to the conveyance of land from Miami-Dade or from
15 the State of Florida -- or the Miami-Dade County to the
16 Presidential Library Foundation.  He had a temporary stay in
17 that.  He was out of town.
18    I was selected to talk about that because he couldn't.  And
19 I was selected on the basis of he knows me.  I worked with him a
20 little bit, and I'm a Navy veteran and good speaker.  That type
21 of thing is happening in other places as well, in my district.
22    Q  Do you know how much you have raised since launching
23 your 2026 campaign?
24    A  I was asked just this the other day, and I'm failing
25 to come up with an answer right now, and my head is fuzzy.

46 (Pages 178 to 181)

Page 182

1    Q    How about a ballpark number?
2    A    A ballpark number is probably around $50,000, but my
3  campaign manager will not be happy with my not knowing the
4  precise number.
5    Q    And is Dr. Brito your campaign manager?
6    A    Yes, ma'am.
7    Q    And for purposes of the 2026 campaign, is Dr. Brito an
8  employee or a consultant?
9    A    She is a 1099 consultant.
10    Q    And since when has that been true?
11    A    Since we started paying her, I guess, it was May. I
12  think it was May.
13    Q    2025?
14    A    Yeah. Or possibly June or possibly July. When is it;
15  October? It might have been -- I don't know.
16    Q    Okay. But some time in this campaign season, spring
17  or summer or 2025?
18    A    Actually, come to think of it, it is more like summer.
19    Q    Okay. So there was a period of time when Dr. Brito
20  was not paid by your -- any version of your campaign?
21    A    Right. Right. She's working a lot of time on a basis
22  that "you will get paid later" or on a basis of volunteer
23  support on the basis of, you know, in-kind, she is a committed
24  campaigner for the campaign.
25    Q    And you -- when we were looking through the Statement

Page 183

1  of Damages that your campaign provided, you said several times
2  something like -- and I'm not going to get the language exactly
3  right -- but -- and tell me if I'm misstating your
4  testimony -- but I heard you to say something along the lines of
5  Dr. Brito, you know, to the best of your understanding,
6  Dr. Brito had prepared this based on her expertise and --
7    A    Yes.
8    Q    -- what expertise is that?
9    A    That expertise includes but not exhaustively, ten
10  years' worth of campaigning experience in South Florida and
11  beyond. It includes a very successful recall of a mayor of
12  Miami as her first success 15 or so years ago. It includes her
13  advocacy in the health care field.
14    There was a show up in -- or a news show up in the
15  Jacksonville area that I understand won an Emmy Award based --
16  recently won an Emmy Award based on Dr. Brito's work. This TV
17  station reported on it, and it was such a big, important piece
18  in health care, having to do with the State of Florida's
19  management of health care provision that they got no award.
20    It has to do with Dr. Brito's Spanish language abilities,
21  has to do with her understanding, having grown up here and
22  having studied rigorously at FIU and other places, the different
23  messaging that needs to occur with the Cuban American community
24  in South Florida, Venezuelans, Nicaraguans, Haitians, the whole
25  gamut of very distinct and diverse population that is in

Page 184

1  the 28th congressional district. She's an expert in that and
2  she has the academic credentials and training to back that up as
3  a PhD in political science at FIU.
4    Q    Do you know when she graduated from FIU with
5  the PhD?
6    A    I know that she had PhD all but dissertation since
7  before I knew her. And she finally defended her dissertation
8  after a long delay within the past year. And it's a very happy
9  occasion, well-deserved.
10    Q    How did Dr. Brito come to work for your campaign?
11    A    In the -- in the House campaign, as we switched over
12  to the House, it was very clear -- well, okay. We were in the
13  Senate campaign. The main people that were helping in the
14  Senate campaign were not from South Florida,--
15    Q    David Keith?
16    A    -- from New Jersey.
17    Yeah, Jake's from New Jersey, Obi Umunna, Florida, but
18  Jacksonville. The Comms Officer Zielinski was from another
19  place as well. We did not have local South Florida expertise.
20  And so Obi went looking, found somebody, he interviewed her
21  and -- and then we -- we brought her on as a call-time
22  assistant. And I think I've explained it beyond that.
23    Q    Okay. I am handing you what I'll mark as Exhibit 21.
24  This is a document that Mr. Press provided to me.
25    MR. PRESS: I'm going to object your using

Page 185

1  this in a deposition. It's marked right on its face.
2  Privilege for settlement purposes only. Rule 408.
3    MS. ALI: I'm not admitting it for anything.
4    MR. PRESS: We're not using it in a
5  deposition.
6    MS. ALI: Okay. Well, you can give the
7  document back to me and I'll ask questions about it.
8    MR. PRESS: We're not asking questions about a
9  settlement document.
10    MS. ALI: What is the basis to object to
11  asking questions about a settlement document in a
12  deposition? I'm not admitting it for any evidentiary
13  purpose at this time.
14    MR. PRESS: The substance of it is privileged
15  and confidential for settlement purposes only. Rule 408
16  precludes any reliance on it.
17    MS. ALI: Let's look at Rule 408. It doesn't
18  preclude asking about it.
19    MR. PRESS: It.
20    MS. ALI: I'll read you the text of the rule.
21    Rule 408 is about prohibited admissibility. It's
22  not admissible to prove the validity or amount of a
23  disputed claim. That has nothing to do with being able
24  to ask about it in a deposition.
25    MR. PRESS: If it has nothing to do with

47 (Pages 182 to 185)

Page 186

1  proving the validity or amount of a disputed claim, then
2  it's irrelevant and has nothing to do with the
3  litigation.
4          MS. ALI:  Well, it's not irrelevant --
5          MR. PRESS:  -- because the only thing in a
6  litigation is the validity or amount of a disputed
7  claim.
8          MS. ALI:  Well, there's been representations
9  made under oath that all of the money that the Campaign
10 has spent to litigate this case has been loaned
11 by Mr. Ehr.
12         MR. PRESS:  I'm going to tell you right now,
13 there were $4,000 spent to litigate this case.
14         MS. ALI:  There is no basis to object during a
15 deposition about -- on relevance grounds.
16         What is your basis for objecting?
17         MR. PRESS:  It's privileged.
18         MS. ALI:  It's not privileged.
19         MR. PRESS:  It is privileged.
20         MS. ALI:  Based on what?
21         MR. PRESS:  Based on Rule 408.
22         MS. ALI:  What are you saying in Rule 408?
23         MR. PRESS:  It's privileged settlement
24 discussions.
25         MS. ALI:  It's not privileged.

Page 187

1          MR. PRESS:  There's also a common-law
2  privilege for settlement discussions.
3          MS. ALI:  For not -- for not questioning a
4  witness about it at a deposition?
5          MR. PRESS:  Correct.
6          MS. ALI:  Based on what?  What are you
7  pointing to?  It's not in the Rule.
8          MR. PRESS:  Based on the common-law privilege
9  and the Rule privilege against use of settlement
10 discussions for anything other than settlement
11 discussions.
12         MS. ALI:  That's not what the Rule -- look at
13 Rule 408.  I can read it to you.  It says, "Evidence of
14 the following is not admissible to prove or disprove the
15 validity" --
16         MR. PRESS:  Correct.  Which -- which means
17 it's not admissible.
18         MS. ALI:  Okay.
19         MR. PRESS:  Period.
20         MS. ALI:  You can object to its
21 admissibility --
22         MR. PRESS:  No, we're --
23         MS. ALI:  -- at summary judgment.
24         MR. PRESS:  -- not discussing it.
25         MS. ALI:  Meaning, like you're going to

Page 188

1  get
2          MR. PRESS:  This is a document from me --
3          MS. ALI:  -- the phone and call the Court?
4          MR. PRESS: -- to you -- it's a document from
5  me to you that is for settlement purposes only.
6          MS. ALI:  What is the basis to not permit me
7  to question a witness about this at a deposition?  If
8  you want to object to its admissibility at summary
9  judgment, you're --
10         MR. PRESS:  I'm --
11         MS. ALI:  -- free to do that.
12         MR. PRESS:  -- instructing the witness not to
13 answer the questions about this document.
14         MS. ALI:  Based on --
15         MR. PRESS:  That's it.
16         MS. ALI:  -- Rule 408?
17         MR. PRESS:  Based on what I just said.
18 I'm done.
19         MS. ALI:  Well, we can take a break, and we
20 can decide.  We can get the Court on the phone.
21         THE VIDEOGRAPHER:  Off the record at 3:02.
22         (OFF RECORD)
23         THE VIDEOGRAPHER:  On the record at 3:18.
24         MS. ALI:  Dan, I want to have a better
25 understanding of what the scope of your objection is.  I

Page 189

1  understand that you have an objection to me asking
2  specific questions about the document that you sent me
3  that was labeled Financial Summary and that your
4  objection is that that's barred by Rule 408.
5          Do I have that right, Mr. Press?
6          THE VIDEOGRAPHER:  Mr. Press, I don't think
7  you have your mic on.  (Indiscernible).
8          MR. PRESS:  Just fell off.  I've explained my
9  objection.
10         MS. ALI:  Is what I just recounted --
11         MR. PRESS:  That's part of it.
12         MS. ALI:  -- an accurate?
13         And what's the other part of it?
14         MR. PRESS:  The general common-law privilege
15 against use of settlement discussions.
16         MS. ALI:  And what can you point me to
17 substantiate --
18         MR. PRESS:  I'm not --
19         MS. ALI:  -- the common-law privilege?
20         MR. PRESS:  I'm not sitting here doing legal
21 research now in the middle of a deposition.
22         MS. ALI:  Are you going -- if I start asking
23 Mr. Ehr general questions unrelated to the financial
24 summary you sent me about his financial status or
25 assets, are you going to take the same position?

48 (Pages 186 to 189)

Page 190

1    I'm trying to understand the scope of
2  your objection.
3        MR. PRESS:  So if you were to ask Mr. Ehr
4  questions about his personal finances, my objection
5  would -- unless you're relating it to what's on that
6  paper or that email, I would not object to it being
7  based on privilege; however, you don't have a judgment
8  against Mr. Ehr and questions about his personal
9  finances are only relevant to collection of a judgment.
10  They're not relevant in any way, shape, or form to
11  liability.
12        And so I would -- and it's getting in to issues
13  that are generally considered confidential.  I would
14  object.  I would instruct the witness not to answer and
15  say that I would go seek a protective order if you're
16  going to explore his personal finances on matters
17  unrelated to the litigation.
18        MS. ALI:  And so your position is that if I
19  ask him any questions about his personal
20  finance -- finances, you will object and instruct him
21  not to answer.
22        MR. PRESS:  Well, I -- you know, let's hear
23  your question.  If it's, you know, if you can relate it
24  to the litigation in some way, you know, I guess I
25  could potentially be reasonably calculated to lead to

Page 191

1  the discovery of admissible evidence.  That's the
2  standard.  But if it's not, then...
3  BY MS. ALI:
4      Q   Mr. Ehr, where did the -- you testified earlier that
5  you had loaned the Ehr for Congress Campaign Committee somewhere
6  in the neighborhood of $200,000; is that right?
7      A   Yes.
8      Q   And where did that money come from that you loaned to
9  the campaign?
10     A   It came from my personal savings.  It came from
11  retirement accounts of various kinds.  And it came in the form
12  of un-reimbursed expenses for fuel, travel, campaign supplies,
13  and things of that nature, out of my personal income from the
14  United States Navy and VA disability compensation.
15     Q   And when you say "personal," do you mean you solely;
16  are you married?  Are these joint assets?  Or when you say
17  "personal," do you mean you, Mr. Ehr, only?
18        MR. PRESS:  So you've asked several questions
19  combined into one so maybe you'd like to break that up
20  into different questions.
21        MS. ALI:  I'm happy to rephrase my question.
22  BY MS. ALI:
23     Q   When you say "personal savings," what are you
24  referring to?
25     A   Savings that I own and have control over.

Page 192

1      Q   Are you the only owner of those savings?
2      A   Yes.
3      Q   They're not jointly held?
4      A   Almost all of them were my own and I think all of them
5  were my own.
6      Q   And how about your retirement accounts?  Are you the
7  only beneficiary of those accounts?
8      A   Yes.
9      Q   Did any of the money that you loaned your campaign
10  come from equity and property?
11     A   No.
12     Q   Do you own any property?
13        MR. PRESS:  By property --
14        MS. ALI:  Real property?
15        THE WITNESS:  No.
16  BY MS. ALI:
17     Q   In the last ten years, have you owned any real
18  property?
19     A   No.
20     Q   Are you --
21     A   Oh, wait, wait.  I did own property in Pensacola,
22  Florida.  Pardon me.
23     Q   When was --
24     A   I was thinking of something else.
25     Q   -- that?

Page 193

1      A   That was in 2017 to 2021.  I've sold that.  It was a
2  house in Pensacola, Florida.
3      Q   And were you the sole owner of that house?
4      A   Yes.
5      Q   Other than that house in Pensacola, Florida, have you
6  ever owned any real property?
7      A   In my life, yes.
8      Q   And before the 2017 to 2021 house in Pensacola, what
9  was the last time before that you owned property?
10     A   I jointly owned, with my wife, a property we had held
11  in London, England.
12     Q   Do you still own that property?
13     A   I do not.
14     Q   When did you -- did you sell that property?
15     A   My name was taken off of the title on agreement with
16  my spouse on or about the year 2006.
17     Q   And why was your name taken off?
18     A   At her request and my agreement to the request.
19     Q   Was it for financial reasons?
20     A   Yeah, it was for tax --
21        MR. PRESS:  I think this is going too far.
22  You're talking about 2006.
23  BY MS. ALI:
24     Q   Other than the jointly owned property in London and
25  the house in Pensacola, Florida, have you owned other real

49 (Pages 190 to 193)

Page 194

1    property since?
2             MR. PRESS:  Can we say since 2006?
3             MS. ALI:  Since 2006.
4             THE WITNESS:  No.
5    BY MS. ALI:
6        Q    Has your spouse owned real property since 2006 --
7             MR. PRESS:  Objection.
8             MS. ALI:  -- other than this London house?
9             MR. PRESS:  Irrelevant.  And we're getting
10    way, way, way too far.
11            MS. ALI:  Are you instructing him not
12    to answer?
13            MR. PRESS:  I will instruct him not to answer
14    and seek a protective order on that.
15            MS. ALI:  And what is the basis of your --
16            MR. PRESS:  That it's totally irrelevant to
17    anything related to this litigation.  And it's getting
18    into his personal, confidential affairs that has nothing
19    to do with anything.
20            MS. ALI:  Other than relevance, are you -- is
21    there any other basis for your instruction to the
22    witness not to answer?
23            MR. PRESS:  Yeah.  Relevance.  And not just
24    not discoverable because it's not related to the
25    litigation or reasonably calculated to lead to the

Page 195

1    discovery of admissible information.  And it's getting
2    into personal matters that shouldn't be discovered.  And
3    I will seek a protective order if you want to persist.
4             His wife's finances have absolutely nothing to
5    do with anything.  He's already told you that none of
6    this money came from his wife.
7    BY MS. ALI:
8        Q    You mentioned un-reimbursed expenses.  Was that
9    included in the 200,000-odd that you have loaned to
10    the campaign?
11       A    Yes.
12       Q    And by that do you mean that you maybe took trips or
13    things like that and didn't seek to be reimbursed for the
14    expenses that you incurred?
15       A    Yes.  I reported but then didn't seek to be
16    reimbursed.  Reported as and documented as loans, not seeking to
17    be reimbursed.
18       Q    Why did you loan your campaign money?
19       A    I thought it was more financially prudent to do so
20    then my experience in 2018.
21       Q    What do you mean by that?
22       A    In 2018 I contributed a large sum to my campaign.  And
23    at the end of it, I recognized that that wasn't a prudent
24    decision.  That wasn't a prudent decision.  I might have done
25    that in 2020 as well.  I forget.

Page 196

1    But in 2024, in that cycle, I chose a different way to
2    finance the campaign, Through personal loans rather than having
3    had contribution.
4        Q    And do you expect to be reimbursed for those loans by
5    the campaign?
6        A    It depends.  I am leaving that option open.  And in
7    the fullness of time, the answer would be yes.
8        Q    And would you expect to be reimbursed from funds
9    dispersed from the Phil Ehr for Congress Campaign?
10       A    That's my expectation.
11       Q    And where would you expect the money to come from into
12    the Phil Ehr --
13       A    I haven't --
14       Q    -- for Congress Campaign?
15       A    -- figured that out yet.
16       Q    You're no longer fundraising?
17       A    I'm no longer fundraising for that entity.  I'm not
18    presently fundraising for that entity.
19       Q    And when you say you're "leaving that option open, and
20    in the fullness of time," maybe you'll be reimbursed, who would
21    be the decision-maker as to whether you get reimbursed or not?
22       A    I suppose that would be the Campaign committee -- or
23    the Campaign committee -- yeah, the Campaign committee.
24       Q    Who is that?
25       A    Myself and Shelby Green.  Although that could change

Page 197

1    as well.
2             Hold on.  I think Shelby Green, by virtue of ceasing to
3    serve as our treasurer, I'm unclear whether she is part of the
4    Campaign team.  Formally, I think the answer is no.  And so the
5    remaining Campaign would be myself.
6        Q    And who would be the decision-maker as to who to
7    reimburse out of any funds that might flow into the Campaign?
8        A    That's my understanding that I would need to seek
9    advice on that.
10       Q    Other than the outstanding amounts owed to Grassroots
11    and loans that you have made, are there any other outstanding
12    expenses owed by the Campaign to anyone?
13       A    Talking about the previous campaign?
14       Q    The Phil Ehr for Congress Campaign.
15       A    There are -- there are debts listed on the FEC report
16    that at present, as we sit here today, I'm intending not to pay
17    based on lack of performance or other basis.  But fundamentally
18    based on advice from my political consultants, Obi Umunna and
19    Jake Briggs, and possibly some others for, you know, not living
20    up to contract.  But I reported them anyway and maybe that
21    report might have been a mistake.  We're going to review the
22    currently existing debts as part of the review that I'm going to
23    do soon.
24       Q    When you say we're going to review that, who are you
25    referring to?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 198

1    A    Myself, Dr. Brito, and if we need -- if we think we
2    need -- well, we'll probably consult with -- we haven't sorted
3    that out -- but we probably will consult with and get legal
4    advice on that.
5        There's also the FEC, the staff has an account manager who
6    can be called for advice.  And I would expect that we would call
7    the FEC and seek guidance about our situation and what is, you
8    know, within the rules.  We'd probably do that prior to seeking
9    legal advice and maybe we won't need it if there is a
10   clear answer.
11       Q    When you launched your 2024 Campaign -- I'm sorry,
12   when you switched in the 2024 Campaign from the Senate to the
13   House race, the Phil Ehr for Congress Campaign Committee, is
14   that a committee that you had used in the earlier 2018 and 2020
15   cycles, or was that a brand-new entity?
16       A    Brand-new entity.  We had shut down the committee in
17   the 2020 cycle.
18       Q    And why was that, if you know?
19       A    Because I wasn't intending to run again.
20       Q    For congress?
21       A    I cleared it all out.
22   For congress or for any federal office.
23   Well, yes, those are the two options.
24       Q    Do you know about how much total debt the campaign has
25   listed on FEC reports?

Page 199

1    A    The 2024 Campaign -- the Phil Ehr for Congress
2    Campaign.  Total debt?  I'd have to refer to it to be sure.
3        Q    Who --
4        A    Refer to the report.
5    Go ahead.
6        Q    You said that the debts that are currently listed on
7    the FEC reports are for entities that you're intending not to
8    pay at this point because of concerns about performance issues?
9        A    Some.
10       Q    Are there any debts listed on the FEC report that you
11   are intending to pay?
12       A    Pending review.
13       Q    Anything that comes to mind that you would squarely
14   put into that category?
15       A    Not at the time, no.  Except for debts owed to myself.
16       Q    So if money were to flow into the Phil Ehr for
17   Congress Campaign, priority number one would be to reimburse
18   yourself for the loans?
19       A    No.  A potential recipient would be myself.  But I
20   wouldn't ascribe priority at this time, and my history has been
21   that my priority has not been myself.
22       Q    Is there any entity that your 2024 Congressional
23   Campaign owes a debt to that you would, sitting here today,
24   choose to pay ahead of yourself if money flowed into that
25   campaign?

Page 200

1    A    If I had determined that their work warranted payment,
2    I would put them all first.
3        Q    And how do you make that determination?
4        A    Well, so far the determination has been from the
5    advice, as I just said earlier, from Mr. Umunna, Mr. Briggs, and
6    Mr. Hyers has also expressed an opinion that somebody should not
7    get paid.  So I take those into account, and it's been unanimous
8    that these vendors didn't warrant payment.
9        Q    Is there anything that might change your mind
10   about that?
11       A    I can't foresee that but I don't want to -- but -- but
12   I don't want to shut that off at this time.  Part of the reason
13   I don't want to shut it off at this time has to do with
14   Mr. Briggs.
15       Has it because of his advice to me and to the committee to
16   put these debts on the report because the FEC, he represented
17   that the FEC would have a process for adjudicating.  I now
18   believe that probably doesn't occur.  So I don't know.  So I
19   need to check that out as well.
20       Q    Jake Briggs gave you advice that the FEC had a process
21   for adjudicating disputes of debts owed?
22       A    Yes.
23       Q    And when did he make give you that advice?
24       A    Several times in the course of 2024.
25       Q    How did he give you that advice?

Page 201

1        A    Orally.
2        Q    You recall those conversations?
3        A    I recall the substance of the conversations.  I
4    couldn't pin a specific date to it.  And there were others in
5    the conversation as well.
6        Q    Who else was present for those conversations?
7        A    Obi Umunna and Vanessa Brito.
8        Q    And Mr. Umunna is a lawyer, correct?
9        A    Yes.
10       Q    And does he have experience doing FEC compliance work?
11       A    I don't think so but he might.  He might have.  I
12   really shouldn't say because I don't know.
13       Q    And did Mr. Umunna or Dr. Brito speak up when
14   Jake Briggs was providing this advice to say that's not correct
15   or what are you talking about?
16       A    No.  Mr. Briggs has probably more experience than the
17   FEC -- well, I don't know.  They didn't speak up at the time of
18   the conversation.
19       MS. ALI:  I think that's all I've got.
20       Thank you for your time, Mr. Ehr.
21       THE WITNESS:  I appreciate it.  Thank you.
22       MR. PRESS:  I just have the -- if we look
23   at -- I didn't -- I'm sorry.  I didn't write the exhibit
24   number.  The FEC report that you used.
25       MS. ALI:  2021.

51 (Pages 198 to 201)

Page 202

1
2                    CROSS-EXAMINATION
3   BY MR. PRESS:
4        Q   You'll note that that is for the quarterly period.  If
5   you look at the bottom of the first page, what's the quarterly
6   period covered?
7        A   It says here, covered April 1st, 2025, through
8   June 30th, 2025.
9        Q   Okay.  Now, if you look at the third page,
10  line item 13, you'll see that $665,000 -- sorry -- $66,500 loan.
11       A   Yes.
12       Q   Is that the one that you said that you couldn't find
13  any evidence of?  If you look at the detail on the report, as we
14  did the other day, that that one reflects that it's made from
15  the committee to the committee.
16       A   That's my understanding, yes.  You're talking about a
17  Form 3 report that is summarized by this document.  And there is
18  a line item in the Form 3 that says, Phil Ehr for Congress is
19  the donor, and Phil Ehr for Congress is the recipient.  That
20  doesn't make sense.
21       Q   That's this reflected here?
22       A   I think so.
23       Q   Okay.  Now, that's the only loan reflected on this
24  report, correct?
25       A   It looks like it.  Within -- within -- yes.

Page 203

1        Q   So, paragraph 13, you had mentioned that there were
2   two other loans which totaled that amount, and you said earlier
3   that they were made about the same time.
4        Does that refresh your recollection as to whether they were
5   made in the second quarter, April through June, or in the first
6   quarter, January through March?
7        A   It does not.  The timing of those, I'd have to go back
8   and look.  I'd have to go back and look.  I suspect because I
9   remember seeing the Form 3 that had the Phil Ehr for
10  Congress -- to Phil Ehr for Congress was a standalone item, and
11  there wasn't anything else there, which makes me think that
12  those other loans were in the previous quarter.
13       For two reasons, it's not on the Form 3 that I looked at,
14  and we wanted to clear those debts, you know, when we could and
15  that would have been prior to April of 2025.
16       MR. PRESS:  Okay.  That's all I have.
17       MS. ALI:  Nothing more from me.
18       THE VIDEOGRAPHER:  Off the record at 3:40
19  p.m., and this ends today's testimony.
20            (Off the video record at 3:40 p.m.)
21       THE REPORTER:  Ms. Ali, will you be ordering a
22  transcript?
23       MS. ALI:  Sure.
24       THE VIDEOGRAPHER:  Hold on.  Sorry.
25  (Indiscernible).

Page 204

1        THE REPORTER:  You're fine.  Go ahead.
2        MR. PRESS:  For me, send me an estimate, if
3   you would of what it will cost and I will let you know,
4        THE REPORTER:  Thank you, Mr. Press.
5        I didn't get what Ms. Ali said.
6        MR. PRESS:  (Indiscernible).
7        THE REPORTER:  Ms. Ali, did you say you would
8   order a transcript?
9        MS. ALI:  Yes.
10       THE REPORTER:  Okay.  And --
11       MS. ALI:  Regular and delivery.  But we get
12  the rough, right, with that?
13       THE REPORTER:  Okay.  I'll check with our
14  team.
15       And then, Mr. Press, you just said yes for the
16  read and sign?
17       MR. PRESS:  He's going to read and sign, yes.
18       THE REPORTER:  Perfect.  Okay.  Awesome.
19       All right.  Thank you.  Thank you so much.
20  Off record.
21
22       (Whereupon the proceedings were adjourned at 3:41 p.m.)
23
24
25

Page 205

1                  REPORTER'S CERTIFICATE
2
3        I, the undersigned, do hereby certify that the
4   foregoing is, to the best of my skill and ability, a true and
5   accurate transcript of proceedings had and evidence presented at
6   the deposition held in the above-styled case, on the 20th
7   October 2025.
8
9
10       _____
11       LAUREN N. FRIDLEY
12       Notary Public in and for the
13       Commonwealth of Virginia
14       No. 7699515, expires June 30, 2028
15
16  [X] Review of the transcript was requested.
17
18
19
20
21
22
23
24
25

52 (Pages 202 to 205)

Page 206

```
1              CERTIFICATE OF OATH
2
3    STATE OF VIRGINIA
4
5
6         I, the undersigned authority, certify that
7    LAUREN N. FRIDLEY remotely appeared before me and was
8    duly sworn.
9         WITNESS my hand and official seal this 20th day of
10   OCTOBER 2025.
11
12
13
14
15   _____
16   LAUREN N. FRIDLEY, CERTIFICATIONS
17   NOTARY PUBLIC â€" State of VIRGINIA
18   My Commission Expires:  June 30, 2028
19   Commission No. 7699515
20
21
22
23
24
25
```

Page 208

```
1    ERRATA SHEET FOR THE TRANSCRIPT OF:
2    Case Name:  PHIL EHR FOR CONGRESS CAMPAIGN COMMITTEE V.
3    GROSSROOTS ANALYTICS, INC.
4    Dep. Date:  OCTOBER 20, 2025
5    Deponent:  PHIL EHR
6                 CORRECTIONS:
7    Pg.  Ln.  Now Reads      Should Read   Reason
8    __  __  _____   _____   _____
9    __  __  _____   _____   _____
10   __  __  _____   _____   _____
11   __  __  _____   _____   _____
12   __  __  _____   _____   _____
13   __  __  _____   _____   _____
14   __  __  _____   _____   _____
15   __  __  _____   _____   _____
16   __  __  _____   _____   _____
17   __  __  _____   _____   _____
18
19        _____
20           Signature of Deponent
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS ____ DAY OF _____, 2025.
23
24   _____
25   (Notary Public) MY COMMISSION EXPIRES: _____
```

Page 207

```
1          CERTIFICATE OF DIGITAL REPORTER
2    STATE OF VIRGINIA:
3
4         I, LAUREN N. FRIDLEY, do hereby certify:
5         That the witness whose deposition is herein
6    before set forth was duly sworn, and that such
7    deposition is a true record of the testimony given
8    by such witness.
9         I further certify that I am not related to any
10   of the parties to this action by blood or marriage,
11   and that I am in no way interested in the outcome
12   of this matter.
13         IN WITNESS WHEREOF, I have hereunto set my
14   hand this 20th day of OCTOBER 2025.
15
16
17   _____
18   LAUREN N. FRIDLEY
19
20
21
22
23
24
25
```

53 (Pages 206 to 208)

**A**

**Aaron** 22:23 24:5,7
  26:25 32:9 94:8
  94:11 95:1
**abilities** 183:20
**ability** 114:1,6
  154:13 161:23
  205:4
**able** 18:23 42:1
  177:10 185:23
**above-styled** 205:6
**absolutely** 17:11
  40:17 59:18 75:6
  78:23 86:7 88:20
  195:4
**absurd** 102:3,13
**academic** 184:2
**academics** 126:12
**accept** 42:14 70:8
  77:24
**accepted** 16:7
  17:19,24,25 39:25
**accepting** 135:5
**accepts** 105:20
**access** 149:22
**account** 18:19
  85:19 172:13,16
  172:17 198:5
  200:7
**accountant** 169:1
**accounting** 141:1
  141:20 144:24
**accounts** 191:11
  192:6,7
**accurate** 12:1
  14:15 17:10 19:13
  25:20 58:1,2,17
  165:22 167:8
  168:18 189:12
  205:5
**acknowledge** 51:21
  52:3
**acknowledgments**
  9:24
**acquire** 73:20
**acquiring** 40:4
  151:22

**acquisition** 39:14
  39:19,22 40:2
  78:23 151:16
**acquisitions** 59:13
  73:20
**act** 80:13,24 81:18
  81:25
**actblue** 81:2 84:16
  84:24 85:6,12,19
  90:24 98:11
  102:17 135:5
  136:24 137:9
  142:2,3,4,11
  155:7 156:19,20
  165:12
**ActBlue's** 136:20
  136:21 137:12
**ActBlue/VAN**
  146:6 147:1
**acted** 20:2,3,3
**acting** 28:24
**action** 139:24
  140:5 161:16
  207:10
**actions** 161:14
**activation** 151:6
**active** 117:6,11
  151:7 176:24
**actively** 174:13
**activities** 35:9,24
  36:2 143:16
  148:17 171:25
**activity** 36:19
  72:12 79:8 156:5
  158:6 159:12
  165:9 180:6,19,20
  181:1
**actual** 18:17 34:2
  124:7
**add** 28:23 54:12
  122:8 166:22
**added** 149:21
  155:9 173:7,8
**adding** 51:17
  152:11
**addition** 77:14
**additional** 51:8

76:8 142:6 144:16
  151:16,23 153:20
  153:21 167:13
**addressed** 146:15
**adds** 173:19
**adjourned** 204:22
**adjudicating**
  200:17,21
**admin** 143:16
  144:3,3
**administer** 9:25
**administrative**
  142:4
**admissibility**
  185:21 187:21
  188:8
**admissible** 185:22
  187:14,17 191:1
  195:1
**admission** 58:12
**Admissions** 34:1
**admitted** 58:13
**admitting** 185:3,12
**adopt** 171:15
**adopted** 171:16
**advice** 24:4 27:23
  28:1 29:1,4,14,15
  30:4,5,8,10,10,15
  31:8 39:24 40:13
  103:20,22 139:25
  140:9,12 174:23
  175:15,15 197:9
  197:18 198:4,6,9
  200:5,15,20,23,25
  201:14
**advise** 51:22
**advisor** 23:21
  158:17
**advisory** 26:24
**advocacy** 183:13
**advocating** 180:2
**affairs** 194:18
**affiliated** 19:17
**affirmed** 105:20
**afford** 177:9
**African** 23:22
**afternoon** 63:23

86:14
**after-work** 170:17
**aggressive** 16:17
  50:19 59:21 60:1
  60:4,15 62:20,22
  63:15 66:7 67:13
  67:17 71:24 77:22
  80:3 87:16
**ago** 19:9 30:22,24
  31:6 51:20 127:20
  127:22 128:2
  183:12
**AGP** 91:9,12
**agree** 9:25 59:19,22
  64:24 101:22
**agreed** 17:20 59:9
  93:23 110:6
**agreement** 5:17 6:8
  38:5,10,14,16,19
  55:20 56:5,20
  58:14 62:6 76:13
  76:25 117:9,17,24
  118:4,15 139:23
  193:15,18
**ahead** 46:15 63:21
  65:16 69:9 71:15
  78:3 87:23 88:1
  121:1 151:5 169:2
  169:18 179:16
  199:5,24 204:1
**air** 71:23 174:16,17
  174:19,20,21,24
  175:4,6,12,20
  176:13 177:4,12
  178:8,15
**airline** 170:15
**airport** 179:25
**air-rescue** 180:5
**al** 9:10
**alarmed** 96:22
**Ali** 3:3,7 4:3 10:10
  10:13 28:11,23
  29:5,10,12 30:3
  30:10,12,17 34:6
  34:9,11 43:14,19
  43:23 44:3,8,17
  44:22,24 55:11,17

55:23 56:1,6,11
  56:14,16,18,19
  82:22 100:13,17
  120:16,18,23
  144:1 159:1 171:2
  171:5,6 175:17,19
  185:3,6,10,17,20
  186:4,8,14,18,20
  186:22,25 187:3,6
  187:12,18,20,23
  187:25 188:3,6,11
  188:14,16,19,24
  189:10,12,16,19
  189:22 190:18
  191:3,21,22
  192:14,16 193:23
  194:3,5,8,11,15
  194:20 195:7
  201:19,25 203:17
  203:21,23 204:5,7
  204:9,11
**align** 16:18
**aligned** 16:20
**allegation** 53:3
**allow** 65:7
**alongside** 181:12
**alphabetical** 171:8
**alphabetically**
  171:4
**ambiguity** 110:20
**amended** 145:8,11
  145:12
**Amendments**
  145:5
**American** 23:22
  183:23
**amount** 74:9 75:4,5
  79:10 81:11 85:25
  95:17 98:14 99:16
  99:17 102:13
  115:10 131:2
  132:15,18 136:8
  141:19 142:1
  148:4 155:9,22
  163:15,16 166:18
  172:1 173:8
  185:22 186:1,6

203:2
**amounts** 155:16
169:9 197:10
**analysis** 7:15
119:10 135:21
137:12
**analytics** 1:6,8 9:7
9:8 10:14 12:21
12:24 19:12 36:16
41:3,6,15,22
42:24 43:2 46:8
47:14,20,22,25
48:4 57:17 59:2,9
61:4 66:15 72:4
78:22 91:9 94:13
94:18,20 95:10
96:14,15,18,21,23
97:5,23 106:19
114:5 128:6,9
130:10 138:23
139:1 140:10
143:7,8,11,12,20
147:4,15 149:12
150:8 208:3
**Andrew** 94:11,12
94:12,15,17,18
**and/or** 57:22
**anecdotally** 180:13
**announced** 133:22
**answer** 11:8,12,14
11:22 16:8 22:4
30:7 31:4 37:11
40:23 42:19
111:18 116:4,12
118:5 132:4
161:10 165:13
177:6 180:14
181:25 188:13
190:14,21 194:12
194:13,22 196:7
197:4 198:10
**answered** 8:1 16:4
23:11 32:20
167:14
**answering** 11:18
112:2
**answers** 11:1,3

157:7
**anybody** 21:12
22:20 26:13 32:8
32:9 53:17 54:8
54:24,25 85:25
107:25 111:16
116:8 124:8
139:20 140:6,7,18
159:5
**anytime** 46:2
**anyway** 21:25
197:20
**apologize** 34:8
55:19
**apparently** 92:6
**appear** 22:13 52:24
87:1 138:19
**appearances**
180:15
**appeared** 206:7
**appears** 91:5 117:7
137:12 149:9
166:23
**Apple** 31:16,16
**appreciate** 138:3
201:21
**approach** 54:12,13
**appropriate** 96:3
**approval** 65:19,25
116:25 119:24,25
139:12
**approve** 61:9,23
64:6
**approved** 64:10
130:20 144:15
**approving** 36:1
**approximately**
9:16 84:13 166:19
**April** 202:7 203:5
203:15
**area** 44:16 183:15
**areas** 146:4
**argument** 99:23
**arises** 42:9
**arrange** 58:9 79:25
126:11
**arranged** 38:21

57:23
**arrangement** 25:8
28:1,2,3 106:18
115:11
**arranging** 59:17
**arrived** 120:6
165:14
**articles** 25:20
**articulate** 157:24
158:6
**articulated** 60:2
**ASAP** 50:15 84:17
86:4
**ascribe** 199:20
**aside** 53:15 160:13
**asked** 28:18 67:4
73:8 77:5,8 83:11
84:24 85:1 86:2
106:5 109:23
132:4 149:25
163:8 181:24
191:18
**asking** 26:23 67:7
81:6 85:18 86:12
97:16 98:21 99:1
106:9,11,11
119:18 141:7
185:8,11,18 189:1
189:22
**asks** 75:18 116:24
**assembling** 143:1,3
**assess** 122:1
**assessed** 134:9
**assessment** 159:11
**assessments** 156:6
**assets** 189:25
191:16
**assigned** 9:22
**assist** 167:16
**assistance** 129:9
168:25 170:10,11
**assistant** 23:5,5
24:18 184:22
**assistants** 21:18
**association** 47:23
171:17 175:13
**assume** 11:14

62:23 63:1 84:22
90:23 96:7 103:13
122:20
**assumed** 40:22
68:2
**assuming** 68:8
**attach** 101:10
**attached** 90:22
**attaching** 149:13
152:22
**attachment** 7:23
151:11,11
**attempt** 151:20
**attempted** 34:25
**attempting** 152:12
**attended** 60:8
**attention** 17:6
148:22
**attorney** 27:23
28:18 97:3,15
99:14 101:16
103:3,22 106:11
106:19 107:9,10
119:21 120:1
139:22 140:5
**attorneys** 3:2,10
95:18 110:11
**attribute** 161:20
**attribution** 133:8,9
**audience** 109:1
**audiences** 62:8
63:10 65:21
**Aug** 6:15
**August** 14:9 34:20
75:11 76:5,13,18
76:24 77:13,21,23
78:4,6 79:2,14
80:1 82:24 83:24
88:16,18,19 117:9
117:17,23 133:16
140:25 149:11
150:14 151:15
152:2,11 153:5,6
153:12 157:9
163:1,22 167:23
168:13,17
**authentically**

179:25
**author** 146:15
**authorised** 102:2
**authority** 74:22
79:23 206:6
**authorize** 74:22
**authorized** 9:24
74:19
**authorizing** 102:9
**autodialer** 178:4
**autumn** 98:23
**Avenue** 3:12
**Aw** 32:24
**award** 183:15,16
183:19
**aware** 21:3 48:3
50:24 57:8,14
58:3,4,14 76:9,21
76:22,22 77:17,18
77:19 80:4 87:17
97:13 98:9,17,21
98:23 100:4
103:17,21,25
111:11 122:14
138:22,24 139:4,8
140:15,20 157:7
160:21,22
**awareness** 57:11
86:17 156:14
**Awesome** 204:18
**a.m** 2:6 9:16 65:5
94:8

---

**B**

**b** 39:13 169:2,3,5,6
**back** 18:3 25:3
32:16 34:15 56:23
62:1 63:7 65:23
73:9,16 74:6 75:7
76:14 78:1,2 80:6
89:2 92:23 94:1
95:19 98:22
100:24 102:14
105:20,21 110:10
118:8 119:15
120:19 122:2
153:4 154:25

170:15 172:7
184:2 185:7 203:7
203:8
**background** 105:1
**backup** 125:8
**badge** 181:6
**balance** 74:16
84:18
**balances** 93:14,17
**ballpark** 73:23
130:8,13,14 136:8
182:1,2
**bank** 18:19 172:16
172:17
**barred** 189:4
**based** 17:13 69:14
85:16 87:1 96:7
104:23 114:3
143:2,3 152:17
162:15 163:5,14
183:6,15,16
186:20,21 187:6,8
188:14,17 190:7
197:17,18
**basically** 45:12
152:14 160:5
**basis** 13:7 20:2
23:1 26:8,19 31:2
97:6,7,17 113:19
113:22,23 115:2,6
148:10 181:19
182:21,22,23
185:10 186:14,16
188:6 194:15,21
197:17
**Bates** 7:19 43:20,23
44:5 64:3 66:11
92:24 150:21
**Bates-labeled** 56:7
60:20 75:10 79:6
**bc** 90:1
**began** 24:17 53:5
87:5
**beginning** 18:11
149:12
**behalf** 9:17 35:7
56:24 57:9 59:23

77:15,17 118:20
**belief** 140:21
**believe** 19:6 32:1
33:2 35:14 55:7
82:17 88:5 92:2
95:17 97:7 108:13
111:18 113:19
118:2 146:8
148:16 157:1
168:18 200:18
**believed** 16:20
**beneficiary** 192:7
**benefit** 11:5 56:7
93:2 149:3
**benefits** 150:18
**best** 11:22 13:22
24:6,14 27:13,19
30:21 33:9 34:19
38:9 46:1,5 54:19
65:20 75:1 77:8
85:22 91:2 123:12
123:14 140:21
143:4 154:12
165:23 167:8
176:25 183:5
205:4
**bet** 70:16
**better** 72:3 106:20
131:4 146:3,3
166:20 175:15
188:24
**beverages** 170:17
**beyond** 29:9 40:5
108:3 112:15
161:25,25 183:11
184:22
**Biden** 25:11
**big** 49:15 70:22,22
70:22 78:9 110:18
132:2 183:17
**bigger** 102:10
153:9
**bill** 16:8,9,22,25
18:5 19:16,24
21:7 26:11 72:4,8
74:9 79:3 85:10
86:21 95:6,25

96:8,9 100:21,24
101:2,16 102:8,12
103:7 118:2
**billed** 131:9
**billing** 86:16,17
**bills** 90:25 91:6
92:8,9
**binded** 32:17
**bit** 18:17 37:2
51:22,25 53:21
68:7 69:4 75:18
121:4 133:12
164:3 166:14
181:20
**black** 44:16,19
**blank** 64:18
**bless** 105:15
**block** 52:14 70:17
105:11
**blood** 207:10
**blue** 41:20,22 43:1
54:13 80:13,24
81:18,25
**blush** 135:16
**board** 22:7 58:5
123:6 175:20,22
176:12 178:9
**bono** 28:3,16,17
**books** 89:14
**borrowed** 140:14
140:17
**bottom** 34:23 41:11
41:12,13 62:3
95:14 109:5 202:5
**bottom-line** 161:21
**bounced** 158:1,3,15
158:23
**bounds** 29:11
**box** 44:19
**Bradley** 91:2 92:7
92:7
**brand-new** 198:15
198:16
**break** 11:17,19
55:12 90:4,8
100:13,18 114:17
120:17 188:19

191:19
**breakdown** 79:19
93:13,16
**briefly** 23:3
**Briggs** 6:18 14:14
15:1 17:15,16
18:1,3,9,9 19:13
21:6,11 24:25
25:1,6 26:9 32:6
42:19 43:3 45:25
47:4,10,10 50:4
51:7,19 52:20
54:21,21,23 55:6
57:22 58:8 82:25
83:4,11 84:21
85:21,24 86:13,22
87:17 88:4,4,12
88:13,23 89:9,21
89:24 92:19,20
93:1,4 94:3 95:16
96:13 99:13
100:25 102:24
103:1 105:1 107:9
110:12 124:18
128:8,12,13,15
129:12,15 131:5
197:19 200:5,14
200:20 201:14,16
**bring** 16:24 55:2,8
74:6 163:16
**bringing** 94:19
163:15
**Brito** 23:4 24:15,16
24:17 25:1,11
35:7 39:11,24
103:11 124:4
129:18 136:11
140:5 141:8
142:20 144:14
159:9 165:4 169:9
169:12 170:19
171:19 177:16,23
180:15 182:5,7,19
183:5,6 184:10
198:1 201:7,13
**Brito's** 183:16,20
**broad** 15:6 40:3,4

**brought** 17:6 22:2
23:21 24:3 33:6
39:8 40:14 167:12
180:22 184:21
**bubble** 48:16
**bubbles** 105:10
**bucket** 98:25
**buckets** 97:20
**budget** 180:4
**build** 177:9
**building** 162:5,5
**bullet** 137:5,9
**bunch** 43:24 44:3
92:8 102:21
171:21
**burnt** 160:5
**business** 30:10 51:2
51:2 71:6 97:9
**buy** 150:17

---

**C**

**C** 3:1
**Caiman** 125:12,22
127:9
**calculated** 144:10
144:12 190:25
194:25
**calculations** 156:6
**calendar** 137:2
**call** 13:4,5,14,15,18
13:22 14:3 17:18
17:18 26:5,15
38:4,20 50:8,9,20
71:23 73:9 75:24
90:4,8,17 108:5,7
108:8 110:9
112:13 117:1
123:17,18 129:13
129:16,19 143:2
162:7 177:8 180:7
180:7,7,7 188:3
198:6
**called** 10:4 14:2
33:3 104:12 119:8
135:20 141:16
159:16 198:6
**calling** 47:8 74:1,4

99:12 123:18
133:1,2 159:19
160:2 162:10,11
162:18,20
**calls** 17:19,22 73:5
87:16 123:21
142:25 159:16
161:24
**CallTime.AI** 14:3
**call-time** 21:18
23:4,5 24:17
184:21
**camp** 53:2
**campaign** 1:3,14
1:15 9:6 12:22
13:3,3,9,10,11
14:6,11,14,18,20
14:24 15:9 16:3
16:19,21,24 17:1
17:10,14 18:8,12
18:14,22,23 19:4
19:12,17,19,22,25
20:3,4,4,12,14,19
20:20,23 21:2,3
21:14 22:9,12,19
22:21,22,25 23:12
24:1,9,19,22,24
25:1,5,5,8,9,11,12
25:15,24,25 26:3
26:16,19,21 27:1
27:24,25 28:16,17
29:18 30:18,20,24
31:7 32:12 33:10
33:15 34:25 35:7
35:17,20 36:7,9
36:25,25 37:1,5,5
37:16 39:17 40:11
40:15,18,18 45:1
48:1,3 49:6,8 53:5
53:8,12,18 54:8
54:24 55:3 56:3
56:25 57:18 58:13
58:13,14 59:1,10
59:20,23 62:21
64:5 65:19 68:15
73:19 76:6,7,8
77:14,15,22 78:12

80:2 82:2,7 83:7
83:21 85:9 86:4
87:5,5,11 88:20
88:21 89:12,23
92:25 93:6,15,24
97:13 98:9 99:23
101:15 103:13,15
103:17,18 104:1
104:17 106:6
107:6 109:6,6,10
110:9 111:16
113:1,12,13,14,18
114:19 115:10,25
116:8,9 117:14
118:18,21,22
119:1,3 120:25
122:12,15 123:7
123:19,24 124:2,5
124:17 126:7
129:3 130:16
131:6,12,17 132:5
132:8,11,19 133:6
134:25 135:5,20
138:22,25 139:1
139:20,21 140:4
140:13,14,17,20
140:21,23,25
141:7 143:2,14
144:14 146:4,11
147:19,25 148:21
148:25 150:17
155:4 156:7,15,21
157:5,8,14 158:8
158:11 159:6,7,8
159:9,12,14,14,18
159:21 160:4,8,15
160:18,20,23,25
161:2,6,19,22,25
162:2,5,8,25
163:4,21,24
164:10,15,16,19
165:4,9,22 166:5
166:13 167:8,14
168:10,16,16
172:7,9,11,13,15
172:18,20 173:9,9
173:11,18,18,25

174:5,8,11,17,18
175:4 178:7 179:2
179:5,6,9,10,10
179:12,17,18,20
180:6 181:23
182:3,5,7,16,20
182:24 183:1
184:10,11,13,14
186:9 191:5,9,12
192:9 195:10,18
195:22 196:2,5,9
196:14,22,23,23
197:4,5,7,12,13
197:14 198:11,12
198:13,24 199:1,2
199:17,23,25
208:2
**campaigner** 144:13
182:24
**campaigning**
155:16 178:1
183:10
**campaigns** 28:4
42:24 50:24 51:6
112:21 135:6
150:9,10 160:15
**campaign's** 33:23
53:2,2 57:9,20
59:19 77:17 87:2
114:6 172:17
**canceled** 89:25
**candidacy** 133:22
172:2
**candidate** 26:8
50:2 74:6 112:15
146:13 156:12
170:1,4 173:1
180:13,18,19,20
180:20 181:1,6
**candidates** 50:25
160:11 181:5
**candidate's** 130:25
**capability** 177:10
**capacity** 27:8 28:7
28:16,18 101:12
101:14
**capitalize** 161:13

**capitol** 134:19
**caps** 75:14
**capture** 157:13
**care** 24:12 183:13
183:18,19
**cared** 24:13
**career** 28:4
**careful** 28:19
**Carlos** 134:24
**carry** 32:16
**carrying** 116:9
**case** 9:10,12 10:14
17:8 19:10 21:9
27:20 37:4,19
39:9 53:3 58:12
99:22,24,25 100:5
113:24 114:13
115:6 120:25
141:16 157:9
159:11 162:24
165:19 186:10,13
205:6 208:2
**cash** 87:6 90:24
168:3
**Cassie** 105:12,12
106:5 122:19,20
122:21
**cat** 142:11
**category** 141:18
142:11 145:4,15
146:17 155:20,21
161:12 199:14
**caused** 31:6 103:15
146:1 161:21
**caution** 18:17
**ceasing** 197:2
**cell** 49:25
**certain** 27:24 77:11
91:16,17,20 133:8
148:4 157:7
**certainly** 52:9
57:16 108:21
116:14 160:12
161:22
**Certificate** 4:4,5
205:1 206:1 207:1
**CERTIFICATI...**

206:16
**certify** 167:10
205:3 206:6 207:4
207:9
**cetera** 40:9
**CFO** 108:1
**chain** 5:20 6:3,17
6:20 7:3,19 25:8
41:4 60:19 61:3
64:4 65:17 66:11
66:14,22 68:15
78:2 82:24 83:2
89:17,20 92:23,23
92:25 95:9,25
100:19,23 153:18
**chalked** 117:16
**challenge** 60:4
78:12
**challenger** 49:23
133:14
**challenging** 14:20
**chance** 11:7
**change** 114:18
121:15,24 142:7
196:25 200:9
**changed** 114:18
**changing** 176:10
**chaos** 134:19
**characterize**
116:11
**charge** 68:13,17
99:16 150:8
**charged** 25:7 104:9
142:5
**Charles** 10:20
**chart** 137:4 155:6
155:11,11
**chat** 31:24 46:11
48:10,18 49:3
67:7 86:20 116:14
121:8 124:17
**chats** 31:20 46:9
**check** 51:9,13 55:8
74:25 83:14 90:11
114:17 151:1
153:13 165:13
200:19 204:13

**checked** 31:25
    117:19
**chiming** 84:21
**choice** 10:15
**choose** 99:6 199:24
**chose** 196:1
**chronology** 21:23
    25:13
**CHUNG** 3:11
**circle** 95:18
**citizen** 176:16,24
**city** 180:1
**claim** 99:25 100:5
    115:6 121:12
    163:2,3,4 185:23
    186:1,7
**claiming** 130:5
    158:14
**clarification**
    108:23,24,24,25
    109:10,11 111:24
    138:3
**clarify** 35:8,23
    89:10 142:10
**clarity** 142:22
**Claudia** 107:19
    108:2
**clean** 178:2
**cleaner** 53:21
**cleaning** 177:21
**clear** 11:6 23:11
    24:7 25:13 34:9
    36:9 89:1 126:24
    173:15,16,22
    184:12 198:10
    203:14
**cleared** 198:21
**clearer** 11:11
    129:10
**clearing** 49:7
    173:13,21
**clearly** 40:23
    168:22
**clerical** 118:3
    166:23
**clients** 20:25 78:16
**Clik** 119:9 149:13

150:2,3,5 151:19
**clipped** 31:19
**close** 21:13 23:15
    42:3 68:2 89:12
    90:11 168:3
**closed** 93:6
**closing** 93:12
**club's** 156:15
**clues** 104:23
**CM** 49:5
**code** 93:22
**coffee** 17:5
**COH** 90:23,24
**cold** 71:7
**colleague** 16:7,25
    42:7 176:21
**colleagues** 54:13
**collection** 26:1 54:6
    190:9
**Collective** 119:9
    149:13 150:2,3,6
    151:19
**Columbia** 1:2 2:12
    9:11 28:13
**column** 138:6,8
    143:25
**combined** 191:19
**come** 13:8 18:21
    23:2 40:16 116:8
    127:12 137:9,10
    137:12 141:9,25
    151:12 157:22
    163:3 179:20
    181:25 182:18
    184:10 191:8
    192:10 196:11
**comes** 83:16 85:15
    107:25 199:13
**comfortable** 42:25
**coming** 18:3 48:17
    58:5 85:8 86:14
    97:10,24 98:22
    115:17 124:6
    179:24
**command** 25:9
    68:15
**commentary** 51:18

**commercial** 20:17
**commercials** 20:17
**Commission**
    206:18,19 208:25
**committed** 104:14
    182:23
**committee** 1:3,14
    1:16 9:6,10 15:12
    40:12 93:6 139:18
    139:18,18,19
    156:15 164:15
    165:22 166:5
    174:17 175:4
    191:5 196:22,23
    196:23 198:13,14
    198:16 200:15
    202:15,15 208:2
**committee's** 25:8
    100:7
**Commonwealth**
    205:13
**common-law** 187:1
    187:8 189:14,19
**comms** 123:24
    124:3,10,11
    184:18
**communicate**
    53:17 92:20 146:9
    146:10 154:13
    159:13 161:2
**communicated**
    32:3
**communicating**
    54:7 74:24 92:20
    119:20
**communication**
    92:7 115:4 141:20
    142:6 143:10
    144:19 146:22
    160:22,23
**communications**
    28:20,25 29:21
    31:5 36:21 37:10
    39:12 48:8 54:6
    85:16 103:7 116:2
    141:1 142:6,23,24
    143:1,9 160:14,17

**community** 180:22
    183:23
**companies** 14:17
    36:10 112:20
**company** 16:5
    19:18,20,21,21,22
    33:3 35:5,18
    47:24 51:25 52:18
    52:19 55:8 74:25
    75:15 86:16 91:19
    106:12 121:25
**compare** 152:19
**compared** 134:9
**compensated**
    173:15 177:1
**compensation**
    35:16 171:18
    191:14
**compete** 134:18
**competency** 112:15
**competent** 16:11
**competitor** 78:9
**complaint** 53:2,4
    100:7,8
**complete** 11:25
    116:3 165:22
    167:8
**completely** 16:10
    179:7
**compliance** 18:18
    18:24,25 19:1,2,5
    24:3 74:25 85:2
    86:23 90:22 91:4
    91:7,8,25 92:1,10
    92:12 103:25
    105:13,24 106:9
    106:12 122:21
    141:1,17,20
    143:19 144:22
    145:20 157:7
    165:5,8,18 167:3
    167:16 176:6
    201:10
**comprehend** 116:5
**computer** 31:17
**concern** 68:20
    97:12,14 103:16

**concerned** 35:16
    35:19 90:12 92:4
    92:5,11
**concerns** 199:8
**conduct** 50:15
    76:20
**conference** 43:1
    134:13,15
**conferencing** 98:20
**confident** 127:24
**confidential** 185:15
    190:13 194:18
**confirm** 62:7
**conflict** 148:23
**congress** 1:2,13 9:6
    9:9 12:3,7 50:24
    164:15 165:2,3,11
    165:16,21 166:5
    166:10,10 167:22
    173:18 174:4,8,14
    174:22,25 175:14
    191:5 196:9,14
    197:14 198:13,20
    198:22 199:1,17
    202:18,19 203:10
    203:10 208:2
**congressional** 13:3
    18:14,21 19:3
    20:4 22:25 112:20
    133:24 164:9
    170:2,3 180:9
    184:1 199:22
**connect** 49:5 50:2
    54:14 86:15 95:3
**connection** 21:4
    29:21 119:2 143:6
**conservative** 68:1
    69:17
**consider** 14:15
**considerations**
    134:10
**considered** 190:13
**consistent** 62:19
    83:20 121:11
    122:19
**consult** 158:16
    169:11 198:2,3

consultant 16:24
   17:5 19:25 20:9
   20:10,12,14 22:12
   23:2 33:5 57:6
   101:16 122:25
   123:6 176:23
   182:8,9
consultants 15:3,4
   15:10,10,13 20:5
   20:6 23:16,17
   26:7 33:5 113:9
   116:7 131:19
   148:20 197:18
consulting 18:9
   19:6 20:5 167:3,3
   168:11
contact 14:3 49:4,5
   50:25 104:2 114:1
   114:7 177:19
contactable 122:16
contacted 35:7,22
   143:4 159:5
contacts 152:14
   158:2,4,19 160:16
contemplating
   123:24 124:2,8
context 73:12 74:1
   104:23 170:18
continuation 51:15
continue 75:22
   80:3 85:8
continued 5:14
   76:8 77:18,22
   80:2 146:12
continues 96:1
continuing 30:18
   31:2 67:16 77:16
   77:20 163:8 172:6
   174:22
continuously 30:25
contract 15:25 48:4
   53:18 54:25 56:2
   57:9,12,15 58:4
   58:19,25 59:1,6
   69:15 76:20,23,24
   77:1,4,10,11,15
   77:19 93:12 97:16

97:19 99:2,22
   106:10 112:3,6
   113:20 115:3,7
   116:3 117:2,4,6
   117:23 118:7,19
   119:16 120:3
   126:23 131:7
   146:5,24 147:24
   148:2,3,5 149:14
   161:21 162:16
   197:20
contracts 59:2
   63:17 77:9
contractual 20:18
contribute 113:1
   156:7
contributed 195:22
contribution 39:10
   156:13 157:5,15
   196:3
contributions
   135:5 145:9
   156:16 157:16
control 51:7 148:6
   191:25
CONT'D 6:1 7:1
conversation 18:4
   18:5 39:8 54:22
   88:9 96:14 97:2
   111:25 113:24
   201:5,18
conversations 13:9
   29:2 98:19 110:24
   119:20 201:2,3,6
conveyance 181:14
coordination 26:6
   114:5 148:12,18
   148:22 177:18
copied 61:6
copies 32:18 39:12
   56:14,15,16 61:8
   65:25
copy 32:11 55:20
   62:8 64:4,9,14
   65:1,19,22 76:12
   118:12 128:7
   177:17

copying 83:11 91:3
   100:24
core 40:17 115:10
   126:10
correct 20:1,21
   23:13,14,18 34:19
   37:6 47:23 48:21
   52:21 54:2 57:13
   58:6 67:11 87:6
   92:15 95:17
   117:21 122:11,13
   125:20 127:14
   128:12,19 129:6,8
   131:21 136:15
   138:14,15,18
   139:6 152:3 164:4
   166:17 174:14,15
   187:5,16 201:8,14
   202:24
corrected 118:3
   166:7,24
CORRECTIONS
   208:6
corrective 161:14
   161:16
correspond 25:22
correspondence
   98:24
cost 145:7,19 204:3
costs 102:3 141:17
   145:17,20 155:5
   155:21
counsel 9:18 24:1
   139:15,17 144:7
count 22:3
Counterclaim-D...
   1:19 9:10
Counterclaim-Pl...
   1:9 9:9
countersigned
   149:14
country 160:11
county 171:15
   176:22 180:1,4
   181:15
couple 42:11 50:14
   51:20 62:8 78:2

84:4 111:9
course 27:10 50:23
   97:14 98:18,23
   105:7 112:20
   118:3 139:24
   140:5 172:6
   173:25 200:24
court 1:1 9:11,17
   10:19,25 11:5
   27:14 33:12 44:13
   56:6 82:22 89:18
   93:2 104:20 121:5
   139:10 149:3
   188:3,20
covered 27:3 202:6
   202:7
create 136:14
created 136:10
   152:19
credentials 184:2
credibility 172:8
   180:22 181:6,7,11
credible 180:13
credibly 180:1
CROSS-EXAMI...
   202:2
crowd 180:25
Cuban 183:23
curious 35:1
current 58:24
   140:4 164:14,16
   172:2,9 177:14
   179:5,10
currently 90:2
   164:5 179:15
   197:22 199:6
cut 74:25
cutting 93:8
cycle 12:3,8 13:20
   14:14 15:13 17:3
   19:3 21:12 119:3
   174:18 175:1
   196:1 198:17
cycles 198:15
C-H-A-R-L-E-S
   10:21

**D**

damages 7:17
   140:24 141:6,15
   154:25 155:1,4
   183:1
Dan 55:19 188:24
Daniel 3:15 62:17
   88:7,9
Danny 32:9 44:20
   45:19 46:7 47:13
   47:16,21 48:14
   52:13 61:4,7,12
   66:14,24 67:7
   68:8,11 69:23
   70:2,3 71:10 75:8
   75:18 78:3,9,15
   80:8,16 81:1,3,6
   81:12,15,23 83:1
   83:4,11,24 84:5,8
   84:11 85:19,21
   86:3,12,15,19,22
   88:5,6 93:1,5,19
   94:25 95:17 97:23
   98:3 116:2 147:22
dark 105:9,10
darker 104:24
   105:2
data 62:6 78:10
   97:15 99:1,1
   106:1,3,12 108:25
   110:14 133:8,9
   135:24 136:2,2,5
   136:16 137:12,13
   137:16,19 150:9
   150:10 151:21
   177:21 178:2
database 49:25
date 6:21 9:15
   41:25 45:4 56:21
   72:7 106:23
   122:13 164:10
   168:13 170:24
   174:12 175:8
   201:4 208:4
dated 57:3 72:5
   75:9 76:18 79:2
   80:1 104:17

**dates** 19:7 28:15
45:5,6 91:6
**David** 14:14,25
15:22,24 16:1,6,9
16:11,15,22,24
17:1,9,17,19,20
17:21 18:6,6
19:11 20:25 21:6
21:11 23:22 26:4
32:5 33:5 35:8,23
35:25 36:16 37:4
37:8,14 38:5,10
38:15,19,21 39:13
39:18,23 40:13,15
40:20 42:17,19,23
43:2 45:25 46:21
47:9 50:5,9 51:7
51:19 52:17,20
54:20,23 55:4,5,7
56:24 57:8,11,22
59:15,22 60:8,13
61:4,22 62:5,11
62:12 63:10,14
64:8 65:4,9,12
66:5,15,25 67:4
67:13,15,24 68:10
68:12,16,19,25
69:13,15,20 70:2
70:13,21,24 71:4
71:17,22 73:15
75:2,8,13,19 77:5
78:3,8,13,17,21
78:21,22,22 79:24
80:11,21 81:3,15
81:18 82:11 85:17
87:17 88:9,12
89:9 91:19 92:19
95:25 96:8,9
99:11,12 100:22
100:25 102:9
110:24 111:2,13
111:17 112:1,4
113:23,24 114:12
115:4 116:12
118:9,14 119:14
132:4 148:23
149:6 153:19,22

154:1,3 179:3
184:15
**David's** 17:25
**Davies** 64:8 65:4,13
70:24 71:7 78:22
**day** 50:17 62:14
65:21,22 71:12
75:9,11 76:5 78:5
80:12,12 81:16,16
83:15,16,24 84:11
84:22 93:20 135:8
139:7 151:14
181:24 202:14
206:9 207:14
208:22
**days** 48:4,14 59:20
62:20 70:16 71:21
84:4 134:8 135:8
149:18 152:10
163:22
**day-to-day** 17:9
19:11 20:2,22
21:9 26:7 81:4
**de** 135:9
**deal** 142:2
**dealing** 146:4
153:9
**Debbie** 46:9 49:15
49:16,17,18,22
50:17 60:5 68:19
70:22 71:6 78:11
133:13 134:14
**debt** 164:17,18,20
169:25 170:12
172:8 173:13,15
173:21,22 198:24
199:2,23
**debts** 164:23
197:15,22 199:6
199:10,15 200:16
200:21 203:14
**December** 66:23
104:18,23 105:11
106:16 107:1
110:25 117:5,13
128:11
**decide** 151:22

**decided** 75:2
133:23 134:18
157:15
**deciding** 157:4
177:19
**decipher** 43:17
**decision** 16:6,23
17:15,19,24,25
25:2,11 55:2,4,5,7
132:3 134:4,6,10
139:9,18,18,21,24
140:8 195:24,24
**decision-maker**
196:21 197:6
**declarations** 17:8
**declare** 34:18
**declined** 159:11
**dedicated** 165:3
**deduced** 163:14
**def** 47:19
**Defendant** 1:7 3:2
9:7
**Defendant's** 33:25
**defended** 184:7
**defer** 146:13 148:1
175:10 178:6
**deferred** 121:11,15
121:18
**deficient** 148:11
**defined** 110:16
**definitive** 158:18
**degraded** 114:1,9
**delay** 83:17 184:8
**delayed** 86:20
**delegated** 79:23
**deliberately** 181:5
**deliver** 154:7,8
**deliverability**
151:17
**deliverable** 115:11
115:22
**delivered** 24:14
**delivery** 147:8
204:11
**Demand** 102:1

**demanded** 102:13
**demanding** 96:4,17
**Democratic** 170:6
176:25
**Democrats** 170:11
**Dep** 208:4
**departed** 123:1
**departure** 37:15
**depending** 62:8
**depends** 69:23
196:6
**depicted** 45:9
**Deponent** 208:5,20
**deposit** 84:17 85:13
**deposition** 1:21
2:10 9:1,5,23
10:22 60:8 73:15
97:25 118:10
147:23 149:7,12
164:1 166:6
172:12 185:1,5,12
185:24 186:15
187:4 188:7
189:21 205:6
207:5,7
**depositions** 137:3
**derived** 141:7
157:21
**deriving** 37:11,18
**desantis** 69:21
**describe** 20:11
36:12 112:9
**describing** 41:18
**description** 5:2 6:2
7:2 79:13 141:19
145:24 146:14
155:22 159:3
161:13
**descriptive** 132:1
**designated** 26:3
104:25
**detail** 37:25 202:13
**detailed** 93:13,16
172:23,23
**details** 14:3 96:3
154:20
**determination**

126:21 163:5
170:6 200:3,4
**determine** 52:5
**determined** 126:16
126:19 180:4
200:1
**detriment** 148:24
**development**
179:21
**devices** 31:15 32:1
32:2
**Dew** 62:4
**Diego** 62:4 63:18
**differ** 174:24
**difference** 74:2
84:14
**different** 12:10
17:4 44:16 50:7
52:13 61:10 62:8
63:8,9,9 64:4,25
65:22 74:2 79:18
100:9 109:25
113:6,6,6,16
118:10,12,12
169:9 172:13
173:5,7 175:1
179:7,14 183:22
191:20 196:1
**digging** 98:22
**digital** 4:5 68:8
94:19,23 95:1
207:1
**direct** 10:8 39:20
76:21 77:15
118:17 160:19
**directing** 26:25
46:24 163:8
**direction** 26:7,9
87:17 96:1
**directly** 16:4 18:9
18:13 94:4 111:3
134:6
**director** 123:24
124:3,10,11
174:19,20
**directors** 175:20
**disability** 191:14

**disappointed** 113:11,14,17
**disappointing** 115:1 163:10
**disappointment** 115:8
**disburse** 165:16,17 165:17
**disbursed** 165:18 165:20
**disbursement** 170:24 171:7,8
**disbursements** 169:6 174:3
**disclose** 28:19
**discount** 151:23
**discoverable** 31:16 194:24
**discovered** 113:23 195:2
**discovering** 57:17
**discovery** 31:17,21 36:11,11 37:3 53:24 58:11 89:23 98:11 111:8 140:13 191:1 195:1
**discrediting** 156:5
**discrepancy** 152:20
**discrete** 122:7
**discuss** 41:24
**discussed** 31:3 38:1 43:2 55:6 103:4 108:22 125:9 151:15 155:11
**discussing** 187:24
**discussion** 16:1 31:3 36:3,15 39:15 148:1
**discussions** 24:2 31:21 97:15 186:24 187:2,10 187:11 189:15
**dispersed** 196:9
**disprove** 187:14
**dispute** 122:8 144:17

**disputed** 121:12 158:4,19 185:23 186:1,6
**disputes** 200:21
**disputing** 158:23
**Disruption** 145:22
**disruptions** 146:1
**dissatisfied** 14:8
**dissertation** 184:6 184:7
**distinct** 183:25
**district** 1:1,2 2:12 9:11,11 28:12 93:7 139:10 164:9 170:2,3 180:10 181:21 184:1
**diverse** 183:25
**DK-000004** 7:20 153:2
**DK-000005** 152:10
**DK-000006** 150:22
**DK-000007** 149:10
**DK-000008** 7:21
**doable** 75:21
**document** 33:13 34:2 43:15 72:10 86:8 93:3 94:2 95:22 102:2 104:20 135:12,14 135:19,23 136:1 136:10,14,17,20 137:4,17 138:20 138:21 149:4,5 153:1,18,21 184:24 185:7,9,11 188:2,4,13 189:2 202:17
**documentation** 145:9,15 155:5
**documented** 155:7 195:16
**documents** 21:4,7,8 31:10,14,16 32:22 33:10 43:16,20 118:7 121:6 153:23
**DocuSign** 62:6

**dog** 171:14
**doing** 18:17,18 92:9 96:14 98:21 119:19 122:5 123:10,12,16 126:11 140:20 146:2 148:14,16 166:20 171:20 178:7 189:20 201:10
**dollar** 50:16
**dollars** 87:13 132:8 179:4
**domain** 156:4
**donate** 161:7
**donated** 73:10,19 102:20
**donating** 160:24
**donation** 138:13 156:10 157:13
**donations** 137:14 147:25 158:1,3 165:10 172:15
**Donohue** 94:12,18
**donor** 17:18 50:8 70:25 73:5 141:1 141:19 142:5,9,23 142:24 143:1 144:19 146:8,22 152:6 155:12,21 156:12 159:5,13 160:24 202:19
**donors** 13:15,17,25 14:3 40:5 47:8 50:3 70:24 73:13 73:17,20 74:1,4 102:19 103:18 104:2 114:1,7 123:15,18 142:6 143:2,9 146:10 154:13 155:23 156:2,4 157:3,13 159:16 160:5,17 160:17 161:3,7 177:8
**door** 163:15,17
**dot** 48:24,24,24

**double** 70:16 71:7 89:2
**doubt** 45:3 46:18 60:16 82:15,16 122:13
**doubting** 99:24
**downloaded** 66:24
**dpress@chung-p...** 3:16
**Dr** 25:1,11 39:11 39:24 103:11 129:18 144:14 165:4 169:9,12 170:19 171:19 177:16 180:15 181:12,12 182:5,7 182:19 183:5,6,16 183:20 184:10 198:1 201:13
**drove** 116:19
**DS** 46:9
**DSCC** 78:16
**dude** 71:8
**due** 121:21 125:8 125:21 134:19 145:8 158:1,3,14 158:23 161:14
**duly** 10:4 206:8 207:6
**Dunn** 181:12,12
**duplicates** 50:13
**D-A-G-S** 176:2
**D.C** 3:5 9:14 28:9

**E**

**E** 3:1,1
**earlier** 98:9 147:23 149:7,25 162:23 171:25 172:12 191:4 198:14 200:5 203:2
**early** 33:6 59:20 62:20 87:2 97:13 104:6,6 127:18,18 163:1,22 164:1,4 179:17
**earned** 126:16,18

**easier** 44:15
**eastern** 63:19
**eating** 78:15
**edits** 64:9
**effect** 18:7 146:3 147:8,8
**effective** 56:21 93:11 148:12,22
**effects** 143:8 161:25 172:7
**efficiently** 75:23
**effort** 74:7 162:10
**Ehr** 1:2,13,14,16 1:21 2:10 6:18 9:1,5,6,9 10:4,11 10:20 57:22,23 58:13 63:15 67:4 72:5,13,17 75:19 79:3,9,14 89:21 100:18 137:14 164:15 165:2,3,10 165:16,21 166:5 166:10,10 167:22 173:18 174:4,8,14 174:22,25 175:13 186:11 189:23 190:3,8 191:4,5 191:17 196:9,12 197:14 198:13 199:1,16 201:20 202:18,19 203:9 203:10 208:2,5
**Ehr's** 93:5
**eight** 7:23 171:21 171:22
**either** 17:3 19:3 58:23 83:7 92:24 108:6 114:25 129:21 139:23 154:14 169:1 175:7
**election** 132:14 140:3 157:9 160:8 160:10,16 163:21 170:4,5 172:2 175:1,5
**electoral** 170:13

electronic 34:17
57:2 76:15
ELECTRONIC...
1:23
Elements 40:9
email 3:8,16 5:20
6:3,20 7:19 33:7
35:14 36:15 38:4
38:8 39:12 40:25
41:4,5 42:4,13
45:7,15 48:14
53:16 54:3,5
60:19 61:3,12,16
61:22 62:4,11
64:7 65:4,5 66:5
69:16 92:6,8,23
92:23,25 94:8
95:1,9 100:19,21
100:23 101:22,24
102:12 104:1
113:24 115:14
119:12 123:15
132:25 142:25
148:14,16,23
149:12 150:7,9,10
150:14,17,18
151:12,16 152:10
152:17 153:18
177:9,12 190:6
emailed 151:8
emailing 131:25
emails 31:22,25
36:10,12 37:14,20
37:21 41:13 43:16
60:14 61:1,2,3
65:18,25 96:7
102:8 105:16,17
114:12 151:7,23
152:6 153:25
158:4,5,9,10,15
158:23,24 160:5
emails/disputed
158:2
Emmy 183:15,16
emotional 115:8
employee 33:2
182:8

employees 15:3,10
15:14,14 23:12
employment 15:15
encouraged 14:13
ended 37:5 130:21
163:19 164:3
170:14
ends 203:19
engaged 27:25
29:13 180:22
engagement 23:23
126:12 127:8
179:15 180:11
England 193:11
enjoying 75:14
ensure 62:16 71:11
entered 56:3
133:13
entire 24:19 49:25
entities 199:7
entity 172:13
196:17,18 198:15
198:16 199:22
entry 166:15
EOW 83:25
equity 192:10
Erin 94:11
Errata 4:6 208:1
erroneous 166:15
166:25 167:1
error 118:3 166:23
167:5 173:10
escalation 141:2,21
144:8 145:2
especially 11:2
ESQUIRE 3:7,15
establish 30:3
estimate 142:1
144:16 156:1,9
157:21,25 204:2
Estimated 155:22
estimates 155:16
estimator 158:7
161:18
et 9:10 40:9
Europe 18:3
Evan 122:20,23,24

122:24 123:9
event 31:5 41:18
89:25
everybody 26:10
32:9
evidence 104:13
161:7 187:13
191:1 202:13
205:5
evidentiary 185:12
exactly 25:18,19
73:16 175:7 183:2
examination 4:3
10:8 166:14
examine 114:3
example 61:7 68:25
109:18 180:5
exception 18:20
26:11
exchange 45:5,7
102:7
exchanges 70:1
excuse 33:12 56:8
58:23 88:7 120:6
137:21,21 139:3
execute 19:15
177:11
executed 34:20
58:14 59:23
executing 36:1 57:8
executing/appro...
35:9,24
execution 40:13
exhaustively 183:9
exhibit 33:18,20
40:24 41:1 44:9
44:23 48:9,20
51:15,23 55:18,21
60:18,22 66:11,18
66:21 72:2,2,6
76:11,16 79:1,4
82:21 83:3 89:16
90:6 92:22 93:9
100:19 104:16
105:4 109:16,19
116:23 119:16
120:24 121:13

124:16,22 135:11
135:15 141:12,13
149:2,8 155:1,12
167:19,20 184:23
201:23
exhibits 5:1 109:13
EXHS 6:1 7:1
exist 112:16,17,18
112:19 113:4
146:8
existed 129:7
existence 112:24,24
existing 197:22
exists 129:5 133:9,9
exit 133:24
exited 163:24
expect 113:2 196:4
196:8,11 198:6
expectation 113:3
148:18,20 196:10
expected 59:15
123:5,8 162:15
expecting 127:3
expended 140:14
expenses 93:8
102:2 121:11
170:20 191:12
195:8,14 197:12
experience 28:4
73:5,6 112:19
131:13 155:15
161:18 162:7
178:7 183:10
195:20 201:10,16
experienced 16:13
16:14 42:8,16,18
105:20
expert 40:3 184:1
expertise 40:16
145:20 183:6,8,9
184:19
expert-level 155:16
expires 205:14
206:18 208:25
explain 30:13
152:5
explained 184:22

189:8
explaining 152:8
explanation 29:9
102:13 137:5
explanations 137:8
exploratory 117:1
120:2 170:12
explore 190:16
exploring 110:5
170:1
exported 152:19
expressed 200:6
extensively 180:9
extent 14:7 31:4
33:13 40:7 43:13
59:6 96:22 163:16
eye 94:3
eyes 75:25 101:5
E-H-R 10:21

———————
F
face 166:10,15
185:1
fact 41:19 86:3
113:17 158:8
factor 148:13 156:5
factors 168:20
facts 101:21
failing 181:24
Failure 158:1,3
fair 11:15 31:1
Fairly 30:22
faith 82:19 116:6
fall 40:20
fallout 146:9
false 163:2,4,4
familiar 37:21 39:3
39:7 47:25 56:5
63:24 107:23
far 24:11,12 53:24
82:9 100:2,4
109:4 111:11
126:1 154:3
193:11 194:10
200:4
farther 68:7 75:18
123:23

fast 68:4
fatigued 160:14
FEC 7:22 25:22
    145:4,11,14,18
    156:18,19,21
    157:4,14 159:4
    164:25 165:1,9,22
    166:9,25 167:7,13
    167:22 169:14
    172:19 197:15
    198:5,7,25 199:7
    199:10 200:16,17
    200:20 201:10,17
    201:24
federal 175:4
    198:22
fee 92:1 155:6,7
feedback 159:25
    160:19 161:1,3,11
feel 69:20
fees 142:2,4,11,16
    155:8
feet 71:7
fell 189:8
felt 110:6 123:7
    130:1 131:16
field 26:21 82:20
    146:3 183:13
fighting 179:21
figure 52:4 67:8
    130:8 132:12
    142:4 152:19
    168:18
figured 196:15
figuring 39:16
file 43:18 44:11
    139:10,21 145:17
filed 9:10 138:22
    138:25 139:4,4
    140:3 145:11
    165:21 166:1
    167:8,23
files 32:11 136:21
    156:21
filing 145:4 175:8
filings 25:22
    145:14

finally 184:7
finance 21:17
    22:12 23:5 24:18
    42:7,15,18 43:11
    145:8 190:20
    196:2
finances 40:18,19
    190:4,9,16,20
    195:4
financial 21:17
    23:2 90:22 189:3
    189:23,24 193:19
financially 195:19
find 74:5 128:25
    166:21,22 202:12
finding 94:9
fine 55:22 70:14,18
    204:1
finish 11:18
Finished 69:11
finite 122:7
fire 69:1
firefighter 180:3
firm 15:23 18:9,18
    18:24 19:2 68:9
    85:2 94:19,23
    95:2 105:24 165:5
    165:8 167:16
    168:11
first 10:18 12:3,6
    17:2 21:24 22:8
    29:14,15 34:12,13
    34:23 38:12 41:4
    41:11,12 44:15,18
    48:16 50:2,17
    53:19 56:20 58:22
    60:19 61:3 63:22
    66:7,11,22 67:3
    67:12,20 78:6
    79:19 80:10,19
    81:14 83:10 84:7
    84:17 92:18,25
    95:16,21,23 97:9
    104:22,25 105:3
    105:11 111:12
    119:25 135:16
    141:18 143:18

144:4,18 153:1
    155:6 168:1 169:8
    170:2 183:12
    200:2 202:5 203:5
firsthand 131:13
    131:13,21,22
fishy 103:14
FIU 183:22 184:3,4
five 34:22 38:3,24
    50:7 70:16 100:5
    100:6 108:15
    114:12 152:10
    153:23 164:12
fix 153:5
flag 132:2
flat 92:1
Fleming 21:18
flesh 151:19
Flight 170:15
flip 32:17 34:15,22
    56:23 60:20 64:2
    68:24 71:15 75:9
    76:14 86:8 92:23
    95:21 149:5 169:2
flipping 64:3
floor 115:24 116:5
Florida 12:9,11,12
    18:3 41:20 49:20
    50:1,2,3 133:14
    157:9 172:3
    176:16,22 177:24
    181:13,15 183:10
    183:24 184:14,17
    184:19 192:22
    193:2,5,25
Florida's 12:19
    183:18
Florida-28 93:21
flow 87:6 147:19,25
    197:7 199:16
flowed 199:24
flux 175:23
focus 75:22
focused 143:18
    177:25
focuses 75:22
folks 64:5 67:8

86:23 110:9
    150:25 151:6
    162:10
follow 39:11 61:7
    84:18 125:14
followed 103:22
following 10:5
    90:21 187:14
follows 45:15
follow-up 125:16
    158:1,3
fondness 46:10
force 60:3 174:16
    174:17,19,20,21
    174:24 175:4,6,12
    175:20 176:13
    177:4,12 178:9,15
forefront 59:11,12
foregoing 34:19
    205:4
forensically 173:7
foresee 200:11
forget 18:5 111:8
    175:8 195:25
forgetting 174:2
    178:23
form 7:22 142:7
    167:5,22 190:10
    191:11 202:17,18
    203:9,13
formal 25:25 34:24
formally 19:17
    28:25 118:19
    134:3 135:6 197:4
format 45:2
formation 172:3
former 49:20 176:6
forth 62:1 63:7
    65:23 118:8 153:4
    207:6
forthcoming
    115:12
forthrightly 123:1
forward 65:17
    86:16 93:7,16
    95:24 139:24,25
    146:11 151:22

forwarded 51:5
found 32:1 33:14
    44:1 184:20
Foundation 181:16
founding 178:10,21
four 27:17 30:22,24
    31:5 34:13 44:12
    44:12 50:6 70:16
    112:20 114:12
    153:23
frame 27:16 88:19
    103:9 173:12,24
fraud 102:15,18
    104:13 159:3,6
    160:18,25 161:4,9
fraudulent 159:12
    159:15
free 150:7,12,18
    151:20 188:11
Freedom 181:9
frequent 157:8,11
    159:17
Fridley 1:24 2:12
    9:17,22 205:11
    206:7,16 207:4,18
friend 16:25
friendly 101:10
front 39:13,19 56:4
    64:4 67:19 70:25
    82:23 89:19 93:3
    104:21 113:3
    135:13
Fuck 70:17
fuel 191:12
full 10:18,20 11:25
    21:13,13 24:9
    27:10 59:6 69:1
    80:14,24 81:19
    82:1 86:18 114:21
    114:24 149:22
    180:14
fullness 196:7,20
fully 146:7
full-on 172:6
full-time 14:24,25
    15:1,2 21:20 22:5
    22:6,13,23 23:1,4

23:15
**functions** 26:2,5
  147:15
**fund** 159:4
**fundamental** 40:16
**fundamentally**
  197:17
**funding** 160:9
**fundraise** 115:24
**fundraisers** 113:8
  162:4
**fundraising** 12:22
  13:20 14:5,18
  33:6 35:9,24 36:2
  36:19 40:10,12,21
  48:5 50:17 54:9
  55:3 58:5 59:13
  59:19 60:7 76:21
  77:16,23 80:3
  85:8,9 89:7
  112:16,20 113:5
  113:10,11,15,18
  115:1,23 116:10
  119:2,4 122:25
  123:6,10 127:6
  132:23,25 134:8,9
  142:7 143:16
  146:6 147:2,5,6,9
  147:10,13,19
  148:4,14,16 150:9
  150:11 155:14
  160:14 161:12,14
  161:20 162:3,3,6
  162:25 163:10,15
  174:14,16 177:3,5
  177:13 179:1
  196:16,17,18
**funds** 39:13,19
  165:16,17,17,18
  165:20 170:12
  177:11 196:8
  197:7
**further** 30:5
  115:17 157:16
  166:14 207:9
**future** 57:19
**fuzzy** 181:25

## G

**GA** 31:18 86:20
  149:13 150:2,3,5
**Gaetz** 12:15,16
**gain** 151:16
**gamut** 183:25
**gasoline** 69:1
**gate** 69:21
**general** 57:6 73:4
  156:14 157:10
  159:18 160:11
  173:12 189:14,23
**generally** 68:14
  190:13
**gentleman** 84:6
**getting** 18:22 31:8
  35:19 71:7 87:14
  90:2 129:9 157:6
  160:4,6,9,15
  162:19,21 190:12
  194:9,17 195:1
**Gimenez** 134:24
**give** 11:3,7 43:23
  48:11 106:12
  185:6 200:23,25
**given** 99:3 151:16
  157:2 177:8 207:7
**gives** 43:18
**giving** 134:11
  152:17
**glad** 153:10
**glitch** 154:9
**go** 18:7 30:5 32:21
  41:25 44:4 46:15
  60:20 62:13 63:14
  63:23 68:4 69:1
  69:16,24 70:11,22
  71:17 73:9 74:5
  78:23 86:12 87:23
  88:1 101:24
  107:20 116:16,16
  141:4 153:1 165:5
  168:23 169:18
  170:25 190:15
  199:5 203:7,8
  204:1
**goal** 60:7 87:12,18

87:25 89:13
  101:19 163:6
  179:1,3,3,4
**goals** 87:25 179:14
**God** 171:2
**goes** 34:23 50:3
  65:21 85:15 147:1
  152:5
**going** 15:2 17:17,22
  21:22 22:21 25:2
  30:5 33:18 35:12
  35:13 37:3 39:16
  40:6 44:8 45:17
  48:9,11 51:14
  55:17 57:17 61:19
  64:3 67:2,10
  73:16 75:19 83:14
  83:15 84:23 85:19
  93:12 95:18 100:2
  101:3 103:15
  108:23 126:20,22
  137:3 143:10
  146:11 148:2
  157:4 162:5
  163:23 169:4
  170:13 183:2
  184:25 186:12
  187:25 189:22,25
  190:16 193:21
  197:21,22,24
  204:17
**goings-on** 19:11
**good** 9:21 10:11,12
  14:10 16:11 20:16
  42:12 50:19 75:20
  78:14 80:9,13,17
  80:23 81:13,18,25
  82:19 84:8 93:21
  113:8 116:6 132:4
  146:11 161:20,23
  171:19,20 181:20
**Google** 108:6
**gotta** 80:14,24
  81:19,25
**gotten** 161:3
**government** 180:2
**GPS** 35:4,6,25 38:5

38:11,15,19 39:5
  39:13,18
**graduated** 184:4
**Graeme** 21:24 22:2
**grasp** 110:18 146:7
**Grass** 47:19
**Grassroots** 1:6,8
  9:7,8 10:13 12:21
  12:24 13:2,19,23
  14:6,15 19:12
  31:18 33:6,23
  36:3,7,16,18 41:3
  41:5,15,22 42:23
  43:2,24 45:19
  46:7 47:13,20,22
  47:25 48:4,15
  53:3,7,16,17,18
  54:4,8,23,25 55:2
  56:3 57:12,17,23
  57:24 58:4,8,15
  59:2,9 60:14,14
  61:4 62:5 63:8,18
  63:23 64:5,14
  65:13,18 66:14
  69:15 71:15 72:4
  76:9,20 77:14,16
  77:18,19 78:22
  80:2,8 83:22 84:5
  85:10,18 87:3
  91:8 92:13 93:12
  94:12,18,20 95:10
  96:1,4,14,15,17
  96:21,23 97:5,23
  99:15,24 100:5,10
  101:19 102:10
  106:10,15,18
  107:12 108:25
  109:24 110:14,25
  111:24 112:2
  113:9,19,25 114:1
  114:5,8 115:3,6
  115:22 116:3,7,20
  117:6,15,21 118:2
  118:10,16,20,22
  119:1 125:13
  128:6,9 129:12
  130:10 131:2,5,12

131:17 138:23
  139:1 140:10
  143:7,8,10,12,20
  144:17 146:20,24
  147:4,6,8,12,15
  147:20,24 148:4
  148:10,19,24
  149:11 150:8,15
  150:25 152:1,21
  154:7,21 158:5,9
  158:12,15 160:1
  162:1,6,19,20
  164:21,22 197:10
**GRASSROOTS_...**
  5:6
**GRASSROOTS_...**
  5:21 60:20
**GRASSROOTS_...**
  64:11
**GRASSROOTS_...**
  62:4
**GRASSROOTS_...**
  6:7
**GRASSROOTS_...**
  6:13 79:6
**GRASSROOTS_...**
  5:18
**GRASSROOTS_...**
  56:24
**GRASSROOTS_...**
  6:9 56:7
**GRASSROOTS_...**
  6:11 76:15
**GRASSROOTS_...**
  6:4 66:12
**GRASSROOTS_...**
  68:18
**GRASSROOTS_...**
  71:22
**GRASSROOTS_...**
  75:10
**GRASSROOTS_...**
  78:4
**GRASSROOTS_...**
  80:7
**GRASSROOTS_...**
  82:11

**GRASSROOTS_...** 66:23
**great** 63:15 66:7 75:15,15 86:15 90:2 103:16
**Green** 168:9,11 175:24 176:5,6,15 178:11 196:25 197:2
**GROSSROOTS** 208:3
**grounds** 186:15
**group** 45:20,22 46:2,3,21 51:18 118:11 124:6 134:7
**groups** 110:16 171:25,25
**grown** 183:21
**Gs** 176:3,4
**guaranteed** 115:24 173:1
**guaranteeing** 148:4
**guess** 22:14 70:5,10 102:5 120:9 127:24 128:3,4 174:9 182:11 190:24
**guessing** 127:17 169:21
**guidance** 26:7 55:7 198:7
**guy** 50:18 67:8
**guys** 78:24
**GWI** 121:16

**H**

**H** 3:4
**Haitians** 183:24
**half** 109:25 164:4
**halfway** 70:2,12 71:10,16
**hand** 10:2 33:18 40:24 48:9,11 51:14 55:17 60:18 66:10 72:1 79:1 82:21 89:16 90:24 92:22 104:16 124:16 141:12 167:19 168:3 206:9 207:14
**handed** 66:21 70:23
**handing** 135:10 184:23
**handle** 94:20
**happen** 106:15 118:13
**happened** 39:9,25 100:9 106:17,21 106:22,22 107:1 111:20 143:2 146:23 154:21 156:24
**happening** 36:4 162:12 163:7 181:21
**happy** 11:10 41:25 62:13 67:13 86:13 86:19 90:16 110:21 150:17 182:3 184:8 191:21
**hard** 32:11 63:15 68:4 82:25
**hate** 50:1
**head** 11:4,5 23:9 63:6 143:5 179:16 181:25
**headers** 65:25
**health** 156:15 171:19 183:13,18 183:19
**hear** 10:25 11:11 28:10 80:11,21 81:15 112:10,23 190:22
**heard** 11:13,15 107:14 116:12 119:11 127:10 129:8 183:4
**hearing** 119:8
**hearsay** 39:23
**heart** 181:9
**held** 2:10 192:3 193:10 205:6
**helicopter** 180:5
**Helm** 90:11
**help** 14:18 16:2 17:22 19:11,15 23:22 49:15 55:2 58:5 65:7 90:4 95:4 122:1 170:13
**helped** 12:21 13:19 126:11 172:7
**helpful** 93:15
**helping** 15:8,12 17:18 21:20 22:9 28:17 67:4 96:2 162:2,3 179:19,21 179:23 180:1 184:13
**helps** 150:8,10
**hereunto** 207:13
**hey** 44:19 46:7 86:19 103:3 150:25 153:12 171:20
**hi** 42:6 62:5 66:6 67:3 83:11 86:22 93:5 94:11,11,11 94:12,15,18 95:1 95:16,25 149:13 149:21 150:15
**high** 71:11
**highlight** 122:14
**highly** 42:8,15
**hindsight** 117:7
**hint** 102:14
**hire** 15:23 16:6 17:16
**hired** 15:23 25:10
**hiring** 16:5 26:6 177:13
**history** 199:20
**hit** 118:16 172:17 179:3
**hits** 85:19
**hitting** 69:20
**hog** 78:23
**Hogan** 2:11 9:13
**Hogenkamp** 32:9 45:19 48:15 61:4 66:14 78:3 80:8 80:16 81:1 83:1 88:5 97:8 116:2 147:22
**Hogenkamp's** 66:25 83:4
**hold** 69:9 75:23 80:9,17 81:13 94:11 197:2 203:24
**holiday** 84:22,22
**hours** 51:20 141:19 142:15 143:1 146:22
**house** 22:21 25:5 29:19 36:25 37:5 93:7 103:18 113:14 114:19 122:2 123:7 132:11,19 134:18 134:20 135:3 162:1 164:8 179:10,17 184:11 184:12 193:2,3,5 193:8,25 194:8 198:13
**HR** 26:6
**hundreds** 49:14
**Hyers** 16:8,9,22,25 19:16,16,24 21:7 26:11 96:9 100:21 100:24 101:2,16 102:8,12 103:7 200:6

**I**

**ID** 152:17
**idea** 73:4 75:4,6 108:12 129:5,14 144:10
**identification** 33:20 41:1 44:23 48:20 51:23 55:21 60:22 66:18 72:6 76:16 79:4 83:3 90:6 93:9 105:4 121:13 124:22 135:15 141:13 149:8 167:20
**identified** 36:20 52:12,14
**identify** 152:6 161:11
**identities** 13:24
**ignore** 52:1
**Im** 68:8
**immediately** 47:21 70:3 157:3
**impact** 35:4,6 38:5 38:11,15,19 39:5 39:13,19 155:14 159:2 162:7 179:12
**impacted** 112:7
**important** 11:2 64:20 183:17
**impression** 16:15 20:24
**inability** 161:13,19
**incentive** 151:22
**incident** 41:17
**include** 26:25 52:6 141:6 142:11,17 147:9 171:14
**included** 46:4 119:5 122:17 142:17 160:5 195:9
**includes** 137:19 142:4 168:21 183:9,11,12
**including** 19:12 26:6 31:21 40:21 79:24 113:9 132:15 177:17,19
**inclusion** 126:13
**income** 115:10 162:15 191:13
**incorporate** 175:6 175:12
**incorporation** 176:11

**incorrectly** 100:11
**incurred** 195:14
**independent** 46:17
  162:9
**INDEX** 4:1
**indicate** 137:18
**indicated** 121:1
  140:25
**indicates** 137:16
**Indiscernible**
  170:21 189:7
  203:25 204:6
**individual** 27:15,21
  156:6 169:11
  178:5
**INDIVIDUALLY**
  1:17
**industry** 40:3 70:6
  112:16 148:7
  159:10
**infighting** 134:20
**influence** 162:16
**info** 95:4
**information** 13:25
  35:25 38:10,15
  79:19 81:11
  119:23 137:10
  167:1,13 195:1
**informed** 162:25
**infrastructure**
  174:10 177:10
  178:24
**inherent** 146:2
**inherently** 157:21
**insane** 63:16
**insofar** 38:21
**instability** 159:3,6
  160:17 161:8
**instruct** 190:14,20
  194:13
**instructed** 87:14,15
**instructing** 188:12
  194:11
**instruction** 194:21
**instructions** 72:25
**intended** 118:2
  126:8

**intending** 83:21
  197:16 198:19
  199:7,11
**intent** 85:9 87:3
**intention** 92:14
**interacted** 180:8
**interacting** 180:9
**interaction** 33:2
  73:13
**interactions** 23:23
**interest** 112:1
**interested** 35:1
  207:11
**interface** 14:2,4
**interim** 124:6
**intermittently** 31:1
**internal** 141:17
  145:22 161:22
  162:17
**International**
  177:24
**interpret** 82:2 84:1
**interpretation** 82:5
**interpreting** 85:6
**interrogatories** 5:5
  25:4 33:24 34:4
  115:17
**interrogatory** 17:7
  22:1 34:12,13,22
  38:3,24 57:20,21
  140:23 162:24
**interruptions**
  145:25,25
**intervening** 48:7
**interview** 18:1,5
**interviewed** 184:20
**introduced** 15:25
  16:1,22 17:17
  18:2
**introduction** 18:4
**investigate** 152:24
**investigation** 39:24
  97:14
**investment** 70:7
  89:2 146:12 148:8
  148:10 155:13
**invoice** 6:6,12

62:14 72:3,7 74:8
  75:2,9,11 76:6,7
  79:2,2,13,19 80:2
  80:10,19 81:14
  84:11 99:6,7
  110:7 117:16,20
  117:22
**invoices** 79:24 82:8
  83:22 85:25 86:20
  87:3 90:13,15,18
  92:4,5,15 93:23
  97:17 99:4,5,15
  108:24 109:10,15
  111:13,24
**involve** 29:24
**involved** 12:24
  18:22 22:9 26:19
  29:22 31:10 68:2
  110:24 139:21
  154:22
**in-house** 177:13
**in-kind** 182:23
**iPhone** 31:16
**irrelevant** 186:2,4
  194:9,16
**isolated** 153:10
**issue** 117:3 119:17
  120:8 140:10
  152:12,14 153:5,8
  154:6 164:21
  167:7,10
**issues** 24:3 29:22
  29:24 31:9 87:6
  146:7,19,23
  147:11 151:17
  164:21,22 179:21
  190:12 199:8
**item** 127:15 129:22
  141:16,16 142:12
  158:17 168:3
  172:25 173:9
  202:10,18 203:10
**itemized** 95:6
  141:6 169:6
**items** 147:9 155:15
  169:11 170:10,16
**it'd** 166:20

**J**

**Jacksonville**
  183:15 184:18
**Jake** 7:4,8 14:14,25
  17:15,16 18:1,2,8
  18:9,20 19:13
  21:6,11 32:5
  42:19 43:3 45:25
  47:3,6,10,10 50:4
  50:9 51:7,19
  52:20 54:20,21,22
  55:6 57:22 82:25
  83:4,11 84:21
  85:17,21,24 86:13
  86:15,22 87:17
  88:4,4,12,13,23
  89:9,21,24 90:1
  90:15 92:19,20
  93:1,4 94:2 95:16
  96:2,11,13 97:1,2
  97:15 98:13,14
  99:13 100:25
  102:24 103:1,7
  104:19,25 105:21
  105:22 106:19
  107:9 116:13
  119:20 121:8
  124:18 128:10
  131:19 132:3
  162:2 197:19
  200:20 201:14
**Jake's** 85:18
  184:17
**January** 203:6
**Jersey** 184:16,17
**Jill** 175:23 176:1,20
  178:8
**Jim** 35:1,6,8,18,22
  35:25 38:4,8,20
  39:12
**Joanna** 7:5 21:18
  90:3 104:19
  119:20 162:3
**job** 1:25 47:7
  103:14 144:13
**Joey** 150:25 151:5
  153:7,12

**join** 111:1
**joined** 22:8 107:6
  107:12 110:9
  159:9
**joint** 191:16
**jointly** 25:7,10
  192:3 193:10,24
**Jonathan** 3:18 9:16
  21:19
**Josh** 95:5,10
**judgment** 92:21
  187:23 188:9
  190:7,9
**July** 5:16 14:21
  25:15 41:5 45:8,9
  46:6 48:5,13
  51:19 53:4,16
  54:3 55:20 56:3,5
  56:21 57:3 58:13
  61:7,10 62:12
  63:24 64:7 65:5
  66:6,22 67:12,25
  69:3,12 70:12
  71:4,16,22 72:1,5
  72:13,17,18 75:9
  76:7 79:13 104:5
  104:9,10 109:19
  117:23 118:4
  122:2 124:21
  132:13 162:9,24
  163:21,22 167:23
  176:7 182:14
**July-to-October**
  25:25
**jumped** 121:1
**June** 53:4 121:1
  122:2,9 124:4
  137:14,15,17,19
  170:25 171:9
  172:10 174:5,8,12
  182:14 202:8
  203:5 205:14
  206:18
**justification** 112:10

**K**

**K** 65:9 66:5

**KATHRYN** 3:7
**Katiana** 41:5,16
  42:6 54:4 149:11
  149:21 150:15
**Katiana's** 54:12
**Katie** 3:7 10:13
**katie.ali@alilock...**
  3:8
**Katz** 18:24 19:1,5
  91:3,7,7,24,25
  92:10 103:25
  105:13,23 122:21
  167:3
**keep** 49:15,22 64:2
  68:19 71:5,23
  78:17 84:6,22
  85:19 92:12,12
  94:3 169:4
**keeping** 72:2 162:4
  164:17
**keeps** 171:19
**Keith** 13:12 14:14
  14:25 15:22,24
  16:1,6,9,11,15,23
  16:24 17:1,9,17
  17:19,20,21 19:11
  21:1,6,11 23:22
  26:4 32:5 33:6
  36:16 37:4,8,14
  38:5,11,15,19,21
  39:18,23 40:13,15
  42:17,19,23 43:2
  45:25 46:21 50:5
  50:9 51:7,20
  52:17,22 54:20,24
  56:24 57:8,11,22
  58:8 59:15,22
  60:13 61:4,23
  62:11,12 63:10,14
  65:9 66:5,15,25
  67:13,15,24 68:10
  68:12,16,19,25
  69:13,15,20 70:2
  70:13,21 71:4,17
  71:22 75:2,8,14
  75:19 77:5 78:3,8
  78:13,17,21 79:24

80:11,21 81:15,18
  82:12 87:17 88:10
  88:12 89:9 91:19
  92:19 96:9 99:11
  99:12 100:22,25
  102:9 110:24
  111:3,13,17
  114:11,12 115:4
  116:6,13 118:9,14
  119:14 131:5
  149:6 153:19,22
  154:1,3 184:15
**Keith's** 35:8,23
  36:1,11 39:13
  40:20 55:4,5,7
  60:8 73:15 81:3
  112:4 113:23,24
  115:13,14 148:23
  179:3
**kept** 133:6
**key** 31:18
**kind** 20:5 26:12
  65:16 79:18 98:25
  103:21 110:5
  111:25 112:10
  124:6 140:11
  179:4 180:5
**kinds** 36:12 40:6
  63:9,9 65:18
  118:12,12 167:17
  169:20,23 191:11
**Kings** 180:16 181:3
**knew** 13:24 14:7
  52:8,18 60:6
  131:11,16 163:16
  184:7
**know** 10:15 11:17
  13:2,19,21 14:1
  15:22 16:4,5,9
  17:1 18:8,12
  24:11,12 26:9,18
  27:5 28:9,15
  32:17 33:4 35:2,3
  35:3 37:23,25
  38:1,18,25 39:5,8
  39:9,14,17,18,21
  40:2,6,7 42:12,21

42:23,25 43:5,15
  44:6 45:22 46:24
  47:10,13,14,20,21
  51:24,25 52:4,11
  52:16,24 53:1
  54:15,24 55:1
  59:1,4,6 60:2
  62:25 63:2 64:9
  67:16 70:4,9
  71:19 72:9 73:2,4
  73:11,13 74:7,21
  74:21 76:10 77:6
  77:7 81:6,8 82:9
  85:2 87:8,10,12
  87:13 88:14,22,23
  89:8,12 90:4
  91:13,15,17,21
  92:13 94:23 96:3
  96:12 98:18 99:9
  100:3,3 102:4,15
  102:16,18,21,24
  103:1,22 104:25
  105:21 106:1,18
  106:22,24 107:6
  107:10,12 108:4
  108:20,21,22
  109:4,7 110:20
  111:16 112:5,15
  112:16,17,17,18
  112:19 113:5,7
  115:18 116:9,12
  116:15 117:14
  118:24 119:4,6,7
  119:11 120:3,7
  121:21 122:16
  124:15 125:1,15
  127:19 129:7,10
  129:12 130:5,16
  131:9,11,11,13
  132:5,9,11,22
  133:6 134:7
  135:23 136:10,12
  136:16,17,19,22
  137:8,11,23,24
  139:24 140:17
  141:4 143:21
  144:8,9,18,21

145:1,9,11,14,16
  145:17,23 147:4
  147:24 149:15,22
  149:25 150:1,5,16
  151:1,17 155:3,17
  156:4,16,21
  157:22 158:20,22
  158:24 159:5,8,20
  161:6,14,16
  162:11 163:17
  165:5 166:20
  168:21 169:10,15
  171:13,22 172:5
  173:17 178:2
  180:20 181:22
  182:15,23 183:5
  184:4,6 190:22,23
  190:24 197:19
  198:8,18,24
  200:18 201:12,17
  203:14 204:3
**knowing** 47:16
  49:8 182:3
**knowledge** 11:23
  13:23 20:2 24:6
  24:14 27:13 34:19
  38:9,18 46:1,5
  54:19 75:1 116:20
  131:8,21,22
  140:21 155:25
  165:23 167:9
  176:25 177:1
**known** 21:18 69:1
  157:3
**knows** 62:17
  101:17 181:19
**Kottmeyer** 35:2,6
  35:15,25 38:20

————————
**L**
**labeled** 18:4 44:11
  62:3 189:3
**labor** 84:22 141:18
  143:16 144:3
  170:20,23
**lack** 146:1 148:12
  148:22 163:5

197:17
**lag** 156:23
**land** 179:22 181:14
**language** 47:19
  82:4 183:2,20
**large** 69:16 159:4
  195:22
**larger** 62:13
**lasted** 108:12
**late** 58:23,24
**lately** 80:9,17 81:13
**launch** 16:2,21
  19:18,23 20:19
  40:18,18 41:24
  50:1 60:7 63:19
  67:4 77:12 151:17
  164:10 172:8
**launched** 14:20,23
  37:5 40:11 45:16
  78:7,11,12 163:21
  172:11 198:11
**launching** 181:22
**Lauren** 1:24 2:12
  9:17,22 205:11
  206:7,16 207:4,18
**law** 15:15 172:3
**Lawler** 22:16,16
  122:24,24 123:16
**lawsuit** 27:14
  138:23,25 139:4,5
  139:21 181:13
**lawyer** 23:24,25
  28:24 101:4,10
  201:8
**lay** 93:22
**laying** 95:10
**layperson** 156:8
**layperson's** 157:20
**lead** 190:25 194:25
**leader** 20:5
**leadership** 25:9
  41:20,21 43:1
  54:13
**leading** 58:24
  87:19,19 110:25
  111:9,10 119:10
  157:8 172:2,3

179:9
leads 22:18
learn 163:3 167:5
leave 22:22 50:16
  55:9 75:5 126:2
  154:5
leaves 74:16
leaving 25:3 196:6
  196:19
led 108:13
left 23:4 24:25 25:1
  25:10 37:4 92:19
  100:21 116:5
  122:12,14 138:6
legal 24:4 27:23,25
  29:1,4,13,15 30:4
  30:5,7,15,15 31:2
  31:8 39:23 92:12
  103:20,22 106:7,8
  106:9 139:25
  140:9,12,12
  143:15,17,24
  144:3,4,5 145:7
  165:19 174:23
  175:15,15 189:20
  198:3,9
legitimate 51:24,25
length 129:2
let's 18:7 34:22
  38:12 69:16 70:1
  70:22 71:8,17
  75:7,9 76:11
  100:13 109:15,15
  118:14,16 135:18
  140:2 141:11
  166:1 185:17
  190:22
level 179:15
Lewis 95:10
Lewis-Daggs
  175:24 176:1,20
  178:8
liability 190:11
Library 181:9,16
licensed 28:9,12
licensing 62:6
lieu 171:18,18

life 193:7
lighter 105:1
liked 42:20
likes 42:8,16 43:4
  43:11
limited 24:8 167:4
line 8:2 25:21 109:5
  124:7 142:12
  158:17 163:18
  166:15 168:2,3
  169:11 173:8
  202:10,18
lines 134:17 183:4
list 13:22 39:14,19
  39:21 40:2,7,9
  49:5 59:3,10,10
  59:13 72:13,17
  74:5 79:9,14
  90:23,24 98:11
  102:3 121:10
  125:8,9 126:13
  129:22 142:16
  151:5,6 152:18,22
  169:6
listed 34:12 92:3
  97:20 117:17
  122:23 146:16
  164:23 166:9
  168:6 169:8,9
  197:15 198:25
  199:6,10
listen 53:19
listening 112:19
lists 13:4,5,14,15
  13:17,23 22:20
  35:8,23 36:1 40:5
  69:22 121:10
  123:17 124:15
  143:3 145:5
  172:19
literally 127:2
litigate 186:10,13
litigation 21:4 27:7
  27:10 29:22,24
  31:11 33:15 45:1
  83:8 135:20
  140:15,19 186:3,6

190:17,24 194:17
  194:25
little 18:17 37:2
  51:12 53:21 68:7
  69:4 73:21 75:18
  82:25 84:12
  101:11,18 120:17
  133:12 154:9
  157:6 164:3 165:9
  166:14 180:19
  181:20
living 197:19
LLP 3:3
Ln 208:7
loan 39:13,19
  121:16 166:9,16
  166:18 167:1
  168:21,21 172:19
  173:4 178:22
  195:18 202:10,23
loaned 173:17
  174:4,7 178:15
  186:10 191:5,8
  192:9 195:9
loans 18:22,22
  140:21 166:22
  172:25 173:5,7,11
  173:23 174:3
  195:16 196:2,4
  197:11 199:18
  203:2,12
local 184:19
locations 61:10
LOCKWOOD 3:3
London 193:11,24
  194:8
long 61:23 62:13
  66:15 75:21 101:8
  107:18 108:12
  165:15 184:8
longer 31:6 123:24
  124:2,8 165:8
  167:16 174:13
  196:16,17
look 34:2 44:8
  59:14 60:17 61:2
  65:9 67:2 75:7

76:11 78:1,2 80:6
  82:10 93:19
  100:22 101:20,21
  106:6,9 114:3,20
  135:18 140:11
  152:9 156:12
  159:10 163:25
  165:19 166:20
  167:11,15 168:2
  169:18 170:24
  171:20 173:6
  174:1,12 185:17
  187:12 201:22
  202:5,9,13 203:8
  203:8
looked 32:18 37:18
  39:9 48:14,15
  50:14 53:7,15,21
  54:7 74:23,24
  79:20 86:1 98:6
  102:9 103:11,12
  118:7 134:7,8,8
  153:17 166:21
  176:9 203:13
looking 19:8 21:19
  22:19 34:10 43:15
  43:17 44:6,16
  52:12 60:13 65:17
  75:8 76:24 93:16
  97:15 99:1 100:18
  109:18 119:15
  164:18 173:19
  182:25 184:20
looks 42:11 46:16
  56:5,10 63:17
  75:20 90:20 101:2
  103:3 104:18
  121:8 151:11
  153:5 202:25
loop 86:22
looping 93:21 95:5
  149:14
loose 15:7
loss 155:12,21,22
  156:1 158:7
losses 180:3
lost 155:13,14

157:25 158:14
  161:13
lot 58:11 97:10,24
  110:20 112:5,10
  118:8 145:12
  160:9 161:19,21
  173:20 178:6
  179:24 182:21
lots 28:3 116:18
love 46:11 65:6
  78:17 84:6
Lovells 2:11 9:13
lower 66:8
loyal 78:24
luck 93:21
lunch 78:15
L-A-W-L-E-R
  22:16

          M
MacBook 31:17
mail 76:21 77:16
  90:11 117:22
  118:8,10,12,14,18
  118:20 119:16
  120:3
mailer-type 76:23
mailing 117:2,4,6
  117:10,15 118:17
main 184:13
maintained 25:8
making 43:7,10
  51:10,11 86:3
  146:9,10 163:12
  173:13,14
Mamlin 150:25
manage 25:2,7
managed 144:14
  146:3
management
  183:19
manager 13:9,10
  23:5 24:18,22,24
  25:6,12 26:1,3,4,5
  26:6,8 49:6,8
  103:13 123:24
  124:3,5 140:4

141:7 149:22
159:8,12 182:3,5
198:5
**managerial** 26:24
**managerial-level**
26:17
**managers** 13:11
21:18 51:5
**managing** 141:19
142:5,15 143:1
144:19 146:22
**March** 203:6
**mark** 33:18,19
40:24 44:9 48:9
51:14 55:18 60:18
66:10 72:2 76:11
79:1 82:21 89:16
92:22 104:16
120:24 135:10
149:1 167:19
184:23
**marked** 33:20 41:1
44:23 48:20 51:23
55:21 60:22 66:18
72:6 76:16 79:4
83:3 90:6 93:9
100:19 105:4
121:13 124:16,22
135:15 141:12,13
149:8,10 152:9
155:1 167:20
185:1
**Marketing** 91:14
91:15
**marriage** 207:10
**married** 191:16
**match** 110:4
**matches** 97:16 99:1
**materials** 53:25
**Matt** 12:15,16
153:6,13
**matter** 9:6,8
207:12
**matters** 106:20
109:2,2 112:15
165:20 190:16
195:2

**maximize** 170:13
**max-out** 145:8
**mayor** 183:11
**ma'am** 44:7 46:19
107:22 174:18
182:6
**McLean** 3:13
**Meadowlark** 33:3
33:4 35:5,19,25
36:3,6,16,18 38:5
38:21 57:18 63:2
113:10,25 114:5
115:5 116:7
121:16 123:10,12
125:14 129:23
130:5,16 131:5,7
131:9,11,16,24
148:12,14,19,24
149:18 150:24
151:4 153:6 154:3
**Meadowlark's**
35:16,18 129:25
152:15
**mean** 13:14,16,17
15:11 23:20 26:24
27:1 32:14 35:12
47:14 49:23 51:22
51:24 79:22 84:1
89:4 96:18 97:1
99:2,5,7,7,10
109:24 112:12
116:18 121:18
123:3 125:6
126:14,17 127:1
128:6 135:25
155:24 156:2
158:2,19 165:7
179:8,19 191:15
191:17 195:12,21
**meaning** 17:18
52:20 89:1 116:7
127:12 132:15
143:15 166:16
187:25
**meaningful** 26:14
**meaningfully** 26:19
**means** 26:22 40:2,4

49:11,13 70:4
71:19 73:2,11
90:4,23 91:22
114:22 116:21
119:12 121:22
124:8,13 136:1
138:13 143:4
144:8 155:25
160:6 161:15,17
165:8 187:16
**meant** 34:3 81:23
96:12,13 101:13
117:22,23 120:10
157:13 175:3
**measure** 97:11
**measuring** 180:11
180:13
**media** 20:14 24:8
24:13 27:5 91:14
91:15 171:20
**meet** 84:8 106:19
108:6 169:13
**meeting** 17:2 41:21
42:7 87:18,25
106:14,15,17,21
107:6 108:9,10,11
108:12,14,15,22
108:23 109:9,24
110:21,25 111:1,5
111:10 116:24
117:1 120:2
125:13 128:5,8,9
128:11,17 129:11
**meetings** 116:15
**Megan** 62:16,25
63:2
**member** 152:12
161:5 178:8
**members** 139:22
140:1 149:15
175:22
**memorializing**
41:19
**memory** 37:7 76:23
77:8 83:20 117:25
150:3 154:12
164:11 166:20

173:6 178:18
**mentioned** 18:24
19:16 43:3 98:25
101:4 103:24
110:15 115:4
122:15 142:23
143:24 162:23
168:12,22 171:24
173:22 195:8
203:1
**mentor** 20:5
**message** 7:7 13:20
40:21 44:10,17,25
45:4,8 46:3,6,12
47:14,15 52:24
54:9 59:3,10
64:14 66:11 84:4
85:18 89:22 92:3
104:22 109:25
116:10 118:11,15
119:2 120:24
121:9 124:21,24
124:25 162:6
**messages** 5:8,11,14
6:14 7:11 31:22
31:23,24,25 44:3
44:4 45:9 48:22
50:4,7,13,14
51:16,17 52:12,13
52:14,17 53:7,15
53:22 54:1 63:9
63:22 66:24 72:19
75:7,11 79:15
80:6 85:5 89:21
98:1,2,6 100:2
104:24 105:2
109:1,20 110:1
119:5,15 125:2
147:22 158:10
**messaging** 59:7
113:7 118:16
126:10 183:23
**met** 17:2 41:19
54:16 97:19 113:4
**methodology** 141:9
155:17
**Miami** 181:10

183:12
**Miami-Dade**
171:15 180:4
181:14,15
**mic** 189:7
**Michelle's** 71:6
**midday** 63:23
**middle** 61:12 63:12
66:4 67:25 68:25
95:15 189:21
**mid-August** 133:13
**mid-October**
133:23 134:12,14
**miles** 179:16
**mill** 75:21
**million** 75:20 87:12
90:12 100:6,6
132:8,13,19,22
163:19 164:3
179:4
**million-dollar**
87:18 163:6
**min** 68:2
**mind** 21:22 47:24
59:12,12 80:13
81:5,17 107:25
115:18 175:3
199:13 200:9
**mine** 105:9
**minimis** 135:9
**minus** 88:18
**minute** 19:9 48:23
68:5 142:14
**minutes** 42:5,11
108:16,18 152:1,2
152:21
**missing** 22:20
115:18 121:10
**Mission** 78:9,13
**misspoke** 137:21
**misstating** 183:3
**mistake** 114:4
117:17,20 166:7
166:11 197:21
**mistaken** 142:3
153:21
**mixed** 180:3

**modes** 113:6 160:4
**moment** 55:15
  178:23
**momentum** 155:14
  161:12 162:4
**Monday** 1:22 9:2
  61:7 70:13
**money** 68:20 85:8
  85:15 97:10,24
  112:5 118:21
  126:14,15 127:13
  131:3,16,17
  134:10 140:18
  143:13 145:17,19
  163:20 169:25
  174:4,7 178:15
  186:9 191:8 192:9
  195:6,18 196:11
  199:16,24
**money-focused**
  179:10
**monies** 85:9 140:14
**monitor** 17:9 19:11
  58:8,9,9 65:7
  79:24,25
**monitoring** 19:15
  20:22 59:17
**month** 23:8 75:21
  86:18 88:18 104:5
  111:9 137:20
  138:4,6,11,13,16
**monthly** 92:1
**months** 27:17
  30:22,24 31:6
  95:6 111:10
  127:20,21,22
  128:2 164:4
  179:17
**morning** 9:21
  10:11,12,15 61:8
  62:12 105:12
**motivated** 134:19
**motivating** 60:3
**mouth** 97:22
**move** 23:6 151:22
**moving** 86:16 93:7
  150:18

**Mucarsel-Powell**
  49:17,18 60:5
  133:13 134:14
**Multiple** 128:21
**multiplying** 99:16
**MW** 78:7
**my-finance-team...**
  54:5

**N**

**N** 1:24 2:12 3:1
  205:11 206:7,16
  207:4,18
**name** 9:21 10:13,18
  10:20 21:20,24
  22:8,15,16 32:10
  32:10,21 41:2,16
  41:17 43:18 47:24
  47:24 57:5 63:5
  72:8 83:4,4 93:3
  107:19 143:12
  175:25 193:15,17
  208:2
**names** 21:25 31:18
  32:5,22 47:24
  107:14,16,17
  151:19 152:13,13
  152:23
**nation's** 134:19
**nature** 191:13
**Navy** 181:7,20
  191:14
**NE** 3:4
**near** 26:7 172:5
  179:24,24
**nearly** 134:25
**necessarily** 58:3
  157:10
**necessary** 16:21
  58:10
**need** 11:17 42:9
  62:2 68:23 70:16
  80:9,17,18 81:13
  84:6 86:20 95:3
  101:21 104:2
  114:20 115:15
  139:10 142:19,20

143:13 149:22
  151:2 154:5 158:6
  165:8 167:15
  169:11 175:16
  180:14 197:8
  198:1,2,9 200:19
**needed** 20:16 25:2
  25:6 65:8 110:6
  121:21 125:10
  153:14
**needing** 147:9
**needs** 101:21 106:1
  106:3 116:24
  119:25 166:7,14
  166:23 174:10
  183:23
**negative** 148:8,9
  162:14,16
**negotiate** 119:25
**negotiating** 116:25
  117:1 120:2
**negotiation** 120:1
**negotiations**
  116:25 125:13
  129:23
**neighborhood**
  191:6
**neighborhoods**
  179:20,24
**neighbors** 179:19
**Nelson** 90:11
**never** 10:24 88:9
  111:2,12 118:1,18
  118:19 128:18
  129:8 158:11
  163:18
**new** 23:1 73:20
  94:19,23 149:3
  152:13,23 168:23
  168:24,25 172:13
  172:13,15,18
  174:17 184:16,17
**news** 183:14
**newspapers** 180:16
**NGP** 37:21 149:21
  152:22 153:8
  174:10 178:24

**Nicaraguans**
  183:24
**nice-to-haves**
  124:14
**night** 67:25 167:6
**nine** 171:22
**nod** 11:4
**node** 122:8
**nomination** 70:23
**nominee** 170:7
**non-environmen...**
  179:22
**noon** 63:19
**normal** 32:2
  170:18
**Northwest** 2:11
  9:13
**notary** 9:24 205:12
  206:17 208:25
**note** 48:24 50:6
  78:6 80:13 81:5,5
  81:7,17 104:4
  122:11 202:4
**notebook** 32:16,17
**noted** 9:18
**notice** 51:20 101:3
**noticed** 166:6
**notify** 103:18
**not-so-good** 50:19
**November** 93:1,4
  93:20 94:2,7,25
  95:12,14,15,24
  98:23 99:18
  100:22,23 157:9
  163:22
**NPR** 180:17
**number** 9:12 21:8
  34:13,22 38:3,24
  44:12 49:3,4,15
  56:17 66:12 72:4
  72:7 99:6,17,25
  100:2,11 102:1,12
  102:19 120:4
  121:7 126:8
  127:15 128:5
  136:7 137:1 138:8
  141:10,24 152:10

155:11,11 157:22
  160:6,14 168:6
  182:1,2,4 199:17
  201:24
**numbered** 38:23
**numbers** 64:3
  79:18,22 80:13,23
  81:18,25 99:5
  113:6 136:3,4
  155:18 163:25
  164:4

**O**

**oath** 4:4 11:21
  57:21 186:9 206:1
**oaths** 9:25
**Ob** 30:2
**Obi** 7:4,10,12 22:8
  96:2,11 97:1,2,15
  98:13 99:13
  100:25 101:11
  102:25 103:2,7
  104:19 105:1,19
  106:19 107:9
  119:20 121:9
  122:19,20 124:18
  125:17,20 128:7
  128:10,13 129:15
  129:17 131:19
  184:17,20 197:18
  201:7
**Obie** 96:13
**Obi's** 98:14 129:9
**Obi/Jake** 105:12
**object** 11:7,8
  184:25 185:10
  186:14 187:20
  188:8 190:6,14,20
**objecting** 139:23
  140:4 186:16
**objection** 188:25
  189:1,4,9 190:2,4
  194:7
**objections** 33:23,25
**obligation** 20:18
**obligations** 113:19
  115:3,7

observation 39:20
  131:14
observed 159:25
obtaining 29:4
obviously 132:8
occasion 184:9
occasional 26:15
occasions 66:1
  128:8,21 137:1
occur 126:25 127:1
  183:23 200:18
occurred 104:6
  112:1 129:2,11
occurring 110:21
October 1:22 2:4
  9:2,15 18:15
  25:16 27:18 28:18
  29:18 30:25 86:18
  87:2 104:6 122:3
  134:1,5,7 135:1
  140:4 157:3 179:4
  182:15 205:7
  206:10 207:14
  208:4
odd 103:3 165:13
offer 103:19 104:2
  113:8
offering 50:25 52:5
office 164:5 198:22
officer 21:24 176:6
  184:18
offices 9:12
official 206:9
oh 12:6 16:25 22:22
  54:16 56:11 67:21
  87:23 88:7 171:2
  171:2,5 192:21
ok 68:11,11 86:15
Okaloosa 176:21
okay 11:20 12:6,9
  12:12,16,19 13:7
  13:14 14:5 17:23
  18:6 19:9,24 21:3
  21:21 22:17 23:10
  24:5,9,15,17
  25:13,14,24 26:13
  27:4,7 28:22 29:7

29:25 30:2 31:24
  32:22 33:21 34:6
  34:22 37:13,17,24
  38:2,18,23 39:3,7
  39:11 40:8,24
  41:4,13 43:10,22
  44:22 45:4,17
  46:15,20 47:5,9
  47:13,18,25 49:10
  50:22 51:13,14
  52:25 54:11,19
  55:11,15,17,22
  56:16 58:11,17
  59:8,15 60:11,23
  61:13,15,18 62:23
  63:3,7,13 64:2
  65:4 66:4 67:1,23
  69:4 70:9 71:21
  72:1 73:18,21,24
  75:7 76:4 77:8,13
  80:20 82:18 83:6
  83:9 85:5 86:11
  88:8,11,13 89:3
  89:17 90:10 91:14
  91:21,24 94:14,16
  95:23 98:5,8 99:4
  100:20 104:12
  106:24 107:12,15
  107:19,23 108:3,4
  108:7,20 109:17
  109:24 110:13,19
  111:4 114:17,23
  115:1,8,20 118:24
  119:13,15,19,22
  120:12,14,24
  121:3 123:23
  124:9,12,23
  125:22 126:3
  127:5,7,9,12,15
  127:22 128:3,5
  129:20 130:2
  132:21 133:4
  135:10,17,22
  137:23,25 138:3
  138:19,22 139:11
  139:14 140:2
  141:11,14 142:13

142:19 149:1
  150:13 151:13
  152:8 153:3 154:5
  154:6,16,18,20,25
  157:6,19 158:13
  167:7 170:19,22
  170:24 171:7,7
  173:5 175:18
  177:6 182:16,19
  184:12,23 185:6
  187:18 202:9,23
  203:16 204:10,13
  204:18
old 165:9,25 166:3
  172:17 174:11
once 16:15 65:22
ones 20:16 44:16
  104:24 114:14
ongoing 19:24 20:1
  31:20 122:5
on-side 51:21
Oops 48:11
open 164:17,17
  196:6,19
opened 172:12
operating 121:10
  146:11
operation 127:6,8
  146:1 148:7
  161:20
operations 17:9
opinion 101:23,25
  200:6
opportunity 104:2
  155:21
opposite 180:8
opt 151:18
option 103:19
  196:6,19
options 198:23
oral 28:2 96:20
  108:11 116:15
  125:20 131:18
Orally 201:1
order 41:10 130:9
  130:10 151:19
  152:19 171:1

178:18,18 190:15
  194:14 195:3
  204:8
ordering 203:21
organization 113:2
organizations
  14:17
organized 171:3
  172:3
organizers 181:4
original 6:21
  152:18
outage 154:13
outcome 207:11
outreach 111:6
outside 160:1
  177:13
outstanding 82:8
  93:14,17,23
  197:10,11
out-of-pocket
  170:20
overall 72:18 79:15
  109:19 116:11
  131:25 179:12
overcharging
  96:19
overstep 101:12
overtures 52:1
over-charging 96:4
  96:18
owe 84:9 118:15
owed 83:22 84:18
  85:10 95:17 96:22
  110:22,23 126:14
  130:1,6,19,24
  131:16 173:14,14
  197:10,12 199:15
  200:21
owes 199:23
owned 192:17
  193:6,9,10,24,25
  194:6
owner 192:1 193:3
owns 168:11

———————
P
———————

P 3:1,1
PAC 172:3,9
pace 172:6
package 66:17,19
page 4:2 5:2,9,12
  5:15 6:1 7:2,6,10
  7:14,16 8:2 32:19
  33:24 34:13,15,23
  34:24 44:15 56:4
  56:23 60:19,21
  61:12 63:12 65:1
  65:2,9 66:5,23
  67:3,12,20,24,25
  68:7,18,25,25
  69:13,19 70:2,11
  70:11,12,21,21
  71:4,5,10,15,16
  71:17,21 75:13,18
  76:14 78:20,20
  82:10 86:8 93:20
  94:1,8 95:1,14,15
  95:16,21,22,23
  152:10 153:1
  168:2,2 169:8
  172:22,22,23,24
  202:5,9
pages 6:16,19,22
  7:18,24 64:13
  69:9
paid 19:22,24
  20:20,20 35:19
  76:7 80:10,19
  81:14 83:16,18
  84:7,13 103:22
  109:6 117:14,18
  117:22 118:16,18
  119:1 121:20,21
  121:22 122:5
  125:10 126:14,15
  130:16,18,23
  131:2,3,12,17
  138:6,11 151:16
  158:11 173:13,25
  182:20,22 200:7
paper 32:17 122:6
  154:24 190:6
paragraph 38:2,23

38:24 53:4 56:20
101:7 172:25
203:1
**Pardon** 88:7
192:22
**parent** 35:5,18
**parentheses** 75:21
101:11
**parenthetical**
91:22
**Parnas** 22:23 24:5
24:7 26:25 32:9
94:8,17,17
**part** 18:6 22:14,24
26:15 31:3,21
44:18 53:19 60:3
76:7 101:22,23
102:14 103:16
109:9,23 112:22
121:22 125:8
139:9,9,12 151:20
151:21 158:11
161:16,17 165:12
170:8,10,11,12
189:11,13 197:3
197:22 200:12
**participants**
104:19 129:13
**particular** 32:5
45:3 58:4 126:12
136:5 155:18
179:1
**particularly** 69:2
**parties** 9:25 133:5
207:10
**partner** 71:6
**parts** 60:10,12
130:18 152:7
**party** 139:16
176:25
**part-time** 22:3
**pass** 93:22
**pasting** 90:20 91:3
**patently** 163:7
**pause** 80:18 118:15
118:17
**pay** 18:21,23 70:18

75:2,5 80:14,24
81:19 82:1,7
83:15,21 85:10
86:4 87:3 90:17
92:9,14,17 125:10
125:21 127:12
130:18 158:9
197:16 199:8,11
199:24
**paying** 15:9 18:8,9
18:12 91:25
125:19 130:22
173:21 174:10,10
182:11
**payment** 72:25
74:14,19,25 82:12
86:23 93:23 95:6
95:11 105:21,22
105:23 118:1
121:12,23 125:12
125:17 158:10
200:1,8
**payments** 18:18,18
74:22 106:6
121:11,11,15,18
122:19,24 125:4,8
130:1,21 169:8,10
169:16,20,23
170:19
**Peer** 72:12,12,13
72:13,17,17 79:8
79:9,9,9,14,14
**peer-to-peer**
118:11
**penalty** 34:18
**pending** 11:19
84:16,23,23 85:6
85:13,19 90:24
199:12
**Pensacola** 170:15
192:21 193:2,5,8
193:25
**people** 15:7,9,12
17:5 22:21 23:1,4
23:10,12,15 26:1
26:18,23,25 27:1
32:3 41:3 50:1

61:6 63:16 64:5
65:18 73:8,9
103:4,6 109:25
110:3 112:13,13
116:19,21 118:11
123:17 160:13
162:11,18,20
170:8 173:14
178:5 180:23
184:13
**people's** 32:5 156:6
**perceived** 15:1
21:1 159:6 160:18
**percent** 88:22
**percentage** 88:24
**perception** 155:13
159:2,3 161:8
**Perfect** 44:1 204:18
**perform** 113:19
115:3,7
**performance** 19:12
58:8 106:10
113:25 161:21
197:17 199:8
**performed** 26:5
**performing** 65:20
114:4
**period** 25:25 66:15
88:14 104:4 107:5
125:25 133:19
134:8 135:4,7
162:9 168:4
182:19 187:19
202:4,6
**periodic** 23:16
**perjury** 34:18
**permission** 150:4
**permissions** 149:22
**permit** 188:6
**permitted** 169:13
**Perry** 3:18 9:16
**persist** 195:3
**person** 11:3 16:5
17:14,21 32:14
41:5,16 51:8
53:16 54:4,17
62:5 86:16 112:25

114:21 130:20
149:11 150:15
152:1 176:11
181:12
**personal** 18:22
27:8 28:6 190:4,8
190:16,19 191:10
191:13,15,17,23
194:18 195:2
196:2
**personally** 32:20
35:3 53:17,25
54:7 77:4,9 97:9
103:1 111:11,12
117:9 139:14
140:18 159:24
160:19 161:1
166:12 173:17
**perspective** 15:7
30:15 106:8
**per-text** 99:16,16
**pet** 171:14,19
**pets** 171:15
**PetSmart** 171:8
**Pg** 208:7
**PhD** 177:23 184:3
184:5,6
**Phil** 1:2,13,14,16
1:21 2:10 7:4,8,13
9:1,6,9 10:4 44:19
46:7 49:5 63:15
67:4 72:4,5,12,17
75:23 79:3,9,14
80:11,21 81:16
83:12 93:5 104:19
121:8 124:18
137:14 143:21
164:15 165:2,3,10
165:16,21 166:5,9
166:10 167:22
173:18 174:4,8,14
174:22 175:13
196:9,12 197:14
198:13 199:1,16
202:18,19 203:9
203:10 208:2,5
**Philip** 58:13 174:25

**Phillip** 9:5 10:20
**Phil's** 70:24 121:16
**phone** 10:25 26:15
35:8,23 38:20
50:7 66:25 73:9
87:16 98:19 108:4
116:14 142:25
159:22 177:6
188:3,20
**phones** 116:19,20
180:7
**phrases** 99:7
**piece** 35:1 151:20
168:1 183:17
**pieces** 27:1 62:2
154:24
**pin** 201:4
**pinging** 50:7
**pinned** 117:25
**pitch** 51:10,11
54:14
**place** 36:21 39:4
40:10,13 62:14
97:10 184:19
**placed** 105:19
**places** 181:21
183:22
**plain** 47:19 82:4
**plaintiff** 1:4 3:10
9:7 139:16 181:13
**Plaintiff's** 33:25
**plan** 61:8 93:23
94:19 95:6,11
105:21,22,23
110:2 125:12,17
125:20 177:12,14
**planning** 82:7 90:3
138:23 139:1
**playing** 26:14
**please** 9:20 10:2
11:6,9,11 38:13
53:20 62:15 64:8
71:5,7 72:24
81:23 93:13 94:14
125:11,11 149:15
149:22 150:16
**pleased** 57:24

pleasure 42:7
pledge 90:11
pledges 116:17
pls 46:21 69:15
  78:21,22 80:12
  81:4,5,16
plus 51:8 88:18
  90:24 98:12
plz 95:3
podium 134:15
point 11:17 20:14
  21:12 24:17,19,21
  27:7,24 28:24
  52:7 63:14 77:13
  78:1 82:7 87:5
  92:14 102:7 106:7
  132:2 135:1
  151:15 189:16
  199:8
pointing 80:5 187:7
points 105:16
  137:5,9
policy 62:14
political 22:10
  23:19,21 101:12
  101:14,16 134:10
  156:10,15 169:13
  170:11,18 172:6,7
  176:23 177:23,25
  184:3 197:18
Politico 134:11,15
Politico's 25:20
politics 177:2
polling 121:25
poor 164:19
pops 175:3
population 183:25
portion 60:7 164:2
portions 31:20
portrayed 59:22
position 189:25
  190:18
positive 113:5
  147:19,25 148:21
  162:13
possible 59:21
  62:17 69:16 174:7

174:9,9 180:6
possibly 108:1
  114:9 116:14
  158:23 163:11
  182:14,14 197:19
postponing 90:1
potential 13:15,17
  73:20 122:2
  199:19
potentially 31:14
  119:23 148:17
  164:18 190:25
practice 28:12
preceding 125:2
precise 182:4
precisely 24:25
  57:16 73:4 87:9
preclude 185:18
precludes 185:16
preliminary 29:3
preparation 123:18
  137:2 166:4,6
prepare 145:19
prepared 166:25
  176:7 183:6
presence 20:1
  112:23
present 3:18
  167:18 197:16
  201:6
presented 205:5
presently 196:18
presidential 160:16
  181:9,16
Presley 13:13
press 3:11,15 11:7
  21:24 27:8 28:10
  28:19 29:3,8,21
  30:1,2,7,11,13,16
  34:5,7 45:5,8
  55:22 56:13,15,17
  120:25 124:21
  134:13,15 143:21
  158:20 171:1,3
  175:16 184:24,25
  185:4,8,14,19,25
  186:5,12,17,19,21

186:23 187:1,5,8
  187:16,19,22,24
  188:2,4,10,12,15
  188:17 189:5,6,8
  189:11,14,18,20
  190:3,22 191:18
  192:13 193:21
  194:2,7,9,13,16
  194:23 201:22
  202:3 203:16
  204:2,4,6,15,17
pressure 163:17
presumably 43:7,9
  49:4,17
pretty 25:18,19
  54:10 67:13 77:10
  77:11 80:9,16
  81:12 105:8
  126:24 127:24
  164:18
prevent 162:20
preventing 49:23
previous 46:10
  51:6 117:12
  125:13 129:22
  140:8 166:22
  167:14 170:6
  179:9 197:13
  203:12
previously 17:3
  73:10,17 170:3
primarily 40:19
primary 31:15
  49:23 60:4 78:12
  101:15 133:14
  157:8
principally 116:21
printed 83:5
prior 25:3 33:6
  37:15 50:24 83:16
  174:11 198:8
  203:15
prioritize 92:17
priority 92:21
  199:17,20,21
private 176:24
privilege 185:2

187:2,8,9 189:14
  189:19 190:7
privileged 31:5
  103:7 119:23
  185:14 186:17,18
  186:19,23,25
pro 28:3,16,17
  31:17
probably 18:6
  35:15 48:24 50:5
  50:8,22 66:1
  67:18 92:8 99:22
  108:19 112:9
  119:12 122:11
  127:20 134:16,22
  140:9 143:4 154:5
  169:19 178:23
  182:2 198:2,3,8
  200:18 201:16
problem 115:13
  120:18 160:11
problems 36:19
  95:2 96:21 100:9
  153:9
proceed 10:7
proceedings 58:24
  118:4 119:11
  140:12 204:22
  205:5
process 54:15
  74:23,24 139:10
  152:6,8 176:10
  200:17,20
processing 83:14
  155:6,7,8
produce 20:16
  102:2,3 106:5
  112:2,3 113:10
  123:7 126:19,20
  126:22 127:3
  147:16,18 148:21
  162:15,15
produced 19:18
  21:4 32:19 33:16
  35:15 36:10 45:1
  53:25 61:1 66:13
  83:7 89:22 92:25

104:17 114:12
  115:9 119:14
  120:25 121:25
  123:20 124:17,24
  135:19 137:17
  140:24 141:15
  149:6 153:19,22
  153:23,24,25
  154:3 155:4,15
producing 123:1,2
  123:4 147:15
  163:1
product 20:17 42:8
  42:16,20 43:4,11
  136:9
production 113:24
  114:11 126:24
  148:23 158:17
professional 16:12
  17:14 28:4 112:16
  113:2,7 144:12,13
  145:21 148:6
  176:18
professionalism
  116:6
professionally
  114:4 157:21
professionals 82:19
  112:23
profile 63:15 70:24
program 76:21
  77:16 119:8 148:6
  150:7,12
programs 177:15
progress 163:6
progression 124:15
prohibited 185:21
promised 129:1
  147:16,17,21
prompt 52:3
proper 171:18
  173:16
properly 11:12
property 192:10,12
  192:13,14,18,21
  193:6,9,10,12,14
  193:24 194:1,6

proposed 64:8
181:8
proposing 63:8
64:14 65:5
prospecting 74:4
prospective 155:23
156:2 161:7
prospects 72:22
73:11,13,19,25
74:3 79:17 109:22
164:18
protective 190:15
194:14 195:3
prove 185:22
187:14
provide 20:15
27:25 29:13 38:4
38:8 59:9 93:13
93:14 96:23,24
97:5 103:23
117:18 125:23
147:25 150:8,10
provided 10:5 13:2
13:23 14:6,10
22:1 24:3 31:21
35:20 45:5 79:19
125:19 128:18
137:13 183:1
184:24
providing 27:23
29:1 96:16 108:25
110:14 123:17
132:2 201:14
proving 186:1
provision 183:19
prudent 195:19,23
195:24
public 155:13
156:4,24 159:2,4
205:12 206:17
208:25
pull 70:23
pulled 151:5
152:22
purchases 59:10
171:22
purpose 29:25

40:17 109:9
115:10,22 169:13
169:25 170:1
173:12 174:24
175:4,5 178:22
185:13
purposes 33:7
64:21 182:7 185:2
185:15 188:5
purview 40:20
push 78:23 80:2
171:15
pushing 60:14
71:23 78:18
102:10
put 33:13 39:25
49:15 74:5 75:25
87:15 97:21 98:11
118:4,14 129:8
139:24,25 144:14
171:19 172:1
173:11 199:14
200:2,16
putting 101:5
123:14
P-H-I-L-L-I-P
10:21
P.C 3:11
p.m 41:14 42:5
61:13,14,22 66:6
93:1 203:19,20
204:22
P2P 46:9

_____

**Q**
qualification
176:19
qualifications
176:12
quality 148:5 158:5
161:23
quantitative
177:25
quarter 86:20
203:5,6,12
quarterly 156:22
157:10 167:23

202:4,5
question 11:10,11
11:14,18 22:4,14
26:22 29:6,9,10
34:23,24 38:13
53:19 85:11 86:2
111:23 112:22
131:4 139:3 158:4
188:7 190:23
191:21
questioning 85:25
187:3
questions 11:1,2,7
11:9,12,22 42:12
72:25 97:18 98:21
99:3,9 109:18,23
110:5,13,17 112:2
129:1 149:17
185:7,8,11 188:13
189:2,23 190:4,8
190:19 191:18,20
QUESTION(S) 8:1
quickly 61:23 65:8
quite 60:1 66:15
73:25 79:21 87:18
103:15 118:8
139:3 173:20

_____

**R**
R 3:1
race 12:14,21,25
13:11 122:1,3
133:14,19,24
135:4 198:13
raise 10:2 49:14
68:5,20 69:21
87:12 112:5 117:3
119:17 120:8
raised 75:20 109:5
132:5,11,15,18,22
134:24,25 163:20
163:22,23 181:22
raising 5:9,10,13
44:18 45:19,22
46:2,21 48:10,18
51:18 67:7 84:6
169:25 170:12

**Rally** 180:16 181:3
ran 12:3,16 170:3
range 127:19
rarely 180:8
reach 29:21 41:23
42:8 52:4 54:21
54:22 67:4 72:24
94:4 112:25
reached 29:15,16
30:14
reaching 29:25
111:8
reactivations
150:18
read 38:12 50:4
58:19 62:2,3
64:11 69:4 77:3
81:22 82:3,25
105:5 116:2
141:11 142:11,15
142:17 148:3,5
185:20 187:13
204:16,17 208:7
reading 58:21 81:9
readout 108:10,11
Reads 208:7
real 46:18 51:21
67:8 75:20 192:14
192:17 193:6,25
194:6
realized 55:19
167:12
really 10:15 22:13
24:12 26:15 29:10
38:1 52:18 66:7
75:14,14 76:24
126:5,16 132:4
163:25 177:11
201:12
real-time 36:8
reason 11:25 14:8
43:10,12 46:18
47:6 50:8 56:4
75:3 82:15,16,17
102:3,20 130:23
131:15 200:12
208:7

reasonable 82:5
102:16 144:15,16
reasonably 190:25
194:25
reasons 113:16
165:6 193:19
203:13
recall 13:1 14:19
19:22 22:5,19
36:14 37:14 43:3
43:12,13 53:14
57:16 58:15 60:13
60:16,16 72:11
92:7 100:7 106:15
123:22 124:7
126:1,5 128:23
135:4 136:1,1
140:2,7,8 154:10
174:6 175:7
183:11 201:2,3
recalled 154:11
recalls 57:23
receipts 141:23
155:5
receive 53:5 86:23
96:20 165:10
172:15
received 45:18
46:13,14,16 47:14
53:22 76:7 80:2
86:14 89:24 92:6
96:25 116:1 118:1
121:6 131:23
140:22 165:14
173:19
receiving 46:11,18
47:15 53:8,11
61:2
recipe 30:11
recipient 199:19
202:19
reckon 89:11
recognize 17:6
33:22 40:25 41:2
41:16,17,17 42:14
44:25 45:2,2 56:2
56:4 62:22 72:3

83:1 135:14
**recognized** 163:2
195:23
**recognizing** 87:25
179:23
**recollection** 27:19
30:21 33:1 46:17
50:23 105:17
203:4
**recommendation**
16:7 17:20
**recommendations**
119:21
**recommended** 16:8
16:9,23 59:23
60:6
**record** 9:4,19,23
11:4,6 23:11 34:9
36:14 37:19 46:13
55:13,14,16
100:14,15,16
117:19 120:20,21
120:22 128:15
188:21,22,23
203:18,20 204:20
207:7
**recorded** 125:12
128:5,9,12,14,17
**recording** 11:1
128:16,20 129:9
129:13
**records** 19:8 133:6
**recounted** 189:10
**red** 132:2
**reelection** 134:25
**refer** 81:24 109:13
114:11 115:16,16
126:23 158:7,16
161:17 180:14
199:2,4
**reference** 84:12
**referenced** 35:15
38:11
**referencing** 45:15
106:14 149:6
**referred** 39:21
102:22 115:13

**referring** 39:14,15
39:15 42:16,19
43:5 49:6,16,17
69:14 76:25 78:11
78:13,21 85:2,3
89:14 98:1,2,10
102:4,5,18,19
104:7 105:22,23
106:2 114:18
129:24,25 152:16
153:19 154:23
156:17 164:21,22
164:23,24 165:24
191:24 197:25
**refers** 38:24 145:23
146:7 164:16
**refiling** 141:1
144:22
**reflected** 136:16
202:21,23
**reflects** 202:14
**refresh** 37:7 150:3
203:4
**refund** 7:15 103:19
104:3 117:3,3
119:17,17 120:3,8
135:20 138:16
142:5 155:7,23
156:3,17,18 157:2
157:14 159:4
161:8
**refunded** 104:10
145:8
**refunds** 96:4,17,22
97:6,12 98:9,11
98:14,17 102:13
102:17,21,23
104:5,7 136:7,8
136:17 137:13,20
138:4,8 142:8
145:13 155:8,8
156:4,5,12,19,19
156:24 159:10
161:4
**regarding** 38:4
39:12 125:12,16
**regards** 91:2

**region** 132:19
**Regular** 204:11
**reimburse** 197:7
199:17
**reimbursed** 195:13
195:16,17 196:4,8
196:20,21
**reimbursements**
170:20
**relate** 190:23
**related** 32:11 109:1
143:6 145:13
158:5 170:16
194:17,24 207:9
**relating** 109:2
190:5
**relationship** 46:11
115:11
**relaying** 119:23,24
**relevance** 186:15
194:20,23
**relevant** 31:11,14
31:16,20 33:10,14
40:5 180:24 190:9
190:10
**reliance** 185:16
**relied** 17:8 19:11
58:7 92:21
**rely** 82:19
**relying** 40:15 113:9
**remaining** 197:5
**remember** 15:21
15:22 19:7 23:8
24:23 27:12,16
29:17 32:5 36:21
36:22,23,23,24
41:21 42:13 46:11
47:15,15 49:7
53:8,11 54:7,10
58:21 63:5 99:12
99:13 101:5
107:14 119:8,10
120:7,7,10,11
125:25 126:6
127:18 129:23
134:11,13,17,20
136:5,9 154:4,20

161:4 166:18
203:9
**remembering** 37:3
37:20 115:15
**reminded** 17:2
**remote** 1:21 2:10
9:1 60:10
**remotely** 18:2
206:7
**renegotiate** 91:15
91:22
**Rental** 72:13,17
79:9,14
**rentals** 59:3,10,13
**repeating** 131:19
**rephrase** 11:10
191:21
**report** 7:16 90:22
90:23 98:8 131:20
135:21 145:19,20
161:5 164:23,24
164:25 165:1,19
166:9,9,21,25
167:23 168:22
169:2 172:16,19
176:9 197:15,21
199:4,10 200:16
201:24 202:13,17
202:24
**reported** 1:23
57:22 109:23
110:8,9 180:17
183:17 195:15,16
197:20
**reporter** 4:5 9:17
9:20,21,22 10:7
10:19,25 11:5
33:12 43:14,22
44:1,7,13,14,21
56:9 82:23 89:18
104:20 121:5
134:12 203:21
204:1,4,7,10,13
204:18 207:1
**reporter's** 56:6
93:2 149:3 205:1
**reporting** 98:22

100:11 134:23
156:24 157:8
168:3 172:18
180:15
**reports** 96:20,25
97:12 123:10
131:18 145:8,11
145:12,18 155:23
156:3,17,18,18,19
156:21 157:4,14
159:4 160:25
161:8 165:9,21
166:1 167:7
173:19 198:25
199:7
**represent** 10:13
27:8 30:18 45:7
63:22 66:13
124:20 150:7
**representation**
165:18
**representations**
86:3 98:3 162:16
186:8
**representative**
49:20
**Representatives**
164:8
**represented** 27:20
28:6 89:5 96:24
97:8,8,23 100:8
128:13 139:14,17
200:16
**representing** 28:16
30:20,24 31:6
**reprogramming**
145:25 146:6
147:1,10,13
**Republican** 12:13
134:19
**reputational**
155:20
**request** 39:13,18
51:22 120:15
128:7 129:25
167:12 193:18,18
**requested** 32:10

138:17 157:2
205:16
**requesting** 35:8,23
36:1 39:12
**requests** 31:18 34:1
58:11,12 125:11
128:22,24
**required** 40:18
112:3 142:1,2
165:6,17 178:25
**requirement**
103:21
**requires** 168:22
**research** 74:5
96:15 121:16,24
136:19 189:21
**resoliciting** 75:23
**resolicits** 72:21
73:3 79:16 99:8
109:21
**resolution** 110:22
140:11
**resolve** 140:10
164:17,20
**resolved** 127:9,16
130:2 153:14
**resonates** 70:24
**resort** 179:20
**resource** 20:8,9
**resources** 124:11
**respect** 106:10
**respond** 53:25 54:3
84:8 94:25 128:24
**responded** 26:10
26:10,11 42:3
84:16
**responding** 61:5,16
62:11 65:13 69:23
71:11 125:1
149:18 151:14
152:21
**responds** 46:21
50:9 68:10,12
80:11,21 81:15
83:24 84:11 86:13
90:1 93:19 152:1
153:12

**response** 38:3,24
39:25 58:12 67:6
68:8 81:3 85:18
86:22 90:10
100:24 112:4,11
115:9 120:13
141:17 150:24
151:4 159:18
162:23,24
**responses** 5:3 17:7
22:1 33:23,25
34:3 57:21 115:16
140:13,23
**responsibility** 23:6
162:20
**responsible** 177:21
**rest** 72:22 79:16
109:21 155:10
**restate** 15:11 38:13
**resubmission** 145:8
**result** 115:9 117:18
**resulted** 142:6
147:15
**resulting** 144:17
**results** 65:7 113:5
113:10,11,15
123:5,8,11,20
148:21 152:18
170:13 180:3
**retained** 27:8
**retention** 144:6
155:12,21 157:16
**retire** 164:18,20
169:25 170:12
172:8
**retired** 181:7
**retirement** 191:11
192:6
**retrospect** 40:22
**return** 70:7 89:2
148:8,9 155:13
**returns** 113:18
115:2,23 127:3
163:11
**reveal** 29:1
**revealed** 115:14
**revealing** 29:20

31:4 103:6
**reverse** 41:10 86:9
86:10 155:12
**review** 64:6 77:1
106:1,4,13 145:7
197:21,22,24
199:12 205:16
**re-activate** 151:20
**re-engagement**
155:13 157:25
158:14
**re-engaging** 151:8
**re-filing** 141:20
143:19
**re-registering** 95:2
**re-solicit** 116:10,11
116:13
**re-solicits** 73:2,5,8
73:16 116:16
**Rick** 14:21 50:2
**right** 10:2 12:4,17
12:22 14:21 21:8
22:7,8,11 23:24
25:18,19 27:9
30:12 31:11 37:7
37:9 41:20 44:9
45:13,14,20,21
48:6,7,25 50:5
51:1 52:7,15,16
52:23 56:17 60:9
64:12,23 67:18
69:9 74:10 76:2,3
81:10 82:8 85:6,7
94:15 96:7 100:1
100:18 103:15
105:3 111:15,21
115:18,20 118:23
120:19 122:18
124:19 133:14,16
133:18 134:2
135:2 138:7,10,12
145:16 148:15
150:14 154:23
156:25 161:10
163:13 166:2
169:22 174:2
175:23 181:25

182:21,21 183:3
185:1 186:12
189:5 191:6
204:12,19
**rigorously** 183:22
**risk** 71:1
**risks** 69:2,8
**risky** 71:8
**risotto** 30:11
**Rob** 27:22,22,23
28:6,9,15,17
29:13,15,16,21
30:1,18,20,24
31:6 105:25 106:3
106:5
**robust** 65:10,13
**Roi** 50:16 66:8
67:14 71:1,8,11
71:13 80:8,16
81:12 87:14 88:2
89:6 157:25
158:14 163:1,2,3
163:4,12
**role** 20:20 21:9
22:10,10 23:19,19
24:5,7,18,20,21
24:21,23 26:24,24
35:8,23 36:1
47:20 77:24
101:15 103:13
126:6 159:11
177:1 180:7
**rolling** 68:3
**Rolodex** 90:3,7,8
**roped** 68:1
**Ross** 27:22,23 28:6
28:9,15,17,21,24
29:13,15,16 30:14
30:18,20,24 31:6
107:11 128:10
129:21
**rough** 85:14 204:12
**roughly** 25:15
28:15
**routine** 26:19
**row** 141:18 143:18
143:18 144:4,8,11

144:18 145:4,22
**Rowan** 21:19
**RSVPs** 90:2
**rude** 51:22,25
**rule** 185:2,15,17,20
185:21 186:21,22
187:7,9,12,13
188:16 189:4
**ruled** 27:14
**rules** 198:8
**ruling** 27:20
**run** 12:6 18:4 32:4
50:24 86:16
133:24 152:12
170:7 177:15
198:19
**running** 12:14
25:24 46:8 49:21
132:16 164:5,7

---
**S**
**s** 3:1 107:18,21
174:24 175:4
**salary** 171:18
**sales** 54:14 72:12
79:8
**satisfaction** 127:10
127:16 130:3
**satisfactory** 163:18
**satisfied** 14:5 97:18
131:1,23
**savings** 191:10,23
191:25 192:1
**saw** 31:19 32:14,22
79:13 97:25
147:12 157:14
163:10
**saying** 14:10 42:25
47:1,9 49:14
50:15 52:18 54:20
54:21 61:23 62:5
63:18 64:8 65:20
67:13 68:19 69:13
71:11 75:14 76:23
78:21 80:8,16,18
81:1,12,22 85:21
86:19 93:5 94:3

94:12,18 100:10
118:14 134:17,21
142:15 150:15,25
152:11,14 160:24
173:3 186:22
**says** 33:5,24 34:7
34:18 35:6,22
38:3 39:11 40:4
41:23 42:11 44:17
44:19 46:7 48:24
49:3,5,12,22,25
53:4 56:21 57:5
61:7 62:12,15
63:14 64:15 65:4
65:9 66:6 67:25
68:8,11,25 69:15
69:20 70:3,13,17
70:21,22 71:5,17
71:22 72:4,12,16
72:18,19,21,24
74:13 75:19 78:7
78:8,9,13,15,17
79:2,8,13,15
80:23 81:18 82:12
83:10,14 84:5
85:1,20 86:15
90:15,16 91:2
93:11 95:5,15,25
100:5 101:2,7,18
102:1,13 109:19
114:21 120:8
121:9,15 122:19
125:3,11 129:22
137:13,20 138:4,6
138:8,11 142:23
143:19 145:4,7
149:13,21 150:22
151:5 155:22
159:2 168:9,13
172:22 173:1
187:13 202:7,18
**SB** 19:6 167:3
**scale** 62:17 65:8,8
66:8 67:14 71:8
71:17 75:22
102:10
**scaled** 70:3

**scare** 101:11,18,19
101:21
**scared** 69:2
**Schacht** 32:23 33:1
46:25 61:17 62:23
63:1
**schedule** 169:2,3,5
169:6
**scheduling** 90:3
**science** 177:24
178:1 184:3
**scope** 188:25 190:1
**Scott** 14:21 50:2
63:15
**screen** 50:12
136:23
**screenshot** 32:19
45:18 46:20 48:10
48:17,18,23 50:18
67:7
**screenshotted**
48:23
**screenshotting**
50:12 51:17
**seal** 206:9
**search** 32:10
**searched** 31:14,18
32:2
**searches** 32:4
**searching** 31:10
**season** 160:8,10
182:16
**seat** 133:24 134:18
**second** 5:4 33:24
34:3,24 38:2,14
38:23 98:8 105:5
106:14 168:2
175:25 203:5
**secondary** 124:14
**secure** 158:1,3
**see** 21:6,7 34:12,13
34:14,15,17,20
35:9 37:2 38:6
41:3,6,9,23,25
42:1,4,9 46:2,6,22
47:19,21 48:16
50:9,10,12,16

54:3,19 56:20,21
56:24 57:2,6 61:1
61:2,3,6,10,17,24
62:3,4,9,11,17
63:10,17,19,20
64:4,6,8,15,25
65:1,2,10,12,14
65:24,25 66:8,22
67:3,3,12,13,18
67:19,20,21,24
68:5,6,7,19,21,22
68:23 69:13,16,17
69:18,23,24 70:19
70:20 71:2,4,8,9
71:10,13,14,16,18
71:19,20,22,24,25
72:7,7,7,14,15,19
72:20,22,25 74:11
74:14,17,19 75:13
75:16,24 76:4,15
76:18,19 78:6,18
78:19,20,24,25
79:3,8,10,11,21
79:22 80:7,8,13
80:14,23,25 81:1
81:1,12,18,19,21
81:25 82:11,12,14
83:4,4,5,10,12,18
84:2,9,14,18,21
84:24 85:21,22
86:2,12,19,24
90:13,18,21,22,25
91:6,10,21 92:8
93:4,8,17,24,25
94:2,5,8,9,16,21
94:25 95:7,9,11
95:16,19,22 96:5
96:7 100:25 101:4
101:6,8 104:22,25
105:25 106:3
120:13 121:12,16
122:24 123:25
125:4 137:6,15
138:4,9 141:21
143:24 144:2
145:5 149:11,18
149:19,23 150:15

150:19,25 151:2,9
151:14,24 152:3,6
152:7,10,15,16,20
152:21,24 153:6
153:10,13,15
158:23 161:10
165:19 167:24
168:4,6,14 169:5
170:4 171:5,7,8
202:10
**seeing** 64:13 65:17
82:5 85:24 136:9
154:6,9,9,10,11
203:9
**seek** 29:15 30:4,5,7
76:8 168:25
190:15 194:14
195:3,13,15 197:8
198:7
**seeking** 119:24
195:16 198:8
**seen** 36:9 39:4
53:24 55:23 67:15
72:9,11 102:8
135:23,24 136:6
154:1,2,3 179:25
**select** 110:3
**selected** 110:3
181:18,19
**Selection** 112:13
**sell** 193:14
**seminar** 126:11
**senate** 1:15 14:20
16:2,21 18:12
19:3,19 20:3 21:2
21:23 22:5,6,9,11
22:19,22 25:5,15
25:24 29:19 36:25
37:1,5,16 39:17
40:11 46:8 49:21
50:2 59:20 78:12
87:10 88:20,20
93:6 97:13 103:18
113:13,18 114:19
122:1 123:7 126:1
126:4 132:5,8,16
132:18 133:13,24

135:3 161:25
162:8 163:21,24
164:2 179:2,9,17
180:6 184:13,14
198:12
**senators/gop** 63:16
**send** 46:20,21,24
47:9,11 64:15
77:16 80:12 81:4
81:5,6,16,23
84:17 100:6
102:10 112:14
149:4 152:23
204:2
**sending** 45:18
48:18 61:8 65:19
80:18 81:13 96:8
109:1 178:5
**senior** 20:9,10,12
**senior-level** 26:17
**sense** 15:7,7 37:1
55:8 59:7 92:17
98:24 118:5
124:14 202:20
**sensitive** 179:22
**sent** 39:11 44:11
45:8,9 48:23 51:8
62:5 63:23 64:5
65:1,23 67:6
72:19 75:12 76:6
79:16 99:17,25
100:5 103:25
109:20,25 110:1
110:15 141:5
189:2,24
**sentence** 38:2,12,14
62:15 93:11
**sentences** 62:22
**separate** 142:12
**September** 80:7
82:11 84:5 86:12
86:13 87:13,19,20
87:24 88:19 89:13
89:20,22,24,25
91:24 134:5,6
162:9 163:2,6,23
**sequence** 147:13

sequences 146:6
147:2,5,6,10,10
sequentially 61:20
61:21
series 66:1 126:9
129:1 137:2
seriously 14:15
serve 176:12 197:3
server 136:20
154:14
service 14:10 75:15
96:23 113:8,8
117:9,17,23 118:4
151:21 154:17
167:3 180:5
serviced 165:4
services 5:16 6:8
12:22 13:2 14:6,7
14:25 15:9 35:17
35:20 38:22 41:25
42:24 48:5 50:25
54:9 55:20 56:5
57:23,24 59:7,9
59:13,16 62:6
72:13,17 76:8,13
76:24 77:18,20
79:9,14 80:4 93:8
96:15,21 97:4
98:20 111:24
112:2 116:3
117:13,15 118:1,8
118:11,13,17,18
119:2,5 123:4
125:19,24 130:17
130:18 131:9,23
132:3 148:11
158:11 162:7
serving 24:1 26:2
26:23
sessions 90:3,8
170:17,17
set 5:4 29:11 33:24
33:25 34:3 50:13
51:15 52:13 98:8
110:17 175:11
178:24,25 207:6
207:13

setting 160:13
175:12
settlement 185:2,9
185:11,15 186:23
187:2,9,10 188:5
189:15
seven 171:21
Severely 114:9
shake 11:4
shape 190:10
share 140:8
shared 99:3
sharing 151:21
Sheet 4:6 208:1
Shelby 168:9,11
175:24 176:5,6,15
178:11 196:25
197:2
shenanigans
134:20
shifting 29:18
short 55:11 87:18
89:15 135:4,7
140:11 142:7
shortcomings
105:20
shorthand 51:3
shortly 137:17
172:14 175:8
shoulders 179:16
show 44:14 60:17
149:1 156:19
172:21 180:21
183:14,14
showed 136:23
148:23
showing 133:7
141:23 180:21
shows 46:14 137:13
shunned 122:16
shut 165:12 198:16
200:12,13
shy 69:20
sic 78:18
side 67:9 107:13
153:8 155:12
177:25

Sig 48:10
sign 77:4,9 204:16
204:17
signal 5:8,10,13 7:7
7:11 31:23,24
44:3,10,17,25
45:19 46:3 48:10
48:18 49:3 51:15
67:7 104:17
120:24 121:8
124:17
signature 34:16,17
57:2 76:15 208:20
signed 48:3 53:18
54:8,25 56:24
57:14 58:3 59:1
63:18 68:9 69:13
77:2,10,10,11
117:8,9 118:7
168:13
significant 87:6
115:9 151:23
significantly 89:15
signify 84:12
signing 57:11 77:15
77:19 151:21
signs 50:16
similar 67:15 68:24
77:21 97:7 110:14
152:17
single 70:25
Sir 10:2
sit 27:10 40:22 59:6
59:8 103:20 120:6
145:16 154:23
197:16
sitting 27:2 169:15
189:20 199:23
situation 95:25
112:8 127:9 130:2
134:9 198:7
six 6:22 42:5 50:7
51:8 56:17 95:15
95:22 127:20,21
127:22 128:1
152:21
size 65:13

skeptical 51:12
skill 205:4
skim 65:16
skip 63:21 65:1,16
78:3
slash 117:23
sleep 172:6
slew 97:12
slow 71:11
slowly 83:14
small 21:7 44:15
64:19 171:25
smaller 72:16
smart 159:9
smoothness 146:1
social 24:8,13 27:5
171:20
software 178:2
sold 193:1
sole 193:3
solely 139:17
191:15
solicitation 51:2,2
87:16 97:9
solicitations 53:5,9
53:11 112:14
123:15 160:6
soliciting 123:19
Solutions 19:6
167:3
solved 153:6
somebody 22:2
41:15 43:18 48:17
49:4 54:23 74:5
103:25 124:6
184:20 200:6
soon 41:24 61:9
84:18 101:4
197:23
soon-to-be 159:8
sorry 22:22 24:15
28:10 33:19 46:15
60:21 82:25 83:17
87:23 88:7 128:1
143:9 165:1
198:11 201:23
202:10 203:24

sort 17:9 21:8
23:15 25:20 26:2
26:2,14,15,18,23
26:25 27:2 28:25
41:8 44:5 51:18
59:15 62:1,19
63:8 64:2,7,25
65:21,22 67:15
68:14,23,24 79:12
79:18,23 90:20
94:1 97:20 108:8
110:6 122:4 137:5
152:5 153:4
sorted 198:2
sorting 143:3 153:7
sotto 101:20
sought 76:10
sound 14:21 21:8
37:21 39:3,7
45:10 47:25 58:1
63:24 67:9 73:22
133:16 134:2
sounds 42:12 45:11
58:2 70:5 73:23
81:8 107:23
118:23 133:18
134:22 135:2
179:3
source 13:12
sources 31:14
South 183:10,24
184:14,19
Southern 49:20
space 78:10
spam 48:24 50:5,8
50:22 51:1,2
Spanish 183:20
Spanish-language
126:9
spans 66:15
speak 25:9 102:6
132:7 201:13,17
speaker 134:20
180:17,23 181:20
speaking 126:11
181:5
special 170:4,5

**specific** 90:15
130:20 142:19,20
159:18,20 160:7
160:22 161:1,4,5
161:10 189:2
201:4
**specifically** 15:23
23:22 31:20 70:5
74:21 88:4 89:7
92:10 98:18
102:16 103:12
109:10 110:11
137:11 170:2
**specifics** 53:14
125:14,15 155:19
**specify** 126:2
**speculate** 36:23
82:4 143:22
158:21
**speculating** 36:24
107:17 158:24
**speculation** 37:2
102:19,22 104:12
**spell** 10:18 21:19
**spend** 68:5 70:14
70:18 71:12 72:18
79:15 109:19
144:5
**spent** 140:25
141:19,24 142:15
143:1 144:19,21
145:1 146:22
168:16 186:10,13
**split** 65:6,12
**spoke** 54:25 105:12
111:12,17
**spouse** 193:16
194:6
**spring** 23:7 182:16
**springtime** 23:3
**square** 64:18
**squarely** 199:13
**staff** 14:24 15:6,11
36:16,16 45:16
46:8 106:19 128:9
131:18 139:22
140:1 143:15

144:3 162:25
163:4 165:2,3
198:5
**Staff/Legal/Admin**
141:18
**stamp** 43:23 92:24
150:21
**stamps** 43:20 44:5
**stand** 14:11
**standalone** 203:10
**standard** 148:7
191:2
**standards** 113:4
148:6
**standby** 105:8
**standing** 180:1
**start** 11:8 17:18
55:16 62:7 65:6
96:4 149:10
172:18 174:21
189:22
**started** 16:16 18:15
87:8,10 107:17
149:16 150:16
182:11
**starting** 21:23 38:1
69:24 103:13
**starts** 34:23 64:7
82:24 107:21
124:25
**state** 19:10 176:16
181:13,15 183:18
206:3,17 207:2
**stated** 35:4 38:4
140:13
**statement** 7:17
14:9,13 19:14
43:7,11 74:7
138:2 140:24
141:15 154:25
155:3 182:25
**statements** 19:10
34:25 35:1 134:11
**States** 1:1 191:14
**stating** 143:12,13
**station** 179:23
183:17

**status** 164:14,16,19
189:24
**stave** 60:4
**stay** 66:7 68:2
181:14,16
**stayed** 133:19
**steady** 71:12
**stenographic** 9:18
**Sterling** 38:25 39:1
39:7
**stipend** 103:23
**stood** 134:14
**stop** 30:16,20 69:4
135:5 170:14
**stopped** 101:3
123:9 132:2 163:7
**stopping** 117:13
**stories** 180:14
**strategic** 30:10
**strategies** 63:8 91:9
91:12 122:25
153:7 179:14
**strategy** 16:18
40:10,12,16 59:20
60:1,4,7,15 62:19
67:16 77:21 110:4
116:10,11 117:1
119:25 120:1
177:3,6,7,8 179:6
179:13
**streamlining** 93:7
**streams** 89:7
**Street** 2:11 3:4 9:13
**stretched** 129:2
**strong** 75:23
**struggling** 108:3
125:3
**studied** 183:22
**stuff** 22:20
**stupidly** 68:2
**subject** 27:14 41:2
181:8
**submission** 100:12
**submit** 145:19
**submitted** 17:8
**SUBSCRIBED**
208:21

**substance** 28:20
29:20 64:20
145:12 185:14
201:3
**substantial** 108:13
108:15 172:5
**substantiate**
189:17
**success** 183:12
**successful** 183:11
**successor** 167:2
**sue** 138:23 139:1
140:10
**sufficient** 176:18
**suggest** 159:6
**suggesting** 119:18
**suit** 139:10,16,17
139:19
**suitable** 170:7
**Suite** 3:4,12
**sum** 132:13 195:22
**summarized**
202:17
**summary** 97:22
168:2 172:22,23
172:24 187:23
188:8 189:3,24
**summer** 83:15
182:17,18
**summertime** 137:2
**super** 71:8
**supplied** 15:24
**supplies** 171:14,17
191:12
**support** 182:23
**suppose** 196:22
**supposed** 112:6
127:2,4 154:8
**suppression** 146:8
**sure** 11:6 18:11
20:24 21:2 22:12
39:4 44:6 53:13
54:10 69:5 71:19
77:10,11 86:23
102:5 105:6,8
106:21,22 109:14
111:25 117:11

119:4,6 120:18
122:17 126:2
133:10,11 143:23
144:6 146:9,10
152:22 167:13
173:13,14 174:1
174:13 199:2
203:23
**surely** 148:7
**suspect** 133:9
162:14 203:8
**suspected** 162:12
**suspicion** 159:12
**sustenance** 170:16
172:1
**swear** 9:20 10:1
**switch** 134:4
**switched** 24:24
103:17 134:3
135:3,6 184:11
198:12
**sworn** 10:4 14:9
19:10 206:8 207:6
208:21
**symbol** 84:12
**systems** 145:22
162:17
**SY011333** 1:25

---

**T**
**table** 40:14 50:17
138:4 141:16,17
141:18 156:20
**tail** 27:6
**take** 9:23,24 11:19
34:25 55:11 62:1
63:24 64:1 68:23
71:1 81:9 100:13
103:14 106:6
109:15 120:17
159:10 188:19
189:25 200:7
**taken** 9:5 10:22
128:15,15 193:15
193:17
**talk** 24:3 70:6
90:16 94:14 99:11

180:15 181:7,18
**talked** 19:9 26:1,13
  26:16,20 32:23
  89:4 99:8 109:7,7
  111:2,22,23
  122:20 133:12
  146:17 158:8
  159:22 164:1
  180:25 181:8
**talking** 20:15 36:13
  37:20,22 38:14
  44:13 47:1,3,3,6
  62:24 70:7 80:15
  85:7 95:18 98:5
  99:12,13 102:15
  102:17 104:5
  110:8 112:23
  113:13 116:19,21
  162:8 165:24
  179:2 180:12,24
  180:24 193:22
  197:13 201:15
  202:16
**Tallahassee** 19:6
**target** 152:6
**targeting** 109:2
  110:2 111:13
  112:10,12,24
  113:7 126:10
  177:20
**targets** 151:6
**task** 47:7
**tax** 193:20
**team** 18:6 20:7
  42:7,15,18 43:11
  51:7 54:14 62:7
  65:18,19 75:19,22
  78:18,23 86:16
  93:21 118:10,12
  129:10 149:13,15
  150:16 152:11
  160:20 161:5
  162:10 163:8
  197:4 204:14
**tech** 46:9 86:16
**technical** 51:1 74:7
  110:17 112:10,12

144:9 146:7,14,15
  152:14 156:9
  157:6,21 158:17
  161:18
**telephone** 47:8
  77:25 154:17
**tell** 11:9,11 60:24
  68:19 71:7 78:21
  78:22 83:6 97:21
  102:25 111:18
  116:13 118:6
  121:19 135:19
  138:16 159:17
  169:12 183:3
  186:12
**telling** 86:6
**tells** 46:8
**temporary** 181:14
  181:16
**ten** 141:24 152:1
  171:22 183:9
  192:17
**tenor** 129:2
**term** 51:1 101:8
  116:12 129:3
  144:9 177:20
**terminate** 117:2,4
  119:16 120:2
**terminated** 118:19
**terms** 21:9 31:18
  40:3,4 95:11
  97:19
**test** 50:15 62:7,7,13
  65:6,10,13,20
  71:13,13,13
**testified** 191:4
**testify** 10:4
**testifying** 60:13
**testimony** 10:5
  12:1 112:4 147:11
  158:18 183:4
  203:19 207:7
**testing** 62:16 63:9
**tests** 69:23
**text** 6:14,17 7:3
  13:19 31:22,24
  34:8 40:21 44:4

45:18 48:14 50:1
  52:13,24 53:22
  54:8 59:2,7,10,12
  63:22 64:14 66:11
  66:14,21,22,24
  70:17,25 72:16
  75:7,10 78:1,2,6
  80:6,8,9,17 81:13
  82:11,24 83:1,10
  83:11 86:1,19
  89:7,17,20 94:19
  98:1,2,6 100:2
  105:10 106:14
  109:1 116:1,10,23
  118:11,15,16
  119:1,5,15,19
  123:23 143:3
  147:22 158:10,10
  162:6 177:9,12
  185:20
**texted** 50:18
**texting** 78:23 80:10
  81:14 94:20
  159:19,25 160:3
  162:12 178:4
**texts** 48:17 54:20
  60:14 77:17 78:2
  80:7,19 81:13
  86:2 87:1 99:8,17
  99:25 100:6,6,11
  102:8,10 110:15
  116:21 142:25
  162:19,21 178:5
**text-and-email**
  162:25
**text-message** 48:5
  77:22 80:3 132:23
**thank** 10:7,14,15
  44:1,7 56:9 83:17
  86:24 93:5,15,17
  94:3 124:25
  141:14 150:15
  153:7 164:13
  167:21 201:20,21
  204:4,19,19
**thankful** 10:17
**thanks** 42:6 66:6

85:21 95:19 96:2
**thereabouts** 164:2
  166:19
**thing** 25:4 45:3
  81:11 98:8 110:6
  111:25 154:2
  181:21 186:5
**things** 13:25 15:2
  16:17 20:7 31:19
  40:5,6,19 65:20
  68:24 75:19 97:20
  98:25 101:8 109:4
  111:14 113:1
  115:5 119:7
  122:18 126:8,10
  126:25 142:16
  143:15 146:16
  150:17 167:11,17
  169:20,23 170:18
  171:20 173:25
  178:24 191:13
  195:13
**think** 15:14 20:11
  21:25 22:20,23,23
  23:10 25:17,22
  26:22 27:3,17
  31:1,8 32:18 34:3
  37:23 40:4 43:10
  44:10 45:6,17
  46:6,13 48:16
  49:8 69:21 70:22
  72:2 75:3 77:10
  78:11,21 80:14,18
  80:24 81:19,23,25
  82:22 84:11 89:18
  89:20,23 91:3,16
  91:18,19 93:2
  94:12 95:1 100:12
  102:17,22 103:12
  104:12,20,23
  105:2 107:16
  108:2 109:2
  111:25 113:4
  114:3,14,15 115:2
  115:18,20,21
  117:8,16 118:2,7
  118:19,21 119:10

119:12 121:9
  122:13 124:4,25
  125:9 126:18
  127:17 130:12,21
  132:12 133:8
  135:12 140:3
  142:3,3,10,10,12
  142:14,16 148:10
  149:1 153:20,20
  153:24 154:19
  164:1 165:12,14
  166:21 169:4
  171:14,19 172:11
  174:11 175:9
  176:18,18 182:12
  182:18 184:22
  189:6 192:4
  193:21 197:2,4
  198:1 201:11,19
  202:22 203:11
**thinking** 14:19
  23:1 36:15 42:21
  49:21 54:16 67:21
  103:14 121:20
  124:5 137:22
  140:7 192:24
**third** 98:25 116:23
  172:22 202:9
**tho** 78:16
**thought** 14:10
  16:10 32:20 49:21
  51:9 96:22 110:22
  110:23 122:10
  130:19,24 131:2
  151:18 195:19
**thousand** 173:20
**thousands** 49:15
**three** 27:17 30:22
  30:23 31:5 41:13
  43:25 50:6 61:10
  64:8 65:6 66:3
  97:20 101:7
  102:12 105:10
  111:7 125:11
  128:5 155:12,20
**threshold** 172:18
**Thursday** 94:2

**tickets** 170:15
**tied** 172:16
**time** 9:15 13:10,15
  13:18 14:23 16:20
  17:18,18 18:11
  21:13,13,24 22:24
  23:6 24:2,9,19
  25:21 26:12 27:16
  37:4 40:11 42:4
  43:1,8 46:2 47:7,7
  47:16,24 49:7,9
  50:8 51:4 52:16
  53:6,12 54:16
  57:18 58:22 59:24
  62:2 65:17 66:16
  68:23 75:24 77:9
  83:21 88:14,19
  90:4,8,17 91:16
  94:1,4 95:16 97:6
  99:18 103:9 104:1
  106:25 107:5
  108:2 112:8
  115:15 117:8,12
  121:2,20 123:9
  124:4 125:7,25
  126:20 131:25
  133:19 134:23
  135:4,7 139:15,23
  140:1,3 145:20
  157:11 162:1,7
  165:15 167:2
  172:17 173:12,24
  182:16,19,21
  185:13 193:9
  196:7,20 199:15
  199:20 200:12,13
  201:17,20 203:3
**times** 18:20 45:6
  88:4,14 99:17
  112:24 123:19
  128:13 183:1
  200:24
**timing** 69:14 203:7
**title** 33:24 34:8
  57:5 193:15
**today** 11:21 12:1
  27:11 40:22 49:15

50:16 59:7,8
  70:25 82:12 84:24
  85:1 93:11 97:7
  97:25 98:6 102:9
  103:21,24 120:6
  125:10 127:23
  144:7 145:16
  169:15 197:16
  199:23
**today's** 203:19
**token** 37:21 114:18
  114:19,24
**told** 28:14 70:24
  71:6 84:16 85:12
  87:14 88:2,3,13
  98:12 99:21 103:2
  103:2,3,8 108:8
  117:12 124:21
  129:12 136:23
  195:5
**ton** 43:15
**tool** 46:9
**top** 23:9 27:2 46:3
  49:3 63:6 67:3
  68:18 71:5 75:13
  78:5,20 93:19
  94:7 95:1 100:23
  104:18 143:5,18
  144:11
**topic** 118:24
  126:12 155:25
  180:24
**topics** 108:23
  111:17
**top-left** 44:18
**total** 50:18 74:9
  79:10 132:6,12,13
  132:18 155:14
  171:22 172:4
  198:24 199:2
**totaled** 203:2
**totaling** 155:9
**totally** 93:20
  194:16
**totals** 159:4
**touch** 112:25 160:4
**touches** 113:6

162:13
**Tower** 181:9
**town** 181:17
**to-full-time** 23:16
**to-line** 41:2
**track** 63:19 72:3
**tracks** 101:3
**traction** 90:2
**traffic** 90:2
**training** 184:2
**transactions** 142:5
**transcript** 203:22
  204:8 205:5,16
  208:1
**transfer** 179:23
**transition** 22:10
  103:20 104:1,6
**transitioned** 25:5
**TransPerfect** 9:18
  9:23
**traunch** 84:17
**travel** 191:12
**treasurer** 167:2,14
  168:9,10,23,24,25
  176:7 197:3
**Trent** 32:23 33:1
  46:21,25 47:9,11
  61:16 62:15,23,23
  63:1,1 68:10
  149:18 150:15,24
  151:14 152:11,20
**tried** 152:16
**trigger** 70:23
**trips** 195:12
**trouble** 162:4
**true** 34:19 42:14,15
  43:7,10 46:1
  82:15,16,17
  163:11 167:8
  182:10 205:4
  207:7
**trump** 69:20 181:8
**trust** 105:19
**trusted** 17:12,13
**truth** 86:6
**truthfully** 11:22
**try** 11:10 60:4

121:19
**trying** 29:10 30:3
  34:9 36:19,20
  41:7 70:13 71:12
  73:20 97:21 190:1
**turbulence** 161:19
  161:22
**turn** 107:17 150:21
**turned** 114:2,7,9
  153:8 155:23
  156:2 160:24
  161:8
**Turning** 154:25
**TV** 183:16
**two** 6:15,19 7:18
  13:11 15:1,13
  21:17 25:10 31:15
  32:2 36:10 38:24
  41:3,21 47:23
  50:6 51:8 56:14
  56:15,16 66:1,1
  66:20 69:9 95:15
  102:1 110:1 115:5
  139:7 141:16,16
  146:17 149:18
  155:11 166:21
  173:5,7 176:3,4
  179:14 198:23
  203:2,13
**two-thirds** 69:19
**two-to** 88:2
**two-to-one** 87:15
  88:22,24,25 89:1
  163:1,12
**two-year** 173:25
**type** 37:25 170:18
  181:20
**types** 69:2 113:1
  116:18
**typos** 61:24

— — — — — —
**U**
**ultimately** 16:23
  70:22
**Umunna** 22:7,8
  24:25 25:3,6,10
  96:13 99:14

100:25 107:9
  110:11 122:12
  173:13,21 174:1
  184:17 197:18
  200:5 201:7,8,13
**Umunna's** 23:19
  101:15
**unanimous** 200:7
**unclear** 106:17
  154:14 197:3
**uncovered** 39:24
**underneath** 72:16
  79:12
**undersigned** 205:3
  206:6
**understand** 11:9
  11:21 30:15 35:3
  35:4,19 49:23
  58:25 59:8 69:14
  73:25 79:21 85:7
  89:6 93:21 96:1
  99:5,15,17,20,21
  100:1 101:13
  106:20 110:7
  116:4,22 117:19
  139:3 147:17
  183:15 189:1
  190:1
**understanding**
  13:7,8,18 21:14
  28:14 30:23 33:7
  33:9,15 36:6,8,9
  49:13 51:5 59:16
  68:14 73:7,15
  74:3 85:11,14,16
  93:16 95:11 97:4
  97:6 104:9 111:2
  111:5,6 114:2,6
  114:21,24 115:23
  117:5 118:6,25
  123:13,14 129:10
  130:9,19,25 131:1
  131:4,15 146:14
  146:16,21 147:20
  151:18 152:3
  156:8 157:12,17
  157:20 160:7

| | | | | |
|---|---|---|---|---|
| 177:25 183:5,21 188:25 197:8 202:16 | **V** | 98:20 108:7,8 116:14 128:16 203:20 | 32:14 52:5 53:19 62:2,7,16 65:20 66:7 68:1,4,19 | 194:10 196:1 207:11 |

**understands** 105:19,25 106:3
**understood** 11:13
11:15 13:4,6 28:5
35:13 59:24 62:20
83:25 88:24 89:4
116:1 117:21
131:1 147:16
**unincorporated** 175:13
**United** 1:1 191:14
**University** 177:24
**unpaid** 20:9 75:5
85:25 90:12,15,25
91:6 92:4,5,8
**unrelated** 189:23
190:17
**unstable** 159:14
**unusual** 98:12,15
102:23,24,25
103:1,2,2,5,8,12
**unwanted** 179:22
**un-reimbursed** 191:12 195:8
**upcoming** 125:4
**updates** 86:13
**uphill** 69:2,8
**upload** 152:13
**uploaded** 14:4
**uploading** 152:16
**upset** 131:19
**URL** 136:24
**use** 15:6,6 38:25
40:16 52:5 64:14
85:9 94:20 141:9
150:9,10 163:9
172:16 174:22
178:2,4 187:9
189:15
**useful** 51:4
**usual** 103:4 125:4,6
**U.S** 9:11 14:20
49:21 139:10
164:8

**v** 1:5,11 208:2
**VA** 191:14
**vague** 112:11
**Vaguely** 13:4
**Val** 50:3
**validity** 185:22
186:1,6 187:15
**value** 166:23
**VAN** 37:21 147:5,6
147:13 152:17
**Vanessa** 7:9,13
23:4 35:7 103:11
121:8 124:4,18
125:3 136:11
140:5 141:8
142:20 144:14
159:9 177:23
201:7
**various** 53:5 61:8
165:6 170:16
179:21 191:11
**vendor** 38:25 51:25
125:23 141:2,20
144:8 145:2
177:13
**vendors** 50:25 53:5
53:8,12 94:21
170:16 200:8
**Venezuelans** 183:24
**venues** 180:2
**verbal** 11:3 131:18
**verified** 57:21
**verify** 163:25
**version** 48:11
64:16,17 65:2,2
182:20
**versions** 64:4,9,13
64:25 65:6,19,22
**versus** 9:7,9 15:18
132:25 133:1,2
**veteran** 181:7,20
**viability** 122:1
**viable** 16:21 170:1
**video** 9:5 19:19,23
20:17,19 77:12

**videographer** 3:18
9:4,16 55:13,15
100:14,16 120:20
120:22 188:21,23
189:6 203:18,24
**videos** 20:16 126:9
**videotaped** 1:21
2:10 9:1
**view** 16:18 17:24
23:5 26:4 63:14
98:14 106:7 146:9
146:23 147:14
148:9 162:18
**viewed** 51:6 54:12
117:11 144:15,15
159:14 171:16
**viewing** 112:7
**Virginia** 3:13 9:25
205:13 206:3,17
207:2
**virtue** 197:2
**Vision** 91:14,15
**visited** 17:4
**visiting** 17:4
**vividly** 42:14 46:13
111:18
**voice** 26:9 101:20
**voices** 116:16
**volunteer** 26:18
28:3,16 182:22
**volunteers** 15:8,12
**voter** 180:11
**voters** 180:8,9
**voter-engagemen...** 179:11

**W**

**w** 149:21
**wag** 27:6
**wait** 11:2,6 127:18
192:21,21
**walk** 31:13
**wanna** 71:11
**want** 11:12 17:1

70:9,25 71:23
100:22 101:12
102:14 105:25
106:3 109:11
118:16 122:14
150:16 152:23
156:7 158:16
167:10,11 181:4
188:8,24 195:3
200:11,12,13
**wanted** 41:23 47:10
70:23 120:1
122:17 129:9
130:21 151:1
153:13 170:7
203:14
**wanting** 16:17
18:20
**wants** 11:8
**warn** 43:19
**warrant** 200:8
**warranted** 200:1
**Washington** 2:11
3:5 9:14 17:4
**wasn't** 18:4,11,17
18:19 20:24 23:3
39:4 49:7 122:16
123:1,2,4 130:14
133:23 139:16,16
139:17 181:1,4
195:23,24 198:19
203:11
**waste** 179:23
**watched** 130:20
**watching** 18:19
50:17
**way** 15:14 29:14
30:8 33:13 43:17
61:1 66:13 69:19
81:22 82:3 88:23
90:17 91:5 112:7
112:9 117:7 179:2
180:11,15 190:10
190:24 194:10,10

**ways** 32:2
**web** 154:14
**website** 157:14
**week** 48:13 66:7
83:15,17 84:1
90:4
**weekend** 41:20
180:16
**weekly** 90:21
**weeks** 111:9
**week's** 90:22
**welcome** 149:13
**well-deserved** 184:9
**went** 18:12,19 23:6
31:17 82:12
100:11 105:15
118:9,20 147:23
151:5 157:14
184:20
**weren't** 54:16 58:3
123:4
**we'll** 44:4 48:22
61:7 68:20 84:17
95:18 119:12
198:2
**we're** 34:10 44:8
54:15 64:13 65:17
67:2,13 70:12,14
77:13 81:9 82:4
90:1 98:5 104:5
113:13 116:15
118:24 137:3
146:2,10,11,12
148:2 152:14
157:6 162:8
163:11 165:24,24
171:20 185:4,8
187:22 194:9
197:21,24
**we've** 67:15 76:25
98:11 102:9 103:4
121:1 122:20
126:18 146:17
152:12 153:17

158:8 165:5,14
169:12
**WhatsApp** 31:25
**WHEREOF**
207:13
**Whittier** 3:12
**wholly** 121:11,15
121:18
**wife** 193:10 195:6
**wife's** 195:4
**wild** 78:23
**Win** 19:21,22
**windows** 161:14
**Wine** 171:22
**wins** 50:3 180:3
**wire** 84:24 85:1
**wired** 78:9,14
**withdraw** 137:24
**withhold** 33:10
**witness** 9:20 10:1
28:22 29:7 30:14
56:8,10,12 120:15
120:17,19 143:23
158:22 175:18
187:4 188:7,12
190:14 192:15
194:4,22 201:21
206:9 207:5,8,13
**women** 41:21
**won** 183:15,16
**Wondering** 152:18
**word** 15:6 63:25
64:1 81:9 84:5
89:25
**words** 97:22 102:6
116:18 154:6
163:10
**work** 14:17 19:2
20:6 36:7,20,20
42:1 44:5 62:15
75:15 78:17 85:20
93:5 118:20 122:4
122:5,7 142:1
144:16 148:20
165:18 170:17
172:1 183:16
184:10 200:1

201:10
**worked** 14:1 15:24
16:11 18:10 19:5
92:1 105:21,22
125:20 180:23
181:11,19
**workers** 26:22
**workflow** 145:24
145:25 146:2
**working** 16:16
21:13 22:2 24:19
36:4,18 63:2,4
68:15 75:14 96:2
96:11 162:1,9
180:25 182:21
**works** 83:25 84:1
91:19 94:4 152:6
**work-related** 172:1
**worried** 153:8
**worth** 102:22 151:7
183:10
**worthwhile** 151:20
**worthy** 146:12
**wouldn't** 19:15
32:20 157:3
199:20
**write** 50:22 95:5
201:23
**writes** 153:7
**writing** 101:17
117:8 128:22
177:17
**written** 22:1 28:2
79:22 82:6 115:16
131:6 152:7 177:5
**wrong** 96:1 97:21
123:11 127:19
138:1,2 151:17
173:3
**wrote** 42:21 53:13
57:5 101:20
105:16 121:19
**W-I-N** 19:21
**W-2s** 15:16,17,19

**X**

**X** 205:16

**Y**

**yeah** 15:20 21:10
23:1 27:18 29:10
30:12 36:4 37:25
43:13 46:16,16
49:18 52:2 55:10
55:23 57:18 63:4
66:1,3 69:10 76:3
89:17 101:24
112:5 117:11
122:6,11 123:11
135:9 136:4
139:18 143:15
156:16 159:22
163:19 170:14
172:11 175:17
177:5 182:14
184:17 193:20
194:23 196:23
**year** 14:9 137:2
160:16 172:10
184:8 193:16
**years** 155:15
183:10,12 192:17
**Yep** 95:24 172:25
**YouTube** 126:9,24
**y'all** 43:17 152:18

**Z**

**zeros** 43:24
**Zielinski** 21:24
22:2 184:18
**ZIP** 44:11
**Zoom** 89:25 90:7
98:19 108:4,6

**Â**

**â** 206:17

**$**

**$1** 68:5 89:2 90:12
**$1-million** 89:13
**$1.3** 132:13,19
**$10K** 91:14
**$10,000** 140:25
141:4,5,6,19,23
141:24 143:16

144:10,18,21
145:1
**$100,000** 130:11
**$126,943.00** 79:10
79:15
**$150k** 117:2 119:17
**$150,000** 120:6
**$175,443.17** 74:16
91:9
**$178.92** 171:11
**$2** 89:2
**$2,500** 145:5
147:14 158:1
**$200,000** 191:6
**$200-some** 173:20
**$250k** 70:14 84:13
**$254,000** 74:19
**$254,989.83** 75:2
**$254,990** 74:14
**$3,500** 159:2
**$4,000** 186:13
**$4,530** 91:9
**$430,000** 109:20
**$430,433** 74:9
**$430,433.00** 72:18
**$450k** 84:13
**$5K** 62:7
**$5,000** 155:22
157:12,17,22
161:13
**$50,000** 98:12
182:2
**$500k** 70:13
**$52,390** 136:17
155:9
**$53,000** 102:22
**$6k** 65:6 91:7,8,25
**$600k** 70:14
**$66,000** 168:21
172:19
**$66,500** 172:19
173:3 202:10
**$6600** 90:10
**$665,000** 202:10
**$700k** 70:18
**$700,000** 163:23
**$88,000** 168:17,18

**$88041.72** 168:6

**0**

**00000745** 5:7
**00002268** 5:22
**00004155** 5:19
**00004187** 6:5
**07/01** 91:7,7
**07/17/23** 5:11,15
**07/31/2023** 91:8
**08/03/02023** 91:9
**09/01/2023** 91:14
**09/10/23** 6:19

**1**

**1** 5:3 33:18,20
101:10 125:12
**1st** 12:9,11,12,19
75:11 76:5,13
80:7 84:5 91:24
134:7 202:7
**1,510,494** 79:16
**1.3** 132:22 164:3
**1:04** 120:20
**1:10** 116:24
**1:14** 120:22
**1:24-cv-03035-A...**
1:5
**1:30** 106:14
**10** 4:3 6:8 76:11,16
**10DLC** 93:14,22
94:4 114:19,21
154:14,17
**10th** 41:5,14 53:16
54:3 89:20,22,24
**10-DLC** 95:3
**10:15** 55:13
**10:28** 55:16
**10:31** 94:8
**100** 70:3 86:16
**105** 7:3
**1099** 182:9
**1099s** 15:18
**11** 6:12 79:1,4
152:2 171:22
**11th** 66:23
**11,600** 72:21 73:3
109:21

**11/15/23** 6:22
**11:12** 65:5
**11:40** 100:14
**12** 6:14 53:4 82:21
  83:3 171:22
**12/22/23** 7:6
**12:02** 46:7
**12:30** 100:16
**121** 7:7
**124** 7:11
**124-cv-03035-AP...**
  9:12
**13** 6:17 89:16 90:6
  172:25 202:10
  203:1
**13th** 2:11 9:13 45:9
  46:6
**135** 7:15
**14** 6:20 92:22 93:9
  100:19
**14th** 150:14
**141** 7:17
**149** 7:19
**15** 7:3 104:16 105:4
  116:23 119:16
  183:12
**15th** 93:1,4
**150** 120:5
**16** 7:7 82:23 120:24
  121:13
**16th** 93:20 94:2
  151:15 152:2
**167** 7:22
**17** 7:11 124:16,22
**17th** 14:21 25:15
  25:16 48:13 51:19
  61:7,10 66:22
  67:12,25 69:3
  75:20 94:7 134:1
  134:5 170:25
  171:9
**18** 7:15 89:18
  135:11,15
**18th** 48:5 56:3,21
  57:3 62:12 63:24
  64:7 65:5 69:12
  70:12 94:25

**19** 7:17 93:3 141:12
  141:13 155:1,12
**194** 8:3

---

**2**

**2** 5:6 40:24 41:1
  65:2 125:12
**2K** 65:7
**2:25** 66:6
**20** 1:22 2:4 7:19 9:2
  89:25 104:21
  108:18 149:2,8
  208:4
**20th** 9:15 34:20
  71:4 95:12 205:6
  206:9 207:14
**200** 3:4,12 84:14
**200,000-odd** 195:9
**20002** 3:5
**20004** 2:12
**2006** 193:16,22
  194:2,3,6
**2017** 193:1,8
**2018** 12:8,24 17:3
  195:20,22 198:14
**202** 164:11
**202.651.2475** 3:6
**2020** 12:3,17,21
  13:3,11,20,23
  14:6,10,18 17:1,3
  20:4,4,13 48:1
  122:9 127:18
  195:25 198:14,17
**2021** 193:1,8
  201:25
**2023** 6:15 14:21
  18:15 29:18 30:25
  41:5 45:9 48:5,13
  51:19 56:3,21
  57:3 58:13,24
  62:12 63:24 66:6
  66:22,23 69:12
  70:12 71:16,22
  72:5,13,17 75:9
  75:11 76:18 77:14
  78:6 79:2 80:1,7
  82:24 83:24 84:5

86:18 87:2 91:24
  93:1,4,20 94:2
  95:24 104:18,23
  107:1 110:25
  117:5 122:2,3
  128:11 132:13
  133:13,16,23
  134:1,12,14
  137:14 149:11
  150:14 157:3
  162:24 163:2,21
**2024** 14:14 15:13
  19:3 20:19 21:12
  23:7 35:7 36:7
  55:3 58:23,24
  113:12 119:2
  121:1 123:7 124:4
  124:21 137:15,17
  137:19 163:22
  164:16 172:7
  179:9,16,17 196:1
  198:11,12 199:1
  199:22 200:24
**2025** 1:22 2:4 9:2
  9:15 34:20 127:18
  137:22 166:1
  167:23 168:13,17
  170:25 171:9
  172:12 174:5
  182:13,17 202:7,8
  203:15 205:7
  206:10 207:14
  208:4,22
**2026** 174:18 179:5
  179:10 181:23
  182:7
**2028** 205:14 206:18
**205** 4:5
**206** 4:4
**207** 4:5
**208** 4:6
**21** 7:22 167:19,20
  184:23
**21st** 66:6 152:11
  168:13,17
**22** 121:7
**22nd** 78:4,6 95:14

95:15 104:18,23
  105:11 106:16,17
  117:13 133:16
  153:5,6 167:23
**22101** 3:13
**2252** 66:4
**2258** 65:12
**2259** 64:7 65:5,12
**2262** 60:21 63:12
**2263** 60:21
**23rd** 71:16 124:21
**24** 5:8,10,13 44:18
  45:19,22 46:2,21
  48:10,18 51:18
  67:7
**24/7** 172:5,5
**25th** 153:12
**25,660** 79:16
**26th** 71:22 72:1
**27** 135:12
**28** 93:7
**28th** 164:8 184:1
**29** 6:15
**29th** 82:24 83:24

---

**3**

**3** 5:8 7:22 44:9,23
  65:2 125:12
  167:22 202:17,18
  203:9,13
**3rd** 86:18
**3:02** 188:21
**3:18** 188:23
**3:40** 203:18,20
**3:41** 204:22
**30** 62:14 69:24
  71:12 205:14
  206:18
**30k** 86:14
**30th** 95:24 100:22
  100:23 134:5,6
  174:5,8,12 202:8
**30,000** 178:19
**31st** 72:5 75:9 79:2
  79:13 80:1
**33** 5:3

---

**4**

**4** 5:10 48:9,20 90:2
  90:17
**4:10** 41:14
**4:16** 42:5
**40** 75:10
**40k** 71:12
**40%** 71:18
**408** 185:2,15,17,21
  186:21,22 187:13
  188:16 189:4
**41** 5:6
**4156** 67:3
**4158** 67:24
**4161** 68:25 69:7,11
**4162** 69:13
**4163** 70:1
**4164** 70:11
**4165** 70:21
**4167** 71:15
**4171** 76:1
**44** 5:8
**48** 5:10

---

**5**

**5** 5:13 51:15,23
  164:13
**5th** 82:11 86:12
**5,000** 130:14
**5,300,000** 109:25
**5,363,853** 72:19
  109:21
**50** 136:2
**50k** 120:3,4
**50%** 71:1
**501** 3:4
**51** 5:13
**52,000** 136:8
**53** 98:12
**53,000** 136:8,9
**55** 5:16
**555** 2:11 9:13

---

**6**

**6** 5:16 8:3 55:18,21
**6:25** 93:1
**60** 5:20
**66** 6:2
**66,000** 166:19

**66,500** 173:9
**6718** 3:12

---
**7**
---
**7** 5:20 60:18,22
**7th** 164:11 172:12
**7,000** 163:19
**7,000-ish** 163:19
**70%** 71:12
**700,000** 134:25
  164:2
**703.734.3800** 3:14
**72** 6:6
**744** 43:24,25
**76** 6:8
**760** 152:13,16,23
**7699515** 205:14
  206:19
**79** 6:12

---
**8**
---
**8** 6:3 66:11,18,21
  168:3
**8th** 121:1 122:9
**8.31.23** 79:9,14
**802** 49:3
**83** 6:14
**890,000** 134:24

---
**9**
---
**9** 6:6 72:2,2,6
  109:16,19
**9th** 76:18 149:11
**9:06** 2:6 9:16
**9:46** 61:13,14
**9:48** 61:22
**90** 6:17
**93** 6:20 136:7
**94** 136:7,17
**9664** 72:4
**989.83** 74:14