**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**PHIL EHR FOR CONGRESS CAMPAIGN**
**COMMITTEE,**
         **Plaintiff,**

                         **Civil Action No.: 1:24-cv-03035-APM**

**v.**

**GRASSROOTS ANALYTICS, INC.,**
         **Defendant.**

\-

**COUNTERCLAIM-DEFENDANT PHIL EHR'S RESPONSE TO**
**COUNTERCLAIMANT'S MOTION FOR SUMMARY JUDGMENT**

Counterclaim Defendant Phil Ehr hereby responds as follows to Counterclaimant's Motion for Summary Judgment.

Plaintiff/Counterdefendant Phil Ehr for Congress Campaign Committee (the "Committee") does not oppose summary judgment dismissing its complaint and for judgment against it as sought in the Counterclaim.    The Committee, and Cmdr. Ehr, learned at the time of the deposition of David Keith, that Mr. Keith, unbeknownst to the Committee or Cmdr. Ehr, had actually authorized Grassroots Analytics ("GA") to incur hundreds of thousands of dollars in texting charges for text campaigns that *they knew* had a significantly negative return on investment.   There is no dispute that Mr. Keith was in a position of at least apparent authority to bind the Committee to this obligation, as outrageous as it was.   This appeared to be a contract-breaching lack of quality control, but discovery proved otherwise.    Accordingly, the Committee agrees that judgment against it is appropriate.

Page 1 of  8

That, however, does not justify judgment against Phil Ehr personally.    GA seeks to hold Cmdr. Ehr ("Ehr") personally liable for the obligations of the Committee, alleging that he is the alter ego of the Committee.    Nothing could be further from the truth.

The requirements for a grant of summary judgment are that " there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  *See also*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 217, 322-28 (1985).   In considering a motion for summary judgment, "all evidence and all inferences ... [that can] be drawn ... must be considered in a light most favorable to the non-moving party."    *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).    The affirmative burden of production is on the moving party, and in this case the ultimate burden of proof is also on GA.   Where the party moving for summary judgment would bear the burden of proof at trial, it bears the initial burden of producing evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. *International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1264-65 (5th Cir. 1991); *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 614 (4th Cir. 1999) (citing *International Shortstop*); C.*A.R. Transportation Brokerage v. Darden Restaurants*, 213 F. 3d 474, 480 (9th Cir. 2000).   "In order to prevail on summary judgment, a party stating an affirmative claim must come forward with evidence entitling it to a directed verdict." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 146 (3d Cir. 1999). If the moving party does not satisfy its initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied.   *Nissan Fire & Marine Insurance. v. Fritz Companies*, 210 F. 3d 1099, 1102 (9th Cir. 2000).    "Because the moving party has the burden of proof under this scenario, the nonmoving party may also defeat the motion by showing

that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *International Shortstop,* 939 F.2d at 1265.

On summary judgment, a Court "must view the evidence in the light most favorable to the nonmoving party [], draw all reasonable inferences in her favor, and eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F. 3d 360, 363 (D.C. Circuit 2007).

A corporation is regarded as an entity separate and distinct from its shareholders," *Lawlor v. District of Columbia*, 758 A.2d 964, 975 (D.C.2000).

> A party seeking to disregard the corporate entity must prove by affirmative evidence that there is unity of ownership and interest and use of the corporate form to perpetuate fraud or wrong. *Lawlor*, 758 A.2d at 975. "Although no single factor controls, courts generally inquire, inter alia, whether corporate formalities have been observed; whether there has been commingling of corporate and shareholder funds, staff and property; whether a single shareholder dominates the corporation; whether the corporation is adequately capitalized; and, especially, whether the corporate form has been used to effectuate a fraud." *Id*. "The inquiry ultimately turns on whether the corporation is, in reality, an alter ego or business conduit of the person in control." *Id*. (quotation marks and citation omitted).

*Ruffin v. New Destination, LLC*, 773 F. Supp. 2d 34, 40 (D.D.C. 2011).   As stated in *Motir Services, Inc. v. Ekwuno*, 191 F. Supp. 3d 98, 110 (D.D.C. 2016)

> The plaintiff has not sufficiently alleged, most importantly, that Ekwuno used the corporate form to perpetrate fraud or that justice and equity warrant piercing the corporate veil. As the D.C. Circuit recently explained, "[a] corporation is `viewed as a distinct entity, even when it is wholly owned by a single individual,'" and "the law takes seriously the formal line between a corporation and a natural person, even when the corporation is, in effect, a one-person firm." *Nat'l Security Counselors v. CIA,* 811 F.3d at 31 (quoting *Quinn v. Butz,* 510 F.2d 743, 757 (D.C.Cir. 1975)). "One-person corporations are authorized by law" and individuals who "expend time and resources" to create and incorporate a corporation "experience burdens as well as benefits associated with the separation between a company's rights and their own." *Id.* As a result, "[o]ne-person corporations ... should not lightly be labeled a sham," *id.* and a plaintiff must allege some injustice or inequity warranting intrusion into the legally distinct identities of a corporation and its sole owner — beyond unity of ownership and interest — to allege

sufficiently an alter ego theory of liability, *see Camacho,* 620 A.2d at 249; *Vuitch,* 482 A.2d at 815-16. While "[t]he court may ignore the existence of the corporate form whenever an individual so dominates an organization `as in reality to negate its separate personality,'" *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,* 608 F.3d 871, 897 (D.C.Cir. 2010) (quoting *Founding Church of Scientology of Wash., D.C., Inc. v. Webster,* 802 F.2d 1448, 1452 (D.C.Cir.1986)), such a situation must be distinguished from that "merely of single ownership, or of deliberate adoption and use of a corporate form in order to secure its legitimate advantages," *Quinn,* 510 F.2d at 758.

The facts simply do not meet this standard, particularly when viewed, as they must, in the light most favorable to Ehr, and without making any determinations as to the credibility of witnesses when the testimony conflicts.

GA first posits that "Ehr dominates the Campaign," asserting that he was involved in its formation, and "exercised ultimate power over all [the Campaign's] decisionmaking". But so what? A person who is the sole shareholder and officer and director of a small business corporation of course meets those tests – which is why they are not what is meant by "dominates" the entity. The reality is quite different, though. Ehr did *not* make all of the decisions. In fact, a review of the substance of GA's SUMF, ¶¶ 12-96, shows that Ehr was only marginally involved, and that David Keith and Jake Briggs made the operational decisions. Certainly, Ehr was not involved in the decision to spend excessively on a texting campaign with a significantly negative return on investment (Keith writing "Even if there's a 50% ROI, I'll take the risk." and "Let's scale on anything above 40%"). [Ehr Dep, GA Exh. 3, at 71:1, 71:17-18]. David Keith was telling people, including GA, "I'm in charge." [*Id.* at 68:12-13.] These were all in text messages between Keith and GA [*Id.* at 66:21-25], which Ehr had not seen. Ehr confirmed in his deposition that indeed, "David Keith was in charge." [*Id.* at 68:16-17].

Keith – not Ehr - made the decision to make the partial payment on GA's invoice. [*Id.* at 74:19-75:6]. While GA highlights that Ehr signed the second contract with GA (for direct mail

services that were never used), he only did it because he was asked to do so by Keith.    [*Id.* at 77:4-7].     This is hardly a situation where Ehr "dominates" the entity.

GA next argues that the Committee disregards corporate formalities.    Its only basis for this position is that the Committee filed some FEC reports late, and there were some inaccuracies in the reports.    Of course, these issues relate to reports due well after the Campaign was over in November 2024 – not at any time relevant to GA's work for the Committee, and involve generally minor delays and issues.    This is a far cry from the unpublished *Teitelbaum* case cited by GA (applying Utah law where it was one small factor – and there is no DC case holding that late tax or other returns would even relevant to the *alter ego* analysis), in which returns were filed years late, after litigation commenced.    This is simply not a basis to impose personal liability.

As for intermingling of funds, that is nonsense.    First, the FEC reports show that of the "nearly $80,000" spent between the end of the November 2024 election and the end of the first quarter of 2025, it was spent not "rather than paying off debt" but ***to*** pay off debt.    The Q1 2025 FEC report shows that of the $65,489 spent in the first quarter of 2025, approximately $16,000 went to pay debt to Change Research, $9000 to pay debt to NGP VAN, $2000 to SB Solutions Consulting for primary debt; $10,000 to Switchboard; $2500 to Southern Progressive Strategies, and $12,000 to pay debt to Obi Umunna.    The rest was for smaller debts and current expenses.

As explained in interrogatory responses, and in response to SUMF ¶ 109,[1]

Following Election Day 2024, the campaign undertook a post-election fundraising and exploratory tour throughout Florida to both raise funds to retire campaign debt and to

---

[1] It is of note that Walt Disney World is an in-state location for Ehr and his campaign.

seek guidance from major supporters regarding a potential future candidacy in their
regions. As part of this tour, the campaign first stopped in St. Petersburg for a meeting
with Phil Ehr and then proceeded to Orlando. Orlando was the second stop, where the
campaign scheduled meetings with two donors and addressed an outstanding balance
owed from the Florida Democratic Party's Leadership Blue conference held earlier that
summer.   Specifically, the campaign had previously reserved a hotel room at Walt
Disney World Resort for staff member Obi to attend Leadership Blue. However, after Obi
accepted a position with the Biden campaign, he was unable to attend, and the reservation
could not be cancelled or transferred. Consequently, the campaign remained responsible
for the cost of the hotel room and paid the charge after the election, on November 29,
2024.   On that same date, members of the campaign also held a donor meeting over
dinner at Chef Mickey's, a restaurant located inside the host hotel at Walt Disney World
Resort. The disbursements reported on the Year-End FEC Report—totaling $1,204.81—
reflect the combined cost of (a) the hotel room payment related to the Leadership Blue
conference reservation, and (b) the donor dinner meeting held at Chef Mickey's.   The
purpose of these disbursements was therefore (1) to satisfy a legitimate campaign debt
incurred prior to the election, and (2) to engage with donors for the dual purpose of debt
retirement fundraising and consultation about the candidate's potential future political
prospects in Central Florida.

The expenditures at various stores for supplies (Total Wine, Dick's, Target) were all legitimate

campaign expenditures, not personal expenses for Cmdr. Ehr.   There is simply no basis for the

allegation that these were personal expenditures.     There was a PetSmart expense for his

campaign manager's dog, which was in lieu of reimbursement to Dr. Brito, his campaign

manager, and was incurred by her, not by Cmdr. Ehr.

While Ehr did lend funds to the Committee, they were accounted for and shown on the

FEC reports.   He disputes the allegations that the loans were not properly accounted for, and the

assertion that he would repay only his loans misrepresents the testimony.   He testified that there

are debts the Committee is not intending to pay because of concerns about performance issues.

He testified that "if their work warranted payment, I would put them all first," ahead of repaying

his loans.   In context, his testimony about the debts to him was simply that he does not dispute

those debts.     Ehr Dep. 199:6-200:8.     There was simply no commingling, and no payment of

personal expenses out of Campaign funds.

As for inadequate capitalization, the Committee did *not* have "significant cash flow issues 'pretty much immediately." The cite to the Ehr Dep. does not say that. The issues began "at some point during your campaign." Ehr Dep. at 87:5:7. Ehr did not know precisely wben they started. Id. at 87:8-9. Ehr was told by Jake Briggs and David Keith that "we were getting an ROI of two-to-one." Id. 87:14-15, 88:4-89:5. It was not until the end of September that it became clear that they were short of their million-dollar fundraising goal. Id. at 89:12-15. While Jake Briggs testified as stated, that is simply not true. In fact, the cash flow issues were likely caused not by inadequate capitalization up front, but by the negative return on the text messaging investment that David Keith authorized GA to undertake. But, to be clear again, Cmdr. Ehr was not involved in or aware of that decision. He was told that the ROI was 2 to 1.

As for the "considerations of justice and equity," the Court first has to find that the other factors are present – and they are not;    And while fraud is not an absolute requirement, the case law "considerations of justice and equity" require some sort of wrongdoing not present here. GA's argument about avoiding injustice is simply that it did work for an entity and did not get paid in full. If that were the standard, the separate entity concept would fall completely by the wayside. As stated in *Motir Services,* 191 F. Supp. 3d at 111,

> The plaintiff's allegations that Ekwuno performed substandard construction work, "made false representations to the Plaintiff about the status of the project's completion,... misrepresented payments to venders, and ... fraudulently charged the Plaintiff for various change orders," simply do not constitute abuse of the corporate form and are insufficient, without more, to warrant piercing the corporate veil. The plaintiff makes no allegation that Ekwuno used the corporate form to perpetrate his alleged wrongdoing, or that he used the corporate defendant as an instrumentality with which to commit fraud. *See Vuitch*, 482 A.2d at 815 n. 4 ("'[I]t is the use to which the corporate form is put which controls....'" (emphasis in original) (quoting *Francis O. Day Co. v. Shapiro,* 267 F.2d 669, 672 (D.C.Cir.1959)); *cf. Quinn*, 510 F.2d at 758-59 (explaining that, while

"[p]enetration of the corporate veil is a step to be taken cautiously," courts will pierce the corporate veil "[w]hen, at some innocent party's expense, the corporation is converted into ... an instrumentality" used with "such domination... as in reality to negate its separate personality").

Nothing here rises even to the level in *Motir*.   Justice and equity require, rather, a finding that

Cmdr. Ehr is not the alter ego of the Committee, and that he is not liable for its debt to GA.

**CONCLUSION**

.      WHEREFORE,   Counterdefendant Ehr respectfully requests that the Motion for

Summary Judgment be denied as to him.

DATED :    **February 2, 2026**

Respectfully submitted,

*/s/ Daniel M. Press*
Daniel M. Press
D.C. Bar No. 419739
CHUNG & PRESS, P.C.
6718 Whittier Avenue, # 200
McLean, VA 22101
Ph. # 703-734-3800
Fax # 703-734-0590
dpress@chung-press.com