UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**PHIL EHR FOR CONGRESS CAMPAIGN COMMITTEE,**
        **Plaintiff,**

v.

**GRASSROOTS ANALYTICS, INC.,**
        **Defendant.**

Civil Action No.: 1:24-cv-03035-APM

*DECLARATION OF PHIL EHR IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT*

I, Phil Ehr, declare and state under penalty of perjury as follows:

1. I am of legal age and competent to testify. I make this Declaration on my own personal knowledge.

2. I am a Counterclaim Defendant in the above-captioned action.

3. I was a candidate for the U.S. House of Representatives from Florida in the 2024 election. I was, as such, a member of the Phil Ehr for Congress Campaign Committee. I w, aas initially running for the U.S. Senate, at which time the Committee was the Phil Ehr for Senate Campaign Committee, an unincorporated organization established in Florida and under the Federal Election Campaign Act.

4. While the Committee had no W-2 employees, it had a number of people working for it, led by Campaign Manager David Keith. The number and varied skill sets of consultants and vendors during the Senate campaign included those making fundraising calls (three people, including Jake Briggs) communications (two people), digital (one person), outreach (one person), management (two people, including Briggs), launch video media (one person), and

many vendor companies.  At the time the campaign was launched, the Campaign had two full-time staff, David Keith and Jake Briggs.

5. As the candidate, it was not my job to manage the campaign. My role was to call prospective donors.   The Committee hired David Keith to do that.  In particular, I was not involved in or aware of the decision to spend excessively on a texting campaign with a significantly negative return on investment.  I was not aware that Keith was pursuing text messaging at a negative return on investment.  I learned during this litigation that Keith wrote to Grassroots Analytics ("GA") "Even if there's a 50% ROI, I'll take the risk." and "Let's scale on anything above 40%".  These were all in text messages between Keith and GA, which I had not seen. GA's quality assurance program, meaning the core purpose of the fundraising partnership (to raise funds for the Campaign), appeared to have been set aside.  I had no role in this operation.

6. The way I made decisions was by approving recommendations presented to me by Keith, Briggs and other staff.  This was true with decisions to bring on Briggs and all other staff members mentioned in this litigation, as well as GA, Meadowlark and all other vendors.   I was not involved in all functions of the campaign.  I did review for editing some email messaging, but no editing of GA-produced text messages.  Keith, and possibly Briggs, would have done that.  Keith's discussion about approving final edits of approval of mailers never occurred, because the Campaign did not pursue mailers.  I did not generally authorize payment to venders.  I did not authorize specific payments to GA or Meadowlark.  Keith and the treasurer authorized payments to GA and Meadowlark.

7. I did not see or review the July Services Agreement, which is the subject of this litigation, at or near when it was signed.  My guidance to Keith and Briggs was to check out

GA's offer and bring them into the campaign provided it made sense for the Campaign. The first time I saw the July Services Agreement was after the Campaign stopped working with GA. I was aware that Keith agreed with GA that they would help the Campaign raise funds, and their activity involved text messages. I did not sign the Campaign's Data Sharing Agreement with GA, which was signed by Trent Schacht of Meadowlark. I did sign the August Services Agreement (for mailers) at Keith's and Briggs' recommendation.

8. While Keith's email (Ex. 32) said that "Phil would like to do the resolicit mailing," I did not personally issue that guidance to GA, Keith, or Briggs. As the candidate, my role was to call prospective donors, not to direct timing and modes of specific fundraising activities.

9. I saw that Jake Briggs referred to me as being "passive" on donor calls. That is not true.

10. The Campaign paid Briggs all that he earned; nothing is owed to Briggs.

11. As the candidate occupied with calling donors in July 2023, August, and September, it was not my role to monitor data required to raise concerns with the quality of services provided by GA. My reply to the effect that the Campaign would imminently send over "the first traunch of what's owed, with the balance to follow as soon as [the Campaign] can" was recommended by Keith and sent by me after I confirmed with Keith and Briggs that the Campaign could pay what was owed.

12. Keith apparently said he followed up directly with me to ask about payment to GA in early September, 2023. See Ex. 22 at 28–29. This did not occur.

13. As the candidate calling donors full time in September 2023, and with Keith and Briggs managing the campaign and Katz Compliance acting as treasurer, I was not the right person to answer questions about payments to GA on behalf of the Campaign Committee.

14. I did not make a statement that I was going to take the Campaign's entire cash on hand and send it to Grassroots. A decision to apply all cash on hand is a manager's decision, not a candidate's decision.

15. My primary reason for switching from the Senate campaign to the House campaign was not due primarily to the backing of Democratic Party leadership of Mucarsel-Powell. My decision was primarily due to her greater fundraising results.

16. I dispute Briggs' claim that I agreed to any repayment plan. I would not have agreed until the Campaign Committee understood the full situation among the Campaign, GA, and other vendors. By October I had asked an attorney to investigate the Campaign's payments and debt situation, particularly regarding GA and Meadowlark. The attorney's investigation included conversations with GA staff, including Claudia Shrivastava, beginning no later than November 2023. Ehr explicitly did not agree to a repayment plan to GA, and conveyed that to Briggs, Ummuna, and the attorney. The attorney, Briggs and Ummuna attended a meeting in December 2023, where the Campaign staff asked a set of data assurance questions that GA did not answer.

17. On or about April 11, 2024, I called Hogenkamp inadvertently while making fundraising calls, which led to a discussion of the GA bills. My recollection of the conversation was that Hogenkamp raised the issue of outstanding invoices, and I referred him to Briggs. I did not agree with Hogenkamp that a payment plan had been arranged. At that time, I was not

opposed to paying the GA invoices, however, GA answers to the Campaign's questions discussed in the December 2023 staff-level meeting were not forthcoming.

18. The Q1 2025 FEC report shows that of the $65,489 spent in the first quarter of 2025, approximately $16,000 went to pay debt to Change Research, $9000 to pay debt to NGP VAN, $2000 to SB Solutions Consulting for primary debt; $10,000 to pay debt to Switchboard; $2500 to pay debt to Southern Progressive Strategies, and $12,000 to pay debt to Obi Umunna. The rest was for smaller debts and current expenses.

19. The Total Wine expenditures shown on the FEC report were for beverages and supplies for campaign-related events. The PetSmart expenditure was in lieu of reimbursement due to Dr. Brito, and was incurred by her, not by me.

I declare under penalty of perjury that the contents of the foregoing paper are true. Executed on February 2, 2026

/s/ Phil Ehr
_____
Phil Ehr